Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 1 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                              January 25, 2021

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF GEORGIA
                ATLANTA DIVISION
NOEL HALL and CHRISTINA HALL,

        Plaintiffs,

                            CIVIL ACTION FILE
    vs.                     NO.:1:18-cv-4710-CAP

CITY OF ATLANTA, a municipal

corporation of the State of

Georgia; GEORGE N. TURNER, in

his individual capacity as

former Chief of Police of the

City of Atlanta Police Department;

and MATHIEU CADEAU, in his

individual capacity as former

Police Officer of the City of

Atlanta Police Department,

        Defendants.
-------------------------------------
        VIDEOTAPED DEPOSITION OF
              MATHIEU CADEAU
             January 25, 2021
               1:37 p.m.
         2000 Century Boulevard, NE
              Atlanta, Georgia
        Thomas R. Brezina, CRR, RMR, CCR-B-2035
```

Page 2

1           APPEARANCES OF COUNSEL
2    On behalf of the Plaintiffs:
3
        SAMUEL L. STARKS, Esquire
4       SHEAN D. WILLIAMS, Esquire
        The Cochran Firm - Atlanta
5       100 Peachtree Street, NW
        Suite 2600
6       Atlanta, Georgia 30303
        (404) 222-9922
7       (404) 222-0170 (facsimile)
        sstarks@cochranfirmatl.com
8       swilliams@cochranfirmatl.com
9
10   On behalf of the Defendants, City of Atlanta and
     George N. Turner, in his individual capacity as
11   former Chief of Police of the City of Atlanta Police
     Department:
12
        TIFFANY C. SELLERS, Esquire
13      Thomas, Kennedy, Sampson & Tompkins, LLP
        3355 Main Street
14      Atlanta, Georgia 30337
        (404) 688-4503
15      (404) 684-9515 (facsimile)
        T.sellers@tkstlaw.com
16
17
     Videographer:  Mr. A.J. Gallo
18
                    - - -
19
20
21
22
23
24
25

Page 3

```
1              INDEX OF EXAMINATIONS
2   WITNESS: MATHIEU CADEAU
3   EXAMINATION                              Page
4   Cross By Mr. Williams                      7
5   By Ms. Sellers                          304
6              INDEX TO EXHIBITS
7   EXHIBIT   DESCRIPTION                    PAGE
8   P-1       Sixth Amended Notice to Take    10
              Videotaped Deposition of
9             Mathieu Cadeau
10  P-2       Defendants [sic] Cadeau's       47
              Answer to Plaintiff's First
11            Amended Complaint for Damages
12  P-3       Georgia POST Application        109
              for Certification
13            (Bates Numbered COA002026
              through COA002204)
14
    P-4       Oath of Office of              109
15            Mathieu Cadeau dtd
              March 25, 2008 (Bates
16            Numbered COA000195)
17  P-5       Data Report System             109
              Individual Officer
18            Profile Bates Numbered
              HALL-FC013505 through
19            HALL-FC013507)
20  P-6       Data Report System             131
              Individual Officer
21            Profile (Bates Numbered
              COA 001609 through
22            COA 001612)
23  P-7       Incident Memorandum dtd        132
              2/15/08 (Bates Numbered
24            HALL-FC013236 through
              HALL-FC013249)
25
```

Page 4

```
1          INDEX TO EXHIBITS (continued)
2   EXHIBIT   DESCRIPTION                    PAGE
3   P-8       Atlanta Police Department      153
              SOP 2010 Work Rules
4
    P-9       Atlanta Police Department      179
5             SOP 2020 Disciplinary Process
6   P-10      Atlanta Police Department      190
              SOP 2022 Early Warning
7             System (Bates Numbered
              FAVORS-COA000560 through
8             FAVORS-COA000565)
9   P-11      Memorandum dtd August 18,      195
              2014 (Bates Numbered
10            COA002025, COA000604, and
              COA007785 through COA007788)
11
    P-12      O.C.G.A. Section 17-4-20       219
12
    P-13      Atlanta Police Department      221
13            OPS Officer Disciplinary
              History (Bates Numbered
14            PLF000003 through PLF000004)
15  P-14      Complaint File Closeout        232
              Report (Bates Numbered
16            COA002324 through COA002355)
17  P-15      OPS Complaint File Closeout    236
              Report (Bates Numbered
18            COA002399 through COA002419)
19  P-16      OPS Complaint File Closeout    244
              Report (Bates Numbered
20            COA000001 through COA000070)
21  P-17      OPS Complaint File Closeout    248
              Report (Bates Numbered
22            COA002421 through COA002484)
23  P-18      OPS Complaint File Closeout    258
              Report (Bates Numbered
24            COA006550 through COA006603)
25
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 5

INDEX TO EXHIBITS (continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| P-19 | OPS Complaint File Closeout Report (Bates Numbered COA000071 through COA000194) | 258 |
| P-20 | OPS Complaint File Closeout Report (Bates Numbered COA0002515 through COA0002574) | 264 |
| P-21 | Blank piece of paper | 288 |
| P-22 | Separation Notice dtd 05-15-17 (Bates Numbered COA000247 | 295 |
| P-23 | Direct Indictment, State of Georgia v. Elsh Mathieu Cadeau | 301 |
| P-24 | Plea of Guilty of Elsh Mathieu Cadeau | 301 |
| P-25 | Transcript of Guilty Plea on February 26, 2020 | 301 |
| COA-A | Large color photo of white van | 305 |
| COA-B | Large color photo of white van and man | 305 |
| COA-C | Large color photo of white van (partial view) | 305 |

(Original Exhibits P-1 through P-25 and COA-A, COA-B, and COA-C have been attached to the original transcript.)

Page 6

Deposition of Mathieu Cadeau

January 25, 2021

THE VIDEOGRAPHER:  This is tape Number 1 to the videotape deposition of Mathieu Cadeau taken in the matter of Noel Hall and Christina Hall versus the city of Atlanta, et al.  Today's deposition is being held on January 25, 2021, and the time is now 1:42 p.m.  Will all counsel please introduce themselves for the record?

MR. WILLIAMS:  My name is Shean Williams.  I'm representing the plaintiffs.

MR. STARKS:  Sam Starks for the plaintiffs.

MS. SELLERS:  Tiffany Carter Sellers on behalf of Defendant City of Atlanta.

THE VIDEOGRAPHER:  And the court reporter --

MR. WILLIAMS:  Mr. Cadeau, you're a party.  You want to state for the record?

THE WITNESS:  I am Mathieu Cadeau.

THE VIDEOGRAPHER:  The court reporter please swear the witness.

Page 7

MATHIEU CADEAU,
having been produced and first duly sworn as a witness, testified as follows:

MR. WILLIAMS:  This will be the deposition of Defendant Mathieu Cadeau in the case of Hall versus city of Atlanta, et al., currently pending in the US District, Northern District of Georgia, Atlanta Division.  This deposition is being taken by notice as well as by agreement of all parties and court order.

This deposition is being taken for all purposes allowed under the Federal Rules of Civil Procedure as well as all discovery purposes.  I propose that we reserve all objections except to the form of the question until later use of the deposition -- this deposition if that is agreeable.

MS. SELLERS:  It's agreeable with me.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q      Mr. Cadeau, you have a right to read and sign, which means that once the deposition has been completed, the court reporter is going to do a transcript of it.  He will send it to you.  You will

Page 8

have the opportunity if you want to, to read it and verify what was said and sign off on it, or you can waive that right and -- after the deposition.  Which do you prefer?  Do you want to just wait until the deposition is over?

A      To read and sign.

Q      Okay.  You can do that before any notary.  The court reporter will get your information and send that directly to you.  Okay?

A      I understand.

MR. WILLIAMS:  Any other matters we got to get on the record?

MS. SELLERS:  Nothing from the Defendant City of Atlanta.

MR. WILLIAMS:  Thank you.

BY MR. WILLIAMS:

Q      Good afternoon, sir.  My name is Shean Williams.  We're here for your deposition.  Have you ever had your deposition taken prior to today?

A      No.

Q      If I may, I will go over a few ground rules so we can make sure we're on the same page and get you out of here sooner than later.  Okay?

A      Okay.

Q      The first one is -- you're doing a good

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 9

1  job, is to continue to give verbal responses.
2  Normal conversations we can nod our head and say
3  uh-huh, but in a deposition the court reporter
4  doesn't have a button for that, so we need to do
5  verbal responses.  Is that agreeable?
6      A       Agreeable.
7      Q       Also, you're doing a very good job of
8  this, but wait until I finish my question before you
9  give an answer, and I will try to wait until I ask
10  another question before -- wait until you finish
11  answering the question before I ask another question
12  so we're not talking over each other.  Court
13  reporters have difficulty when we're talking at the
14  same time.  Okay?
15      A       Okay.
16      Q       Also it's important if you don't
17  understand my question, please ask -- tell me, and I
18  will try to rephrase the question in a way you do
19  understand.  I don't want us to finish this
20  deposition and later you say you didn't understand,
21  so if you tell me you don't understand a question, I
22  will rephrase it.  If you don't tell me that, I'm
23  going to ask that you answer the question, and I'm
24  going to assume that you understood the question.
25  Is that agreeable?

Page 10

1      A       Agreeable.
2      Q       You understand your testimony here is
3  under oath and under penalties of perjury?  Do you
4  understand?
5      A       I understand.
6      Q       And you understand what under oath and
7  the penalties of perjury are?  You understand what
8  that means?
9      A       Yes.
10      Q       All right.  Are you taking any
11  medications or any type of -- anything else that
12  would prevent you from testifying truthfully here
13  today?
14      A       No.
15      Q       Are you taking any medications or
16  anything that will prevent you from recalling
17  events?
18      A       No.
19          (Exhibit Number P-1 was marked for
20          identification.)
21  BY MR. WILLIAMS:
22      Q       Exhibit 1 to your deposition will be
23  the sixth amended notice of the videotape
24  deposition.  This is going to be the first exhibit
25  to your deposition.  You don't have to get up.  I'll

Page 11

1  make the trip to you.  That is your deposition
2  notice that we sent you by e-mail; am I correct?
3  And by mail.  Am I correct, sir?
4      A       Yes, you're correct.
5      Q       And that is the notice you got to
6  appear here today for your deposition?
7      A       That is correct.
8      Q       For the record, would you state your
9  full name?
10      A       My name is Mathieu EPS Cadeau.
11      Q       Is that how your name is pronounced on
12  your birth certificate?
13      A       Yes, it is.
14      Q       And what is your date of birth?
15      A       My date of birth is August 15, 1966.
16      Q       What is your physical address, where
17  you reside?
18      A       My physical address is 2000 Towaliga
19  Court.
20      Q       Spell that for us.
21      A       Towaliga is spelled T-O-W-A-L-I-G-A.
22  Towaliga Court, and that is in Locust Grove, Georgia
23  30248.
24      Q       Who resides there with you?
25      A       My aunt and uncle and cousin.

Page 12

1      Q       And do you own that residence?
2      A       No, I do not.
3      Q       Do you own any residence in the state
4  of Georgia?
5      A       No, I do not.
6      Q       Are you married?
7      A       No, I am not.
8      Q       Have you ever been married?
9      A       Yes, I have.
10      Q       And who were you married to?
11      A       I was married to Michelle Yarborough.
12      Q       And when were you -- when did you get
13  married?
14      A       2000 and again in 2001.
15      Q       You-all got married twice?
16      A       We did.
17      Q       Did you get divorced?
18      A       Yes.
19      Q       When did you get divorced?
20      A       In 2012, 2013.
21      Q       Do you have any adult children -- any
22  children over 18?
23      A       Under -- under my insurance?
24      Q       No.  Any children, period.  No
25  insurance --

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 13

```
1    A    Oh.
2    Q    Any children under -- over 18?
3    A    Over 18, yes.
4    Q    And what are their names?
5    A    Jacqueline Sterling and Quinten.
6    Q    Sterling?
7    A    Sterling.
8    Q    Are they -- do they reside in Georgia?
9    A    No, they do not.
10   Q    Do you have any relatives other than
11   your aunt, uncle, and cousin that reside in Georgia?
12   A    I have another cousin that resides --
13   Q    What's that cousin's name?
14   A    His name is Patrick.
15   Q    What is Patrick's last name?
16   A    Cherubin.
17   Q    Spell that for us.
18   A    C-H-E-R-U-B-I-N.
19   Q    You are a defendant in this lawsuit.
20   Have you been a defendant in any other lawsuits that
21   you can recall?
22   A    Yes.
23   Q    What other lawsuits?
24   A    I believe this is with Carolyn Carr.
25   Q    Was that here in Georgia?
```

Page 14

```
1    A    Yes.
2    Q    Can you tell me the circumstances
3    behind -- regarding that lawsuit?
4    A    It was during a festival where I was
5    working an extra job.
6    Q    And what was the -- in your viewpoint
7    what were the circumstances that happened in that
8    incident?
9    A    The festival was coming to a close.  We
10   were to reopen -- open the streets because the
11   streets were closed at the time of the -- during the
12   festival.  So in opening the streets we ordered --
13   we needed to have the pedestrians or all parties
14   involved in the festival move onto the sidewalk.
15   During so, I was in contact with a couple that was
16   in the street.  I had asked them to please move over
17   to the sidewalk.
18        Miss Carr came out and said, if I can
19   recall, fuck you; what the fuck, and I believe
20   that's what was said.  I then again asked for the
21   couple to please move onto the street -- please move
22   onto the sidewalk; the streets are being reopened.
23   Miss Carr then proceeded to continue to say, what
24   the fuck; fuck you, and then gave me the middle
25   finger.
```

Page 15

```
1         I ordered her -- and she was with her
2    -- another person at the time, who I later found out
3    to be was her husband.  I ordered for the both of
4    them to stop.  They continue on walking.  I
5    continued to give a lawful order to stop.  They
6    continue on walking into their home.
7    Q    To their home?
8    A    Into -- into a building.  Into a
9    building.  I followed them, still giving orders to
10   stop.  They refused to stop.  Once they entered the
11   building, I entered the building behind them.  The
12   husband then pressed the button for the door to
13   close.  I took Miss Carr out of the building -- out
14   of the building for my safety and everyone else's.
15   Took her out of the car -- took her out of the
16   building, excuse me, to then further conduct an
17   investigation.  At that time Miss Carr was placed
18   under arrest.  Mr. Carr was cited for disorderly
19   conduct.
20   Q    Both of them, or one of them?
21   A    Both of them were cited for disorderly
22   conduct.  Mr. Carr I believe was cited for -- I
23   can't think of the charge right now --
24   Q    Okay.
25   A    -- but it was preventing or hindering
```

Page 16

```
1    police official duties.
2    Q    Okay.  And there was a lawsuit filed by
3    the Carrs against you?
4    A    That is correct.
5    Q    And were you represented by counsel in
6    that case?
7    A    It was the city.
8    Q    So the city of Atlanta law department
9    represented you in that case?
10   A    Yes.
11   Q    Were you working in your capacity as a
12   police officer at the time this incident happened?
13   A    Yes.
14   Q    Did you ask for them to represent you?
15   A    I did question if they were going to do
16   so, and they did.
17   Q    Okay.  Did you -- they're not
18   representing you in this case, are they?
19   A    In this case?  No.
20   Q    Are you -- do you currently -- you
21   don't currently have representation; am I correct?
22   A    That is correct.
23   Q    Did you ask them, the city of Atlanta,
24   to represent you in this case?
25   A    Yes.
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 17

```
1      Q        When did you ask that?
2      A        When I received notice -- when I
3  received notice of the suit.
4      Q        Who did you talk to?
5      A        I do not remember their names at this
6  time.
7      Q        Was it a male or female?
8      A        Both.
9      Q        Did you talk to them in person, or over
10 the phone?
11     A        It was in person.
12     Q        Where were you -- where was the --
13 where did this conversation occur?
14     A        At the city law office.
15     Q        Who was -- I know you don't remember
16 their names.  How many people was in this at the
17 time you had this conversation besides yourself?
18     A        There were separate conversations.  The
19 first one was with the female attorney, and then the
20 second conversation was with the male attorney.  The
21 male attorney did have another party -- another
22 party with him.  That's what I can recall.
23     Q        Do you know the positions of the people
24 that were -- you were meeting with, even if you
25 don't remember their names?
```

Page 18

```
1      A        I don't remember their positions.
2      Q        Do you remember the month and year that
3  this occurred in?
4      A        I'm going to say it would have been in
5  2020 before the year -- the month, I do not --
6  that's not clear to me.
7      Q        What were you told as -- when you asked
8  to -- the city to represent you like they did in the
9  Carr case?
10     A        That, I cannot recall.
11     Q        Were you ever told that they would
12 represent you?
13     A        Yes.  They did -- I was told that.
14     Q        When were you told that?  The first
15 time, or the second time?
16     A        The first time.
17     Q        Can you tell me, did the female tell
18 you that the city of Atlanta would represent you?
19     A        I'm not understanding your question.
20     Q        Did the female person you talked with
21 the first time, did she tell you the city would
22 represent you?
23     A        For which case are you referring?
24     Q        For this case.
25     A        No, she did not.
```

Page 19

```
1      Q        Okay.  I think I miss -- I think I --
2  you misunderstood my question, so let me go back.
3  In this case --
4      A        Okay.
5      Q        -- has the city of Atlanta law
6  department or anybody from the city of Atlanta told
7  you that they will represent you in this case?
8      A        No, they did not.
9      Q        Okay.  Had ever been given a reason
10 why they're not representing you in this case?
11     A        Yes.
12     Q        Who told you that?
13     A        The male.
14     Q        When did he tell you?
15     A        He mentioned that the reason why they
16 would not represent me is because I was terminated
17 for cause.
18     Q        Did he -- do you recall anything else
19 from that conversation?
20     A        That was pretty much it.
21     Q        Did he explain to you why the city
22 could not represent you even though you were
23 terminated for cause?
24     A        That was the only reason that was
25 given.
```

Page 20

```
1      Q        That case of the -- the case that was
2  brought against you by the Carrs, was the city of
3  Atlanta a party in that lawsuit as well?
4      A        Yes.
5      Q        What happened to that case?
6      A        From what I recall, that case was
7  settled.
8      Q        So the -- so the Carrs got a settlement
9  for the dismissal of that case?  Is that your
10 understanding?
11     A        I believe so.
12     Q        Do you remember what the settlement
13 amount was?
14     A        No, I do not.
15     Q        Were you -- did you have to give
16 approval of the settlement?
17     A        No, I did not.
18     Q        Did they -- did anybody ask for your
19 approval in the settlement?
20     A        No, they did not.
21     Q        Do you know -- were you given any
22 reason why that case was settled on your behalf?
23     A        From my understanding it was due to the
24 fact that I was not -- I -- I was not identified as
25 an officer.
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

---

Page 21

1    Q       What do you -- what do you -- what was
2  your understanding "identified as an officer" meant?
3    A       That I was not identified as an
4  officer.
5    Q       So does that mean that you didn't
6  identify yourself as an officer, or you was working
7  an off-duty job?  I'm trying to understand what you
8  mean by "identified as an officer."
9    A       That was the only reason that was given
10  to me.
11    Q       Okay.  Let me ask you a couple of
12  questions about the facts you -- what you told me
13  regarding the incident with the Carrs.  You said
14  that you guys were clearing -- the festival was
15  coming to a close and you guys was reopening
16  streets; am I correct?
17    A       That is correct.
18    Q       Did you-all in fact reopen the streets
19  at the time this incident happened?
20    A       Yes.
21    Q       So the streets were open?
22    A       Yes.
23    Q       Okay.  You said Miss -- you said, I
24  asked them, please to get out of the street?
25    A       To move onto the sidewalk.

---

Page 22

1    Q       To move onto the sidewalk?  Okay.  What
2  direction were they going when you asked that
3  question?
4    A       I would say they were coming from my
5  right.
6    Q       Were they going in the direction of the
7  building that you said they ended up going to?
8    A       Yeah.
9    Q       So they were going -- they were going
10  in the direction of that building --
11    A       Yes.
12    Q       -- when you first spoke to them?
13    A       Yes.
14    Q       And when you asked -- did you use the
15  word "please"?  Did you use --
16    A       Yes.
17    Q       -- the word "please"?  Okay.  You
18  said -- and then you said she said something to the
19  effect of, fuck you?
20    A       Yes.
21    Q       Okay.  Is there -- is there something
22  illegal about the word -- saying the word "fuck
23  you"?  Is there a crime under Georgia statute or the
24  city of Atlanta statute?
25    A       No.

---

Page 23

1    Q       I'm correct, we have what we call the
2  Constitution of the First Amendment of freedom of
3  speech; is that correct?
4    A       Yes.
5    Q       So she was not committing a crime when
6  she said anything to you to the effect of "fuck you"
7  or any communication to you; am I correct?
8    A       No.
9    Q       I'm not correct?
10    A       Reason why I feel -- the reason why she
11  gave -- when she said fuck you, it was not direct to
12  where it was one on one to you or not.  It was one
13  on one where there is a crowd of people
14  participating in a festival, of women and children
15  and other participants.
16    Q       Okay.
17    A       By her saying that, could have incited
18  a negative -- a negative atmosphere.
19    Q       So is your view that the word -- the
20  curse words in that crowd was a crime?
21    A       It could have been cited one.
22    Q       Well, I'm asking, was it a crime?
23    A       No.
24    Q       What crime could it have, in your
25  words, incited?  What would have been the charge for

---

Page 24

1  that?
2    A       A riot.
3    Q       A riot?
4    A       Yes, sir.
5    Q       So she basically communicated with you
6  twice and kept walking away from you; am I correct?
7    A       Yes, sir.
8    Q       So she was not walking towards you?
9    A       At the time -- in the first contact of
10  noticing her and -- and her husband, Mr. Carr, it
11  was beforehand.
12    Q       Okay.
13    A       When I observed them not making the
14  adjustment to go over to the sidewalk, we were still
15  -- they was still coming towards my direction.
16    Q       But they were not coming towards you,
17  though?
18    A       Well, it was in my direction but not
19  towards -- not directly towards -- directly towards
20  me as -- as the court reporter is.
21    Q       I gotcha.
22    A       Right coming --
23    Q       So they were coming your direction, but
24  they were not coming at you?
25    A       That is correct.

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                         January 25, 2021

---

Page 25

1    Q        You wasn't in fear of your life or
2    anything, a physical threat, were you?
3       A     No.
4       Q     Was anybody else in the area, you felt
5    that they had a physical threat to them?
6       A     No.
7       Q     You said you ordered both to stop.  Why
8    were you ordering them to stop?
9       A     Because of her actions.
10      Q     What action?
11      A     Of the belligerence of saying "fuck
12   you," giving me the middle finger.
13      Q     And is that a crime?
14      A     It is not a crime, come to realization
15   after having been counseled about it, yet it was not
16   normal.  It wasn't normal.
17      Q     What do you mean, wasn't normal?
18      A     The reason why I say it wasn't normal
19   is because that's not the normal reaction -- or,
20   excuse me, normal response to be given if an officer
21   is directing you to go to a safer place, right, to
22   come out, to be out of harm's way while the streets
23   are going to be open.
24      Q     It is your understanding that their
25   position is they were walking towards their building

---

Page 26

1    where they lived; is that correct?
2       A     At the time, I didn't know where they
3    were walking to.
4       Q     Yes.
5       A     I know they were walking across --
6    across me.
7       Q     But you came to later learn that they
8    were actually walking towards you as they were going
9    to their building, their home?
10      A     Yes.  I later found that out, yes.
11      Q     And you said you got counseled and you
12   learned that it wasn't a crime from counsel.  I want
13   to make sure I understand that.
14      A     Well, after finding out the results or
15   the conclusion of the suit, this is when I was then
16   told that their actions was not criminal.
17      Q     Who told you that?
18      A     My supervisor.  My supervisor and the
19   law department.  Excuse me.  The law department
20   explained that to me.
21      Q     So after the case was settled, the law
22   department and your -- was your supervisor also
23   involved in that?
24      A     No, sir.
25      Q     Just the law department?

---

Page 27

1       A     That is correct.
2       Q     So let me rephrase.  After the lawsuit
3    was resolved and settled where the Carrs were paid
4    money, the law department told you that what the
5    Carrs did was not a crime?
6       A     Yes.
7       Q     And you got counseled on it, that they
8    should have never been, what, arrested?
9       A     That, I didn't -- I did not hear that.
10      Q     Well, tell me what you heard as relates
11   to the counsel you got.  Give me what you recall
12   from that.
13      A     What I recall from -- what I recall
14   from that -- from that conversation was, anybody can
15   say what they want.  Pretty much that.
16      Q     Pretty much what?
17      A     Pretty much that:  That anybody can say
18   what they want.  Saying "fuck you" or anything
19   that's derogatory is not a crime.
20      Q     Is that the first time you had that
21   understanding?  That people can say what they want
22   because of the First Amendment?
23      A     No because -- let me not say no.  From
24   my understanding and training in the academy there
25   are things that are called fighting words.

---

Page 28

1       Q     Okay.
2       A     Things that can lead to -- lead to a
3    fight such as cursing, making derogatory statements,
4    or even racial statements.  From my understanding,
5    by Miss Carr, Mrs. Carr saying "fuck you" to me and
6    raising her middle finger were fighting words.
7       Q     So your actions regarding the Carr --
8    Carrs and approaching them and ultimately arresting
9    them and charging them was based on your
10   understanding and the training you received at the
11   City of Atlanta Police Department?
12      A     That is correct.
13      Q     You felt at that time that you were
14   following the policies and procedures set forth for
15   you by APD?
16      A     Yes.
17      Q     And as relates to the Carrs incident,
18   you felt at that time you was following the customs
19   and practice set forth that you understood to be at
20   APD?
21      A     Yes.
22      Q     Did you ever get any -- before the
23   lawsuit did anybody at the city of Atlanta say to
24   you, hey, we've looked at this and reviewed this
25   file, and what happened, First Amendment is allowed;

---

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 8 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                          January 25, 2021

Page 29

1  people can say what they want; whatever you did, you
2  should not have arrested?  Did anybody ever do that?
3       A     No.
4       Q          Is it fair to say until you got -- the
5  lawsuit was settled and the law department told you
6  that what you did was not appropriate, before then
7  you didn't know that you had done anything that was
8  wrong?
9            MS. SELLERS:  I object to the form.
10 BY MR. WILLIAMS:
11      Q          Let me ask it a better way.  Let me ask
12 it a better way.  Do you feel based on the
13 conversations that you had and the counsel you got
14 from the city of Atlanta, do you understand now as
15 you sit here, that it was improper to arrest the
16 Carrs for saying what she said and the middle
17 finger?
18      A     Yes.
19      Q          All right.  Did you have that
20 understanding or get that understanding or training
21 from anybody else at the City of Atlanta Police
22 Department?
23            MS. SELLERS:  Object to the form of the
24       question.  I'm just putting objections on the
25       record.

Page 30

1  BY MR. WILLIAMS:
2       Q          Yeah.  When she does that -- I'm sorry;
3  we should have explained it to you -- she's just
4  protecting the record.  She represents the city of
5  Atlanta.
6       A     Okay.
7       Q          But once the objection is on, you can
8  answer the question if you understand it.
9       A     I don't understand what you just said.
10      Q          I'm going to try to ask it a better
11 way.  Prior to being told by the city of Atlanta law
12 department after the case settled that what you did
13 was wrong, before that happened, did anybody in the
14 City of Atlanta Police Department tell you that what
15 you did was improper or wrong?
16      A     No.
17      Q          In fact, there was an OPS investigation
18 of the incident; correct?  Do you recall that?
19      A     I don't recall that.
20      Q          Okay.  Okay.  All right.  Did your
21 supervisors know what happened with the incident
22 after it happened?  Did you tell your supervisors?
23      A     What -- there was a supervisor on
24 scene --
25      Q          Okay.

Page 31

1       A     -- at the time of the arrest.
2       Q          Who was that?
3       A     Sergeant A. -- I'm going to say
4  Sergeant Williams.
5       Q          Did Sergeant Williams witness the
6  incident involving you and the Carrs?
7       A     He was called to the scene once the
8  arrest was made.
9       Q          Okay.
10      A     He had to authorize the citation, the
11 citation of arrest.
12      Q          So in authorizing the citation did you
13 explain to him everything that happened as you've
14 told us today?
15      A     I did.
16      Q          And at any point did Sergeant Williams
17 as your supervisor say to you at that time, Cadeau,
18 he's -- freedom of speech, First Amendment; they
19 have a right to say what they want to say?  Did he
20 say that or Sergeant Williams say that?
21      A     Not at the time.
22      Q          Did he ever say it?
23      A     No.
24      Q          Did any sergeant or supervisor ever
25 tell you what your actions were in arresting or

Page 32

1  approaching or arresting the Carrs was wrong?
2       A     No.
3            MS. SELLERS:  I object to the form.
4  BY MR. WILLIAMS:
5       Q          Is it -- do you believe not being told
6  that it was wrong, made you feel like what you did
7  was acceptable under the APD policies and
8  procedures?
9            MS. SELLERS:  Object to the form.
10           THE WITNESS:  Yes.
11 BY MR. WILLIAMS:
12      Q          Did you get any training after the
13 incident with the Carrs where they trained you on
14 policies and procedures or told you certain things
15 regarding people's Constitutional rights?
16           MS. SELLERS:  Object to the form.
17 BY MR. WILLIAMS:
18      Q          Let me ask it a better way.  Did you
19 get any additional training as a result of what
20 happened with the Carrs?
21      A     No.
22      Q          After the case was settled with the
23 Carrs, did anybody ever come up to you and -- well,
24 let me ask you this.  Did you get any disciplinary
25 action as a result of -- after the case settled?

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 33

1   After you were counseled by the city of Atlanta
2   police -- I mean city of Atlanta law department?
3           MS. SELLERS:  Object to the form.
4           THE WITNESS:  No.
5   BY MR. WILLIAMS:
6       Q       Is it fair to say that the fact that
7   you didn't get any discipline from the APD regarding
8   that incident with the Carrs, that you felt like the
9   APD -- you were following APD's policies,
10  procedures, and customs?
11          MS. SELLERS:  Same objection.
12          THE WITNESS:  Reask.
13  BY MR. WILLIAMS:
14      Q       Am I correct that the fact that you
15  didn't get any disciplinary action as a result of
16  what happened with the Carrs, that you took that to
17  mean that you were doing what you were trained to
18  told to do pursuant to the APD policies and
19  procedures?
20      A       Yes.
21      Q       At the time this incident happened what
22  was your rank?
23      A       Officer.
24      Q       Did you ever get a promotion during
25  your time at APD?

Page 34

1       A       Yes.
2       Q       When did you -- what promotion did you
3   get to?
4       A       I was promoted to the rank of sergeant.
5       Q       What year did you get promoted to
6   sergeant?
7       A       2014.
8       Q       This incident with the Carrs, it
9   happened in two thousand -- well, let me ask you
10  this.  Did you get promoted before or after the
11  incident with the Carrs?
12      A       After.  Wait.
13      Q       I have the incident with the Carrs
14  happening around April of 2014 -- 2014.  Does that
15  sound about right to you?  Is that -- during that
16  time?
17      A       I guess.  I can't recall the year.
18      Q       Okay.  Okay.  That's fair.  Does the
19  April time frame, the spring time frame, sound about
20  right?
21      A       It could.
22      Q       Do you believe you got a promotion in
23  the second part of the year after that incident?
24      A       No.  It wasn't that year.  I'm thinking
25  -- I'm thinking of the exact year of when I was

Page 35

1   promoted.
2       Q       Okay.
3       A       I believe it was a few -- a couple of
4   years after that.
5       Q       So you think more '15 or '16?
6       A       Yes.  More -- I believe more '16.
7       Q       The incident involving our client, Noel
8   Hall, which we're here for today, were you a
9   sergeant at that time?
10      A       Yes.
11      Q       Do you -- that happened in February of
12  2017.  You recall that time frame?
13      A       Yes.
14      Q       How long before that incident do you
15  believe you was a sergeant -- had been a sergeant?
16      A       I would say the second part of 2016.
17      Q       Okay.  So if the incident involving the
18  Carrs happened in 2014, you would have gotten a
19  promotion after that incident?
20      A       That is correct.
21      Q       The incident involved Wet Willie's, do
22  you remember that?  The OC spray?
23      A       Yes.
24      Q       That also happened in 2014.  Do you
25  recall that?

Page 36

1       A       Yes.
2       Q       Did you get a promotion after that
3   incident?
4       A       Yes.
5       Q       Who promoted you?  Was it a supervisor?
6   Was it a recommendation?  That's what I am getting
7   at.
8       A       My answer would be that all promotions
9   are approved by the chief.
10      Q       Was Chief Turner the chief when you
11  were promoted?
12      A       I do not recall.
13      Q       Tell me your understanding of what has
14  to happen for you to get a promotion.
15      A       The requirements to be promoted, you
16  must have time served in the department.  You must
17  have put in an -- an application as required to be
18  submitted in order to take the test, a written
19  examination and oral examination.
20      Q       Okay.  And you did those things?
21      A       Yes, I did.
22      Q       Was that the first time you tried to
23  get a promotion?
24      A       Yes, it is.
25      Q       Okay.  Had you ever tried to get a

Page 37

1   promotion before then and was turned down?
2       A       No.
3       Q       Was that the first -- on the first time
4   that you asked for a promotion, did you get it?
5       A       Yes.
6       Q       And what does a promotion do for you
7   regarding -- what benefits does it have as opposed
8   to an officer, just a regular officer?
9       A       The benefits would be to guide the
10  officers under your command.
11      Q       So you become a supervisor of the
12  officer -- of other officers?
13      A       That is correct.
14      Q       What other benefits?
15      A       In supervising other officers, teaching
16  them, giving them the tools that would be necessary
17  to be not only just good officers, but better
18  officers, better educators.
19      Q       Anything else benefits of getting a
20  promotion?
21      A       Salary.
22      Q       What is the salary increase?
23      A       If I recall, about four.  About 4,000.
24      Q       Any other benefits?
25      A       That's about it that I can -- that I

Page 38

1   can recall.
2       Q       I have -- I have a friend that works in
3   DeKalb.  He tells me that when he became a sergeant
4   and got promoted, he gave a -- more flexibility as
5   relates to getting extra duty -- extra off-duty
6   jobs.  Is that the same for APD?  Did you have more
7   flexibility now to do extra-duty jobs or off-duty
8   jobs?
9       A       No.
10      Q       Okay.  Now, we talked about the -- the
11  curse words, the "fuck you" from Miss Carr, and you
12  said that that -- those words in a crowd can incite
13  a riot or something?
14      A       Yes, sir.
15      Q       Did it incite any riot or anything that
16  day with the Carrs?
17      A       As a result it did not.
18      Q       And then you said that they had entered
19  a building; is that correct?
20      A       Yes.
21      Q       Before you got to them, they were in a
22  building which you now -- you learned later was
23  their home?
24      A       Yes.
25      Q       Did you have a warrant to go into their

Page 39

1   -- that building?
2       A       No.
3       Q       Were you lawfully able to go into that
4   building and arrest them without a warrant?
5       A       Yes.
6       Q       Explain how you were able to do that.
7       A       They disobeyed lawful command to stop.
8       Q       Okay.  And what law would they have
9   broken?
10              MS. SELLERS:  Object to the form.
11              THE WITNESS:  What is that word?  That
12      law -- I'm still trying to find that word --
13      the wording for it.  That law is, again,
14      preventing me to carry out my lawful duties.
15  BY MR. WILLIAMS:
16      Q       What about what she said or what you
17  described they did, prevented you from doing your
18  lawful duties?
19      A       By not stopping.
20      Q       And what -- how by not stopping were
21  you prevented from doing your lawful duties?
22      A       Because they continued on going into
23  the building.
24      Q       Was it against the law for them to
25  continue to go against the building?

Page 40

1       A       Once given a lawful order, yes.  It is
2   my -- it was my belief that, yes.
3       Q       As we sit here today what lawful order
4   did you give them?
5       A       To stop.
6       Q       And under what law in Georgia or the US
7   Constitution is a person required to stop just
8   because an officer says --
9       A       I can't answer that question at this
10  time.
11      Q       All right.  You agree with me, nothing
12  about what she said or pointing the finger at you,
13  there is nothing illegal about that; am I correct?
14              MS. SELLERS:  Object to the form.
15              THE WITNESS:  To my understanding, that
16      the behavior that she displayed was illegal.
17      It was not a proper conduct.
18  BY MR. WILLIAMS:
19      Q       What -- you say illegal.  Illegal to me
20  means you broke a law.  What law can you tell me
21  based on your training, education, policies and
22  procedures of APD did she break by using any of the
23  words she used to you or pointing the finger?  What
24  law did she break?
25      A       That would be considered disorderly

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 41

1  conduct.
2      Q      Is that based on your training and the
3  customs you understand to be at APD?
4      A      Yes.
5      Q      So when someone -- from your training
6  and experience at APD, if someone was to say
7  something or point a finger at an officer, your
8  training and the policies you understand at APD,
9  allows an officer to arrest them?
10     A      Yes.
11     Q      Did you train the people that you
12 supervised when you became a sergeant, that same
13 concept?
14     A      No.
15     Q      Now, when they got into the building
16 they were in their home, actually; correct?
17     A      Once I found out -- later to find.
18     Q      You didn't know they were in their home
19 at any time prior to the time you arrested them?
20     A      No.
21     Q      Okay.  You took -- I think you said you
22 took Miss Carr out of the building for your own
23 safety.
24     A      My safety and for theirs.
25     Q      Okay.  Why their safety?

Page 42

1      A      Harm could have been -- harm could have
2  been evident going into the building, where they --
3  where I may have had to defend myself in that manner
4  going into it because I don't know -- I don't have
5  any information of -- or I have no knowledge of
6  going into that building.  So for my safety and
7  theirs so that everyone is safe, it's to get myself
8  and Miss Carr out.
9      Q      Do you believe you never approached the
10 Carrs and went towards them, if you had just not
11 responded to anything she said or did, do you think
12 they would have just gone into their building and it
13 would have been over?
14     A      I cannot answer that question.
15     Q      You cited the Carr -- Miss Carr for
16 disorderly conduct.  Could you please tell us what
17 the disorderly conduct or the conduct she did to get
18 charged with disorderly conduct?
19     A      The language that she used and the
20 disobedience to a lawful order.  The language that
21 she used in the presence of women and children.
22     Q      Have you ever used curse words when you
23 were a police officer?
24     A      No.
25     Q      How long have you been -- how long were

Page 43

1  you on the force?
2      A      I was -- I would say ten years.
3      Q      In the ten years of you being on the
4  force you have never used a profanity at any time
5  while you was on the force?
6      A      No.
7      Q      Have you ever heard other officers use
8  a profanity?
9      A      Yes.
10     Q      Am I correct that it is improper and
11 against APD policies to use profanity as a police
12 officer?  Am I correct?
13     A      Repeat the question again.
14     Q      Am I correct that there is a policy
15 written for APD to -- that you cannot use profanity
16 as a police officer?
17     A      Yes.
18     Q      Any other lawsuits other than the Carr
19 one and this one?
20     A      Can you reask again, please?
21     Q      Sure.  Any other lawsuits -- any other
22 lawsuits other than this case with the Halls and
23 then the case with Mr. Carr and Mrs. Carr?
24     A      No.
25     Q      Only time you've been sued is during

Page 44

1  your -- as part of your responsibilities as a police
2  officer with APD?
3      A      Yes.
4      Q      As you sit here today do you hold any
5  professional licenses?
6      A      No.
7      Q      Did you ever hold a professional
8  license?
9      A      No.
10     Q      You was a peace officer at one point;
11 correct?  You had a certification of a peace
12 officer?
13     A      Yes.
14     Q      And you lost that?
15     A      Yes.
16     Q      Were you ever a member of the police
17 union?
18     A      Yes.
19     Q      When were you a member of the police
20 union?
21     A      As of 2008.
22     Q      And was you a member of the police
23 union until your -- until you stopped working at
24 APD?
25     A      Yes.

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

---

Page 45

1    Q        Briefly just tell me your educational
2  background.
3    A        I hold a bachelor's from the University
4  of Phoenix.
5    Q        When did you graduate or get that
6  bachelor's degree?
7    A        2011.
8    Q        Any other -- you graduate from high
9  school?
10   A        Yes.
11   Q        Okay.  What high school did you
12 graduate from?
13   A        Far Rockaway High School.
14   Q        And where is that located at?
15   A        Queens, New York.  Far Rockaway, New
16 York.
17   Q        Are you from Queens?
18   A        I am.
19   Q        Were you born in Queens?
20   A        No.
21   Q        Where did you -- where did you grow up,
22 and where were you raised?
23   A        Queens.
24   Q        Okay.  Tell me the circumstances that
25 brought you to leaving Queens and coming to -- well,

---

Page 46

1  after you left Queens.  Where did you go?
2    A        After leaving Queens I went to
3  Maryland.
4    Q        And after Maryland where did you go?
5    A        Georgia.
6    Q        Tell me the circumstances that led you
7  to come to Georgia from Maryland.
8    A        I've always had the desire to be -- to
9  be in law enforcement.  It would provide a better
10 living for my family.  It would provide stability
11 for my family.  That's why I came to Georgia.
12   Q        So you came from Maryland to Georgia to
13 get into law enforcement?
14   A        Yes, sir.
15   Q        Were you in law enforcement in
16 Maryland?
17   A        No.
18   Q        Why did you choose Georgia over
19 Maryland or Virginia or DC?
20   A        Cost of living.  Yet I was a
21 corrections officer in DC.
22   Q        Were you married at this time?
23   A        Yes.
24   Q        So tell me how did you -- the
25 circumstances that led you to -- to apply and start

---

Page 47

1  working at APD.
2    A        I'm not understanding your question.
3    Q        How did you get to -- a desire to be in
4  law enforcement, a desire to move to Georgia?  Tell
5  me the circumstances that got you hired at APD.
6  What happened?  Tell me the steps that led you to
7  getting hired at APD.
8    A        I saw that APD was -- the City of
9  Atlanta Police Department was accepting
10 applications.  I submitted an application, went
11 through the process.  I was given an offer.  I did
12 some research about Atlanta, about Georgia, about
13 the benefits, and made a decision along with my
14 family to come to Georgia.
15   Q        So when you took the offer you were
16 living in Maryland?
17   A        Yes, sir.
18   Q        When -- do you recall when you got
19 hired?
20   A        2007.
21       (Exhibit Number P-2 was marked for
22       identification.)
23 BY MR. WILLIAMS:
24   Q        You have been a party to this lawsuit,
25 and part of that is you have to file what we call an

---

Page 48

1  answer to the lawsuit.  I want to show you what's
2  been marked as Exhibit 2, which is the answer that
3  was filed by you in this case.  Have you seen -- am
4  I correct Exhibit Number 2 is a copy of the
5  lawsuit -- a copy of the answer filed by you to
6  plaintiffs' first amended complaint that was filed
7  on September 24th, 2020?
8        MS. SELLERS:  Exhibit 2, Shean?
9        MR. WILLIAMS:  Yes.
10       THE WITNESS:  Yes.
11 BY MR. WILLIAMS:
12   Q        And did you actually complete Exhibit 2
13 yourself?  Is that -- is that your doing?  Did you
14 type this up?
15   A        Yes.
16   Q        And that's your signature on the last
17 page of Exhibit Number 2?
18   A        Yes.
19   Q        And one of the things in the complaint
20 that we allege is that -- that the incident
21 involving the Halls, at that time you were in the
22 regular course of your employment as a police
23 officer of the city of Atlanta and the City of
24 Atlanta Police Department.  Am I correct you was in
25 the regular course of your employment as a police

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 49

1 officer, city of Atlanta and APD, when the incident
2 with the Halls happened?
3     A     Yes.
4     Q          Is it fair to say that your actions
5 with the Carrs was because she stated a profanity to
6 you?
7             MS. SELLERS:  Object to the form of the
8         question.
9 BY MR. WILLIAMS:
10     Q          Did you understand my question?
11     A     No.
12     Q          Is it -- am I correct that the thing
13 that started your approaching the Carrs and
14 ultimately arresting them, the thing that started
15 all of that was the fact that she said a few
16 profanities to you and gave you the finger?
17             MS. SELLERS:  Same objection.
18             THE WITNESS:  I can't answer that
19         question.
20 BY MR. WILLIAMS:
21     Q          Why not?
22     A     Because it's not a -- that question
23 does not desire -- does not desire a yes or no.  I
24 believe that her behaviors were inappropriate and
25 illegal.

Page 50

1     Q          And which behavior was inappropriate
2 and illegal?
3     A     Both.
4     Q          Which -- which one?  Both?
5     A     Which was her using profanity and
6 raising her middle finger at me in the presence of
7 women and children.
8     Q          And that is the reason you arrested
9 her; correct?
10     A     That is correct.
11     Q          If she didn't do any of those things,
12 you would not have charged her or arrested her; am I
13 correct?
14     A     That is correct.
15     Q          Is it fair to say you have a problem
16 when people use profanity or obscenities towards you
17 as an officer?
18     A     Ask the question again.
19     Q          Do you have a problem when -- you as an
20 officer when people use profanities or things toward
21 you?
22     A     No.
23     Q          That was never an issue for you?
24     A     No.
25     Q          What about if someone didn't follow

Page 51

1 your -- what you believe were commands?  Did you
2 have a problem with that?
3     A     No.
4     Q          Do you believe that the law requires a
5 citizen to always follow an officer's commands?
6     A     As long as it is lawful, yes.
7     Q          What if the Constitutional right says
8 that they don't have to?  Do they have to still
9 follow your commands?
10             MS. SELLERS:  Object to the form of the
11         question.
12             THE WITNESS:  I can't answer that --
13         that answer correctly.
14 BY MR. WILLIAMS:
15     Q          Let me give you an example.  I have the
16 Constitutional right to freedom of speech.  You're
17 aware of that; correct?
18     A     Yes.
19     Q          If I want to keep talking and you say,
20 be quiet, if I want to just keep saying something
21 and you say, stop saying it, do I have the
22 Constitutional right to talk even when you tell me
23 not to as an officer?
24     A     If that is coming to my understanding
25 that what you are saying and what you are doing is

Page 52

1 going to pose any type of threat or danger or is not
2 helping the situation to come to -- and resolve,
3 then I would ask or suggest that you refrain from --
4 refrain from continuing that behavior.
5     Q          Okay.  I'm not doing a threat or danger
6 to anyone.  I'm just talking, and you don't --
7     A     If you -- if you are just -- I'm sorry.
8 Go ahead.
9     Q          I'm just talking and no threat inciting
10 any riot or anything.  I'm just talking, and you
11 tell me as an officer, stop talking.  Do I have to
12 comply with your commands?
13     A     What is the given situation of this --
14 of you talking?  Why am I -- I'm not asking a
15 question, but these are the things that's going
16 through my mind as you're asking that question.
17 What is the situation?
18     Q          Does it matter?
19     A     Why am I there?
20     Q          If I'm talking and I have a
21 Constitutional right to talk and I'm not a threat to
22 you, I'm not inciting a riot; I'm just talking
23 because I want to.  Does an officer have a right to
24 tell me to stop talking?  Do I have to comply?
25             MS. SELLERS:  Object to the form of the

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 53

1    question.
2            THE WITNESS:  Again, what is the
3    situation?  You're saying that you're -- I'm
4    not trying to be --
5    BY MR. WILLIAMS:
6        Q    No.
7        A    -- combative here.
8        Q    Well, let me turn it around to you.
9    What situation would it be okay, if I'm not a threat
10   or inciting a riot, for an officer to tell me to be
11   quiet and I have to follow his command?  I'm just
12   asking you the opposite question.  You tell me what
13   the circumstances, situation where you think you --
14   an officer tells me to be quiet and I have to be
15   quiet.
16       A    Your question is still not clear.
17       Q    Is there any circumstances that you
18   believe that a person, a private citizen, is
19   required to obey an officer's command to be quiet?
20       A    If the situation provide -- if the
21   officers evaluates the situation and evaluates the
22   circumstances of what's going on and if he's not --
23   and if the officer is trying to assess or get an
24   assessment of what's going on, the behavior that
25   you're asking, that you are -- that you are posing

Page 54

1    in that scenario, if it's hindering that, then the
2    officer will ask for you to be quiet.
3        Q    And --
4        A    If it's not -- if it's not going -- if
5    your behavior is not helping to get the facts or the
6    -- the -- the facts surrounding the -- the
7    situation, and you're not helping that, then yes,
8    the officer should ask you for you to be quiet.
9        Q    Yes.  My question, though, goes a
10   little bit further.  I then say no, I'm not going to
11   be quiet.  Does the officer have a right to arrest
12   me or charge me?
13       A    If you're not helping the situation,
14   then the officer would have the right because then
15   -- what is that word?  If you are not -- if you are
16   not helping the situation, if you are not helping
17   the situation come to a resolve -- that word is not
18   coming -- and you're hindering the investigation of
19   that officer, I'm going on the basis that the
20   officer is there for a reason.
21            Because you have not put a situation to
22   where he walked in at Subway, you're ordering a
23   sandwich, he's there waiting to order, and you're
24   talking about sports, and you're saying something
25   about, you disagree with -- we're here in Georgia --

Page 55

1    Matt Ryan's play or his performance on Sunday's
2    game.  That -- that is one thing.
3            But if the officer is there responding
4    to, let's say, a case of where he's responding to a
5    call, if he's responding to a 911 call and you're
6    having that behavior and he's not able to deem
7    what's going on, what's happening, and he's asking
8    you to then at that point be quiet or to refrain
9    from saying what you are saying, to stop doing that,
10   then yes, what you are doing is a violation.
11   Your -- your behavior, what you are displaying is a
12   violation.
13       Q    Do you understand when you was a police
14   officer at APD, that people have the Constitutional
15   right to freedom of speech?
16       A    Yes.
17       Q    What is your understanding of what that
18   -- what the First Amendment allows a private citizen
19   to do?
20       A    You're free to speak.
21       Q    What does that mean to you as an
22   officer?
23       A    You are free to speak.
24       Q    Is there any limitations to that, that
25   you are aware of?

Page 56

1        A    Not that I'm aware of.
2        Q    If I use the word "Bumpity Bump" and
3    kept -- and called somebody Bumpity Bump or called
4    another officer Bumpity Bump, would the Constitution
5    First Amendment allow me to do that?
6        A    Yes.
7        Q    And if I use the word "Bumpity Bump" or
8    call an officer Bumpity Bump and I have a
9    Constitutional right to say that, as you just
10   testified to, would an officer have a right to use
11   force on me?
12       A    Cannot answer that question.
13       Q    Why not?
14       A    Because the question that you are
15   asking, you're petitioning to what the Constitution
16   law and also the rights of another.
17       Q    What rights of another are you talking
18   about?
19       A    You're saying plainly, just to say if I
20   say Bumpity Bump.  If you just say Bumpity Bump, is
21   that -- is that a violation of your Constitutional
22   right?  Yes?  I -- I'm just trying to make this
23   clear.  I'm just trying to be clear.  If you are
24   just saying Bumpity Bump just to say Bumpity Bump,
25   is that a violation of your Constitutional right?

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

Page 57

1    Q    Are you asking me?
2    A    No.  I'm just trying to make clear.
3    Q    Oh, okay.  Well, I thought you said
4 that --
5    A    It wasn't -- it wasn't mentioned that
6 when you say Bumpity Bump, did you say it to
7 another?  Who did you say it --
8    Q    Yes.  I'm saying, if you say it to
9 another officer.
10   A    Oh.
11   Q    I said that.
12   A    Okay.
13   Q    You're saying -- if I say Bumpity Bump
14 to another officer --
15   A    Uh-huh.
16   Q    -- but I'm no threat to that officer or
17 anyone else -- I'm just saying Bumpity Bump -- does
18 an -- an officer have a right to use physical force?
19        MS. SELLERS:  Object to the form of the
20     question.
21        THE WITNESS:  Using that terminology or
22     any terminology that is disrespectful or
23     derogatory towards another is not right.
24 BY MR. WILLIAMS:
25   Q    But is it allowed for an officer to use

Page 58

1 physical force?  I know you're saying it's not
2 right, but does that justify physical force by an
3 officer?
4    A    Just that alone, no.
5    Q    What would be necessary for -- beyond
6 saying Bumpity Bump before an officer could use
7 physical force on that person?
8    A    Physical -- a threat of safety would
9 have to be displayed.  Excuse me.
10   Q    A threat of safety to whom?
11   A    The officer.
12   Q    So what is your understanding when an
13 officer can legally use physical force?
14   A    If physical force is being presented.
15   Q    Okay.  Is that your understanding of
16 what the law --
17   A    Or an attempt.  Any force that is used,
18 officer is allowed to go one step above that force
19 being used.
20   Q    Is that what you were taught at APD?
21   A    Yes.
22   Q    Is that the training that you used
23 in -- excuse me -- when you encountered the Carrs?
24   A    Yes.
25   Q    Was that the force -- is that the --

Page 59

1 the training and practice you used when you arrested
2 anybody during your time at the APD?
3    A    Repeat the question.
4    Q    Did you use that concept you just
5 testified to as part -- that training that you got,
6 as part of when you dealt with anybody and arrested
7 them when you was an APD officer?
8        MS. SELLERS:  Object to the form of the
9     question.
10       THE WITNESS:  I cannot answer that
11    question.
12 BY MR. WILLIAMS:
13   Q    Okay.  What is the legal constitutional
14 reason an officer can use force?  What were you
15 trained when you were an APD officer?
16   A    When there is force being -- when there
17 is a strong belief that force or resistance of force
18 is being used, I can then use force.
19   Q    Who trained you on that?
20   A    The instructors at the academy.
21   Q    Was that a custom and practice that you
22 saw being used at APD during your tenure there?
23       MS. SELLERS:  Object to the form of the
24    question.
25       THE WITNESS:  I cannot answer that

Page 60

1    question.
2 BY MR. WILLIAMS:
3    Q    Why not?
4    A    It's not clear.
5    Q    Well, what you just described of force,
6 you can use force when attempted force or resisting
7 force, what you just described to me, you said you
8 got it in training; right?
9    A    Yes.
10   Q    Did you see other officers using that
11 same type of training when you were around them?
12       MS. SELLERS:  Object to the form of the
13    question.
14       THE WITNESS:  I can't answer.
15 BY MR. WILLIAMS:
16   Q    Did you train the people underneath you
17 with that same philosophy that you just testified to
18 of when you can use force?
19   A    I only advise if I -- if I witnessed or
20 it was brought to my attention of when force is
21 used, and once -- and once -- and once force has
22 been used and deemed necessary to give retraining or
23 to give -- or to present it again or to give a
24 refresher in roll call training, I then did so.
25   Q    If I disobeyed you, one of your

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 61

1  commands or say something to you but I'm not
2  obstructing your -- you or your ability to do what
3  you need to do, do I have a right to disregard your
4  command?
5       A      Only if it's unlawful.
6       Q      What is unlawful?  Your command?
7       A      If I'm giving you an unlawful command.
8       Q      Is it -- is it your belief, then, that
9  pretty much an officer has a legal right to require
10  private citizens to follow their commands unless
11  they're unlawful?
12              MS. SELLERS:  Object to the form of the
13       question.
14              THE WITNESS:  I'm not understanding
15       your question.  Can you --
16  BY MR. WILLIAMS:
17       Q      Is it your belief that an officer --
18  strike that.  Is it your belief that a person must
19  follow an officer's commands unless it's unlawful?
20       A      Yes.
21       Q      Where were you trained on that from?
22       A      That would be from -- that would be at
23  the -- at the academy.
24       Q      Was that training reinforced after you
25  got to the academy with your superiors?

Page 62

1       A      I would say yearly because we have what
2  they call in-service.
3       Q      And you were -- was it a custom and
4  practice that you understood at APD, that a private
5  citizen was required to follow an officer's commands
6  unless it was unlawful?
7       A      That is correct.
8       Q      Did your superiors tell you that as
9  well?
10       A      Cannot answer that question.
11       Q      Do you believe that it is -- that an
12  officer can use force against a person, a private
13  citizen, if that person is not a threat who has
14  caused injury or harm to the -- the officer or
15  someone else?
16       A      Repeat the question again.
17       Q      Do you believe that an officer can use
18  physical force against a private citizen if that
19  citizen is not a threat to the officer or someone
20  else?
21       A      Oh, no.
22       Q      If an officer uses physical force
23  against a private citizen and that private citizen
24  is not either a threat to the officer or someone
25  else and that officer still uses force against that

Page 63

1  individual, that is a violation of the Constitution;
2  is that correct?
3              MS. SELLERS:  Object to the form.
4              THE WITNESS:  That also would not be in
5       the right.
6  BY MR. WILLIAMS:
7       Q      Okay.  Why do you say it wouldn't be in
8  the right?
9       A      Going to your question, to my
10  understanding, if the person is not a threat to the
11  officer or others, the officer's actions to use
12  force is against their Constitutional right.
13       Q      Yeah.
14       A      So I've answered no.  So -- I'm sorry.
15  If it's against -- is it against their
16  Constitutional right to use force if they were not a
17  threat?
18       Q      Yes.
19       A      Then yes, it would be a violation.
20       Q      Of their Constitutional right?
21       A      I'm at a disadvantage of knowing the
22  entire Constitutional right.  Which one are you --
23  are you referring to?
24       Q      Any of them that you are aware of.  Is
25  it -- go --

Page 64

1       A      So then if you are saying any of them,
2  then to use force and no threat is being present,
3  then the officer would be in violation of that
4  Constitutional right to use force.
5       Q      Okay.  You agree with me, then, that an
6  officer -- it is unlawful under the Constitution of
7  Georgia and the United States for an officer to use
8  force on a private citizen when that citizen is not
9  a threat to that officer or someone else?  Do you
10  agree with that?
11       A      I believe that the officer is not in
12  their right to use force if no force is being
13  presented.
14       Q      Okay.  But if an officer -- my question
15  is a little bit different.  If an officer uses force
16  on a private citizen who is neither a threat to the
17  officer or to someone else, you agree with me that
18  officer is violating that person's Constitutional
19  rights if they use force on that person?
20       A      Yes.
21       Q      It is also -- if an officer uses
22  physical force on a person, a private citizen, who
23  is no threat to the officer or to someone else but
24  still uses force, that would be a crime, wouldn't
25  it?  If that officer used force on that person?

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 65

1    MS. SELLERS:  Object to the form.
2    THE WITNESS:  Ask the question again,
3  please.
4  BY MR. WILLIAMS:
5    Q    I'll give you a hypothetical.  A
6  person, private citizen, is handcuffed, sitting
7  there, no physical threat or harm to anybody, and
8  the officer just comes up and hits that private
9  citizen in the face with his hand.  Is that a crime?
10   A    Yes.
11   Q    Why?
12   A    Why did -- well, from going with your
13  -- your hypothetical, the officer just walked up to
14  a private citizen that was handcuffed and just hit
15  them with their hand.
16   Q    Uh-huh.
17   A    Yes?
18   Q    He's no threat.  He's no harm.
19   A    So what -- again, with your
20  hypothetical then yes, the officer did commit a
21  crime.
22   Q    What crime?
23   A    What comes to mind is assault.
24   Q    Aggravated assault; right?
25   A    Not with his hand.

Page 66

1    Q    Why not?  You can't have aggravated
2  assault with your hand?
3    A    How so?  Going with your hypothetical
4  -- your hypothetical says that he hits the private
5  citizen handcuffed.  Yes?  With his hand?
6    Q    So what is your understanding of when
7  you have aggravated assault?  You got to have a
8  weapon or firearm?
9    A    You need to -- either a weapon -- a
10  weapon or a foreign object.
11   Q    But you believe it's at least an
12  assault?
13   A    Yes.
14   Q    A felony assault, though?
15   A    An assault.
16   Q    But charged as a felony, not a
17  misdemeanor?  Not a simple battery; right?
18   A    That would not be simple battery.
19   Q    That would be a felony; correct?
20   A    I would not deem so because what -- I'm
21  sorry.  Go ahead, sir.
22   Q    If someone just hit someone in the face
23  with their hands and they are no threat, they can't
24  defend themself because they're handcuffed, you
25  don't believe that is a felony?

Page 67

1    A    I would have to review the statute on
2  that.
3    Q    Okay.  You would agree with me if you
4  saw an officer hit a private citizen who's
5  handcuffed who is no threat to that officer or
6  anyone else and physically hit him in the face, you
7  agree with me that you -- if you saw that officer do
8  that, you would have a legal duty under your oath of
9  office to report that officer with charges; correct?
10   A    After -- after finding out what
11  happened, what led up to that, then bring that to my
12  supervisors.
13   Q    Would you bring it to your supervisor
14  to report that a crime had been committed?
15   A    I would report to my supervisors that
16  this incident took place.
17   Q    But what about the crime?  Would you
18  tell them a crime -- you saw a crime?
19   A    I would tell them that I saw that the
20  officer assaulted that -- that individual.
21   Q    Yeah.  But would you tell the officer
22  -- your supervisor, you saw a crime?
23   A    Isn't note -- making the notification
24  to the supervisor is indicative -- indicative of
25  that crime.

Page 68

1    Q    You charged the Carrs with a crime
2  based upon somebody saying curse words to you and a
3  finger.  You would not charge that officer with a
4  crime if you saw what I just described, where he or
5  she hits this guy in the face when he's handcuffed?
6  Doesn't your oath of office under the Constitution,
7  require you to do that?
8    MS. SELLERS:  Object to the form of the
9    question.
10   THE WITNESS:  I cannot answer that
11   question.
12  BY MR. WILLIAMS:
13   Q    Why not?
14   A    Because if I'm to see another officer
15  commit a violation in that -- a violation such as
16  what you hypothetically question, I would then
17  bring it to my supervisor.
18   Q    Would you expect --
19   A    And then I would -- then I would follow
20  the actions from my supervisor or -- from my
21  supervisor of how to either further handle the
22  situation or the supervisor would then take that --
23  take the command of that incident.
24   Q    So you are saying that once you tell
25  your supervisor, it's on the supervisor to decide

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 18 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 69

1  what to do?
2      A      I would follow my supervisor's
3  direction.
4      Q      But you would expect your supervisor,
5  knowing what you know the Constitution requires and
6  the policies and procedures of the APD, you would
7  expect that office -- that supervisor to report that
8  crime to the district attorney's office or file
9  charges against that officer?  Wouldn't you expect
10 that?
11     A      Once I've made that notification, I
12 have -- I would have no -- I would leave that up to
13 the chain of command.
14     Q      Do the criminal laws of Georgia apply
15 differently to private citizens than officers?
16     A      No.
17     Q      Well, if you saw an individual hit
18 somebody in the streets of Atlanta, hit somebody in
19 their face and they're no threat to that person or
20 anyone else, wouldn't you charge them with a crime
21 and arrest them?
22         MS. SELLERS:  Object to the form of the
23     question.
24 BY MR. WILLIAMS:
25     Q      Haven't you arrested people for assault

Page 70

1  and battery?
2      A      I have.
3      Q      So if you see and you know someone has
4  committed a crime, you arrest the private citizen,
5  why are the laws or your actions different with an
6  officer?
7      A      There's different steps.  Again, I
8  would go back to the chain of command with my
9  supervisors of how that incident supposed to be
10 handled.
11     Q      Well, I'm asking you, why are there
12 different steps?  Why are the citizens of Atlanta
13 and people treated differently in your mind to the
14 officers?
15     A      I cannot answer your question.
16     Q      Why not?
17     A      Because what you are -- what you are
18 asking is still -- is based on a hypothetical.
19 Where are the facts?  There is an investigation that
20 would be conducted by the supervisor, which would
21 then go to internal affairs, which in this case in
22 the state of Georgia -- in the City of Atlanta
23 Police Department; OPS --
24     Q      Okay.
25     A      -- Office of Professional Standards.

Page 71

1  There from at that point the decisions and
2  appropriate actions would be taken.
3      Q      You agree with me that the OPS should
4  take action, and if there was a crime committed,
5  they need to report that to the district attorney?
6  You agree with that?
7      A      If they find -- if that was in their
8  findings, yes.
9      Q      Well, what if they don't find it?  What
10 if they just look over it and say, I'm not going to
11 say anything?  Don't you think they have a duty to
12 find that if there is a crime?
13         MS. SELLERS:  Object to the form of the
14     question.
15         THE WITNESS:  I have no -- I have no --
16     no overriding rules on that.  If that is --
17     if the -- the -- if the Office of
18     Professional Standards, after conducting an
19     investigation and after them conducting an
20     investigation, come to whatever conclusions
21     they come to, then that is where it goes.
22 BY MR. WILLIAMS:
23     Q      Okay.
24     A      If it then follow throughs to the DA's
25 office --

Page 72

1      Q      Okay.  Did you -- you agree with me
2  that Mr. Hall, our client, and his wife, on the day
3  the incident involving you, that they had a -- they
4  had Constitutional rights that you were required to
5  protect as a -- as a officer of APD?  Do you agree
6  with that?
7      A      Yes.
8      Q      You agree with me that you were
9  required to follow and make sure that you did not
10 violate their Fourth Amendment to the Constitution.
11 Do you agree with that?
12         MS. SELLERS:  Object to the form of the
13     question.
14         THE WITNESS:  Repeat that question
15     again, sir.
16 BY MR. WILLIAMS:
17     Q      Do you agree with me when you
18 interacted with the Halls, you were required to not
19 violate their Fourth Amendment rights under the
20 Constitution?
21         MS. SELLERS:  Same objection.
22         THE WITNESS:  Cannot answer that
23     question.
24 BY MR. WILLIAMS:
25     Q      Why not?

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 73

```
1       A       I'm sorry.  For another time.  Re --
2   reask your question.  Repeat your question again.
3       Q       Yeah.  My question is, you were
4   required to -- in your interactions with the Halls
5   on the day of the incident for which we're here for,
6   you're required to make sure that you did not
7   violate their Fourth Amendment rights under the
8   Constitution; am I correct?
9               MS. SELLERS:  I'm sorry.  The same
10          objection.
11              THE WITNESS:  Not just theirs.
12          Anyone's.
13  BY MR. WILLIAMS:
14      Q       Okay.  But you agree the Halls had a
15  Constitutional right you could not violate that day
16  specifically; right?
17      A       Yes.
18      Q       Okay.  All right.  What is the Fourth
19  Amendment?  Do you know what the Fourth Amendment
20  is?
21      A       I cannot recall the Fourth Amendment in
22  its -- in its entirety.
23      Q       What part do you recall?
24      A       The right to be protected of your
25  possessions, papers -- papers and effects.
```

Page 74

```
1       Q       That's what you recall?
2       A       Is -- that's what I am recalling and
3   that -- violation of search and seizure without
4   affirmation of a warrant or affidavit or sworn --
5   sworn affidavit.
6       Q       You agree with me the Halls had a
7   Fourth Amendment right to be free from unreasonable
8   arrest at the time you interacted with them?  Do you
9   agree with that?
10      A       Yes.  And so was anyone else.
11      Q       Do you agree with me the Halls had a
12  right, a Fourth Amendment right, to be free from
13  unreasonable use of force?
14      A       Before being in contact with them?
15  Yes.
16      Q       Before being in contact with them, what
17  do you mean by that?
18      A       I'm sorry.  Yes.
19      Q       Okay.  So you are saying yes to my
20  question?
21      A       Yes.
22      Q       Okay.  You agree with me that the
23  criminal laws of Georgia and the United States
24  should apply to you the same way they apply to
25  private citizens?  Do you agree with that?
```

Page 75

```
1       A       Yes.
2       Q       You -- take me through your tenure,
3   employment with APD.  You said you hired in 2007?
4       A       Hired in 2007.  Graduated in 2008.
5       Q       From cadet school?
6       A       Yes.  The academy.
7       Q       And then tell me -- take me through
8   from the time you went from graduation, all the
9   different positions you had going up until the time
10  you stopped working there.
11      A       I was an officer from once I graduated
12  and became sergeant in 2016.
13      Q       Between 2016 -- 2008 and 2016 where did
14  you work?
15      A       In zone two.  That would be the
16  Buckhead area.  That's where I -- that was my
17  assignment.
18      Q       You worked consistently in the Buckhead
19  area the whole time?
20      A       Yes, sir.
21      Q       In 2016 through the time you stopped
22  working were you -- did you also work in the
23  Buckhead area?
24      A       No.
25      Q       Where --
```

Page 76

```
1       A       I was a -- once I was promoted, I then
2   was assigned to zone three.
3       Q       Where is zone three?
4       A       That would be -- that would encompass
5   Mechanicsville, Pittsburgh.  I believe that's Grant
6   Park, Adair Park, that area.  That would be south.
7   I'm going to say south.
8       Q       What were your duties and
9   responsibilities --
10      A       Southwest -- southeast.
11      Q       I'm sorry.
12      A       Part of south -- that was south
13  Atlanta.  Let me say it that way.
14      Q       As an officer from 2008 to 2016 what
15  were your job duties and responsibilities as an
16  officer in the zone two Buckhead area?
17      A       As any area, to respond to 911 calls;
18  serve -- protect and serve the community as best
19  possible within -- within my power.
20      Q       What does protect and serve the
21  community mean to you?
22      A       I mean, protect those that are unable
23  to protect themselves; serve the community by being
24  of service to them.
25      Q       Do you have -- do you believe you had
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 77

1   that responsibility to protect and serve the Halls
2   prior to and during the incident in February of
3   2017?
4       A       Yes.
5       Q       What was your job duties and
6   responsibilities when you became sergeant in zone
7   three?
8       A       My job duties and responsibilities as
9   sergeant was to make sure that we have adequate
10  coverage to patrol the area to -- to patrol the area
11  that we're in jurisdiction of or responsible for;
12  make sure that the officers are fully equipped, that
13  their equipments were in proper working order.
14          Also to give an update of the current
15  events that are taking place within the area
16  throughout the city and within -- within our
17  patrolling area; to be safe; render aid; and also to
18  -- also to review reports; attend community
19  meetings; give evaluations.  Perform evaluations.
20  Excuse me.
21      Q       Okay.  Did you have any weapons
22  certifications during your APD?
23      A       Yes.
24      Q       What weapons certifications did you
25  have during your time with APD?

Page 78

1       A       Weapon certification in use of firearm,
2   of my handgun and shotgun.
3       Q       What about OC spray?
4       A       Yes.
5       Q       You had a certification for that?
6       A       Yes, sir.
7       Q       Did you receive training on that?
8       A       Yes, sir.
9       Q       What was your understanding when OC
10  spray was allowed to be used?  What were you trained
11  on that on?
12      A       The training to use OC spray is to --
13  is an option that we're to use if the -- if the
14  threat can be quelled by the use of OC spray, which
15  is to have them disorientated, possibly disarm the
16  individual if they're holding a weapon, if their
17  behavior was totally erratic.  Or erratic.
18      Q       Erratic?
19      A       Erratic behavior, display of erratic
20  behavior.
21      Q       Can you use OC spray on somebody who
22  has erratic behavior but they're no threat?
23          MS. SELLERS:  Object to the form of the
24      question.
25          THE WITNESS:  Can't answer that

Page 79

1           question because your question -- that
2           question isn't clear because you --
3   BY MR. WILLIAMS:
4       Q       Well, let me ask it this way.  Is it
5   allowed to use OC spray when the person you're using
6   it on is no threat to you or to anyone else?
7       A       I -- I understand your question now.
8   No.
9       Q       So regardless if they have erratic
10  behavior, if they're not a threat to you or anyone
11  else, you can't use OC spray; am I correct?
12      A       If they're not a threat, no, you cannot
13  use OC spray.
14      Q       Did you have -- do you know what a CVSA
15  exam is?  The polygraph truthfulness thing they give
16  you?  You ever heard of that?  Controlled voice?
17      A       Yes, I have.
18      Q       Did you have to do that when you got
19  hired?
20      A       Yes, I did.
21      Q       And you took that as part of your
22  admission to the police academy; correct?
23      A       Yes, I did.
24      Q       Has anyone ever asked you -- and I mean
25  anyone, including anybody you've gotten counseling

Page 80

1   from or anybody at APD.  Has anybody ever accused
2   you or questioned you whether you treat white
3   suspects different than black suspects?
4           MS. SELLERS:  Object to the form of the
5       question.
6           THE WITNESS:  No.
7   BY MR. WILLIAMS:
8       Q       The Carrs are white individuals;
9   correct?
10      A       Yes.
11      Q       The Halls are white individuals as
12  well; correct?
13      A       Yes.
14      Q       Did you ever -- as part of your
15  training ever see a video of an officer shooting
16  into a moving vehicle that was leaving Magic City in
17  2015?
18      A       I do not recall.
19      Q       You don't recall that?
20      A       No.
21          MR. WILLIAMS:  Let's take a little
22      break.
23          THE VIDEOGRAPHER:  Going off the video
24      record.  The time is 3:21.
25          (A recess was taken.)

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

**Page 81**

```
1              THE VIDEOGRAPHER:  The time is 3:41.
2       We're back on the record.
3  BY MR. WILLIAMS:
4       Q       Mr. Cadeau, we're back on the record.
5  You understand that your testimony is still under
6  oath?  Do you understand that?
7       A       Yes.
8       Q       Okay.  Did you ever work with or under
9  Chief Turner when he was not a chief?  Did he work
10 in any of your zones or anything under you -- were
11 you under his supervision at all during your tenure?
12      A       When I was -- yes.
13      Q       Other than when he was chief, tell me
14 when that was.
15      A       Only when he was chief.
16      Q       Okay.  Only when he was chief.  Okay.
17 He was never your direct supervisor or anything
18 before he was chief?
19      A       No.
20      Q       Okay.  What about Lieutenant Childers?
21      A       Lieutenant Childers?
22      Q       You ever heard of her?  Okay.  What
23 about Captain Steed?  You ever work with Captain
24 Steed?
25      A       Can't recall.
```

**Page 82**

```
1       Q       Okay.  What about Major Hobbs?
2       A       Yes.
3       Q       Okay.  When did you work with deputy --
4  I mean, Major Hobbs?
5       A       In zone two.
6       Q       And what -- what time period was that?
7  Do you recall?
8       A       I do not recall the time period.
9       Q       And how did you -- what was Lieutenant
10 Hobbs' relationship with you from a managerial
11 standpoint at that time?
12      A       I was an officer, and he was the major
13 of the zone two precinct.
14      Q       Did you ever interact with Major Hobbs
15 as part of your daily responsibilities in zone two?
16      A       Not as my daily responsibilities, no.
17      Q       What about Deputy Chief Spillane?
18      A       Not a daily interaction, but I did meet
19 with him.
20      Q       For what?
21      A       The incident involving the use of OC
22 spray.
23      Q       Tell me about that incident.
24      A       The incident was when I used force -- I
25 used the OC spray on an arrested citizen.
```

**Page 83**

```
1       Q       And why did you meet with Deputy Chief
2  Spillane on that?
3       A       For that, because I was being counseled
4  for that -- for that incident of using force of OC
5  spray.
6       Q       So was he counseling you?
7       A       No.  We had to meet.  I had to meet
8  with him in his office for that incident.
9       Q       Okay.  So tell me what -- why did you
10 have to meet with him?
11      A       Because my use of OC spray was not --
12 was not reasonable at the time.  I was at fault.  I
13 was found at fault.
14      Q       Do you believe you were wrong?
15      A       I do not believe so.
16      Q       Why don't you believe you were wrong?
17      A       Because what was presented to me, the
18 arrested citizen lunged at me --
19      Q       Okay.
20      A       -- which was threat -- lunging at me,
21 threatening me bodily harm, so I used my OC spray.
22      Q       So the only reason you used OC spray is
23 because this arrestee was -- lunged at you?
24      A       That is correct.
25      Q       How did he lunge at you?
```

**Page 84**

```
1       A       He rose up from the bench, and it
2  appeared that he was going to kick me.
3       Q       Which foot?  Which leg?
4       A       Cannot tell because he was shifting
5  from side to side.
6       Q       So what threat was he -- were you
7  concerned about?
8       A       My leg.
9       Q       You was concerned about your leg?
10      A       Yes, sir.  Well, my knees, really.
11      Q       Where were you at in relation to this
12 arrestee?  How close?
13      A       In front of him.
14      Q       Why --
15      A       I can't give you -- I can't give you an
16 approximate distance.
17      Q       Were you at -- it was enough that you
18 felt a threat?
19      A       Yes, sir.
20      Q       Why were you close to him that you
21 would even be to -- a threat?  Was he your arrest --
22 did you arrest him?
23      A       No.
24      Q       So why were you even close to him?
25      A       Well, I was there watching him for
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 85

1  another officer, and during that time that's when he
2  had made derogatory statements to a female officer
3  by calling her Bumpity Bump.
4       Q      What does Bumpity Bump mean?
5       A      That means big ass, fat ass, plump ass.
6  It was a statement towards -- towards her body part.
7       Q      Did you --
8       A      Her buttocks.
9       Q      Did you ever mention that this arrestee
10 lunged at you in any of your statements to your
11 superiors or in a report or OPS file?  Did you ever
12 mention that at all?
13      A      I believe so.
14      Q      So if -- if you're telling us you used
15 it because of lunging, any of your OPS statements or
16 anything you said to OPS, you should -- you would
17 have mentioned that at that time; right?
18      A      Yes, sir.
19      Q      So why was you meeting with Spillane --
20 Spillane again?  I'm confused.  Was he disciplining
21 you?  Was he --
22      A      It was --
23      Q      -- counsel --
24      A      -- it was for discipline.
25      Q      And what was the discipline?

Page 86

1       A      Suspension.
2       Q      For how many days?
3       A      I believe one.
4       Q      One day?
5       A      I believe so.
6       Q      And where did you -- where did you
7  spray him at?
8       A      It was in the zone two precinct, inside
9  of a -- where we -- it was in a room where we --
10 where we're able to place detainees and conduct
11 our -- and also conduct our reports.
12      Q      So how -- was anybody else in the room?
13 Other than you and this detain -- were you in the
14 same room with the detainee?
15      A      Yes, sir.
16      Q      Okay.  Anybody else in the room?
17      A      Not that I recall.
18      Q      So where did you -- so you -- he lunged
19 at you.  Tell me -- tell me what happened right
20 before he lunged at you that you felt a threat that
21 you had to use OC spray.  I want to go through the
22 events of what happened.
23      A      From what I recall, I was explaining --
24 I was getting the individual to stop making
25 derogatory comments, those comments to the female

Page 87

1  officer.
2       Q      So, what?  Just tell him to stop?
3       A      Stop because he's being -- that was
4  disrespectful to the officer, and it was also
5  agitating the officer.
6       Q      Did the officer tell you it was
7  agitating her?
8       A      Her attitude and what she -- she had
9  also told the detainee to also stop.
10      Q      But did the officer tell you it was
11 agitating her?
12      A      No.  But I can tell.  I was able to see
13 from her demeanor that she was agitated.
14      Q      So you took it from her demeanor that
15 she was agitated?
16      A      Yes.
17      Q      Couldn't she have just handled the
18 situation herself?
19      A      I can't answer that question.
20      Q      Why not?  Weren't you there?
21      A      That would be answering for her.
22      Q      Well, I'm asking you.  Wasn't she in a
23 position to handle it herself, based on what you
24 saw?
25             MS. SELLERS:  Object to the form of the

Page 88

1       question.
2             THE WITNESS:  I can't answer that
3       question.
4  BY MR. WILLIAMS:
5       Q      Was there anything you saw preventing
6  her from handling the situation herself?
7       A      From what I can recall -- I can't
8  recall the entire events to say that she could or
9  she could not have.  I can only recall -- I'm only
10 recalling what I -- what I am remembering -- what --
11 I can only recall from what I can see from the
12 events.
13      Q      Was she -- did this arrestee make a
14 physical threat to her?
15      A      No.
16      Q      Did the arrestee -- was the arrestee at
17 any point a threat to her?
18      A      Physical threat, no.
19      Q      Was it a threat, period?
20      A      No.
21      Q      Was this arrestee a threat to anyone
22 else in the room other than yourself?
23      A      No.
24      Q      So you hear this.  It's not -- it's --
25 am I correct based on our earlier conversation, this

Case 1:18-cv-04710-CAP    Document 260-10    Filed 08/16/21    Page 23 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 89

1  arrestee has a Constitutional right to say Bumpity
2  Bump?  Correct?  Under the First Amendment freedom
3  of speech; correct?
4       A       Under the Constitutional right as
5  you're putting it out to be, yes.
6       Q       Well, not as I am putting it out to be.
7  Isn't it -- based on your understanding of the First
8  Amendment, your training?  Is it something I'm
9  missing?  Does the APD policies, procedures say a
10  person can't say Bumpity Bump?
11      A       No.
12      Q       Is that against the law?
13      A       No.
14      Q       Was it illegal for him to say Bumpity
15  Bump to her, this other officer?
16      A       No.
17      Q       So you heard Bumpity Bump.  What did
18  you do next?
19      A       I told him to stop saying that; you're
20  being disrespectful.
21      Q       And then what happened?  Then what did
22  you do?
23      A       He kept on.  From what I can recall, he
24  kept on --
25      Q       Saying Bumpity Bump?

Page 90

1       A       Kept on saying Bumpity Bump -- Bumpity
2  Bump.
3       Q       But you agree he had a Constitutional
4  right to say it; correct?  Correct?
5       A       Yes.
6       Q       Okay.  What did you do after he
7  continued to have his Constitutional right to say
8  Bumpity Bump?
9       A       I repeatedly told him to stop -- to
10  stop saying that; you're being disrespectful.  She's
11  already -- she, the female officer, has asked you to
12  stop saying that.
13      Q       So what happened next?
14      A       From what I recall, he said, if I call
15  her Bumpity Bump, I can call her Bumpity Bump.
16      I then said, she's telling you not to,
17  so why are you -- why are you continuing
18  disrespecting her and doing something she's asking
19  you not to do?  You're being disrespectful.
20      Q       Okay.
21      A       No one is being disrespectful to you.
22      Q       Okay.  What happened next?
23      A       Then at that point then I -- if I
24  recall, at that time things were getting heated.
25  There was no trading of words, like anything

Page 91

1  derogatory, but he was -- he was getting -- he was
2  starting to get upset because I'm telling him to
3  just stop.
4       Q       Are you getting upset?
5       A       No.  I told him to stop.
6       Q       And he kept going?
7       A       He just kept going for a time, and I
8  told him to stop.
9       Q       So what happened next?  If he continued
10  to do it and you're --
11      A       So --
12      Q       -- not getting upset, so what happened
13  next?
14      A       What I can recall was then getting up.
15      Q       Getting up from where?
16      A       From the desk that I was sitting at.
17      Q       How far was your desk from him?
18      A       Not far.
19      Q       What is not far?
20      A       I would say about the proximity to
21  myself and the court reporter.
22      Q       How far do you think that is?
23      A       Approximation, about, I don't know; say
24  about four, six feet.
25      Q       Okay.  And what is he -- you're in a

Page 92

1  desk.  Is that your desk?
2       A       Not my assigned desk, no.
3       Q       Okay.  Whose desk was it?
4       A       It's a open desk.  It's open to anyone.
5       Q       And where is this desk situated at?
6       A       On -- towards the back of the room.
7  There is computer terminals on these -- on these
8  desks.  There is one to the left and one to the
9  right.
10      Q       And where is the arrestee at?
11      A       To -- here, to my left.
12      Q       And where is he sitting at?  In a
13  chair?
14      A       No.  He's on the bench.
15      Q       On a bench?
16      A       Yes, sir.
17      Q       So the bench is as close as you are
18  from the --
19      A       Where -- I'm going from here because
20  he's the closest proximity.
21      Q       Yeah.
22      A       Right?
23      Q       I'm not going from here.  I'm talking
24  about, was it more than five feet away?  Ten?
25      A       I would say approximately four to

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 93

1  six feet.
2      Q      Okay.  So your desk was that close to
3  the bench?
4      A      That is correct, sir.
5      Q      Okay.  And how close was this female
6  officer?  Where was her desk?
7      A      The desk that she was sitting at would
8  be across from me.
9      Q      Across from who?
10     A      Me.
11     Q      So how far was she from him?
12     A      From the --
13     Q      Arrestee.
14     A      The arrestee?
15     Q      And the bench.
16     A      Diagonally about the same distance.
17     Q      So she's the same distance you are from
18 the arrestee?
19     A      Yes.
20     Q      She is the one he's, in your words,
21 disrespecting?
22     A      Yes.
23     Q      So you said something about, you got
24 up?
25     A      I did.

Page 94

1      Q      Why?
2      A      Because then I was trying to intimidate
3  him by being up.
4      Q      You were trying to intimidate him?
5      A      Yes.
6      Q      Why were you trying to do that?
7      A      To stop him from doing what he was
8  doing because every time she would get up to go out
9  of the room and come back into the room, he just
10 kept saying "Bumpity Bump."
11     Q      So where in -- what -- is that
12 something you were trained to do?  To get up and try
13 to intimidate somebody?
14     A      No.
15     Q      Okay.  So when you got up to try to
16 intimidate him, what law had he broken, if any?
17     A      He had not.
18     Q      What illegal act has he done?
19     A      He had not.
20     Q      Do you think it is proper policing when
21 you're to protect and serve, for an officer to get
22 up with the intentions to intimidate somebody?  Do
23 you think that's proper police work?  Did you
24 understand my question, sir?
25     A      No.

Page 95

1      Q      No, it's not?
2      A      No.
3      Q      Did you understand it wasn't
4  appropriate policing at the time you did it?
5      A      No.
6      Q      When did you realize it was not proper
7  policing?
8      A      I'm sorry I'm taking so long to answer
9  this question.  I'm trying to make sure I give you
10 the accurate answer or as clear as possible.  So the
11 question you're asking is, is that proper policing
12 in its totality?  So my answer is going to be --
13 when did I realize that?  Once I was spoke -- once I
14 was spoken to by a supervisor.
15     Q      Which supervisor was that, that you --
16 that you learned and realized it was not the proper
17 policing?
18     A      I do not recall the supervisor's name,
19 but I do know once I was spoken to by a supervisor.
20     Q      Now, is this incident before or after
21 the incident with the Carrs?
22     A      I do not recall.
23     Q      Now, you're writing stuff down.  What
24 are you writing?
25     A      These are questions that you have --

Page 96

1  that you have asked me, so I'm writing them to make
2  sure that I have a clear understanding of your
3  questions.
4      Q      Okay.  Did you -- after -- you said you
5  got up to intimidate him; correct?
6      A      Yes, sir.
7      Q      So did you -- he could not come to you,
8  correct, because he was -- he was handcuffed;
9  correct?
10     A      Yes.
11     Q      He was -- also wasn't he shackled to
12 the bench?
13     A      Not that I can -- not that I -- not
14 that I can say, no.
15     Q      Not that you can say?  You don't
16 recall?
17     A      Because -- no.
18     Q      Did you-all have a practice of
19 shackling them to the bench as well as their hands,
20 their legs and their hands?
21     A      Legs and hands to the bench.  His legs
22 and -- his legs were not shackled to the bench.
23     Q      If the OPS file says that, that they
24 were shackled, would you disagree with that?
25     A      I would say that I would -- that I

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

Page 97

1    don't remember his -- seeing his legs shackled to
2    the bench.
3        Q       But would you disagree with that if
4    that is what the OPS file says?
5        A       If that is what the file says, then I
6    would have -- I have no choice but to agree with it.
7        Q       You would --
8        A       But --
9        Q       -- agree with the OPS file?
10       A       Yes.  But I don't remember -- I do not
11   recall it being that way.
12       Q       If his feet are shackled, he can't kick
13   and lunge at you with his feet, can he?
14       A       That would be depending upon -- I
15   cannot say yes.  Nor can I say no because that would
16   be dependent upon how his legs are shackled.  If his
17   legs are shackled -- are just to -- are just to his
18   ankles, then yes, he would still have the ability to
19   kick me.
20       Q       But you don't even remember them being
21   shackled; correct?
22       A       I don't remember them being shackled,
23   no.
24       Q       You agree with me if he in fact lunged
25   at you as you claim and his feet were shackled, you

Page 98

1    would remember that?  That is something you would
2    remember?
3        A       I would remember more so of the action
4    than the potential of him being shackled to say that
5    he could not.
6        Q       So tell me, you got up and -- because
7    you wanted to intimidate.  What did you do to
8    intimidate him?
9        A       I just stood in front of him and told
10   him, no; stop doing it.
11       Q       So you were five to six feet away from
12   him, and now you closed the gap to what?  How far?
13   How far were you away from him --
14       A       I can't --
15       Q       -- in front of him?
16       A       I can't give -- I'm not able to give
17   you a distance.
18       Q       Were you one feet away from him?
19   Two feet away?
20       A       Again, I cannot recall the distance of
21   how close I was, but -- though I believe that I was
22   close enough to where -- for him to -- able to lunge
23   and kick, he would be able to make contact.
24       Q       So let me ask you this.  Was he able to
25   lunge and kick at you when you were sitting down?

Page 99

1        A       No because --
2        Q       Was he a threat --
3        A       -- there would have been a desk between
4    the two of us.
5        Q       Was he a threat to you when you were
6    sitting down?
7        A       No.
8        Q       So he didn't become a threat to you
9    until you got up with the purpose of intimidating
10   him; correct?
11       A       Yes.
12       Q       And he wouldn't have been a threat to
13   you but for the fact that you got up from your desk
14   and went and stood in front of him; correct?
15               MS. SELLERS:  Object to the form.
16               THE WITNESS:  Repeat the question,
17          please.
18   BY MR. WILLIAMS:
19       Q       He would not have been a threat to you
20   but for the fact that you decided to get out of your
21   desk to go intimidate him and stand in front of him;
22   isn't that true?
23       A       Yes, it would be.
24       Q       You initiated the opportunity for there
25   to be a threat by leaving your desk and going in

Page 100

1    front of him; correct?
2        A       Repeat your question again, please.
3        Q       You initiated the incident where he
4    became a -- a threat to you or you felt threatened
5    by leaving your desk and coming in front of him?
6    You started that; right?
7                MS. SELLERS:  Object to the form of the
8          question.
9    BY MR. WILLIAMS:
10       Q       You can answer.
11       A       I'm sorry.
12       Q       I said, you can answer the question.
13       A       Yes.
14       Q       Now, he was not talking to you?  He was
15   talking to this female officer; correct?
16       A       Yes.
17       Q       So the only reason he was engaged with
18   you later is because you initiated conversation with
19   him about being disrespectful; correct?
20       A       Yes.
21       Q       So not only did you initiate the threat
22   of -- what you call a threat of him lunging to you;
23   you also initiated the conversation between you and
24   him because he was not even talking to you?
25   Correct?

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 101

```
 1      A       Yes.
 2      Q       You initiated the conversation with the
 3 arrestee before you used the OC spray on him;
 4 correct?
 5      A       Repeat the question again.
 6      Q       You initiated a conversation with him,
 7 the arrestee --
 8      A       Yes.
 9      Q       -- before you used the OC spray;
10 correct?
11      A       Yes.
12      Q       And you got out of your chair, your
13 desk, to intimidate him before you used the OC
14 spray; correct?
15      A       Yes.
16      Q       Now, where is the OC spray at on your
17 person at this time, when you get out of your desk?
18      A       The OC spray is on my duty belt.
19      Q       On your duty belt?
20      A       Yes.
21      Q       On your left or right side?
22      A       Right side.
23      Q       On your right side.  When you went to
24 intimidate him did you also have your weapon on you?
25 Your gun, your firearm?
```

Page 102

```
 1      A       Yes.
 2      Q       And that was on your left side?
 3      A       Right side.
 4      Q       Right side?  Okay.  So did you have
 5 your OC spray -- your hand on your OC spray when you
 6 went over there, or sometime after that?
 7      A       No.  My hand was not on the OC spray
 8 when I went there.
 9      Q       Okay.  So did you use the OC spray
10 because of what he said to you?
11      A       No.
12      Q       Did you get angry at the suspect for
13 what he said to you?
14      A       No.
15      Q       So tell us, this jury, why you used the
16 OC spray.  Tell us why you used the OC spray.
17      A       Because I felt threatened by his
18 actions.
19      Q       And the action is the lunging?
20      A       Well, it resulted in lunging, but
21 that --
22      Q       What resulted in lunging?
23      A       Excuse me.  His action was that he
24 lunged at me, and I perceived that he was going to
25 cause -- that he was going to cause harm to me, and
```

Page 103

```
 1 that's why I used it -- and that's why I used the OC
 2 spray.
 3      Q       What harm were you threatened with that
 4 he was --
 5      A       That he was -- that he was going to hit
 6 me or -- hit me, strike me.  That he was going to
 7 hit me.
 8      Q       Can you explain how someone could cause
 9 you harm if their hands are cuffed and their legs
10 are shackled?
11      A       In my experience in corrections I've
12 seen inmates fight officers while they were in
13 shackles, while they were handcuffed and had leg
14 irons on them.
15      Q       So tell me, did -- in this case did he
16 -- did you think he could do that?  Not what you
17 have experienced in corrections.  What was his
18 threat to you at that time?  Did you think he could
19 cause you harm?
20      A       Yes, I did think so.
21      Q       What harm was you concerned about?
22      A       My harm.
23      Q       Where?
24      A       Harm to me.  Anywhere.
25      Q       Did you think you had a -- a serious
```

Page 104

```
 1 harm he was going to use -- he was going to be able
 2 to do?
 3      A       Possibly, yes.
 4      Q       What serious harm were you concerned
 5 about with a person that was handcuffed?
 6      A       That would only be theorizing.  I don't
 7 know.
 8      Q       Be what?
 9      A       I don't know, but I would say that's --
10 I would say that being that he does have handcuffs,
11 which is metal, that can cause harm to me.
12      Q       Were you not able to get out of the way
13 when he lunged at you?
14      A       I was able to step back.
15      Q       So tell me --
16      A       But then --
17      Q       -- what you did.
18      A       So from when -- from when he lunged, I
19 stepped back and deployed my OC spray.
20      Q       So you didn't deploy your OC spray
21 until you had stepped away?
22      A       Until his -- until I saw his action, so
23 immediately I stepped back and deployed my OC spray.
24      Q       But you had already stepped back when
25 you deployed your OC spray; correct?
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 105

1      A        It was all in -- in the same motion.
2      Q        Could you have just stepped back and
3  not used the OC spray?
4      A        I could have.
5      Q        Why didn't you?
6      A        Because I felt threatened.
7      Q        Was you threatened after you -- was you
8  in harm of being in a threat once you stepped back?
9      A        Again, it was in a fluid motion that I
10 stepped back while he was coming at -- while he
11 lunged at me.
12     Q        Because he could not come at you
13 because he was handcuffed; correct?
14     A        Again, sir, I do not know what his
15 experience is in being handcuffed, so that was not a
16 chance that I was going to take to see what he could
17 do.
18     Q        Did you use the OC spray to prevent him
19 from lunging at you?
20     A        I used the OC spray to further prevent
21 him in doing anything else.
22     Q        Doing what else?
23     A        I don't know what else he would have
24 been -- I do not know his capability of what else
25 that he could do, whether he would be able to come

Page 106

1  to me and take action, so using the OC spray would
2  prevent further action.
3      Q        So you did use the OC spray from
4  preventing him from lunging at you or doing anything
5  else?
6      A        I used the OC spray to prevent him in
7  committing -- in doing any further actions that he
8  may have intended to do.
9      Q        And in your mind, based on what you
10 presented with, what other actions were you
11 concerned he may be a threat to you for?
12     A        At that point I'm just thinking of my
13 safety, of him being able to harm me, so I cannot
14 accurately give you what other possible harms may
15 have taken -- you know, that may have -- may have
16 resulted.  My safety is what I am concerned about.
17     Q        Everything you did prior to and at the
18 time of this incident with this arrestee, do you
19 believe was it consistent with the training and
20 customs you had been taught at Atlanta Police
21 Department?
22              MS. SELLERS:  Object to the form of the
23        question.
24              THE WITNESS:  Repeat the question
25        again, please.

Page 107

1  BY MR. WILLIAMS:
2      Q        Yeah.  What you did -- I'm not talking
3  about now, but at the time you did it, do you
4  believe what you did that day with this arrestee
5  prior to and at the time you used the OC spray on
6  him, do you believe that was consistent with your
7  training and the customs and practice you had
8  learned at APD?
9              MS. SELLERS:  Object to the form of the
10        question.
11              THE WITNESS:  To your question of, were
12        my actions consistent and accustomed to the
13        training that I -- that I received from the
14        academy prior to using my OC.
15 BY MR. WILLIAMS:
16     Q        Let me ask it a better way.  Okay?  Let
17 me be more simple.  What you did that day regarding
18 that arrestee, everything you just testified to,
19 including using the OC spray, was that consistent
20 with the training you had received from APD up until
21 that time?
22     A        Yes.
23     Q        And --
24     A        Prior -- prior to using the OC, yes.
25     Q        What about when you used the OC spray?

Page 108

1  Was that consistent with the training that you
2  received from APD up until that time?
3              MS. SELLERS:  Object to the form of the
4        question.
5              THE WITNESS:  I would say yes.
6  BY MR. WILLIAMS:
7      Q        Would you -- was what you did prior to
8  using the OC spray on that arrestee, was that in
9  line with the custom and practices you had seen and
10 learned at APD at that time?
11     A        I cannot answer that question.
12     Q        Did you use the OC spray to deter him
13 from doing anything that would threaten you?
14     A        Yes.
15     Q        Did you use the OC spray before the
16 arrestee lunged at you?
17     A        No.
18     Q        Did you use the OC spray after the
19 suspect arrestee lunged at you?
20     A        No.
21     Q        If you didn't use it before or after,
22 when did you use it?
23     A        When he did it.
24     Q        But you use --
25     A        When I saw his action.

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 109

```
1      Q      But you first stepped back; correct?
2      A      Again, it was all when he -- when he
3  made movement, I reacted.
4             (Exhibits Numbers P-3, P-4, and P-5
5         were marked for identification.)
6  BY MR. WILLIAMS:
7      Q      I'm going to show you what's been
8  marked as Exhibit Number 3. I'll also give you
9  Exhibit Number 4 and 5 over here so I don't have to
10 keep walking back. Exhibit 3 to your deposition is
11 Bates Numbered COA002026 through 002204. I will
12 represent to you, Mr. Cadeau, that these are the
13 person --
14     A      I'm sorry. Where are we at again?
15     Q      That document in front of you.
16     A      This one here?
17     Q      Yes. The Bates number on the side --
18 the top --
19     A      Yes.
20     Q      -- that is how we're identifying this
21 document?
22     A      Okay.
23     Q      Exhibit 3 is -- I'll represent is the
24 personnel file of yours that was produced by city of
25 Atlanta in this case.
```

Page 110

```
1             THE VIDEOGRAPHER: Shean.
2  BY MR. WILLIAMS:
3      Q      They've already sent those
4  verifications about it. My question to you is -- I
5  got a couple of questions about what is in that
6  file. Okay. Have you -- first, have you seen this
7  document before? I guess the best way to -- have
8  you seen your personnel file prior to today?
9      A      Prior to today? Not since April 23rd
10 of '07, according to the date.
11     Q      Okay. Well, let me ask you this. Go
12 to Bates Number CO -- COA002109. Do you see that?
13 Do you see it at the top?
14     A      I see it.
15     Q      And you can take that paper clip off if
16 it makes it easy for you. This is a letter talking
17 about a truth verification exam that was given to
18 you in April of 2007 before you were hired. Do you
19 recall doing that truth verification exam? Do you
20 recall that?
21     A      I do. I do recall that.
22     Q      Do you recall that they had to give you
23 a couple of those exams because one of them became
24 -- it showed some evidence of not truthfulness and
25 they had to give you another one? Do you recall
```

Page 111

```
1  that?
2      A      I take -- I only recall taking one --
3  one exam.
4      Q      That's all you recall?
5      A      Just one CVSA.
6      Q      What do you recall the results of that
7  exam?
8      A      The results? The results, I do not
9  know.
10     Q      Is that the only time in your career
11 since 2007 until the time you were no longer with
12 APD, that you ever took a truth verification exam?
13     A      Yes.
14     Q      Were you ever asked to take one at any
15 time in 2007 until the time you stopped?
16     A      Not that I recall.
17     Q      Did you ever volunteer to give one at
18 any time during your tenure at APD?
19     A      Not that I recall.
20     Q      Did you understand that when you had an
21 OPS file opened up, that they had a right, a legal
22 right under your employment with APD, to give you a
23 truth verification exam? Did you understand that?
24     A      Yes.
25     Q      In fact, they would get you to sign off
```

Page 112

```
1  every time you had an OPS file, that you understood
2  that; correct?
3      A      Yes.
4      Q      You understood when you were
5  investigated, what -- not only with OPS, but anytime
6  you talked to another officer, you were required to
7  be truthful and honest?
8      A      Yes.
9      Q      Tell me -- you understand the
10 importance of being truthful as relates to your job
11 as a police officer?
12     A      Yes.
13     Q      Tell us why it's important.
14     A      It's important to be truthful because
15 under department's policy lying or falsification
16 will not be tolerated.
17     Q      Do you think honesty and truthfulness
18 is critical as relates to being an officer
19 specifically?
20     A      Yes.
21     Q      Why?
22     A      Because our actions and what we deem to
23 -- because of our actions rely on the facts, on true
24 facts, and we must be able to produce those true --
25 those true facts.
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

---

Page 113

1    Q    Do you agree with me that an officer
2    who is not truthful, was not honest should not be
3    employed with the police department?  Do you believe
4    that?
5    A    Yes.
6    Q    Explain why an officer who is not
7    truthful and honest, why that officer should not be
8    employed at the police department.
9    A    Because that is the company's -- that
10   is the department's policy.  That if you're not --
11   if you are not honest and truthful in your
12   statements, then you're not honest and truthful in
13   your actions.
14   Q    Isn't the foundation of justice, is
15   honesty and truth?
16   A    Yes.
17   Q    And if you are going to carry out your
18   Constitutional rights, I mean, you're not -- strike
19   that.  If you are going to carry out your oath of
20   office, if you are not truthful and honest, it is
21   impossible for you to do your job and to carry out
22   your oath of office; isn't that true?
23   A    Repeat the question, sir.
24   Q    Yes.  If truth is the foundation of
25   justice, isn't it true that if an officer is not

---

Page 114

1    truthful and not honest, they cannot carry out their
2    duties and responsibilities under the oath of
3    office?
4         MS. SELLERS:  Object to the form of the
5         question.
6         THE WITNESS:  Just repeat the question
7         one more time again, please.
8    BY MR. WILLIAMS:
9    Q    If you agree with me that the
10   foundation of justice is truth -- you agree with
11   that?
12   A    Yes.
13   Q    In order -- and your job as an officer
14   is to pursue justice for all citizens; correct?
15   A    Yes.
16   Q    In order to carry out your oath of
17   office and pursue justice, you agree with me that an
18   officer must be truthful and honest in order to
19   carry that duty out?
20   A    Yes.
21   Q    And if they're not truthful and honest
22   or found not to be truthful and honest, they should
23   not -- they should be terminated at the police
24   department; isn't that true?
25   A    Yes.

---

Page 115

1    Q    We're finished with Exhibit Number 3,
2    sir.  You can put that back up, and then go to
3    Number 4 if you have it over there.  You can put it
4    back in there so it doesn't get tangled up.
5    Number --
6    A    I was looking for Number 4.
7    Q    Oh, okay.  Cool.  And you could put the
8    one -- one, two, and three to the side so it's not
9    in your way.  You can put them on top of each other
10   so you have more room.  You got it?  Because I'm
11   about to give you a bunch.  That's all.  I was just
12   warning you.  You're about to get a bunch of them,
13   so I want you to have room.  All right.  Exhibit
14   Number 3, it's Bates Number --
15   A    You said Exhibit Number 3?
16   Q    I mean Exhibit Number 4.  I apologize.
17   I didn't mean to have you going through circles like
18   that.  Exhibit Number 4 --
19   A    Yes, sir.
20   Q    -- it is Bates stamped COA000195.  It's
21   the oath of office that you took in March of 2008;
22   am I correct?
23   A    Yes, sir.
24   Q    Is that your signature at the bottom?
25   A    Yes, sir.

---

Page 116

1    Q    Is that when you officially became an
2    officer with the APD?
3    A    Yes, sir.
4    Q    Okay.  Am I correct that Mr. Hall and
5    Miss Hall had a right to expect that you would carry
6    out and follow everything set forth on Exhibit 3
7    when you interacted with them in February of 2017?
8    A    Yes.
9    Q    Now, one of the things you said that --
10   that you would -- in the first paragraph, "I
11   solemnly swear that I'm duly qualified according to
12   the Constitution and laws of Georgia to perform the
13   duties imposed upon me as a police officer of the
14   city of Atlanta, Georgia; that I will to the best of
15   my ability discharge the duties thereof and
16   preserve, protect, defend the Constitution of the
17   United States and the constitution of the state of
18   Georgia."
19        Do you see that?
20   A    Yes.
21   Q    Do you agree that you had that
22   responsibility and duty in February of 2017?
23   A    Yes.
24   Q    In fact, you had that duty and
25   responsibility during your interaction with the

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 117

1  incident with the OC spray; correct?
2      A      Yes.
3      Q      The incident with the Carrs; correct?
4      A      Yes, sir.
5      Q      Every time you interacted with any
6  citizen, you were required to follow that paragraph;
7  am I correct?
8      A      Yes.
9      Q      The next paragraph says, "I swear that
10 I am not the holder of an office of trust under the
11 government of the United States or any other state
12 or any foreign state which I am prohibited from
13 holding the laws of state of Georgia.  Nor am I the
14 holder of any unaccounted-for public money due to
15 this state or any public subdivision or authority
16 thereof."
17         Do you see that?
18     A      Yes, sir.
19     Q      As part of any of your extra jobs did
20 you control or take money as part of that
21 establishment?  And what I mean by that, like take
22 money at the door, the register, anything like that?
23     A      No.
24     Q      Okay.  The third paragraph says, "I
25 further swear that I will enforce the criminal laws

Page 118

1  of the state of Georgia and the ordinances of the
2  city of Atlanta."
3         Do you see that?
4      A      Yes, sir.
5      Q      And that means you would enforce the
6  criminal laws of the state of Georgia, whether it is
7  a private citizen or if you saw a police officer
8  violate criminal law; isn't that correct?
9      A      Yes, sir.
10     Q      You don't treat them different, do you?
11     A      No.
12     Q      And if you yourself is committing a
13 crime, you need to enforce against yourself that you
14 have committed a crime and need to report that;
15 correct?
16     A      Yes.
17     Q      It says that I will abide by the rules
18 governing the Atlanta Police Department, adhere to
19 the law enforcement code of ethics, uphold the ethic
20 code of the city of Atlanta.
21         Do you see that?
22     A      Yes, sir.
23     Q      You were required to do that and comply
24 with that in your interactions with the Halls;
25 correct?

Page 119

1      A      Yes.
2      Q      And you was required to do that
3  regarding your interaction throughout with anybody
4  during your tenure at APD; isn't that true?
5      A      Yes.
6      Q      "In doing so, I will be mindful of the
7  trust that has been placed in me to improve the
8  quality of life and make every effort to live up to
9  that trust."
10         You understand that your oath of office
11 required you to improve the quality of life of Mr.
12 and Mrs. Hall?  You agree with that?
13         MS. SELLERS:  Object to the form of the
14     question.
15         THE WITNESS:  It would be to the Halls'
16     and anyone else that I'm in contact with.
17 BY MR. WILLIAMS:
18     Q      So not only the Halls; correct?
19     A      That is correct.
20     Q      Not only the Carrs; correct?
21     A      That is correct.
22     Q      Not only the arrestee of the OC spray?
23     A      That is correct.
24     Q      Anybody you interacted with?  You
25 agree?

Page 120

1      A      That is correct.
2      Q      Do you agree that you are not to --
3  that means you're not to intentionally intimidate
4  somebody; isn't that true?
5      A      Yes, sir.
6      Q      It says, "I will not prosecute the
7  innocent nor help to shield the guilty.  Nor will I
8  be influenced in the discharge of my duties by fear,
9  favor, affection, reward, or the hope thereof."
10         Do you see that?
11     A      Yes, sir.
12     Q      That means you're not to arrest
13 somebody if they are doing their Constitutional
14 rights?  Doesn't that -- doesn't that what that
15 means?
16     A      Yes, it does.
17     Q      Let's look at Exhibit Number 5.  This
18 is Bates numbered Hall FC013505 through Hall
19 FC013507.  This is the training report for you with
20 OP -- with APD.  That is your name on top; correct?
21     A      It is.
22     Q      Why is your name different than what we
23 know about today?
24     A      Because I've always gone by Mathieu.
25     Q      Okay.  What is your real name?

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 121

```
1      A        My real -- excuse me.
2      Q        Your legal name?
3      A        Elsh Mathieu Pierre Sterling Cadeau.
4      Q        Ellis?
5      A        Elsh.
6      Q        Elsh?
7      A        Yes.
8      Q        Cadeau -- Mathieu Cadeau is your middle
9   name?  Mathieu is your middle name; correct?
10     A        Yes.
11     Q        You're known by Mathieu Cadeau, but
12  your real full name is Elsh --
13     A        Yes.
14     Q        -- Mathieu Cadeau; correct?
15     A        Yes.
16     Q        Now, what day -- we know what day you
17  started as an officer.  That was in March 2008;
18  correct?
19     A        Yes.  In March 2008 is when I
20  graduated.
21     Q        When was you terminated?  Do you recall
22  when that was?
23     A        That would be May or -- I think May of
24  2017.
25     Q        Is it fair to say, then, you should not
```

Page 122

```
1   have -- you would not have -- participate with any
2   training with APD after May of 2017?
3      A        That is correct.
4      Q        Now, let's talk about some of the
5   training.  Did you receive training in when to use
6   deadly force?
7      A        Yes, sir.
8      Q        So tell us what your training was on
9   use of deadly force, when deadly force was
10  appropriate.
11     A        From what I can recall, deadly force is
12  appropriate when there is -- when serious bodily
13  harm is presented -- when serious bodily harm or
14  death is being presented, deadly force can be a tool
15  to myself or to another.  Deadly force can be used.
16     Q        Do you believe that you have to have a
17  reasonable apprehension of threat to you or someone
18  else before you can use deadly force?
19     A        Yes.
20     Q        And so if there is no reasonable threat
21  to you or someone else, you agree with me that
22  deadly force is not allowed?  Am I correct?
23     A        Repeat the question again, sir.
24     Q        You agree with me that if there is no
25  threat to yourself or to anyone else, that deadly
```

Page 123

```
1   force is not allowed?
2      A        Yes.
3      Q        In fact, it's a -- it's a
4   Constitutional violation to use deadly force when
5   there is no threat to you or someone else --
6      A        Yes.
7      Q        -- isn't that true?
8      A        Yes.
9      Q        You agree with me that it is critical
10  for an officer like yourself to receive adequate
11  training on when to use force or when to use deadly
12  force?  You agree with that?
13     A        Yes.
14     Q        Explain why that is important.
15     A        I believe it is important in the
16  day-to-day interactions that you have with the
17  community, that you are able to recognize the
18  threat, especially -- especially a threat in that
19  magnitude where deadly force -- where deadly force
20  may be used.
21     Q        You agree with me that you need to have
22  adequate training to even recognize whether
23  something is a reasonable threat in the first place?
24     A        Yes.
25     Q        Because you're making decisions what
```

Page 124

```
1   you perceive to be a threat, and those decisions are
2   determining whether to use deadly force or just
3   regular use of force; correct?
4      A        Yes.
5      Q        You agree with me when using force you
6   can't create the threat?  You can't put yourself in
7   a situation where you make yourself be acceptable to
8   a threat?  Do you agree with me?
9      A        Yes.
10     Q        Did you receive any specific training
11  on shooting into moving vehicles or to vehicles?
12     A        Yes.
13     Q        When did you receive that training?
14     A        I can't recall the year.
15     Q        What were you told regarding when you
16  can -- were you told you can shoot into moving
17  vehicles?
18     A        What I recall is a scenario-based
19  incident.
20     Q        So tell me what you -- when can you use
21  deadly -- what was your training on when you can use
22  deadly force regarding a moving vehicle?
23     A        In regards to a moving vehicle, if
24  there is a belief, a strong belief that the vehicle
25  is coming towards you or another to cause bodily
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                      January 25, 2021

Page 125

1  harm or death, then deadly force can be used.
2      Q        This happened in 2017, the incident
3  with Mr. Hall?
4      A        Yes.
5      Q        When was you provided that training you
6  just said?  When were you provided that?
7      A        I recall having in-service that year,
8  earlier that year.
9      Q        Before the incident?
10     A        That is correct.
11     Q        On Exhibit Number -- I think it's 5 --
12 it says you got some deescalation technique training
13 and firearm training, February 23rd, 2017.  Do you
14 see that?
15     A        Yes, sir.
16     Q        Do you believe in that training, that
17 you were given the training you just recited to us,
18 about when to use force regarding moving vehicles?
19     A        During that -- within that time I
20 believe so.
21     Q        Okay.  And your -- you recall who gave
22 you that instruction?
23     A        It would be a combination of
24 instructors.
25     Q        Do you remember any of their names?

Page 126

1      A        No, I do not recall their names.
2      Q        And did they tell you that it's okay to
3  use -- to shoot into a moving vehicle if you believe
4  that the vehicle is a threat to you or someone else?
5      A        Yes.
6      Q        When is a vehicle, a moving vehicle, a
7  threat to you or someone else?  Explain that to me.
8  Explain the training you got on that.  When does
9  that happen?
10     A        When the vehicle is coming into -- into
11 the direction of myself or into the direction of
12 others, that would cause bodily harm or death.
13     Q        Other than the one in February did you
14 receive any other training on shooting into moving
15 vehicles?
16     A        Not that I recall.
17     Q        There is some standard operating
18 procedure -- policies and procedures of APD.  Were
19 you familiar with those?
20     A        From what I can recall, yes, there are.
21     Q        Would you get a policy manual, or would
22 they be available to you at the station or online?
23 How did you know what you could and could not do
24 regarding work rules and policies and procedures?
25     A        You would either -- you can either get

Page 127

1  it -- you would go to the supervisor and either get
2  the book, or you can retrieve it online.
3      Q        How did you go about making sure that
4  you were up to date on what the policy and
5  procedures were and what you needed to follow?
6      A        Whenever I would -- of course during
7  in-service and then also if I had any questions in
8  that matter, I would then look up that standard
9  operation and procedure.
10     Q        Did you ever just get a policy manual
11 and go through each policy yourself?
12     A        During the academy, yes.
13     Q        But after the academy you just would go
14 back and go online when you wanted to update
15 yourself and be familiar with something?
16     A        Yes.  When needed.
17     Q        Was training on shooting into moving
18 vehicles done by a computer simulation?
19     A        It was done by a video simulation, if
20 that answers your question.
21     Q        Video simulation?
22     A        Yes.
23     Q        Tell -- explain that simulation to me.
24     A        You would go to a room.  You'd be given
25 -- given information to recall -- that you are in

Page 128

1  response to, and then the video would play.
2      Q        And then what would you do while the
3  video is playing?
4      A        Pay attention to what's going on.  If
5  there is any -- it was a -- an interactive video
6  that would play.  So meaning that what I saw, I
7  would then either speak according to the -- speak
8  accordingly or take -- take the necessary and
9  appropriate actions from what I observed from this
10 video.
11     Q        Were you tested and scored on that --
12 that training video?
13     A        I was tested.  I'm not sure of the
14 scoring.
15     Q        Now, you agree with me that to the
16 extent that the SEOP policies applied to you, you
17 were required to follow them?
18     A        Yes, sir.
19     Q        And you agree with me that you should
20 be held -- you and all the officers at APD should be
21 held accountable when you do not follow policies and
22 procedures?
23     A        Yes.
24     Q        You agree with me that if you're not --
25 if an officer is not held accountable when they

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 129

1    violate a policy and procedure, that officer would
2    get the belief that they can continue to violate
3    policies?  You agree with that?
4         A    Answer that -- I mean, repeat the
5    question again, please.
6         Q    You have kids; right?
7         A    Yes.
8         Q    And if you keep letting them do
9    something that you know is wrong, they starting to
10   think that that's okay?
11        A    I understand, yes.
12        Q    Do you understand that concept?
13        A    Yes.
14        Q    So if you let officers who violate
15   policy and procedures not be disciplined or
16   retrained, you understand and agree with me, just
17   like with your kids, that those same officers will
18   believe that their actions are okay or acceptable to
19   their supervisor and managers?  You agree with that?
20        A    Yes.
21             MS. SELLERS:  Object to the form.
22   BY MR. WILLIAMS:
23        Q    You agree with me that if an officer is
24   not held accountable to policies in the trainings
25   that they are given, it will create a custom and

Page 130

1    practice within the department where officers think
2    that those type of actions are okay?  Do you agree
3    with that?
4         A    I can't answer that.
5         Q    All right.  Let's go through a couple
6    of policies here.  Can I ask you a question?  Is it
7    fair to say that you were not -- you did not receive
8    any training in 2018 from APD?  Am I correct?
9         A    Yes, you are.
10        Q    So if there is a training document that
11   says you got firearm training, use of force
12   training, and fostering positive community relation
13   training in 2018, that report is incorrect; correct?
14        A    That would be.
15        Q    And if you got -- you were terminated
16   in May of 2017; correct?
17        A    I believe that is around about.
18        Q    So if there is a training document that
19   says you took due regard, deescalation techniques,
20   firearms training, and -- well, due regard and --
21   no, strike that.  If there is a document that says
22   you had due regard training in November of 2017,
23   that would be inaccurate as well?
24             MS. SELLERS:  Object to the form.
25   BY MR. WILLIAMS:

Page 131

1         Q    Am I correct?
2         A    That would be.
3              (Exhibit Number P-6 was marked for
4    identification.)
5    BY MR. WILLIAMS:
6         Q    Let's show you -- I'm going to show you
7    what's been marked as Exhibit Number 6.  Exhibit
8    Number 5 was the other training history one I gave
9    you; correct?  Exhibit Number 6 is Bates numbered 0
10   -- I mean COA000609 through COA001612.  Do you see
11   that?  That is Exhibit 6.
12        A    Yes, sir.
13        Q    Okay.  This was the one actually
14   produced by the city of Atlanta in this case.  Do
15   you see that the one in Exhibit 6 has training
16   history for you from March 22, 2018?
17        A    Yes, sir.
18        Q    And March 7, 2018?
19        A    I do.
20        Q    And February 10, 2018?
21        A    I do.
22        Q    That's impossible; right?
23        A    That would be.
24        Q    Do you see down, it has you had --
25   November 8th, 2017, you had due regard training?

Page 132

1         A    Yes, sir.
2         Q    That is also impossible; correct?
3         A    Yes, sir.
4         Q    So Exhibit 6 document is inaccurate,
5    isn't it?
6         A    It would be.
7         Q    I'm going to show you what's been
8    marked as Exhibit Number 7.  Okay?
9              (Exhibit Number P-7 was marked for
10   identification.)
11             MR. WILLIAMS:  Tiffany, I'll give you a
12   copy of this because I kind of took some of
13   these out of order.
14             MS. SELLERS:  Thank you.
15             MR. WILLIAMS:  The other ones, they're
16   in the -- the method that they were produced
17   to us.  Okay?
18             MS. SELLERS:  Okay.
19             MR. WILLIAMS:  But I kind of took these
20   out of -- some of the things, and I wanted
21   you to have exactly the way they are in the
22   exhibit.  Okay?
23             MS. SELLERS:  Okay.
24             MR. WILLIAMS:  All right.
25   BY MR. WILLIAMS:

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 133

1    Q    Mr. Cadeau, Exhibit Number 7, I'm going
2  to tell you, are things I got out of your training
3  cadet file, academy file that was produced to you by
4  the district attorney's office.  It's Hall FC013236
5  through Hall FC013249.  Do you see that?
6    A    Yes, sir.
7    Q    Now, back in 2015 -- '08, you were
8  still a cadet; correct?
9    A    Say that.
10   Q    You were still a cadet?  You was not an
11 officer yet?
12   A    Can you repeat the date?
13   Q    Yes.  February 15, 2008.  That is the
14 first page of Exhibit --
15   A    Yes, sir.
16   Q    -- Number 8.
17   A    I was still an officer.
18   Q    You see it says you had a rule
19 violation of 2C?
20   A    Yes, sir.
21   Q    Do you recall what that rule violation
22 was?  What is 2C?
23   A    No, I do not.
24   Q    Okay.  Okay.  Maybe we'll ask them
25 that.  Okay.  Go to the next page of Exhibit Number

Page 134

1  7.  Staff member SPO Adams, do you recall who -- do
2  you recall that person?
3    A    Yes, sir.
4    Q    It says you arrived late to roll call
5  due to traffic accident on I-285 from Exit 51,
6  Bouldercrest.  Do you see that?
7    A    Yes, sir.
8    Q    Now, is that your handwriting?
9    A    It is.
10   Q    So you were claiming that you were late
11 because of traffic; correct?
12   A    Yes, sir.
13   Q    Okay.  Did you have a problem of being
14 late while you was a cadet?  Did you have multiple
15 incidents of being late?
16   A    No.
17   Q    It was never brought to you as a
18 concern?
19   A    I was reminded.
20   Q    Was it ever discussed that you had --
21 that it was a concern that you need to get
22 corrected?
23   A    Yes, it was.
24   Q    You also had issue of being late while
25 you was an officer, correct, during your tenure?

Page 135

1    A    I'm sorry.  Repeat the question.
2    Q    Didn't you also have issue with being
3  late when you became a full officer during your
4  tenure?  Weren't you -- didn't you have multiple
5  incidents where you were late to roll call?
6    A    Yes.
7    Q    Were you ever reprimanded for that?
8    A    Yes.
9    Q    Let's go to the next page of Exhibit
10 Number 7.  This one is on 1/10/08.  It's another --
11 "Recruit Cadeau arrived late to the Atlanta Police
12 Academy.  It was caused by another major accident."
13   Do you see that?
14   A    Yes, sir.
15   Q    The next page is an incident --
16 incident memorandum from your academy of 1/22/08.
17 Said you did not have on proper attire for the
18 morning remedial physical training.
19   Do you see that?
20   A    Yes, sir.
21   Q    Do you recall that incident?  You may
22 not.
23   A    I do.  I do.  Reading the statement,
24 that has been recalled to memory.
25   Q    Let's go to the next page, Bates Number

Page 136

1  Hall FC013240.  This is an incident of rule
2  violation 2C as well.  It says you failed to have
3  equipment and you was late for morning call again.
4    Do you see that?
5    A    Yes, sir.
6    Q    You have multiple late calls and
7  violations in the three months leading up to the
8  time when you started off as an officer; correct?
9    A    According to what you're saying, yes.
10   Q    You don't dispute that, though, do you?
11   A    No.
12   Q    Now let's look at what Officer C. Jones
13 says about you on the next page, which is Hall
14 FC0013241.  It says, "Recruit Cadeau has taken an
15 unfavorable position within his classmates, acting
16 as a class coordinator supervisor, and this has not
17 been received happily, neither by his classmates nor
18 by myself."
19   Do you recall this incident?
20   A    Yes, sir.
21   Q    Who is Officer C. Jones?
22   A    She was our class coordinator.
23   Q    She's your superior for the purposes of
24 being a recruit?
25   A    Yes, sir.

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 137

1   Q      Were you ever promoted to be class
2   coordinator supervisor?
3        A      I would say that during the course of
4   the academy, we all have taken the opportunity of
5   taking the role of, I would say, class supervisor.
6   We all each took -- took a turn taking that role.
7        Q      Were you formally appointed class
8   supervisor, though?
9        A      Not formally appointed, no.
10       Q      It says, "One such example was during
11  this time his class sergeant went so far as to
12  instruct a recruit to stay home due to heavy traffic
13  rather than attend the graduation ceremony for class
14  Number 200, which said recruit volunteered to do."
15              Do you see that?
16       A      Yes.
17       Q      Were you -- were you counseled on this
18  incident and advised that your actions were
19  undesirable, unacceptable?
20       A      Yes.
21       Q      You was removed as the class sergeant
22  for that period?
23       A      Yes.
24       Q      It also says, "It is recommended -- it
25  is my recommendation that Recruit Mathieu Cadeau be

Page 138

1   observed during his training, as he pushes the
2   boundary between recruit and sworn officer and at
3   times fails to remember that he is a recruit in
4   training."
5              Do you see that?
6        A      Yes, I do.
7        Q      Let's go to the next page.  On 9/13 of
8   '07 you got into an accident; correct?
9        A      Yes.
10       Q      Tell us about what happened with that.
11       A      This was after a -- after a training --
12  after a training event, where I was returning one of
13  the vehicles that we were using for that training,
14  back to the -- back to the parking lot where it
15  needed to be parked, and while -- while parking the
16  vehicle I rubbed against another parked vehicle.  I
17  reported the incident to Sergeant Barr.  To, excuse
18  me, SPO Barr.  Reported the incident of what I have
19  done and submitted this -- this incident.
20       Q      Were you disciplined at all?
21       A      Yes.
22       Q      Let's go to the next page.  Actually,
23  no.  The page after that, which is Hall FC013246.
24  It says, "Recruit" --
25       A      1646?

Page 139

1        Q      13246, yes.
2        A      Okay.
3        Q      I'm sorry.  Officer Jones against to
4   Sergeant Pickard.
5        A      That's pronounced Pickard.
6        Q      Pickard.  Who was that?
7        A      He was the sergeant over our class and
8   over the -- the recruit academy.
9        Q      Officer Jones is saying to Pickard that
10  at the last sentence of the second paragraph on this
11  page, "Recruit Cadeau failed to take our advice and
12  continue to run in the back.  It is my
13  recommendation that Recruit Mathieu Cadeau be
14  dismissed from training from class 202 due to his
15  failure of the physical training examination Number
16  4."
17              Do you see that?
18       A      Yes, sir.
19       Q      What was that about?
20       A      During -- during the time of the
21  academy we were required to pass the four agility
22  tests.  That is pretty much -- is towards the end of
23  our -- of our -- of the academy class.  At that time
24  you -- we had to obtain a certain time to complete
25  the mile-and-a-half run along with the agility test.

Page 140

1        Q      Did you -- let's go to next page, Hall
2   FC013247.  This is Sergeant Pickard writing a memo
3   to Lieutenant Hudson Baker.  Do you know who
4   Lieutenant Hudson Baker is?
5        A      I do not recall.
6        Q      Did you ever see this letter?
7        A      No.
8        Q      It says, "By his actions" on the second
9   paragraph --
10       A      Where are you?
11       Q      -- third line, second paragraph.  "He
12  attempted to interject a place for scrutiny, which
13  is otherwise a test of integrity.  On one occasion
14  his conduct was, in my opinion, borderline
15  cheating."
16              Do you see that?
17       A      Yes.
18       Q      Do you agree with his assessment of
19  what happened regarding that physical fitness
20  training exam?
21       A      No, I did not.
22       Q      It says, "This allowed the slowest
23  runners to get several seconds ahead before the
24  clock began.  His actions demonstrated an effort to
25  manipulate the system."

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 141

1          Do you see that?
2     A     Oh, I see that now.  Yes, I do see
3 that.
4     Q     Then it goes down on the third
5 paragraph.  It says, "As I reviewed this -- his
6 file, I found an additional memo illustrating his
7 poor decision making."
8          So within a few months before you even
9 hired, a sergeant is noting your poor decision
10 making while you was a cadet.  Do you see that?
11          MS. SELLERS:  Object to the form of the
12      question.
13          MR. WILLIAMS:  Huh?
14          MS. SELLERS:  I said, object to the
15      form of the question.
16          MR. WILLIAMS:  Okay.  I'm sorry.  I
17      thought you was --
18          THE WITNESS:  I do see the state -- I
19      do see the -- the sentence that you are
20      referencing, sir.
21 BY MR. WILLIAMS:
22     Q     Do you dispute that Sergeant Pickard is
23 discussing in a memo your poor decision making while
24 you was a cadet?
25          MS. SELLERS:  Same objection.

Page 142

1 BY MR. WILLIAMS:
2     Q     Do you dispute that?
3     A     I would dispute Sergeant Pickard's
4 reference in that statement.
5     Q     Okay.  You would dispute it, but you do
6 agree he said it?
7     A     I have no choice to what's being
8 presented to me.
9     Q     Did you ever have a conversation with
10 him or anybody about poor decision making while you
11 was a cadet?
12     A     Not that I recall.
13     Q     The last paragraph says, the second
14 sentence, "Therefore, I think that absent dismissal
15 he should be recycled to complete the program again
16 and understand that his manipulative actions and
17 failure to follow instructions have consequences.
18 The consequences attached to his conduct should be
19 corrected with additional training.
20          This additional training will give us a
21 platform to evaluate that his poor -- that his poor
22 decision making has improved.  As we all know, poor
23 decision making as an officer affects the
24 department, the city of Atlanta, the citizens of
25 Atlanta, and the law enforcement world nationwide."

Page 143

1          Do you see that?
2     A     Yes.  I do see -- I do see the
3 paragraph you're referencing.
4     Q     Were you ever dismissed from the
5 program?
6     A     From the academy?  No.
7     Q     Were you ever required to recycle to
8 complete the program?
9     A     Yes.
10     Q     When were you required to do that?
11     A     That would have been at the time of the
12 fourth of agility test.
13     Q     So explain what you -- what you meant
14 by recycle.  What did you have to redo?
15     A     I had repeat from the -- I had to
16 repeat the fourth agility test and then continue on
17 forward.
18     Q     Did that push you back from your class
19 that you entered in with?
20     A     Yes, it did.
21     Q     Do you agree with this sentence?  That
22 poor decision making as an officer affects the
23 department, the city of Atlanta, the citizens of
24 Atlanta, and the law enforcement world nationwide.
25          Do you agree with that?

Page 144

1     A     Yes.
2     Q     Do you think that you had poor decision
3 making when you dealt with the Carrs?
4     A     Not at the time, no.
5     Q     What about now?
6     A     After -- after receiving the counseling
7 discussion, I understand that now.
8     Q     Okay.  So when you talked to the people
9 at the city of Atlanta law department, you
10 understood it at that moment?
11          MS. SELLERS:  Object to the form of the
12      question.
13          THE WITNESS:  Afterwards.  After the
14      discussion.
15 BY MR. WILLIAMS:
16     Q     I'm trying to make sure we're on the
17 same page.  What discussion?
18     A     After the discussion with the city --
19 with the -- with the law department.
20     Q     After the case was settled; correct?
21     A     I would say after speaking with them.
22 I do not know when the case was settled.
23     Q     Okay.  But as a consequence of that
24 poor decision, the city of Atlanta and the city of
25 Atlanta law -- I mean City of Atlanta Police

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 145

1 Department had to pay money to the Carrs; correct?
2          MS. SELLERS:  Object to the form of the
3     question.
4          THE WITNESS:  I can't answer --
5          MS. SELLERS:  Facts not in evidence.
6          THE WITNESS:  -- that question.
7 BY MR. WILLIAMS:
8     Q       You can't?  You don't know if they paid
9 money to the Carrs?
10    A     I believe you asked that earlier.
11    Q       Yes.  I asked you how much, but didn't
12 you say they had a settlement?
13    A     I know that it was settled.  I don't
14 know to what extent of how it was settled.
15    Q       Okay.  So you don't know that they got
16 money?
17    A     No, I did not.  You just now informed
18 me, but I didn't know.
19    Q       Do you think you did poor decision
20 making as relates to your interaction with the Halls
21 in this case?
22    A     No.
23    Q       Was your actions of shooting into the
24 Halls' vehicle consistent with the training you
25 received from the Atlanta Police Department?

Page 146

1    A       Yes.
2    Q       And was it consistent with the written
3 policies of the APD?
4          MS. SELLERS:  Object to the form.
5          THE WITNESS:  Yes.
6 BY MR. WILLIAMS:
7    Q       Was it consistent -- your actions in
8 the shooting into the Halls' vehicle, consistent
9 with the customs and practices that you had learned at
10 the City of Atlanta Police Department?
11          MS. SELLERS:  Same objection.
12          THE WITNESS:  Yes.
13 BY MR. WILLIAMS:
14    Q       Do you believe your actions prior to
15 the shooting into Mr. Hall's vehicle was consistent
16 with the training you received from APD?
17          MS. SELLERS:  Object to the form of the
18     question.
19          THE WITNESS:  Repeat your question
20     again, please.
21 BY MR. WILLIAMS:
22    Q       Yes.  My question is a little bit
23 different.  Was your actions right before the
24 shooting into the Halls' vehicle -- was your actions
25 before that happened, was that consistent with your

Page 147

1 training at APD?
2    A     Yes.
3    Q       Was that consistent with the written
4 policies and procedures of APD?
5    A     Yes.
6    Q       Do you think you used poor judgment and
7 decision making in the incident involving the OC
8 spray with the gentleman that was arrested, that was
9 the arrestee?
10          MS. SELLERS:  Object to the form of the
11     question.
12          THE WITNESS:  I believe so.
13 BY MR. WILLIAMS:
14    Q       Even today as we sit here?
15    A     Yes.
16    Q       You don't believe --
17    A     No.  Go ahead, sir.
18    Q       No.  Go ahead and finish.
19    A     No.  Go ahead.
20    Q       Did you have --
21    A     I was going to say, after I've been --
22 after having the discussion with Deputy Chief
23 Spillane, yes, I do see that it was inconsistent.
24    Q       Okay.  So let me make sure.  At the
25 time you did it, you believed that it was consistent

Page 148

1 with your policies -- well, let me ask you this way.
2 When you -- your actions in OC spraying the
3 arrestee, you believed at that time they were
4 consistent with your training and the policies at
5 APD; am I correct?
6          MS. SELLERS:  Object to the form of the
7     question.
8          THE WITNESS:  Repeat the question, sir.
9 BY MR. WILLIAMS:
10    Q       Yeah.  When you pepper sprayed, OC
11 sprayed the gentleman, the arrestee, you believed
12 that your actions at that time were consistent with
13 your training from APD; isn't that true?
14    A     Yes.
15    Q       And you believe they were consistent
16 with the policies and procedures of APD?
17    A     Yes.
18    Q       Do you believe that your termination
19 from APD was unwarranted?
20          MS. SELLERS:  Object to the form of the
21     question.
22 BY MR. WILLIAMS:
23    Q       Why?
24    A     There was a -- there was a threat to

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 149

1  myself, Officer Evans -- and Officer Evans at that
2  time.
3      Q      And what was the threat?
4      A      I saw that --
5      Q      I'm sorry.  I apologize.  I thought you
6  were finished.  Go ahead and finish.
7      A      I saw that in that and also continuing
8  that time, I also saw an immediate threat to the
9  pedestrians, Captain Carter, Officer Evans, and
10  myself.
11     Q      Do you stand by the statements you made
12  in the OPS file following the shooting of the Halls
13  incident?
14            MS. SELLERS:  Object to the form of the
15        question.
16            THE WITNESS:  To what I can recall,
17        yes.
18  BY MR. WILLIAMS:
19     Q      Did you -- were you honest and truthful
20  when you talked to the investigators and your
21  superiors after the shooting of Hall, of what
22  happened?
23     A      Yes.
24     Q      Were you honest and truthful in why you
25  -- what the threats were and what you saw and why

Page 150

1  you made the decision?
2      A      Yes.
3      Q      What about when you were involved in
4  the criminal proceedings?  Were you honest and
5  truthful then?
6      A      Yes.
7      Q      Why do you believe the APD made the
8  decision to terminate you, then, if you don't think
9  it was warranted?
10     A      Repeat the question, sir.
11     Q      Why were you fired, then?  Why did APD
12  fire you?  Why do you believe they fired you if you
13  believe that the termination was unwarranted?
14            MS. SELLERS:  Object to the form of the
15        question.
16            THE WITNESS:  I cannot give you a clear
17        answer onto that.
18  BY MR. WILLIAMS:
19     Q      What were you told the reason you were
20  fired?  How about --
21     A      That I used excessive force.
22     Q      And you don't believe you used
23  excessive force?
24     A      I do not believe so.
25     Q      What is your definition -- or what is

Page 151

1  your understanding of the definition of "excessive
2  force"?
3      A      Of going beyond what was being
4  presented.  That is to -- that is to my
5  understanding of excessive force.
6      Q      I'm confused.  Say that again.
7      A      So taking a scenario that you -- a
8  scenario question you gave, if there is no threat
9  being presented, can force be used?  So if force is
10  used and there is no force presented, there is no
11  threat or force presented, then that is excessive.
12     Q      You believe that your termination from
13  APD was not justified based on the training you
14  received?
15            MS. SELLERS:  Object to the form of the
16        question.
17            THE WITNESS:  Repeat the question
18        again, sir.
19  BY MR. WILLIAMS:
20     Q      Do you believe that your termination
21  from APD was not justified based on the training you
22  were provided?
23     A      No, I do not believe so.
24     Q      So you agree with my statement?
25     A      What is your statement?

Page 152

1      Q      That you believe that your termination
2  from APD was not justified based on the training you
3  received?  Do you agree with that statement?
4      A      Not just on that, no.
5      Q      Do you believe it was justified --
6  strike that.  Do you believe it was not justified in
7  light of the training you received?  How about that?
8            MS. SELLERS:  Object to the form of the
9        question.
10            THE WITNESS:  I'm sorry, sir.  I'm not
11        clear on your question.
12  BY MR. WILLIAMS:
13     Q      Okay.  Let me ask it again.  Do you
14  believe that your termination from APD was not
15  justified and should not have happened since you
16  followed the training you received at APD?
17            MS. SELLERS:  Object to the form.
18            THE WITNESS:  Yes.
19            MR. WILLIAMS:  Did I give you Exhibit
20        Number 8?  What did I just give you, Tiffany,
21        if you don't mind?
22            MS. SELLERS:  Twenty-seven.
23            THE WITNESS:  Seven.
24            MR. WILLIAMS:  Exhibit 7?
25            MS. SELLERS:  Mine is 27.

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 153

1          MR. WILLIAMS:  It was Exhibit 7.  I
2  just didn't give you -- the sticker has seven
3  on it.
4          MS. SELLERS:  Okay.
5          MR. WILLIAMS:  It's Exhibit 7.  I'm
6  sorry.
7          MS. SELLERS:  No problem.
8          (Exhibit Number P-8 was marked for
9  identification.)
10 BY MR. WILLIAMS:
11     Q     I show you what's been marked as
12 Exhibit Number 8 to your deposition.  This is the
13 APD work rules policy that was in place prior to the
14 time of your incident with the Halls.  My question
15 to you is, do you recognize SOP 2010?  Have you seen
16 this prior to today?
17     A     I've seen this during my employment.
18     Q     You have?
19     A     Yes, sir.
20     Q     You agree that you were required to
21 follow Exhibit Number 8 in your interactions with
22 the citizens, private citizens, during your tenure
23 at APD?
24     A     Yes.
25     Q     On page 2 of Exhibit Number 8 it says,

Page 154

1  "All violations of established work rules shall be
2  investigated fairly, uniformly, and equitably."
3          Do you see that?
4     A     Yes, sir.
5     Q     Do you agree with that?
6     A     Yes.
7     Q     At the bottom of page 2 it says, "All
8  employees shall respond in appropriate manner to all
9  situations by being considerate of the rights,
10 feelings, and interests of all persons."
11         Do you see that?
12    A     Yes.
13    Q     Do you agree with that?
14    A     Yes.
15    Q     Do you agree you were required to be
16 considerate of the rights, feelings, and interests
17 of all persons, including Mr. Hall?
18    A     Yes.
19    Q     Including the Carrs?
20    A     Yes.
21    Q     Including the arrestee?
22    A     Yes.
23    Q     Do you think it is being considerate of
24 people's rights, feelings, and interests if you
25 intentionally get up to intimidate them?  Do you

Page 155

1  think that is in compliance with this?
2     A     No, it would not.
3     Q     By getting up at your desk and going
4  over to the arrestee, you agree with me that you
5  violated rule APD.SOP 2010?
6     A     Could you repeat that question again?
7     Q     Yes.
8     A     Two zero --
9     Q     By getting out of your desk --
10    A     Yes.  I'm sorry.
11    Q     -- as you admitted and testified, to
12 intimidate the arrestee who was handcuffed, do you
13 agree with me that you were not being considerate of
14 that person's rights, feelings, and interests?
15    A     Yes.
16    Q     And thus you were violating rule 4.1.1
17 of this policy?
18    A     Yes.
19    Q     You were never disciplined for that,
20 were you?  Well, strike that.  Were you ever
21 disciplined for you getting up and intimidating him?
22    A     I was -- I was disciplined on that
23 incident, on that entire incident.
24    Q     And you were disciplined for the OC
25 spray; right?

Page 156

1     A     That would be as -- that is part of the
2  incident, so I was disciplined on the entire
3  incident.
4     Q     And you agree with that discipline?
5  You deserved that one?
6     A     Yes.
7     Q     By pepper spraying a handcuffed man, do
8  you believe you violated his Constitutional rights?
9          MS. SELLERS:  Object to the form.
10         THE WITNESS:  No, I did not.
11 BY MR. WILLIAMS:
12    Q     Why not?
13    A     Because the arrestee was a threat to me
14 at the time of incident or while -- the reason why I
15 deployed my OC.
16    Q     It says, "Employees shall be truthful
17 in their written and spoken words at all times."
18         Do you see that?
19    A     Where are you?
20    Q     I'm on page 3.  I'm sorry.  4.1.3.
21    A     Yes.
22    Q     You understood that prior to the --
23 the -- you understood that truthfulness throughout
24 your tenure at APD?
25    A     Yes.

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 157

1    Q        You understood that you could be fired,
2    terminated if you were not truthful?
3    A        Yes.
4    Q        Based on your earlier testimony,
5    truthfulness is important for an officer because of
6    the pursuit of justice?
7    A        Yes.
8    Q        You agree with me that if you are not
9    truthful, you should not be -- you should be
10   terminated at APD?  Do you agree with that?
11   A        Yes.
12   Q        What does being truthful mean to you?
13   Define that for us.
14   A        You're being -- being truthful is being
15   honest.  No deceit, no covering.  You're just honest
16   to the facts.
17   Q        You agree with me also you should not
18   do anything that brings discredit upon the
19   department; correct?
20   A        That is correct.
21   Q        You must also show up to court;
22   correct?
23   A        Yes.
24   Q        You must uphold the Constitution of the
25   United States and Georgia and obey all federal,

Page 158

1    state, and local laws?
2    A        Yes.
3    Q        So one thing you can't do is you can't
4    commit an assault on a private citizen, can you?
5    A        No.
6    Q        And it would be an assault if you are
7    committing and using physical force that is not
8    justified; am I correct?
9    A        Yes.
10            MS. SELLERS:  Have a break?
11            MR. WILLIAMS:  Say again.
12            MS. SELLERS:  Take a break?  Is that
13       okay?
14            MR. WILLIAMS:  Can I just finish this?
15       Give me two minutes, and I'll be out of here
16       on this one.
17            MS. SELLERS:  I'm not being -- you
18       still got the time.
19   BY MR. WILLIAMS:
20   Q        Go to page 8 of Exhibit Number 8,
21   4.216.  It talks about sleeping on duty.  Do you see
22   that?
23   A        Yes, sir.
24   Q        It says, "Employees shall not sleep or
25   doze during the time they're on duty or they are

Page 159

1    responsible for reporting to work physically able to
2    appropriately complete tour of duty."
3            Number 2 says, "Employees unable to
4    remain awake and complete the tour of duty shall
5    report to their supervisor, who shall take
6    appropriate action."
7            So this says you can't sleep on duty;
8    correct?
9    A        Yes.
10   Q        That is a violation of a work rule?
11   A        Yes.
12   Q        It's also unsafe for yourself as well
13   as the people you're to protect and serve; correct?
14   A        Yes.
15   Q        It also says if you feel like you can't
16   stay awake, you were to report it to your
17   supervisor; correct?
18   A        Yes.
19   Q        So if you ever are asleep on the job
20   and getting tired, you need to not only report it to
21   your supervisor, but if it happens, you need to get
22   off shift; correct?
23   A        Yes.
24   Q        And if someone asked you if you have
25   been asleep, you can't lie to them because you would

Page 160

1    be in violation of the truthful one if you lied to
2    them about it; correct?
3    A        Yes.
4    Q        It also says you must be punctual under
5    four, two, 18; correct?
6    A        Yes.
7    Q        And you must submit all reports
8    promptly, correctly, and completely; correct?
9    A        Yes.
10   Q        And then let's go to page 12, 4.2.5.
11   A        And what page is that, sir?
12   Q        Page 12.  Actually, let's take a break
13   right now, and we'll come back to that.
14            MR. WILLIAMS:  Can we just do like five
15       minutes?
16            MS. SELLERS:  Yes.
17            THE VIDEOGRAPHER:  Going off video
18       record.  The time is 4:21 [sic].
19            (Discussion ensued off the record.)
20            THE VIDEOGRAPHER:  It's 5:21.  We can
21       go off the record.
22            (A recess was taken.)
23            THE VIDEOGRAPHER:  The time is 5:32.
24       We're back on the record.
25   BY MR. WILLIAMS:

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 161

1    Q      Mr. Cadeau, let's go to page 12 of
2  Plaintiffs' Exhibit Number 8.  It is rule 4.2.50.
3  It says, "Employees are expressly prohibited from
4  the unnecessary and unreasonable use of force
5  against any person or property."
6           Do you understand what unreasonable
7  means?
8    A      Yes, sir.
9    Q      Explain to us -- tell us what your
10  understanding of unreasonable.
11    A      What is not in -- what doesn't -- what
12  doesn't coincide, what doesn't match, what is not
13  agreeable would be unreasonable.
14    Q      If you look down below, it says,
15  "Reasonableness of particular use of force must be
16  judged from the perspective of reasonable officer,
17  and this calculus must embody an allowance for the
18  fact that police officer often forced to make split
19  decisions about" --
20           (Court Reporter clarification.)
21           MR. WILLIAMS:  I'm sorry.  I'm sorry.
22      You ready?
23           THE REPORTER:  Yes.
24  BY MR. WILLIAMS:
25    Q      "And this calculus must embody an

Page 162

1  allowance for the fact that police officers are
2  often forced to make split-second decisions the
3  amount of force necessary in a particular
4  situation."
5           Do you understand reasonableness means
6  what other officers in your same or similar
7  circumstances with the situation would do?  Do you
8  understand that?
9    A      I understand.
10    Q      What does "unnecessary" mean to you?
11    A      Not needed.
12    Q      Do you agree with me that you are not
13  allowed to use force that is not needed?
14    A      Yes.
15    Q      You agree with me in the incident with
16  the OC spray with the arrestee, you could have just
17  jumped -- lunged back and walked away without using
18  OC spray?  Isn't that true?
19    A      I could have.
20    Q      That would have been a reasonable thing
21  to do as well; correct?
22    A      It may.
23    Q      Number 2 under 4.2.5 says, "Employees
24  shall only use force which is reasonable and
25  necessary to effect an arrest, prevent an escape,

Page 163

1  necessary restrict the movement of a prisoner,
2  defend him and herself or another form physical
3  assault to accomplish other lawful objective."
4           When you used force on the Carrs were
5  you trying to effect an arrest?
6    A      I'm sorry.
7    Q      When you use the -- the force on the
8  Carrs -- well, let me ask you this.  Did you use
9  force on the Carrs?  They allege that, but do you
10  believe you used any force?
11           MS. SELLERS:  Object to the form of the
12      question.
13           THE WITNESS:  No.  I -- no, I do not
14      believe so.
15  BY MR. WILLIAMS:
16    Q      You believe you used -- you -- you
17  obviously used force regarding the Halls; correct?
18  You fired your weapon?
19    A      Yes.
20    Q      Were you trying to arrest them?
21    A      No, I wasn't trying to arrest the
22  Halls.  I was trying to stop the threat from the
23  Halls from bodily harm -- from serious bodily harm
24  to the pedestrians, myself, along with Officer Evans
25  and Captain Carter.

Page 164

1    Q      Which pedestrians you're talking about?
2    A      The pedestrians in the crosswalk.
3    Q      How many was in the crosswalk?
4    A      I can't tell you.  I do not recall.
5    Q      Do you think the pedestrians that you
6  claim were in the crosswalk were in more danger of
7  Mr. Hall's vehicle than your gun that you shot?  Do
8  you understand my question?
9    A      No, I do not.
10    Q      Do you think there was any threat of
11  potential harm for you shooting a gun into a moving
12  vehicle, to the pedestrians around?  Was that a
13  threat?
14    A      The threat that I perceived was Mr.
15  Hall --
16    Q      I --
17    A      -- driving his vehicle in the manner in
18  which he did, which was an immediate threat to me,
19  to those people in the crosswalk, myself, along with
20  Captain Carter and also Evans.
21    Q      Were -- these people in the crosswalk,
22  were they on the right of Mr. Hall's vehicle or to
23  the left?
24    A      I can't answer that question.
25    Q      Were they in front or on the side or

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 165

1  behind?
2      A      In the direction that he was traveling
3  when he made that hard accelerated turn, when he
4  gunned it, they would be in the crosswalk.
5      Q      So you were --
6      A      So they would be -- so they would be
7  directly in front of him.
8      Q      And you're testifying that there were
9  pedestrians in front of Mr. Hall's vehicle prior to
10  and at the time you fired the weapon?
11     A      I would testify that having knowledge
12  of that intersection, that is a -- that is a very
13  busy intersection, that there are pedestrians in
14  that crosswalk.
15     Q      I'm not talking about what -- your
16  prior statement.  I'm talking about at the time
17  right before it happened, in the time you shot, was
18  there pedestrians you can testify under oath that
19  was in front of his vehicle?
20     A      I cannot answer that question.
21     Q      Why not?
22     A      I cannot answer that question.
23     Q      You don't recall as we sit here?
24     A      I do not recall from my understanding,
25  after -- after looking back, after the foot chase

Page 166

1  with Mr. Hall, I did not see any pedestrians in the
2  crosswalk.  I looked to see if there were any
3  injuries, and there were none.
4      Q      Did you have your -- did you have a
5  camera on?
6      A      No, I did not.
7      Q      Did you have a camera, a body cam, at
8  that time?
9      A      No, I did not.
10     Q      Do you believe firing a weapon at a
11  moving vehicle poses any threat to the public or the
12  pedestrian?
13     A      At the time of the incident that did
14  not come to mind.
15     Q      Well, as we sit here today do you think
16  shooting into a moving vehicle poses a threat to the
17  pedestrians and the public that was in that area?
18     A      With the intention of stopping the
19  threat, no.
20     Q      Intentions of stopping the threat?
21  What threat are you talking about?
22     A      The person that's operating that
23  vehicle.
24     Q      Let's get off of that threat for a
25  second.  We'll come back to that.  You testified you

Page 167

1  believe Mr. Hall was a threat.  My question is,
2  aside from Mr. Hall do you think you firing your
3  weapon that day was a threat to the pedestrians and
4  the public at that time?
5      A      No.  I do not believe so.
6      Q      You did not have any consideration that
7  your bullets could have gone through the vehicle,
8  around the vehicle and hit some innocent public
9  person?  You didn't -- had no belief of that?
10     A      No, I did not.
11     Q      Do you think you shooting into a moving
12  vehicle where you believe there might have been
13  pedestrians around, was reasonable?
14     A      Repeat your question again, sir.
15     Q      You believe that shooting into a moving
16  vehicle at the intersection -- of a busy
17  intersection where you say -- your experience is
18  that there is pedestrians around, you believe doing
19  that was reasonable?
20     A      Yes.  I did believe that it was
21  reasonable.
22     Q      Did you know that there was other
23  people in the vehicle besides Mr. Hall?
24     A      No, I did not.
25     Q      Were you shooting to kill?

Page 168

1      A      I was shooting to stop the threat.
2      Q      You were shooting to stop the vehicle?
3             MS. SELLERS:  Object to the form of the
4      question.
5             THE WITNESS:  No.  I was shooting to
6      stop the threat.  I recognized that during
7      that incident Mr. Hall was the threat.
8  BY MR. WILLIAMS:
9      Q      Okay.
10     A      By his behavior and by his display, by
11  his mannerism, and the -- and the display of how he
12  was operating his vehicle --
13     Q      Okay.
14     A      -- that he was the threat.
15     Q      So you -- you were shooting to stop Mr.
16  Hall?
17     A      That is correct.
18     Q      And based on my understanding of
19  training, when you shoot somebody, you shoot to
20  mass -- to kill them; correct?  You don't pull your
21  gun out to shoot somebody and not shoot to kill.
22  Isn't that how you-all were trained?
23     A      We are choose -- we are trained to
24  discharge our weapon center mass of the target.
25     Q      And that is -- and that kills somebody,

Page 169

1  right, normally?
2      A      Normally.
3      Q      Okay.  So when you shot to stop the
4  threat and you shot Mr. Hall, you were shooting to
5  kill him to stop the threat; correct?
6      A      I was shooting to stop the threat, yes.
7      Q      And your means of doing that was to aim
8  center of mass; correct?
9      A      Of the target presented, yes.
10     Q      And you know based on your training,
11 aiming at the center mass will generally kill
12 somebody; correct?
13         MS. SELLERS:  Object to the form.
14         THE WITNESS:  I cannot answer that
15     question.
16 BY MR. WILLIAMS:
17     Q      Do you think it's safe to shoot someone
18 driving a moving vehicle with other people around
19 that vehicle?  Because once they shoot the person
20 with the moving vehicle, they lose control of the
21 vehicle and the dangers that you say you were trying
22 to protect, you just put them back in play; right?
23         MS. SELLERS:  Object to the form.
24         THE WITNESS:  That was not my belief.
25 BY MR. WILLIAMS:

Page 170

1      Q      What about now?  Do you recognize that
2  when you shoot somebody driving a vehicle, you agree
3  with me they can lose control of that vehicle?
4      A      Yes.  I agree with that, that they can
5  lose control of that vehicle.
6      Q      You didn't think --
7      A      Or --
8      Q      I'm sorry.
9      A      Or that vehicle can come to a stop.
10     Q      Did you think about the fact that the
11 person who you shoot, no longer can -- may no longer
12 have control of that vehicle when you were making
13 the decision?  Did that cross your mind at all?
14         MS. SELLERS:  Object to form.
15         THE WITNESS:  I'm sorry.
16 BY MR. WILLIAMS:
17     Q      Did it cross your mind when you think
18 about the fact that if you shoot at somebody, center
19 of mass who's driving a moving vehicle, that they
20 can lose control of their vehicle and cause harm to
21 others?  Did you think about that at all?
22     A      No.  I was only thinking about
23 preventing from that happening.
24     Q      Do you believe you would have been
25 justified had you shot and killed Mr. Hall?

Page 171

1      A      I believe I was justified in stopping
2  the threat.
3      Q      Do you believe -- my question, do you
4  believe you would have been justified had you shot
5  and killed Mr. Hall?  That was my specific question.
6      A      I believe I would have been justified
7  in stopping the threat.
8      Q      What about killing Mr. Hall?  Do you
9  think that would have been justified?
10     A      Yes.
11     Q      Why?
12     A      Because I would have stopped the
13 threat, and I recognized Mr. Hall as being the
14 threat.
15     Q      Did APD train you on how to avoid
16 shooting at suspects in vehicles?
17         MS. SELLERS:  Object to the form of the
18     question.
19         THE WITNESS:  I can't answer that
20     question.
21 BY MR. WILLIAMS:
22     Q      Why not?  You don't recall?
23     A      No, I do not.  Maybe -- I may be
24 unclear in your question.  I don't understand --
25     Q      Did you ever receive any training on

Page 172

1  how to avoid shooting at a suspect in a vehicle?
2          MS. SELLERS:  Object to the form.
3          THE WITNESS:  Repeat it one more time,
4      sir.
5  BY MR. WILLIAMS:
6      Q      Did you receive any training while you
7  were at APD on how to avoid shooting at a suspect in
8  a moving vehicle?
9      A      Yes.
10     Q      Tell me what that training was.
11     A      It would be determined on what is
12 presented to you.  What is in your eyesight, what is
13 your visual?
14     Q      So you would -- were you ever told that
15 you can avoid shooting the vehicle, shooting the
16 suspect, but you can stop the vehicle?  That's what
17 I am getting at.  Were you told to shoot at the
18 suspect, or were you told to shoot in a way that you
19 don't hit the suspect but you can stop the vehicle
20 from move --
21     A      No.  We were trained to -- in order to
22 stop the threat is to recognize what the threat is
23 and to stop the threat, and if that means that if
24 serious bodily harm were to come to you and others
25 in that situation and deadly force is to be used --

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 173

1    Q        So you were trained in order to stop
2  the threat of a moving vehicle, if you feel that
3  your life or someone else's life is in danger, you
4  need to shoot at the person driving to stop that
5  threat?
6    A        To save the lives of others from harm,
7  yes.
8    Q        Okay.  All right.  Let's go to 4.69,
9  page 19 of this exhibit.
10   A        Nineteen, you said?
11   Q        Okay.  Page 19, "Employees should only
12 use deadly force to apprehend a suspected felon."
13          Do you see that?  When -- you see that
14 code section right there, Number 1?  It's at the
15 bottom of page 19, 4.69.
16   A        Okay.
17   Q        Do you see that?
18   A        Yes, sir, I do see that.  I do see the
19 paragraph.
20   Q        You agree with me, this is the only
21 time you should be able to lawfully use excessive --
22 I mean use deadly force; am I correct?
23   A        Repeat your question, sir.
24   Q        Am I correct 4.6.9 is the only time
25 legally you're allowed to, under the APD policies,

Page 174

1  use deadly force?
2    A        I see it.
3    Q        Is that correct?
4    A        I'm sorry.
5    Q        Is that the time, as you understand it,
6  when you can use deadly force?  What is set forth
7  under 4.6.9?
8    A        Yes.
9    Q        Which one of these were you
10 justified -- that you believe was justifiable, the
11 reason you was able to use deadly force on Hall?
12   A        It was when he or she reasonably
13 believes that a suspect possesses a deadly weapon or
14 any object, device, or instrument when used
15 offensively against a person is likely to or
16 actually does result in bodily injury.
17   Q        Who -- what was the deadly weapon?
18   A        The van.
19   Q        Okay.  And who was the -- offensively
20 against the person that was likely or to -- or to
21 actually does result in bodily serious harm?  Who
22 was that person?  Give me a list of the people.
23   A        The person -- the persons that -- the
24 persons that would be in serious bodily -- that
25 would be in harm or likely to be in serious bodily

Page 175

1  injury would be myself, Officer Evans, Captain
2  Carter, and the --
3    Q        Officer Evans?
4    A        Officer Evans, Captain Carter.
5    Q        Captain Carter?
6    A        And the pedestrians in the crosswalk.
7    Q        But you can't tell me who those
8  pedestrians are, can you?
9    A        I cannot.
10   Q        You can't tell me where they were
11 located?
12   A        I cannot.
13   Q        You can't even tell me how many there
14 was, can you?
15   A        I cannot.
16   Q        Can you even tell me if there was any
17 pedestrians in the walkway?
18   A        I cannot.
19   Q        Where was Captain Carter at prior to
20 the shooting?
21   A        Captain Carter was on the other -- on
22 the other side of the roadway in the crosswalk.  He
23 was in the crosswalk.
24   Q        The crosswalk where Mr. Hall was
25 driving, or another crosswalk?

Page 176

1    A        Behind -- the crosswalk that was behind
2  me.
3    Q        Behind you?
4    A        That is correct.
5    Q        So he was not in the pathway of the
6  van, was he?
7    A        Captain Carter?
8    Q        Yes.
9    A        In the direction that Mr. Hall turned
10 his van, then yes, Captain Carter would be in the
11 direction of the van.
12   Q        But at the time you shot, he wasn't in
13 the direction of --
14   A        I cannot say.
15   Q        You cannot say?
16   A        I can't say that he was there.  I
17 can -- what I am saying to you is that to my
18 knowledge and to my knowledge of where Captain
19 Carter would -- to where Captain Carter would be,
20 would be in the crosswalk, and he would be in the
21 direction of Mr. Hall's van.
22   Q        At the time you shot, was he in the
23 pathway of Mr. Hall's van?
24   A        I cannot say.
25   Q        What about Officer Evans?  Where was he

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 177

1  at?
2     A      He was to the right of me.
3     Q      Right of you.  Was he in the pathway of
4  the van?  Was he to the side of the van?  In front
5  of the van?
6     A      He was to the side of the van.
7     Q      He was not in front of the van?
8     A      No.
9     Q      Were you in front of the van?
10    A      I was.
11    Q      You were in front of the van?
12    A      I was in front of -- I was in front of
13 the van during the time of the incident.  I was
14 also then at the side of the van before Mr. Hall
15 made that hard turn.
16    Q      When you pulled the trigger, were you
17 in front of the van?  That's my question.  When you
18 pulled the trigger and shot, were you in front of
19 the van?
20    A      No.
21    Q      Were you in the front of the pathway of
22 the van?
23    A      No.
24    Q      When you shot Mr. Hall, shot your
25 weapon, where were you actually located in relation

Page 178

1  to the van?
2     A      To the side of the van, to what I can
3  -- to what I recall.
4     Q      When you shot, am I correct you were
5  not in the pathway of the van when you pulled the
6  firearm?  When you shot your firearm?  Am I correct?
7     A      No, I did not.  No, I was not.
8     Q      So am I correct?  Am I correct?
9     A      Repeat your question again.
10    Q      When you fired your firearm you were
11 not in the direct pathway of the van?
12    A      No, I was not.  You are correct, yes.
13    Q      When you fired your firearm, Officer
14 Evans was not in the direct pathway of the van; am I
15 correct?
16    A      No.
17    Q      Am I correct?
18    A      Yes, you are correct.
19    Q      When you fired your firearm, Captain
20 Carter was not in the pathway of the front of the
21 van, was he?
22    A      I cannot answer that.
23    Q      When you fired your firearms, you did
24 not see any pedestrians in front of -- in the
25 pathway of the van, did you?

Page 179

1     A      When I fired -- no, I did not.
2            (Exhibit Number P-9 was marked for
3     identification.)
4  BY MR. WILLIAMS:
5     Q      Let's go to Exhibit Number 9.  Exhibit
6  Number 9 is the disciplinary policy, APD 2020.  Just
7  to -- just to finish up the last -- what we were
8  just talking about, if no one was in the direct
9  pathway of the van when you fired your weapon, why
10 did you use deadly force?
11    A      I worked at that intersection for eight
12 years.  I'm very familiar with that intersection.
13 I'm very familiar with the -- the pedestrian volume
14 when working that intersection.  I was in fear of my
15 safety and also for the safety of others in the
16 crosswalk or in that area.  As mentioned, Captain
17 Carter and Officer Evans.
18           Some few years ago working that same
19 intersection a vehicle that failed to obey commands
20 plowed -- excuse me -- continued moving through the
21 intersection, seriously injuring a little boy.  That
22 bothered me because after -- again, I've already
23 worked that intersection for about four years with
24 no injuries and then having to deal with that.
25           So the reason why I fired that -- my --

Page 180

1  I discharged my weapon, because not only was --
2  because of that fear of someone being seriously
3  injured again as that little boy was.
4     Q      So did you make the decision to fire
5  your firearm at the time of the incident with Mr.
6  Hall because of the incident that happened
7  previously?  Is that what your testimony is?
8            MS. SELLERS:  Object to the form.
9     Assumes facts not in evidence.
10           (Court Reporter clarification.)
11           MS. SELLERS:  Assumes facts not in
12    evidence.  I'm sorry.
13 BY MR. WILLIAMS:
14    Q      Let me just be clear.  Are you saying
15 the incident involving this little boy you just
16 described played a factor in your decision on using
17 force regarding the Hall incident?
18    A      I'm going to say that it did play a
19 factor to the fact that knowing what can happen when
20 being struck by -- by a weapon, what it can cause.
21    Q      Is there -- is there -- are you allowed
22 to use incidents that happened in the past in the
23 policies and procedures regarding use of force, the
24 ones that we just looked at?  Is that ever a factor
25 in the things you saw in the APD policies?

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

---

Page 181

1      A      It is not a factor, though it is --
2      Q      The policy doesn't say it's a factor?
3  Something in the past should be used as part of your
4  analysis on when to use force, does it?
5      A      Not that I recall, no.
6      Q      Okay. But you can finish. Go ahead.
7      A      So I don't even know where I was at
8  now. Oh, your questioning was, why did I discharge
9  my weapon; am I correct?
10     Q      Yes.
11     A      Okay. That was the reason why. And
12 also after giving Mr. Hall an alternate route that
13 would -- that would be a safe result for everyone,
14 he chose opposite of that alternate --
15     Q      Okay.
16     A      -- and gunned his vehicle towards my
17 direction in the direction of others, and that is
18 why -- and in fear of my safety and the safety of
19 others is the reason why I discharged my weapon.
20     Q      Let me ask you this. How are you in
21 safe -- how are you in danger and others are in
22 danger if you just testified no one was in the front
23 of the path of the vehicle?
24     A      I'm speaking -- my answers are speaking
25 to you based on the results, the results where no

---

Page 182

1  one was injured.
2      Q      Well, let me ask you this. Let me just
3  break it down real simple. You agree you just
4  testified that no one was in front of the path of
5  the van? Neither yourself, Officer -- Captain
6  Carter, Officer Evans, and you didn't see any
7  pedestrians that was in front of the pathway of the
8  vehicle; am I right?
9      A      Yes, sir.
10     Q      Okay. You just testified to that. My
11 question is real clear, real simple. Do you under
12 the policies and procedures and your training at
13 APD, is it your belief that you can shoot Mr. Hall
14 and use deadly force at that time even though there
15 is nobody in the path of that vehicle? Do you
16 believe your training says you can do that?
17     A      No.
18     Q      Did you -- explain to me why did you
19 use deadly force if no one was in front of the
20 vehicle.
21     A      As a result, there was no one in front
22 of the vehicle, but it was likely too that there was
23 -- that again, that I was in front of that vehicle
24 with the exception of me moving out of the way for
25 immediate reaction. But again, the knowledge that I

---

Page 183

1  have of that intersection, there was no indication,
2  no clearance given to me, no signal given to me that
3  that crosswalk was clear.
4      Q      So you believe what you did regarding
5  your whole thought process and totality of
6  circumstances, based on your -- was consistent what
7  you were told and trained at APD?
8      A      Yes.
9             MS. SELLERS: Object to form.
10 BY MR. WILLIAMS:
11     Q      And based upon your training and what
12 you were taught at APD, you feel like your shooting
13 of Mr. Hall was justified?
14     A      Yes.
15     Q      Everything you did that day was
16 consistent with what you were told the proper
17 practices are at APD? Is that fair?
18             MS. SELLERS: Object to the form of the
19        question.
20             THE WITNESS: Yes.
21 BY MR. WILLIAMS:
22     Q      Let's go to 20 -- Exhibit Number 9,
23 which is the APD.SOP 2020. This is the --
24     A      Which page again, sir?
25     Q      I'm just going through the whole

---

Page 184

1  document right now. It's 46 pages. My first
2  question is, have you ever seen this disciplinary
3  policy as part of your -- during your tenure at APD?
4      A      Yes.
5      Q      Did you ever review this policy when
6  you were going through any of your OPS
7  investigations or issues?
8      A      Yes.
9      Q      So it's fair to say you're familiar
10 with the disciplinary policy -- policy at APD?
11     A      Repeat your question, please.
12     Q      You understand, then -- you're familiar
13 with how the discipline process works at APD?
14     A      Yes.
15     Q      Okay. You understand that the only
16 person that could -- the person ultimately
17 responsible for discipline at APD is the chief of
18 police? You understood that?
19     A      Yes.
20     Q      And as you said, you can be promoted by
21 the chief, but the person can also terminate you is
22 only the chief; correct?
23     A      Yes.
24     Q      In this case you had a situation where
25 you were recommended for you to be terminated

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 185

1  this -- before the incident involving Mr. Hall;
2  correct?
3       A      Yes.
4       Q      And you used the disciplinary policy to
5  appeal your -- the decision up to the chief of
6  police; correct?
7       A      That is correct.
8       Q      Which was specifically Chief Turner?
9       A      Yes.
10      Q      And am I correct he -- that before you
11 got to Chief Turner, all of the officers below you,
12 all of his supervisors below Chief Turner, had
13 recommended you to be terminated?  Is that correct?
14      A      Those that were given the case.  I
15 would say I believe, yes.
16      Q      It was consistent from your
17 understanding that the people before Turner had
18 recommended termination?  Is that fair?
19      A      Yes.
20      Q      And the person you understand that made
21 the decision to overrule those people were Chief
22 Turner?
23      A      Yes.
24      Q      You understand that there is something
25 called a reckoning period where you're -- if you

Page 186

1  commit -- are found in violation of certain
2  incidents or work rules, it can carry over, and it's
3  part of the decision regarding your discipline on
4  the next work rule?  Do you understand that?
5       A      Yes.
6       Q      So you also understand that there is
7  something called an Early Warning System?
8       A      Yes, sir.
9       Q      Tell us what -- what that is.
10      A      For -- you're placed on Early Warning
11 for the disciplinary actions of a violation that's
12 been committed.  Providing that it's a -- more or
13 less in that warning you're observed for the next
14 whatever duration of time that has been -- that has
15 been agreed upon in order to resolve that violation
16 or that work rule violation.
17      Q      Were you in the Early Warning System?
18      A      Yes, I believe so.
19      Q      Based on the policies and procedures
20 set forth in Exhibit Number 9 that you have in front
21 of you, am I correct the violation of excessive
22 force or unnecessary force is a grounds for
23 termination?
24      A      Yes.
25      Q      Am I also correct that being untruthful

Page 187

1  or violating the truthfulness requirement is also
2  grounds for termination?
3       A      Yes.
4       Q      Am I also correct that if you commit a
5  crime in violation of Georgia laws, that is a
6  grounds for termination?
7       A      Repeat your question again.
8       Q      Am I correct if you commit a crime, a
9  criminal act, as an officer in your duty, that is a
10 grounds for termination?
11      A      Yes.
12      Q      In fact, if you commit a criminal act
13 outside of duty, that's grounds for termination; am
14 I correct?
15      A      Yes.
16      Q      In your experience with your OPS other
17 than the incident with the Hall matter, what did --
18 when you were found in violation of a work rule, was
19 it -- did you ever receive additional training after
20 you were found in violation?
21             MS. SELLERS:  Object to the form of the
22      question.
23             THE WITNESS:  I would say yes.
24 BY MR. WILLIAMS:
25      Q      When?

Page 188

1       A      Once the incidents -- whenever ruling
2  that was found upon the incident, I would then be --
3  I would then be required to sit down with my -- have
4  a conference with my supervisors.  We would review
5  the work rule violation -- the work rule policy.
6       Q      Do you remember which specific one --
7  violation that you were -- you had this counseling
8  session for?
9       A      Whichever one that required that I --
10 that I --
11      Q      Is it fair to say that if you had this
12 counseling, it would be in your OPS file?
13      A      It should be.
14             MS. SELLERS:  Object to the form.
15 BY MR. WILLIAMS:
16      Q      Okay.  What does sustained mean?
17      A      Sustained means that I committed the
18 violation to what was -- what has been brought to my
19 attention.
20      Q      Go to page 45 of 46 of Exhibit
21 Number 9.
22      A      You said 45?
23      Q      Yes.
24      A      Okay.
25      Q      Do you see what the definition of

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

---

Page 189

1  sustained is?  Read that in the record.
2      A       "Sustained.  The investigative file
3  provides sufficient evidence to support the finding
4  that the employee -- that the employee committed the
5  violation."
6      Q       We deposed Chief Turner a week ago, a
7  week and a half ago, and when we asked him what the
8  standard of review, he said preponderance of the
9  evidence.  Did you understand that in order to be
10 found sustained, all that they needed to show was by
11 preponderance of the evidence to support the
12 finding?  Did you know that?
13      MS. SELLERS:  Object to the form.
14      THE WITNESS:  No.
15 BY MR. WILLIAMS:
16      Q       Did you have a police union
17 representative available whenever you had an OPS
18 complaint?
19      A       Yes.
20      Q       At each one?
21      A       Yes.
22      Q       I saw that some of your -- when you got
23 violations, the recommendation of your suspension
24 would sometimes come down.  Am I correct?  They
25 started like -- the suspension started at five days;

---

Page 190

1  correct?
2      A       Not that I recall.
3      Q       We'll look at it.  What is
4  preponderance of the evidence?  Do you know what
5  that means?
6      A       I would say with the amount of evidence
7  that has been collected or that has been presented,
8  if it's able to satisfy the -- to satisfy the
9  infraction or the violation.
10      (Exhibit Number P-10 was marked for
11      identification.)
12 BY MR. WILLIAMS:
13      Q       I want to show you what's been marked
14 as Exhibit Number 10 to your deposition.
15      MR. WILLIAMS:  Tiffany, it's Exhibit --
16      it is APD.SOP 2022.
17 BY MR. WILLIAMS:
18      Q       Sir, I want to show you what's been
19 marked as Exhibit Number 10.  It is APD.SOP 2020 --
20 I mean 2022 -- signed 7/14 of 2010.  Have you seen
21 this Early Warning System prior to today?
22      A       No.
23      Q       But you were a part of that system;
24 correct?
25      A       During my employ, yes.

---

Page 191

1      Q       What was the circumstances that got you
2  put into the system?
3      MS. SELLERS:  Object to the form of the
4      question.
5      THE WITNESS:  I do not recall.
6  BY MR. WILLIAMS:
7      Q       If you look at page -- the first page
8  of APD.SOP 2022, it says, "The policy:  APD would
9  actively monitor all employees' conduct and provide
10 appropriate intervention where it is evident that
11 behavior problems exist and there is the potential
12 for undermining the achievement of department goals
13 and objectives."
14      Do you see that?
15      A       Yes, sir.
16      Q       So you were -- you were in this system,
17 which is set up to make sure when there is behavior
18 problems that exist among an officer in the
19 department?  You understand that?
20      A       Yes, sir.
21      THE VIDEOGRAPHER:  Your mic.
22 BY MR. WILLIAMS:
23      Q       Did you -- did someone have a
24 conversation with you when they put you in the
25 department, explain why you was being put in there?

---

Page 192

1      A       Yes.
2      Q       Who did that?
3      A       My supervisor did.
4      Q       Which supervisor?
5      A       I can't recall which one.
6      Q       Let's go to page 2 of this policy.
7  Under Number 3 it says, "Any sustained unauthorized
8  use of force allegation or two or more unauthorized
9  force complaints against the employee within a
10 one-year period."
11      Do you see that?
12      A       Yes, sir.
13      Q       Am I correct, didn't you have two or
14 more unauthorized force complaints against you
15 within a one-year period?
16      A       I do not recall.
17      Q       Tell me what happened when you got put
18 in the -- into the Early Warning System.  What did
19 that entail for you?
20      A       That entailed of me being observed on
21 my behaviors and also of my work conduct for the
22 duration of time, which -- during which if I felt
23 that there was a need to use the resources available
24 to help resolve that problem, I am to utilize those
25 resources made available.

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 193

1    Q       Well, did you -- did you have to meet
2  with anybody?  Have discussions or meetings?
3    A       I used the psych service.
4    Q       Psychological services?
5    A       Yes, sir.
6    Q       What did you -- who did you meet with
7  over there?
8    A       I do not remember the -- the doctor's
9  name.
10   Q       Was it APD employees?
11   A       I'm -- I can't -- I do not recall.
12   Q       How many times did you meet with them,
13 or how often?
14   A       As needed.
15   Q       When you got into the program, did you
16 meet with them initially?
17   A       Yes, I did.
18   Q       And tell me what you -- what was
19 going -- what happened with that.
20   A       We just had discussions on what was
21 taking place.
22   Q       Well, what was your discussions?  Tell
23 me what you discussed with the --
24   A       I cannot answer that.
25   Q       Why not?  Why not?

Page 194

1    A       Because that's private.
2    Q       Oh.  What private are you referring to?
3    A       Well, dealing with me, my family,
4  everything that is -- that's associated with me.
5    Q       But let me get this clear so we can --
6  if we have to go to the court.  You were required to
7  talk to this psychologist or somebody from the psych
8  department as part of your job; correct?
9          MS. SELLERS:  Object to the form of the
10        question.
11         THE WITNESS:  It wasn't required.  It
12        was a resource made available to me.
13 BY MR. WILLIAMS:
14   Q       I thought the Early Warning System
15 required you to go see someone at the psych
16 department.  Is that not true?
17   A       I did speak with someone, yes.
18   Q       That was not my question; did you speak
19 to someone.  My question is, doesn't the Early
20 Warning System require you to meet with someone from
21 the psych department?
22   A       Not that I recall.
23   Q       Okay.  All right.  So you believe you
24 had the option not to talk to someone at psych?
25   A       I believe so.

Page 195

1    Q       Okay.  I'm going to show you what's
2  been marked as Exhibit Number 11.
3          MS. SELLERS:  Number what?
4          MR. WILLIAMS:  Eleven.
5          (Exhibit Number P-11 was marked for
6          identification.)
7  BY MR. WILLIAMS:
8    Q       I want to show you what's been marked
9  as Exhibit Number 11 to your deposition.  Get a
10 chance to look at that, sir, I'm going to ask you a
11 few questions about it.  Tell me whenever you're
12 ready, sir.  I'll start back up with the questions.
13         MR. WILLIAMS:  Can I get, like, seven
14        more?
15         THE REPORTER:  Can we stop a second,
16        counsel?
17         MR. WILLIAMS:  Yeah.  I wasn't asking
18        any questions.  Yeah.
19         THE VIDEOGRAPHER:  Going off the video
20        record.  The time is 6:20.
21         (Discussion ensued off the record.)
22         THE VIDEOGRAPHER:  Time is 6:21.  We're
23        back on the record.
24 BY MR. WILLIAMS:
25   Q       Mr. Cadeau, have you seen those

Page 196

1  documents prior to today?
2    A       No.
3    Q       All right.  Before you got into the
4  Early Warning System, this document on Exhibit
5  Number 11 says you started back in August of 2014.
6  Does that sound about right?
7    A       With what's been -- being presented,
8  then yes.
9    Q       Before August of 2014 did you meet with
10 anybody at the city of Atlanta or APD psychologists
11 before you got into the Early Warning System?
12   A       Yes.
13   Q       You did?  Was that voluntarily on your
14 part?
15   A       Yes, sir.
16   Q       When did that happen?
17   A       I would say between two thousand --
18 between 2013, 2014.
19   Q       So when you got into the Early Warning
20 System, you already had been seen by the
21 psychologist before the Early Warning System?
22   A       By -- by, by a psychologist.  Yes.
23 Yes, I did.
24   Q       At APD and city of Atlanta?  Or just a
25 psychologist, period?

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 197

1    A    Outside -- outside of the department.
2    Q    No.  I'm talking about within the
3 department.
4    A    Oh, no.  Not that I recall, no.
5    Q    Okay.  So that's what I -- let me go
6 back to my question.
7    A    Okay.
8    Q    Before August of 2014 had you seen any
9 psychologist or psychiatrist or anybody from that
10 department at APD before you went into the Early
11 Warning System?
12    A    No.  Not that I recall, no.
13    Q    All right.  Now, you saw somebody when
14 you got the evaluation at the -- before you got to
15 the academy?  Don't you see somebody then?
16    A    Yes.
17    Q    Okay.  I'm not talking about that.
18    A    No.  I'm talking during that time.
19    Q    Okay.  All right.  So you had outside
20 people you saw, but that was not related to your job
21 at APD; am I correct?
22    A    That is correct.
23    Q    Okay.  So let's talk about the Early
24 Warning -- the people you met at APD.  Did you ever
25 have a conversation with Chief Spillane or Major

Page 198

1 Dalton regarding you being in the Early Warning
2 System?
3    A    I don't recall.
4    Q    Let's go to page 3 of Exhibit
5 Number 11.  On February 10th, 2015, there is a memo
6 from Chrisanne Mayer to Deputy Chief Spillane.  You
7 see that?
8    A    That's 785?  Is that what you're
9 referring --
10    Q    7785, yes.
11    A    Yes, sir.
12    Q    When you went into Early Warning
13 System, didn't you not have a evaluation session as
14 part of the Early Warning System on October 7, 2014,
15 pursuant to this memo?
16        MS. SELLERS:  Object to the form of the
17    question.
18        THE WITNESS:  According to this memo,
19    yes.
20 BY MR. WILLIAMS:
21    Q    So I am correct that as part of you
22 being in the Early Warning System you saw the psych
23 department with the APD; correct?
24    A    Yes.
25    Q    Okay.  So I'm going to ask you again,

Page 199

1 what did you guys discuss pursuant to your Early
2 Warning evaluation session back in October of 2014?
3        MS. SELLERS:  Object to the form of the
4    question.
5        THE WITNESS:  I cannot recall.
6 BY MR. WILLIAMS:
7    Q    You cannot recall?
8    A    No.
9    Q    Do you remember -- do you remember --
10 did you ever meet with -- did you ever have
11 scheduled sessions with the EAP clinician?
12    A    Yeah.
13    Q    How often would you go to that?
14    A    Whenever a date was scheduled for me to
15 attend.
16    Q    How would you know if you was -- how
17 would you know when your date was scheduled for you?
18    A    We would schedule -- we would confirm
19 on the date.
20    Q    Who was "we"?
21    A    Myself and the clinician.
22    Q    Okay.  Did you ever meet with Dr.
23 Mayer?  Do you remember Dr. Mayer?
24    A    I do.
25    Q    Did you ever -- you don't recall any

Page 200

1 conversation with Dr. Mayer as we sit here today?
2        MS. SELLERS:  Object to the form of the
3    question.
4        THE WITNESS:  Not in all its entirety,
5    no.
6 BY MR. WILLIAMS:
7    Q    Well, tell me what you do recall.
8    A    I don't.
9        MS. SELLERS:  Objection.
10 BY MR. WILLIAMS:
11    Q    You just said you don't remember it in
12 its entirety.
13    A    I don't remember.  I don't remember
14 what conversations we've had.
15    Q    All right.  Well, I was just trying to
16 make sure.  You said in the entirety, so I was
17 trying to make sure --
18    A    Right.  In its entirety, no.
19    Q    Let me finish.  Let me finish.
20    A    I'm sorry.
21    Q    I wasn't trying to say in the entirety.
22 I'm saying -- when you say entirety, it seems to
23 suggest you may remember some of it, though, so my
24 question is, do you remember any conversations at
25 all, any things that you-all might have discussed

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 201

1    with Miss Mayer or anybody in the EAP clinician
2    department?
3                MS. SELLERS:  Object to the form.
4                THE WITNESS:  No, I do not.
5    BY MR. WILLIAMS:
6         Q       Did you recall ever going to a verbal
7    judo course?
8         A       Yes.
9         Q       What was that course about?
10        A       It's about deflecting aggressive
11   language.
12        Q       Explain.
13        A       So I can -- let's say if you were
14   speaking aggressively, and instead of speaking back
15   to you, use different words to bring that -- to
16   bring -- to bring effective communication in a
17   subtle tone.
18        Q       Did someone at the APD or during your
19   sessions suggest that you was having problems with
20   people who were speaking aggressive or using
21   profanity to you?
22        A       Not that I recall.
23        Q       Were your supervisors aware you were
24   seeing a psychologist or somebody outside of work?
25        A       No.

Page 202

1         Q       Did you -- did you complete this verbal
2    judo course?
3         A       Yes.
4         Q       How many days was it?
5         A       One.
6         Q       Did you get a certification or
7    certificate for it?
8         A       No, sir.
9         Q       It says your sessions address the
10   concerns regarding Officer Cadeau's recent use of
11   force complaints as well as personal emotional
12   stressors that were affecting his ability to
13   effectively perform job and extra job and related
14   duties.
15               Do you see that?
16        A       Yes, sir.
17        Q       What personal emotional stressors were
18   affecting your ability to effectively perform your
19   job and extra job and related duties?
20               MS. SELLERS:  Object to the form of the
21   question.
22               THE WITNESS:  I was taking care of two
23   households, which required -- which brought,
24   greater financial obligations.  I took on --
25   in order to meet those financial obligations,

Page 203

1    there was a need to work extra jobs.  Also, I
2    was going through a divorce.
3    BY MR. WILLIAMS:
4         Q       When was your -- when did you -- when
5    did -- when was your divorce filed?
6         A       2013.
7         Q       And when was it finalized?
8         A       2013.
9         Q       2013?
10        A       Uh-huh.
11        Q       So you -- because you was taking care
12   of two households, you needed to work extra jobs?
13   Is that fair?
14               MS. SELLERS:  Object to the form of the
15   question.
16               THE WITNESS:  Yes.
17   BY MR. WILLIAMS:
18        Q       And did you still need -- were you
19   still carrying two households in 2017?
20        A       No.
21        Q       What about 2016?
22        A       Yes.
23        Q       When -- why did the obligation of two
24   households stop in 2017?
25        A       By that time it was -- it was

Page 204

1    exhausted.
2         Q       It was what?
3         A       Excuse me.  I was exhausted.  I was
4    tired and --
5         Q       Okay.
6         A       And I needed to separate and get -- I
7    needed to put things in a better perspective that
8    was going -- that was going to be beneficial to me.
9         Q       Okay.
10        A       So to put -- to put it plainly --
11        Q       Okay.
12        A       -- going through this divorce, my
13   family never came down to Georgia.  The plan was for
14   them to come down once I laid the foundation.  That
15   never happened.
16        Q       In 2008?
17        A       In 2008 all the way through here until
18   today.  They're not here.  My wife, my two boys,
19   they're not here.  They're still up north.
20        Q       So --
21        A       So --
22        Q       Go ahead.  I apologize.
23        A       And when I say I was -- I was
24   responsible for two households, my home, their home.
25        Q       So you had that responsibility

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 205

1   throughout the start of your career at APD?
2        A       Yes, I did.
3        Q       And that continued until when?
4        A       Until 2016.
5        Q       And what did you do different in 2016?
6   Did you not -- I know you was already divorced, but
7   did you not still have to have responsibility for
8   the kids?
9        A       No.  But I was -- but I made myself
10  available to the needs -- to their needs.
11       Q       I'm confused.  I apologize.  What
12  changed in 2016 to '17 that you did not have to
13  support two households?
14       A       Well, what happened is -- is that it
15  was needed that my -- my ex-wife needed to stay in
16  her home.  She needed to start pulling her weight.
17       Q       So did she do that in '16 or '17?
18       A       At that point we had irreconcilable --
19  we could not agree.  We could not agree, so in order
20  to -- in order to -- how can I say it?  In order to
21  put things that would be best for us, even though
22  it's -- it was going to be a strain, I had to just
23  relinquish some things, relinquish some of those
24  responsibilities off of me and placed it on her.
25       Q       And what were those responsibilities?

Page 206

1        A       Insurance; her part of the rent; what
2   the boys needed, what our sons needed for college.
3   Those things.
4        Q       How old were your kids in 2016?
5        A       My oldest son was attending Morgan
6   State.
7        Q       Okay.
8        A       And my youngest son was just starting
9   Morgan State -- not Morgan State.  Montgomery
10  Community College.
11       Q       Okay.  Okay.  Why didn't your family
12  come down here at any point before -- during your
13  time you was an APD officer?
14       A       I wish I could give you that answer.
15       Q       So when you say you were two
16  households, were you traveling back and forth
17  between Maryland and Atlanta while you was working
18  at APD?
19       A       Yes.
20       Q       When would you travel back -- when
21  would you travel to Maryland?  What was your
22  routine?
23       A       At first it was for any reason given.
24  Then it went to -- when I was trying to find
25  employment back in Maryland under the police

Page 207

1   department there.  Then it was once a month, every
2   two months.  Started doing like that.  It's where it
3   started to -- doing.
4        Q       And then you-all just decided to get a
5   divorce in 2013?
6        A       Yes, sir.
7        Q       You-all got married when again?  Is it
8   2000, 2001?
9        A       2000 and 2001.
10       Q       You-all got married twice?
11       A       Not to sound sexist, but women.
12       Q       Okay.  So I saw a -- I saw a marriage
13  license that said Bahamas.
14       A       That was in 2000.
15       Q       And did you-all do it again, like,
16  formally in two thousand --
17       A       Had a formal ceremony in 2001.
18       Q       That's what I thought.  All right.  But
19  you --
20               THE WITNESS:  Not anything towards you.
21               MS. SELLERS:  Hey, I only got married
22      once.
23  BY MR. WILLIAMS:
24       Q       So basically you took this job in
25  Atlanta with the hope and understanding that your

Page 208

1   family was going to come move here once you got the
2   job, and that never happened?
3        A       That is correct.
4        Q       And for five years -- no, actually for
5   until 2006, you were in -- you're dealing with the
6   responsibilities of basically supporting two
7   household?
8        A       Yes.
9        Q       And when this says emotional stressors
10  affecting your ability to be effective and perform
11  jobs and extra jobs, that was related to your family
12  situation?
13       A       Yes.
14       Q       Gotcha.  Okay.  Did you ever have
15  communication or conversations with your superiors
16  about these emotional stressors related to your
17  family?
18       A       I did.
19       Q       Who did you specifically talk to?  Your
20  superiors.
21       A       Whoever was my superior at the time.
22  What is their name?  I can see their faces, but
23  their names aren't coming.
24       Q       What time period were you letting your
25  superiors know -- I can figure out their names then.

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 209

1    What time period were you letting your sergeants or
2    superiors know what was going on with your family
3    situation?
4         A     I would say about 2013, 2014.  Around
5    about that time, in those years.
6         Q     When you had the incident with the --
7    the arrestee, were you dealing with emotional
8    stressors then?
9         A     At the time -- I didn't realize it at
10   the time.  Yes.
11        Q     What about the Wet Willie's situation
12   with the OC spray?
13        A     No.
14        Q     What about the incident with the young
15   man that -- the complaint regarding the Jay-Z
16   concert?  Do you remember that?
17        A     Jay-Z concert.
18        Q     Beyonce Jay-Z concert?  Young man was
19   working at Georgia World Congress Center and was
20   walking.  You thought he was not paying attention to
21   your --
22        A     Okay.
23        Q     -- your directions.  Were you going
24   through emotional stressors then?
25        A     No.

Page 210

1         Q     It also says, "He's presented as
2    forthcoming and by report of Officer Cadeau, his
3    external provider, he has identified and approved
4    issues that could increase the potential for further
5    complaints."
6              Did you provide the APD or these people
7    in the psych department --
8         A     Excuse me.
9         Q     -- your information from your external
10   provider?  Did you give them documents or
11   information that's from your outside counsel, you
12   was getting counseling from?  Did you provide that
13   information?
14        A     I --
15             MS. SELLERS:  Object to the form of the
16        question.
17             THE WITNESS:  I recall letting them
18        know that I did speak with an outside
19        provider.
20   BY MR. WILLIAMS:
21        Q     Okay.  You don't recall if you gave
22   them any information or documents?
23        A     I do not recall that.
24        Q     It says you continue to follow
25   recommendations of your external provider.  Was

Page 211

1    yourself external -- were you still seeing your
2    external provider as well?
3         A     Yes.
4         Q     What is your external provider's name?
5         A     I would have to look that up.
6         Q     Do you know where they were located at?
7         A     They were in Atlanta.
8         Q     What city?  I mean --
9         A     I'm sorry.  They were in -- is it
10   Memorial?  Right by -- by the -- I'm sorry.
11        Q     No problem.
12        A     I would say in the zone six area.
13        Q     Okay.
14        A     I'm sorry to put it that way.  I
15   believe it was, yeah, on Memorial.
16        Q     Do you remember the building as you sit
17   here?
18        A     Yes, I do.
19        Q     Where --
20        A     There's --
21        Q     -- on Memorial?
22        A     There is a -- there is a -- I believe
23   it's called a -- I think it's a Vortex directly
24   across the street.
25        Q     Okay.

Page 212

1         A     There is a -- a restaurant across the
2    street from it.
3         Q     Okay.
4         A     There is a farmers market to the right
5    of it next to a bank.
6         Q     Okay.
7         A     It's a small little farmers market.
8         Q     Okay.  How did you find out about this
9    place?
10        A     I believe on the Internet.
11        Q     Okay.  Okay.  After the incident
12   involving -- if you go to the next page, there is an
13   e-mail between Carla Moore and Jeff Glazier.  Do you
14   know who Carla Moore is?
15        A     I do not remember.
16        Q     Okay.
17        A     I don't recall.  Excuse me.
18        Q     Did you talk to a -- a Dr. Moore or any
19   doctor after the shooting involving Mr. Hall?
20        A     I did.
21        Q     You did?
22        A     I did.
23        Q     Why -- who told you to do that?
24        A     I believe that was part of the protocol
25   of an officer-involved shooting.  That was part of

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 213

1    the -- yeah.  I believe that was part of the
2    protocol for -- once an officer is involved in a
3    shooting.
4         Q        It says you would experience emotional
5    -- moderate emotional distress.  Why would you
6    experience emotional distress?
7              MS. SELLERS:  Object to the form of the
8         question.
9              THE WITNESS:  Even though if it comes
10        down to making that -- making a decision or a
11        split-second decision to take a life to save
12        lives, you really don't want to take a life.
13        It was taking a life.  That situation is --
14        is -- is, excuse me, did place me some -- it
15        -- it did have -- it did take -- it did
16        have -- I did have some emotions about that.
17             And also playing back the incident that
18        took place in -- a few years ago prior to
19        that and then be -- to be reminded of it ten
20        days prior of that incident with Mr. Hall.
21   BY MR. WILLIAMS:
22        Q        Were you -- were you an officer
23   involved in the incident with this kid that you
24   talked about got --
25        A        Yes.

Page 214

1         Q        What is the name of this young man?
2         A        Chase Marston.
3         Q        Chase who?
4         A        Chase Marston.
5         Q        Spell that.
6         A        M-A-R-S-T-O-N.
7         Q        Did you authorize the APD counselors to
8    get your external counseling records?
9         A        I do not recall.
10        Q        Did you get a psychological evaluation
11   as part of your Early Warning System, being in the
12   Early Warning System?  Did they do an evaluation of
13   you?
14        A        I believe so.
15        Q        Do you have those records?
16        A        No, I do not.
17        Q        Did you attend any other courses other
18   than the one-day verbal judo course?
19        A        Aside from my yearly in-service
20   training?  I don't believe -- I do not recall.
21        Q        Do you believe your participation in
22   the Early Warning System made you a better officer?
23        A        Yes.
24        Q        How?
25        A        Being able to identify if -- any

Page 215

1    stressors that I may be feeling, any experiences
2    that I may be having that may have a negative impact
3    and, in doing so, being able to -- in order to
4    recognize those factors, make better decisions, make
5    more of an appropriate decision.
6         Q        You believe being in the Early Warning
7    System helped you with the incident with Wet
8    Willie's for the truthfulness issue?
9         A        Yes.
10        Q        In what way?
11        A        It was, again, understanding --
12   understanding if there are stressors involved,
13   recognize the stress, accept that there are
14   stressors there.  Denying them -- denying the
15   stressors just makes matters worse.
16        Q        All right.  So did you receive any new
17   or additional training while in the Early Warning
18   System?
19        A        Not that I recall.
20        Q        Did you -- did your commanders or
21   supervisors discuss with you the use of force
22   incidents that led you being in the Early Warning
23   System?
24        A        Yes.
25        Q        Who?  Who did that?

Page 216

1         A        I see his face.  I don't know -- I see
2    his face.  His name is not coming to me.
3         Q        Did you discuss your emotional
4    stressors that you were dealing with when you had
5    the discuss -- the conversations with your
6    commanders about your use of force incident?  What I
7    am getting at, did you explain to them that part of
8    what you learned in the Early Warning System is the
9    reason you're having these issues or related to your
10   emotional stressors?  Did you have that conversation
11   with them at that time?
12        A        I do not recall.
13        Q        Did your assignment change while you
14   was in the Early Warning System?
15        A        No.
16        Q        Did you continue to have the extra job
17   hours and stuff that you were having?
18        A        I did.
19        Q        If you're dealing with the emotional
20   stressors during this, why are you continuing to
21   work the additional hours?  Is it because of the
22   money?
23        A        To support my family, yes.
24        Q        Did you ever go back to the same duties
25   and assignment at the end of your time in the Early

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

Page 217

1  Warning System?  Well, let me ask you this.  Did you
2  ever get out of the Early Warning System before you
3  was terminated?
4       A     I did.
5       Q     When?
6       A     I believe so.  I'm sorry.  I'm sorry.
7  I -- I believe so.
8       Q     Did you -- did you -- so while you was
9  in the Early Warning System your duties, your
10 assignments, nothing changed about what your
11 day-to-day job was, did it?
12      A     It was reduced.  The amount of extra
13 jobs that I was working was reduced.
14      Q     Okay.
15      A     And as far as my normal operations or
16 normal duties, while on shift, that did not change.
17      Q     Did you -- what requirements did you
18 have to meet in order to get out of the Early
19 Warning System?  What were you told you had to do to
20 get out?
21      A     I do not recall.
22      Q     Did you receive any training on the
23 legal and tactical relating to shooting and nonshoot
24 scenarios when you were either in in-service or at
25 the academy?

Page 218

1       A     Yes.
2       Q     What training on legal and tactical
3  related to shooting and nonshooting scenarios did
4  you get?
5       A     Both classroom and -- both classroom
6  and practical training that we received.  We
7  received a discussion of going over use of force.
8       Q     Did you receive any training that
9  justified shooting into a moving vehicle?
10            MS. SELLERS:  Object to the form of the
11      question.
12            THE WITNESS:  Repeat your question,
13      sir.
14 BY MR. WILLIAMS:
15      Q     Did you receive any training on the
16 circumstances that justify shooting into a moving
17 vehicle?
18      A     Yes.
19      Q     What?  What justification training --
20 what training did you receive justifying shooting in
21 a moving vehicle?
22      A     As to, again, what is observed; what
23 are -- what are the facts; and what actions -- and
24 what actions to take.
25      Q     So tell me specifically what were you

Page 219

1  told that justified shooting into a moving vehicle?
2       A     If there is going to be imminent danger
3  or perceived that bodily harm is going to come to --
4  serious bodily harm is going to come to you or
5  others.
6       Q     And that is why you believe your
7  actions regarding Mr. Hall -- that training is why
8  you believe your actions regarding Mr. Hall were in
9  compliance with the training and the practices you
10 were taught at APD; correct?
11      A     Yes.
12            (Exhibit Number P-12 was marked for
13      identification.)
14 BY MR. WILLIAMS:
15      Q     When you were -- let me show you this
16 document.  I'm going to show you what's been marked
17 as Exhibit 12.  Have you ever seen that document
18 prior to today?
19      A     No.
20      Q     Have you ever seen that statute prior
21 to today?
22      A     Prior to today, no.
23      Q     Have you ever received any training on
24 OCGA 17-4-20 while at APD?
25      A     I recall during in-service.

Page 220

1       Q     In-service?
2       A     In in-service, an in-service training.
3       Q     Were you ever given a copy of that?  Do
4  you remember getting a copy of that?
5       A     I believe so.
6       Q     Tell me when you got this training.
7       A     More than likely during yearly
8  in-service when they -- when we have discussions
9  over use of force.
10      Q     Are you saying more likely because you
11 specifically remember, or you just believe that you
12 normally would get training on that?
13      A     We normally would go over use of force
14 training --
15      Q     I'm not talk --
16      A     -- in in-service.
17      Q     I'm sorry.  I'm not talking about just
18 use of force.  I'm talking about that specific
19 statute.  As we sit here today under oath --
20      A     I do not recall.
21      Q     -- do you specifically recall ever
22 getting a copy of that statute?
23      A     I do not recall.
24      Q     And specifically as relates to that
25 statute, not use of force but that statute, do you

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 221

```
1    specifically receive any training on that?
2        A       I do not recall.
3                (Exhibit Number P-13 was marked for
4        identification.)
5    BY MR. WILLIAMS:
6        Q       I want to -- let's talk about your OPS
7    history and get you out of here.  Okay?  I want to
8    show you what's been marked as Plaintiffs' Exhibit
9    Number 13.  Okay?
10       A       Thank you.
11       Q       Plaintiffs' Exhibit Number 13, Bates
12   stamped PLF00003 and 00004, have you seen this
13   document prior to today?
14       A       No, I have not.
15       Q       As you look at it could you tell me,
16   does this in your recollection accurately set forth
17   the OPS complaints that was -- that you had during
18   your tenure at Atlanta Police Department?  Does
19   it -- have you had a chance to look at it?
20       A       I am reviewing it.
21       Q       Okay.  So am I correct, these are the
22   OPS complaints you've had filed against you during
23   your tenure at APD?
24       A       I believe so.
25       Q       Okay.  The first one deals with the
```

Page 222

```
1    incident where this lady, you come to the scene and
2    you demand this lady throw her keys to you?  Do you
3    recall that incident?  You got sustained in
4    January 20th, 2009?
5        A       Yes.
6        Q       Do you remember that incident?
7        A       I remember that incident.
8        Q       Were you -- did you receive any
9    additional training after that?
10       A       I was counseled after that, yes.
11       Q       But other than counsel did you receive
12   any additional training?
13       A       Not that I recall.
14       Q       Did you get any other discipline other
15   than the oral admonishment?
16       A       No.
17       Q       Do you believe as we sit here today,
18   that you did anything wrong in that incident?  I
19   guess, do you agree with the sustain -- it being
20   sustained against you?
21       A       Yes.
22       Q       You did agree with it?
23       A       Yes.
24       Q       Now, the next one is the complaint of
25   -- where the person said that you drove a certain
```

Page 223

```
1    way to cause their head to get hit in the police
2    car.  Do you remember that incident?  It says you
3    were exonerated from that.  Do you remember that?
4        A       Yes.
5        Q       Did you -- were you truthful and honest
6    in all your statements to the OPS for the -- the
7    first incident as well as the second incident?  This
8    one right here, where you was exonerated?  Were you
9    truthful and honest in both of them?
10       A       Yes.
11       Q       So we have one sustained back in 2009.
12   Then the next sustained would have been July 7,
13   2011.  You were sustained for failure to show up for
14   work; correct?  Do you recall that incident?
15       A       I do not recall.
16       Q       The incident where you said you were
17   sick and you called in but you did not talk to
18   someone -- to a supervisor.  Does that refresh your
19   memory?
20       A       That may have happened.
21       Q       But you -- you acknowledge that you had
22   issues during your employment as a cadet as well as
23   an officer of showing up late and failure to show;
24   isn't that correct?
25       A       Showing up late, yes.
```

Page 224

```
1        Q       Did you ever get disciplined for that?
2        A       I was counseled about that, yes.
3        Q       But were you ever disciplined?  You
4    were talked to about it, but were you ever
5    disciplined?
6        A       Yes, I was.
7        Q       When?  Because I don't see it on here.
8    You were -- you were disciplined -- you got an oral
9    admonishment for failure to show up?
10       A       I know I was disciplined.  I remember
11   -- I can recall being disciplined --
12       Q       Okay.
13       A       -- in regards to that matter.
14       Q       Okay.  So that's your second sustained;
15   correct?
16       A       Yes, that would be the second.
17       Q       And then the next one was sleeping on
18   duty in June of 2008.  Do you recall that incident?
19       A       Yes.
20       Q       Tell me what happened with that.
21       A       I had to move from my place of
22   residence, and I requested to have that day off.
23   Due to staffing I was not able to get that day off,
24   so I did -- I did move.  I did do my move from the
25   establishment to -- into another establishment.  I
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 225

1    reported to work, and during the course of the
2    evening, I would say towards the later part of the
3    night, because I worked the overnight shift going
4    into the early morning --
5         Q        What was your shift time?  When did you
6    come in that night?
7         A        Ten to six.  Ten p.m. to 6 a.m.
8         Q        And what time do you think you fell
9    asleep?
10        A        I would say -- I do not recall the time
11   frame.  I do -- what I can recall -- I cannot recall
12   the time.  I can recall the moment -- moments before
13   falling asleep I went to a convenience store to get
14   a Dr. Pepper to keep me through the evening.  I made
15   it to an intersection that was at my -- that was in
16   my patrolling area, and I just -- I woke up to
17   officers knocking on my window.
18        Q        Were these officers from Sandy Springs?
19        A        Yes, sir.
20        Q        What did you say to them when you woke
21   up to them?
22        A        I recall saying, I must have just
23   knocked off.
24        Q        Then what happened?
25        A        I was met by my sergeant.  Asked me --

Page 226

1    we discussed what had went on, and then my sergeant
2    then advised me to speak with our lieutenant at the
3    time.
4         Q        So wait a minute.  You were -- met with
5    your sergeant.  Did you call your sergeant and say,
6    hey, I just fell asleep; based on our policies, I'm
7    supposed to let you know?  Did you do that?
8         A        No, I did not.
9         Q        Why not?
10        A        I have no answer for that.
11        Q        We saw a policy earlier about sleeping
12   on the duty.  If you are tired, you're supposed to
13   let your superior know; correct?
14        A        Yes.
15        Q        If you were violating a -- it was a
16   rule of sleeping, you're supposed to let your
17   superior know; correct?
18        A        Yes.
19        Q        So how was it that if you didn't do
20   that, how did your supervisor learn?
21        A        I believe that the supervisor was made
22   aware of when Sandy Springs gave their report.
23        Q        So you didn't voluntarily give the
24   information to your supervisor; is that correct?
25        A        Excuse me?

Page 227

1         Q        You didn't voluntarily tell your
2    supervisor preemptively what happened before Sandy
3    Springs, did you?
4         A        No.
5         Q        Why not?
6         A        I wasn't feeling tired at the time.
7         Q        But you did go to sleep?  You
8    acknowledge that; right?
9         A        With what was presented and how things
10   happened, yeah.
11        Q        What was presented was the fact that
12   you yourself just admitted under oath that you was
13   woken up by Sandy Springs Police?
14        A        Yes.
15        Q        I mean, that's not in dispute, is it?
16        A        No.
17        Q        You were -- you're an officer who
18   investigates crime.  It doesn't take Columbo to know
19   you fell asleep; right?
20        A        Yes.
21        Q        You understood that at the moment that
22   Sandy Springs Police knocked on your window; right?
23        A        Yes.
24        Q        Where were you at when you fell asleep?
25        A        At the intersection of Powers Ferry and

Page 228

1    Mount Paran Road.
2         Q        Was the car on?
3         A        I do not recall.
4         Q        Were you at a stoplight or to the side?
5         A        I was at a stop sign.
6         Q        You was at a stop sign?
7         A        Yes, sir.
8         Q        Didn't a citizen at Sandy Springs first
9    notice you?
10        A        I can't answer to the events to what
11   led up to them being there.
12        Q        Would you dispute that if someone said
13   they saw your car swerving before you stopped and
14   went to sleep?  Would you dispute that?
15        A        I wouldn't be able to clearly answer
16   that question, so no.
17        Q        Let me ask you this.  You agree with me
18   sleeping on the job not only is dangerous for
19   yourself?  It's dangerous for the public; correct?
20        A        I do agree.
21        Q        What did you tell the sergeant when he
22   talked to you about the incident?
23        A        About what?
24        Q        Didn't you say your sergeant approached
25   you?

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 58 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

Page 229

```
1     A     Yes.
2     Q     What did you tell him?
3     A     I told him that during my patrol I went
4  to a convenience store to get -- to get a Dr. Pepper
5  to get me through the night and I drove from -- when
6  leaving from the convenience store I came -- I came
7  up to the intersection, and then I was awoken up by
8  Sandy Springs.  So I must have just knocked off.
9     Q     So you told your supervisor you fell
10 asleep?
11    A     I told him that.
12    Q     Did you tell anybody that night, that
13 you had not fallen asleep?
14    A     No, I did not.  Not that I recall, no.
15 Excuse me.
16    Q     Not that you recall.  You would not --
17 I mean, if you had told somebody that you hadn't --
18 been asleep, that would have been --
19    A     That would have been lying.
20    Q     That would have been lying; correct?
21    A     Yes.
22    Q     Do you believe that other people would
23 lie on you or say that you told them something that
24 is not true at the department?  Is there somebody
25 out there that would lie against you?
```

Page 230

```
1     A     I cannot answer that question.
2     Q     Who is Scott Jones?  Was he your
3  sergeant?
4     A     Oh, I don't know his -- I'm not
5  familiar with his first name.
6     Q     Okay.
7     A     But I -- a Sergeant Jones.
8     Q     Was that the superior you're talking
9  about?
10    A     Yes, I am.
11    Q     All right.  And was he a truthful,
12 honest guy?
13    A     Yeah.
14    Q     He's a -- you believe, a guy with
15 integrity?
16    A     Yes.
17    Q     In his statement to the OPS he said, "I
18 did ask if he happened to fall asleep sometime
19 tonight while on duty.  He stated no."
20          That's what's in the statement by
21 Sergeant Jones.
22    A     Repeat that again, please.
23    Q     He then asked -- "I then asked if he
24 happened to fall asleep tonight while on duty.  He
25 stated no.  I responded back to the front of
```

Page 231

```
1  Swinging Richards and advised Lieutenant Whitmore
2  that I spoke to Cadeau and advised her what he
3  said."
4          Do you recall that?
5     A     I don't recall him going to Swinging
6  Richards.  That, I don't recall.
7     Q     Do you recall the incident at Swinging
8  Richards?
9     A     No.
10    Q     Do you recall him asking you if you
11 fell asleep?
12    A     What I can recall him asking me was,
13 was I hiding something?  That, I recall.
14    Q     You don't recall him asking you if you
15 fell asleep?
16    A     I don't recall.
17    Q     You understand that he's saying under
18 oath that you said you hadn't -- you wasn't asleep.
19 You understand that; right?
20    A     Yes, sir.
21    Q     That -- if he's truthful, then you were
22 lying; is that correct?
23    A     I understand.
24    Q     Which would be another incident or
25 issue about truthfulness with you from the Wet
```

Page 232

```
1  Willie's stuff; correct?
2          MS. SELLERS:  Object to the form of the
3  question.
4          THE WITNESS:  I do not -- I cannot
5  answer that question.
6  BY MR. WILLIAMS:
7     Q     All right.  I'm going to show you
8  something.  Which exhibit is that again?
9     A     Thirteen.
10         (Exhibit Number P-14 was marked for
11 identification.)
12 BY MR. WILLIAMS:
13    Q     I'm going to show you what's been
14 marked as Exhibit 14.
15         MR. WILLIAMS:  Tiffany, Exhibit 14 is
16 Bates stamped COA002324 through COA002355.
17 BY MR. WILLIAMS:
18    Q     Go to 002335 and 0022 -- 002334 and
19 2335.  It's your statement in this investigation.
20 Do you see that?
21    A     Yes, sir.
22    Q     You had to be truthful and honest when
23 you gave this?
24    A     Yes.
25    Q     When they asked you on page 02334,
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                                    January 25, 2021

Page 233

1  "When Sandy Springs PD made contact with you, were
2  you sleeping," what was your answer?
3       A    Where?  What page are you on, sir?
4       Q    002334.  Part of your employee
5  statement.
6       A    My -- "When Sandy Spring PD made
7  contact with you -- with you, were you sleeping?"
8            Is that the question you're asking?
9       Q    Yes.  What was your response?
10      A    "I don't remember.  I must have."
11      Q    How did you say you don't remember when
12 you clearly knew that you had been waken -- awoken
13 by Sandy Springs Police?  Why would you give that
14 response, "I don't remember"?  Can you explain that
15 to me?
16      A    I cannot explain that to you.
17      Q    Okay.  Let's go to 002334.  At the
18 bottom it says, "Is there anything you would like to
19 add or remove from your statement?"
20           Do you see that?
21      A    Yes.
22      Q    And your response is what?  Read that
23 for us.  What was your response?
24      A    "Yes.  In reference to Sergeant Jones'
25 statement, he asked me if I happened to fall asleep

Page 234

1  sometime tonight while on duty.  I stated, no.  I
2  felt that I -- I felt that I just dozed off
3  accidentally and didn't deliberately go somewhere to
4  fall asleep.  I should have explained this to
5  Sergeant Jones."
6       Q    So when he asked you, had you fallen
7  asleep anytime while on duty, you did admit in your
8  employment statement that you stated no; correct?
9       A    Yes.  In this statement I did state no.
10      Q    But that was not true, was it?
11      A    What's that?
12      Q    That you didn't fall asleep that night?
13      A    It's true that I did.  Is that what --
14 your point --
15      Q    You told Sergeant -- you admitted you
16 told Sergeant Jones you didn't fall asleep; right?
17      A    Yes.
18      Q    Why did you tell Sergeant Jones no when
19 you knew you'd fallen asleep?
20      A    I cannot give you a clear answer.
21      Q    Is there a pattern of you not being
22 honest and truthful when you are asked questions by
23 your superiors?
24      A    No, there is not.
25      Q    Isn't this the same issue that happened

Page 235

1  with the Wet Willie where you were asked about, did
2  you use OC spray?  Isn't that the same type of
3  situation that happened?
4       A    I can't answer that question clearly.
5       Q    Were you ever disciplined for not being
6  honest with Sergeant Jones?  I know --
7       A    No.
8       Q    -- you were disciplined for sleep, but
9  were you hon --
10      A    It was -- it was just that.  It was
11 just sleeping.
12      Q    Based on the policies, procedures of
13 APD, shouldn't you have been disciplined for not
14 being honest to Sergeant Jones?
15           MS. SELLERS:  Object to the form of the
16      question.
17           THE WITNESS:  Based on policy, yes.
18 BY MR. WILLIAMS:
19      Q    The next thing we're looking at is, we
20 got another -- that was sustained is you were in a
21 vehicle accident in 2012, but you was exonerated
22 from that; correct?  I'm sorry.  We're back to the
23 OPS file.
24      A    Yes.
25      Q    And the next thing is -- is actually

Page 236

1  the incident involving the Carrs; correct?  No, it's
2  not.  No, it's not.  You failed to appear on a
3  subpoena on a case for court; isn't that correct?
4       A    I do not recall.
5       Q    Let me show it to you.  By the way, on
6  the incident involving the sleeping were you ever
7  given a truth verification test, a CVSA test?
8       A    Not that I recall.
9       Q    If they wanted to know if you were
10 being truthful and honest about your communication
11 with Sergeant Jones, they could have given you one;
12 correct?
13           MS. SELLERS:  Object to the form of the
14      question.
15 BY MR. WILLIAMS:
16      Q    Am I correct?
17      A    Yes.
18           (Exhibit Number P-15 was marked for
19      identification.)
20 BY MR. WILLIAMS:
21      Q    I show you what's been marked as
22 Exhibit 15.
23      A    Thank you.
24      Q    Have you seen -- this is your OPS file.
25 Is COA002399 through COA002419.

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 60 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                            January 25, 2021

Page 237

```
 1        MS. SELLERS:  Exhibit 15, does it have
 2    a Bates number?
 3        MR. WILLIAMS:  COA002399 through
 4    COA002419.
 5  BY MR. WILLIAMS:
 6    Q        This is the issue where you issued a
 7  citation to somebody for disorderly conduct but did
 8  not -- did not show up for the court date.  Do you
 9  recall that?
10    A     Yes.
11    Q        This is where your -- you actually
12  signed for the subpoena before the court date, and
13  yet you still did not show up on the court date;
14  right?
15    A     Yes.
16    Q        But you did in fact receive the notice
17  of the court date before -- and signed for it before
18  the court date?  Didn't you get the subpoena before
19  the court date?
20    A     To what I can recall, no.
21    Q        So what is your understanding of why
22  you missed the court date?
23    A     My understanding is that when I
24  received the subpoena, that the court date had
25  already passed.
```

Page 239

```
 1    A     I can't answer that question.
 2    Q        Well, let's go to Bates Number 002410.
 3  Okay.  It says, "Finding of fact.  Officer Cadeau
 4  received a city of Atlanta municipal court subpoena
 5  for November 8th, 2012."
 6    A     What page are you on?
 7    Q     I'm on 002410.
 8    A     Okay.
 9    Q        "Cadeau failed to appear for the court
10  date.  I find the allegations against Cadeau for
11  failing to appear, sustained."
12        Do you see that?
13    A     Yes.
14    Q     And let's go to the COA002412.
15    A     Yes.
16    Q     It says, "Officer Cadeau did not attend
17  the above-referenced court session."
18        Do you see that?
19    A     Yes.
20    Q     Is that your signature on the page?
21    A     On 2412?
22    Q     Yes.
23    A     At the bottom, yes.
24    Q     That's your handwriting; correct?
25    A     Yes.
```

Page 238

```
 1    Q        We go to page COA002412.  Actually, go
 2  to zero -- COA002407 first.  This is your statement
 3  under oath; am I correct?
 4    A     Yes, sir.
 5    Q     "Did you receive a subpoena for
 6  appearance in a municipal court of Atlanta for
 7  November 8th, 2012?"
 8        Your answer was, "Yes, but the subpoena
 9  appeared to be late to me."
10        Do you see that?
11    A     Yes.
12    Q     "Did you sign for the subpoena?
13        "Yes.  But I wrote 'received late' in
14  the signature spot."
15    A     Yes.
16    Q     "Did you know that the subpoena was
17  received before the date you signed for it?
18        No.
19        Did you attend the court date?
20        No, I did not.  The court day had
21  already passed."
22        Is that -- that's correct?
23    A     Yes.
24    Q     But that is not true, is it?  The court
25  date hadn't passed, had it?
```

Page 240

```
 1    Q     Read what you wrote and signed on
 2  December 13, 2012.
 3    A     "On 11/14/2012 I realized that I had
 4  overlooked a subpoena issued to me for 11/8/2012.  I
 5  had missed that court date.  Since -- I had missed
 6  that court date.  Since this happened, I have been
 7  very careful in double-checking the subpoena logbook
 8  to ensure that this does not happen again."
 9    Q     So you signed for the subpoena?  You
10  signed the logbook to when you got it; correct?
11    A     Excuse me.
12    Q     You signed -- you were acknowledging
13  you signed the logbook when you got the subpoena?
14    A     Yes.
15    Q     Okay.  The court date was November 8th,
16  2012; correct?
17    A     Yes.
18    Q     Look on the next page.  What does the
19  investigator say?
20    A     What page are we at now?
21    Q     The next page, 002413.  What does it
22  say?
23    A     Where?  Where do you want me?
24    Q     "My investigation" at the top.
25    A     Okay.
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 241

1    Q        "My investigation revealed that the
2    subpoena was received in zone two on October 31st,
3    2012."
4             Do you see that?  "It was logged in by
5    the morning watch subpoena book on November 1, 2012.
6    Officer Cadeau stated he signed for the subpoena
7    because he overlooked it."
8             But you got the subpoena before the
9    8th, didn't you?  You signed for it before the 8th,
10   didn't you?
11   A        No.  And the reason why I'm answering
12   no is because in my statement beforehand, going back
13   to 2407, it was asked me, did I receive a subpoena
14   in municipal court of Atlanta for November 8th,
15   2012, and I said, yes, but the subpoena appeared to
16   be late, so I wrote "received late" in the signature
17   spot.
18   Q        No.  But the subpoena wasn't late,
19   though, was it, sir?
20   A        It wasn't given to me until after the
21   court -- until after the date.  That's why -- that's
22   why I signed it to say, but I wrote received late in
23   the received -- in the -- in the signature spot.
24   Q        Why did it -- why did you receive it
25   late?  Whose fault was it that you received it late?

Page 242

1    A        I cannot answer that.
2    Q        So why were you sustained for this if
3    you didn't do anything wrong?
4    A        I cannot answer that question.
5    Q        All right.  So you got another
6    sustained for not showing up for court, but you do
7    acknowledge that the fact is, that subpoena was at
8    your -- in your department a week before the court
9    date; right?
10            MS. SELLERS:  Object to the form of the
11        question.
12            THE WITNESS:  I cannot answer that.
13   BY MR. WILLIAMS:
14   Q        Well, you're disputing what the OPS
15   file says?
16   A        I'm not disputing what the OPS file is
17   saying.  I'm only -- the only thing I cannot give
18   you an answer to, when it was -- when the department
19   received it.
20   Q        Do you dispute that the findings said
21   the department received it on October 31?
22   A        I'm sorry.
23   Q        Are you disputing the findings of the
24   OPS that says the subpoena got to you -- got to the
25   department on October 31?

Page 243

1    A        I cannot answer that question.
2    Q        You can't answer if the OPS findings
3    are accurate?
4            MS. SELLERS:  Object to the form of the
5        question.
6            THE WITNESS:  Are you saying -- are you
7        saying according to the OPS findings?
8    BY MR. WILLIAMS:
9    Q        Yes.
10   A        Oh.  No, I'm not disputing it.
11   Q        Okay.  All right.  The next thing we
12   see is your use of force as relates to the Carr
13   matter.
14   A        The who?
15   Q        The Carr matter.  No, not the Carr
16   matter.  The incident -- actually, it is the Carr
17   matter; right?  With the Carr family?  Is that the
18   next incident?
19   A        It doesn't -- on here for the history
20   it doesn't show names.
21   Q        Okay.
22   A        It just shows the violation.
23   Q        141021 -- 14I0260.  I'm sorry.  Yeah,
24   that is the Carr matter.  Let's give you that file,
25   Exhibit Number 16 to your deposition.

Page 244

1    A        Thank you.
2            (Exhibit Number P-16 was marked for
3        identification.)
4    BY MR. WILLIAMS:
5    Q        Now, the interesting thing about the
6    Carr matter is, OPS investigated that incident;
7    correct?  Isn't that correct?
8    A        Yes.
9    Q        And they found you had no sustained --
10   they found nothing to sustain the allegations;
11   correct?  There was an issue whether your extra job
12   permit was approved, correct, and then there was an
13   issue whether you used unnecessary force on the
14   Carrs; am I right?  You can go to COA00007 if you
15   want.
16   A        Your question, sir?
17   Q        Am I correct that Exhibit Number 16 is
18   the incident with the Carrs where there was -- OPS
19   investigated you for whether you had the extra job
20   permit appropriately as well as unnecessary force
21   regarding the Carrs; is that correct?
22   A        Yes.
23   Q        And the investigation, they basically
24   do not sustain either one; correct?
25   A        That is correct.

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 245

```
1      Q       But later you were counseled by the
2  city of Atlanta law department that your actions
3  were inappropriate; correct?
4              MS. SELLERS:  Object to the form of the
5         question.
6  BY MR. WILLIAMS:
7      Q       After the case settled?
8              MS. SELLERS:  Same objection.
9              THE WITNESS:  Yes.  After the
10        conclusion of the case, I was then counseled.
11 BY MR. WILLIAMS:
12     Q       And you were counseled that the Carrs
13 were in their rights to curse at you and to give the
14 finger to you; right?
15             MS. SELLERS:  Object to the form of the
16        question.
17 BY MR. WILLIAMS:
18     Q       They had the Constitutional right to do
19 that?  Weren't you counseled on that?
20             MS. SELLERS:  Same objection.
21             THE WITNESS:  I was counseled that
22        their -- their First Amendment right cannot
23        be taken away from them, nor can it be -- nor
24        can it be violated.
25 BY MR. WILLIAMS:
```

Page 246

```
1      Q       So can you explain how the city of
2  Atlanta and the law department enters into a
3  settlement with the Carrs but the OPS investigation
4  finds nothing where you were sustained for what
5  happened?  Can you explain that?
6      A       I cannot explain that.
7      Q       You agree that that's inconsistent,
8  isn't it?
9      A       I cannot answer that.
10     Q       What was your probable cause to even
11 engage Mr. -- the Carrs that time?
12     A       My probable cause to engage them was
13 to -- was to arrest them, as you point -- as your
14 question.
15     Q       What were you arresting them for?
16     A       Disorderly conduct and obstruction.
17     Q       What --
18     A       And obstruction.
19     Q       What was the disorderly conduct that
20 gave you the probable cause to go arrest them?
21             MS. SELLERS:  Object to the form of the
22        question.
23             THE WITNESS:  The behavior and the
24        language that was used against me in the
25        presence of women and children.
```

Page 247

```
1  BY MR. WILLIAMS:
2      Q       All right.  So you did not get a
3  sustained on that, but there was a settlement of
4  that case; correct?
5              MS. SELLERS:  Object to the form of the
6         question.
7              THE WITNESS:  I cannot answer that
8         question.
9  BY MR. WILLIAMS:
10     Q       I thought you said it was a settlement?
11             MS. SELLERS:  Object to the form of the
12        question.
13             THE WITNESS:  I said that once the case
14        settled.  It was settled, concluded, ended.
15        That's what I meant.
16 BY MR. WILLIAMS:
17     Q       Oh, okay.  Did you understand -- who
18 told you it was settled?
19     A       When I spoke to those at the law
20 department, that they said that the case is now
21 over.  It's concluded.  It's settled.
22     Q       All right.  The next one is the
23 incident with the OC spray with the arrested guy;
24 correct?  And you said he lunged -- didn't you
25 testify earlier that you testified -- that you gave
```

Page 248

```
1  a statement that he lunged at you; is that correct?
2      A       To what I -- to what I recall, yes.
3      Q       I mean, if it happened, you would have
4  said that in the OPS file; correct?  Isn't that
5  true?
6              MS. SELLERS:  Object to the form of the
7         question.
8  BY MR. WILLIAMS:
9      Q       Am I correct?
10     A       Yes.
11             (Exhibit Number P-17 was marked for
12        identification.)
13 BY MR. WILLIAMS:
14     Q       I want to show you what's been marked
15 as Exhibit 17 to your deposition.
16     A       Thank you.
17     Q       For all these OPS files -- all these
18 OPS files did you have a union representative there
19 with you?
20     A       Yes.
21     Q       Is it a lawyer that's there?
22     A       Your union rep would be your counselor.
23     Q       Okay.  Okay.  This is Bates stamped
24 COA002421 through COA002484, and let's go to your
25 statement.  Go to C zero -- COA002438.
```

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 63 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 249

```
 1    A    Three eight?
 2    Q    Through COA002439.  Do you see that?
 3  Your statement.  You gave the statement on August,
 4  it looks like 6th of 2014.  Do you see that?  Do you
 5  see it?
 6    A    I'm sorry.  Repeat your question.
 7    Q    Yes.  You gave a statement under oath
 8  on -- on August 6, 2014.  You signed it on page
 9  COA002438 and COA002439.  Do you see that?
10    A    Yes.
11    Q    Is what you put on here truthful and
12  accurate?
13    A    Yes.
14    Q    Can you tell us where you put -- where
15  the arrestee, Mr. Squire, lunged at you or was a
16  threat to you?
17    A    It is not noted here in this statement.
18    Q    In fact, would you please read the --
19  your answer to this question when the interviewers
20  asked you, "Was Mr. Squire a physical threat to you
21  or to any other officer when you sprayed him?"
22         What was your answer?
23    A    "He was not a physical threat to me,
24  but he was being verbally disruptive to Officer
25  Carter while she was attending to another prisoner
```

Page 250

```
 1  by leaning towards her, referring to her as Bumpity
 2  Bump."
 3    Q    "Exactly why did you use your OC spray
 4  on Mr. Squire," which is the next page?
 5         What was your answer?
 6    A    "Because I felt he was becoming a
 7  distraction towards Officer Carter and for not
 8  complying with my commands to stop referring to
 9  Officer Carter as Bumpity Bump."
10    Q    He asked you, "Have you answered all my
11  questions truthfully and to the best of your
12  knowledge?"
13         What do you say?
14    A    Yes.
15    Q    Did you at any point in your statement
16  say, because he was lunging as you testified here
17  today?
18    A    No, I did not.
19    Q    In fact, when asked, was Mr. Squire a
20  physical threat to you or any other officer, you
21  said, he was not a physical threat to me, didn't
22  you?
23    A    I did.
24    Q    So is -- this directly contradicts your
25  testimony here today earlier, doesn't it?
```

Page 251

```
 1    A    It would.
 2    Q    You said when was asked, "Why did you
 3  spray Mr. Squire," you did not say, lunging?  You
 4  said, "For not complying with my commands."
 5         Do you see that on the next page?
 6    A    Yes.
 7    Q    So as -- I'm going to ask you again
 8  under oath, is the reason you sprayed Mr. Squire,
 9  who was an arrestee, because he did not comply with
10  your commands?
11         MS. SELLERS:  Object to the form of the
12       question.
13         THE WITNESS:  No.  That's okay.
14  BY MR. WILLIAMS:
15    Q    Go ahead.
16    A    Repeat your question again, please.
17    Q    As you sit here now I'm going to give
18  you a chance to answer this question under oath
19  again.  Is the reason you sprayed Mr. Squire, who
20  was handcuffed, was not because he was a threat to
21  you but because he did not obey your command; isn't
22  that true?
23    A    According to this document and what I
24  -- according to this document, that would be true.
25    Q    And that contradicts and that is
```

Page 252

```
 1  against your earlier testimony; is that correct?
 2    A    It does.
 3    Q    Is it lawful for you to use OC spray on
 4  an arrestee who's handcuffed just because they don't
 5  follow your commands?
 6    A    It is unlawful.
 7    Q    It is unlawful, isn't it?
 8    A    Yes, it is.
 9    Q    In fact, it's an assault, isn't it?
10    A    Yes, it would.
11    Q    Was you ever disciplined for this
12  assault?
13    A    I was disciplined for the incident,
14  yes.
15    Q    In fact, you was disciplined, and then
16  your discipline was lowered, wasn't it?
17    A    I can't answer that question.
18    Q    Was you ever charged or was your case
19  ever sent to the district attorney for the assault?
20    A    Not that I recall.
21    Q    Do you agree with me you did commit an
22  assault on Mr. Squire; right?
23         MS. SELLERS:  Object to the form of the
24       question.
25         THE WITNESS:  To what is being shown,
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                    January 25, 2021

---

Page 253

1        yes.
2   BY MR. WILLIAMS:
3        Q      Let me ask you this, Mr. Cadeau.  If
4   you have an oath of office that we talked about
5   earlier to follow the laws of Georgia, the
6   Constitution, you agree with me, you violated Mr.
7   Squire's Constitutional right of unnecessary force
8   and excessive force when you sprayed him in the face
9   while he's handcuffed because he did not comply with
10  your command; isn't that true?
11              MS. SELLERS:  Object to the form of the
12       question.
13              THE WITNESS:  In the questions that you
14       are asking, that would be true.
15  BY MR. WILLIAMS:
16       Q      Based on the policies and procedures,
17  based on the Constitution of Georgia and the United
18  States, by using your OC spray on a handcuffed man
19  just because he did not follow your commands and
20  because he's saying stuff that you don't like, the
21  policies of APD require you to be terminated for
22  doing that, doesn't it?
23              MS. SELLERS:  Object to the form of the
24       question.
25              THE WITNESS:  I cannot answer that

---

Page 254

1        question.
2   BY MR. WILLIAMS:
3        Q      When I asked you earlier, should an
4   officer continue to work who uses unnecessary force
5   on somebody who is not a physical threat to them or
6   someone else, you testified that that person should
7   not be employed at APD.  Do you recall that?
8              MS. SELLERS:  Object to the form of the
9       question.  Assumes facts not in evidence.
10  BY MR. WILLIAMS:
11       Q      I asked you about a couple of hours
12  ago -- I said, if you use force on somebody who
13  is -- during the time I kept asking, is force
14  allowed when they're not a threat to you or no one
15  else?
16              You said, no.
17              I said, if someone uses that force and
18  they're no threat to you or someone else and they do
19  it, do you agree with me they should not work at
20  APD?  You recall me asking you that?
21              MS. SELLERS:  Object to the form of the
22       question.  Assumes facts not in evidence.
23              THE WITNESS:  I do recall.
24  BY MR. WILLIAMS:
25       Q      And what did you say to me then?

---

Page 255

1        A      I said, they should not.
2        Q      They should be terminated; right?
3        A      I said they should, yes, I did.
4        Q      You just admitted in your own statement
5   that you used force on somebody who was not a threat
6   to you or anyone else.  Based on your own statement,
7   based on your own testimony here today under oath,
8   you agree with me you should have been terminated;
9   isn't that true?
10              MS. SELLERS:  Object to the form of the
11       question.
12              THE WITNESS:  To your question, yes.
13  BY MR. WILLIAMS:
14       Q      Can you explain to me -- not only was
15  you not terminated, but look -- look at page -- go
16  to page COA002471.
17              THE VIDEOGRAPHER:  Shean?
18              MS. SELLERS:  Give me a count the time,
19       please.
20  BY MR. WILLIAMS:
21       Q      Do you see it?
22       A      I'm here.
23       Q      Okay.  This is the notice of final
24  adverse, and do you see where you -- they say you
25  were requesting a reduction, a suspension without

---

Page 256

1   pay for two days.  Do you see how you're requesting
2   your suspension to be dropped?  Do you see that?
3        A      I see it.
4        Q      And am I correct --
5        A      Excuse me.  I'm sorry.
6        Q      Go ahead.
7        A      Okay.
8        Q      By the way, where did you spray him at?
9   Before we forget, where did you spray him at?
10       A      Across the eyes.
11       Q      Did you intentionally spray him across
12  the eyes?
13       A      Yes.
14       Q      Why?
15       A      In deploying OC spray -- I'm trained to
16  deploy OC spray across the eyes from right to left
17  or left to right.
18       Q      Did they tell you -- so what you did
19  regarding spraying Mr. Squire in the eyes was
20  pursuant to your training?
21       A      Yes.
22       Q      So if you look at -- I see -- I'm
23  sorry.  Go to page COA002429.  Go back.  There is a
24  memo to -- from Spillane to Chief Turner.
25       A      You said two nine?

---

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 65 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                    January 25, 2021

Page 257

1    Q      Yes.
2    A      Excuse me.
3    Q      002429.
4    A      Okay.
5    Q      And you see where Chief Turner signs
6  off a recommendation of four days' suspension for
7  the maltreatment or unnecessary force and one day
8  for the conduct, so that is a total of five days.
9           Do you see that?
10   A      Oh, okay.  Yes, I do.
11   Q      Am I right?
12   A      I do see that.
13   Q      That's on October 15, 2014.  Do you see
14 that?
15   A      Yes, sir.
16   Q      And let's go back to what actually
17 happened.  No, actually we can just go to the
18 exhibit with your OPS.  Look at your exhibit with
19 your OPS, the one that has your -- your history.
20   A      Yes, sir.
21   Q      What was your ultimate suspension?
22   A      From what it shows, two days.
23   Q      So not only did you start with five
24 days, not only did you not get terminated, your
25 suspension went down from five days to two; isn't

Page 258

1  that right?
2    A      From what it shows here, yes.
3    Q      Can you explain how somebody who has
4  admitted to have committed an assault on somebody
5  not only is not terminated but the suspension that
6  they're originally given is lessened?
7           MS. SELLERS:  Object to the form of the
8       question.
9           THE WITNESS:  I cannot answer that
10      question.
11          MR. WILLIAMS:  Let's change the tape.
12          THE VIDEOGRAPHER:  Going off video
13      record.  The time is 7:47.
14          (A recess was taken.)
15          (Exhibits Numbers P-18 and P-19 were
16      marked for identification.)
17          THE VIDEOGRAPHER:  The time is 7:55.
18      We're back on the record.
19 BY MR. WILLIAMS:
20   Q      All right, Mr. Cadeau.  After we got
21 past the incident of the OC spray and the handcuffed
22 guy, Mr. Squire, you then get a complaint against
23 you for July 14, 2014, when this lady says you're
24 yelling at her about her not turning right into
25 Dunkin' Donuts when you were doing an extra job

Page 259

1  outside of a Dunkin' Donuts.  Do you recall that?
2    A      Yes.
3    Q      This is -- this is after you got into
4  the Early Warning program; correct?  This happened
5  in July of -- well, actually, went into the Early
6  Warning program a month after that; right?
7    A      After this?
8    Q      After the incident with the Dunkin'
9  Donuts lady.
10   A      I do not recall.
11   Q      Okay.  They did not sustain that, but
12 she was pretty adamant that you just yelled at her
13 for no reason when she just didn't understand your
14 traffic instructions.  What is your -- what is your
15 recollection of what happened?
16   A      To my recollection I believe that she
17 mentioned that I used -- that I was cursing at
18 her --
19   Q      Uh-huh.
20   A      -- yelling and cursing at her, and I
21 did not curse at her.
22   Q      So if she came and testified at this
23 trial that you in fact cursed at her, you would
24 dispute those facts?
25   A      That is correct.

Page 260

1    Q      And this was not sustained because it
2  was basically your word against hers; correct?
3    A      I can't answer that question.
4    Q      All right.  Well, let's go to the next
5  one, though, which happened also August 1 of 2014.
6  This is the incident where this kid had his
7  headphones on.  He worked at the World Congress
8  Center out there in the same area where the Hall
9  situation happened.  It's not part of that document.
10   A      Not part of this?
11   Q      No.  But I'm just talking to you about
12 it.
13   A      Okay.
14   Q      If you want to see it, I can show it to
15 you, but do you recall the incident where this
16 incident where this kid was walking and the
17 headphones, he could not hear you, and you was --
18 approached him because he was not following the
19 directions you thought he should, and then there was
20 an allegation that you threw him up against the
21 fence and assaulted him when you finally came to
22 him.  Do you remember -- that's the allegation.  I'm
23 not saying it's true.  I'm just telling you that is
24 the allegation.  Do you recall that?
25   A      I recall the incident.

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                      January 25, 2021

Page 261

1    Q    Tell me what you recall about it so
2  we're on the same page.
3    A    I had -- I was working that
4  intersection, and I had started to release vehicle
5  traffic.  I had stopped pedestrian traffic from
6  crossing Northside Drive and released northbound
7  traffic, and then I released the pedestrians to walk
8  northbound, and then I went to tend over to south --
9  to the southbound side.
10       And once I told the pedestrians it was
11 clear to walk across what was called Joseph
12 E. Boone, I then released southbound traffic, but as
13 I looked behind me I saw the gentleman, the -- the
14 gentleman walking across the street, and I went
15 towards him to get him out of harm's way of the
16 vehicles that were coming.
17       Then I got him over to the side, and
18 yes, I did yell at him to say, you could have been
19 seriously hurt; why did you keep walking across the
20 street?  And then I saw that he had a shirt that had
21 the Georgia Aquarium, and I said, if someone tells
22 you to -- to -- if you are telling someone -- I
23 remember -- I recall stating to him that if -- when
24 you are working at the Georgia Aquarium and you're
25 telling someone that they cannot go into an area,

Page 262

1  are they not supposed to follow your direction?
2       I said, same thing here because you're
3  trying to keep them safe.  I'm trying to keep you
4  safe.
5    Q    You gave him a citation; right?
6    A    Yes, I did.
7    Q    And what was the citation for?
8    A    Disobeying traffic -- traffic
9  personnel, I believe.  I recall.  I believe so.
10   Q    There was witnesses that made
11 accusations that you actually physically threw him
12 up against a fence and used unnecessary force on
13 him; am I correct?
14   A    I can't answer that.
15   Q    Did you learn that he had headphones in
16 his ear and he could not hear you?
17   A    No, I did not.
18   Q    You never learned that as part of the
19 file?
20   A    I can't recall that, sir.
21   Q    Is this near the intersection where the
22 Hall incident happened?
23   A    It is in that same intersection.
24   Q    So you got the Dunkin' Donuts
25 situation.  You got the Wet Willie's situation we're

Page 263

1  about to talk about.  You've got the Carrs and that
2  festival.  You have this kid in the Jay-Z Beyonce
3  concert.
4    A    Is this the same incident with the
5  gentleman with the headphones?
6    Q    Headphones.
7    A    Oh, okay.
8    Q    And then we got the Halls, and it all
9  seems consistent with people not obeying your
10 commands.  Have you noticed that you have -- there
11 is issues and allegations when you make a command
12 and tell people to do and if they don't follow it,
13 something seems to happen after that?  Do you see
14 the consistency in that?
15   A    I cannot answer that question.
16   Q    You cannot answer it?
17   A    No.
18   Q    Why not?
19   A    If I'm looking at the timeline of these
20 incidents and I'm just saying -- and I'm just
21 looking at dates.  I'm just looking at dates.  I've
22 also demonstrated these same duties in between these
23 occurrences where this is not a result.  There is --
24 these results have not occurred.
25   Q    But you were not sustained on that,

Page 264

1  even though there was a witness and some audio
2  presented to OPS about this incident; correct?
3    A    I can't answer that.
4    Q    Well, look at -- you can look at the
5  report, the OPS history.  You did not give get -- it
6  was deemed not sustained; correct?
7    A    0635.
8    Q    You were sustained for courtesy.
9  That's what you were sustained for; right?  Do you
10 see it now?  It's 14C0540UAF.
11   A    Okay.  And courtesy was sustained.
12       (Exhibit Number P-20 was marked for
13    identification.)
14 BY MR. WILLIAMS:
15   Q    As a matter of fact, let's go and
16 introduce it, Exhibit Number 20.  This is the
17 incident where it was sustained, an issue for
18 courtesy but not on the unnecessary force; correct?
19   A    Looking at page COA002516, that is
20 correct.
21   Q    And if we look at COA002517 in the OPS
22 investigation note, it says, "Cadeau stated he
23 grabbed Mr. Thurmond's arm and walked him back
24 across the street.  Cadeau stated at no point did he
25 touch Mr. Thurmond's head, face, or anything like

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 67 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 265

1  that with his finger."
2              Do you see that?
3      A      What page are you on?
4      Q      08 -- zero -- COA00257.
5      A      257?
6      Q      Uh-huh.
7      A      257.
8      Q      C000025 -- it's, like, in the first
9  three pages there, page Number 3.
10     A      2517?
11     Q      2517, yes.
12     A      Okay.
13     Q      I said 07?
14     A      You said seven.
15     Q      Okay.  2517.  I'm sorry.
16     A      And where are you on this page?
17     Q      It says, you admitted to grabbing Mr.
18 Thurmond's arms and walked him back across the
19 street.
20     A      Yes.
21     Q      And on the next page, 2518, it says,
22 "Cadeau was witnessed by impartial witness treating
23 Mr. Thurmond rudely and disrespect -- respectfully
24 and belittled him in front of everybody."
25             Do you see that?

Page 266

1      A      I do see it.
2      Q      Are you saying you didn't do that?
3      A      I'm saying that I did not.
4      Q      Mr. -- Mr. Thurmond comes and testifies
5  in court, are you going to dispute if he testifies
6  that you were disrespectful, rude, and belittled
7  him?  Would you disagree with him on that?
8      A      Yes, I would.
9      Q      And what about the witness?  You'd
10 disagree with her as well?
11     A      Yes.
12     Q      He says you did admit you explained to
13 him boisterously, a concern for his safety.
14             What do you mean by that?  Do you see
15 what you said?  You said you explained to him
16 boisterously, his concern for his safety?
17     A      That my voice was -- my voice was, say,
18 loud.
19     Q      What is --
20     A      And --
21     Q      Go ahead.  I'm sorry.
22     A      And that I was concerned about his
23 safety.
24     Q      Let me understand this.  You are doing
25 an extra-duty job to do traffic, right, at this

Page 267

1  time; correct?
2      A      Conduct pedestrian and vehicular
3  traffic, yes.
4      Q      You got this guy that walks across the
5  street who doesn't hear you.  Clearly something is
6  going on.  He's now across the street.  Why do you
7  feel the need to do all of this and bring him back,
8  give him two citations?
9      A      He was not across the street.
10     Q      You didn't have to walk him back?
11     A      I walked him back, but when I
12 encountered him, he was in the street.
13     Q      Why don't you just let him go across
14 the street?
15     A      Because he could have gotten hurt.
16 This is August of 2014?  Yes?
17     Q      Yes.  This is after the same type of
18 stuff happened with the Carrs.
19     A      And this is also -- this is also after
20 the incident involving Chase Marston at that same
21 intersection.
22     Q      So is -- are you saying that you made
23 decisions about the incident with Mr. Thurmond based
24 upon this incident with this Chase?
25     A      It's -- I would not say that it's

Page 268

1  totally based on this incident, but I'm taking
2  safety in that matter of safety, higher.
3      Q      Okay.
4      A      My concerns are higher.
5      Q      Let's go, then, to the Wet Willie's
6  situation.  That's Exhibit Number 19, is it?  OPS
7  file 14I0635.
8      A      That is 18.
9      Q      That is 18?  Okay.  Thank you.
10 Eighteen.  Now, this is the incident where you were
11 working an off-duty job; correct?
12     A      Yes.
13     Q      At Wet Willie's --
14     A      Yes.
15     Q      -- on Ponce?  Is that on Ponce?
16     A      No.
17     Q      That's on Piedmont?
18     A      That's on Piedmont.
19     Q      Okay.  Tell me what happened.
20     A      It was the end of the night.  There was
21 a fight that had broken out by the rear exit door.
22 With the assistance of security, we was able to get
23 the fight out of the exit door.  I recall once the
24 fight exited the door, made sure that the crowd
25 dispersed.

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 269

1    I went back into the Wet Willie's
2 location and saw that there was another fight that
3 took place inside of Wet Willie's, and there was
4 larger than the first one. So I go through the
5 crowd yelling, get away, get away. The crowd
6 dispersed. I made notification.
7    The victim told me that she gave me
8 information, description of the person that --
9 persons that attacked her. I went to that
10 direction, located the suspects, brought them back,
11 had them arrested. Supervisors came to the
12 location. They asked if I had just deployed my OC,
13 and I said no.
14    Q    Why did you say no?
15    A    Because I did not. I did not recall
16 just deploying my OC during that interaction.
17    Q    Did you not do it, or you don't recall
18 doing it?
19    A    I said -- I stated to my supervisors,
20 no, that I did not.
21    Q    As we sit here today did you, in fact,
22 deploy your OC spray?
23    A    No, I did not.
24    Q    Was your OC spray ever deployed?
25    A    Yes, it was.

Page 270

1    Q    So how did it get deployed?
2    A    An investigation was done.
3    Q    By whom?
4    A    What is his name? Heath. I think it
5 was Heath. Heald was his name.
6    Q    Who is Heald?
7    A    Sergeant Heald.
8    Q    Who was he with?
9    A    He's with the -- at the time, he's with
10 the city of Atlanta.
11    Q    Who is he with now?
12    A    I would assume he's still with the city
13 of Atlanta.
14    Q    Is he part of OPS?
15    A    No. When I asked him -- when the
16 supervisors came, those parties that were inside
17 stated that there was a witness that stated to my
18 supervisor that I deployed OC, and I said, I did not
19 deploy OC. Sergeant Heald then requested for my
20 canister. I gave him my OC canister.
21    He shook it, and he said, oh, you
22 know -- you're -- he's like, oh, yeah, it's been
23 used.
24    And I said, I didn't do it. So they
25 went inside to conduct their investigation. I

Page 271

1 remained outside. I thought about it with
2 everything being presented; with the OC, the
3 witness. Then I recant -- then I changed my answer
4 from no to yes to what was presented. So an OPS
5 investigation was done. When the OPS investigation
6 was -- had concluded, they had recommended
7 termination for lying.
8    Q    Let me get this straight. You first
9 said no, you didn't. Then you said you recanted and
10 said yes, you did?
11    A    Yes.
12    Q    And then there was an OPS
13 investigation?
14    A    Yes.
15    Q    Where you also told them you had done
16 it; correct?
17    MS. SELLERS:  Object to the form of the
18    question.
19    THE WITNESS:  I'm sorry.
20 BY MR. WILLIAMS:
21    Q    In the OPS investigation didn't you
22 state that you said you had used the OC spray?
23    A    I did mention that.
24    Q    So initially, no; at the scene, yes;
25 during the OPS investigation you said yes? Correct?

Page 272

1    A    Yes. So --
2    Q    Did you say no again at some point?
3    A    I know adamantly for myself that I did
4 not, but with the evidence presented I said yes. So
5 going through the -- going through the
6 investigation, upon recommendation I then had to
7 meet with Chief Turner at the time.
8    Q    Okay.
9    A    And then meeting -- and then meeting
10 with Chief Turner, I did have union representation
11 throughout the -- throughout the process, excuse me,
12 and there was video showing that I did not deploy
13 OC. What had taken place was that I had the OC
14 canister in my hand while I was going through the
15 crowd.
16    Someone came on my blind side and
17 knocked it out of my hand, and realizing that, I
18 stepped on it, and in stepping on the OC, it
19 deployed into the crowd. Video also shows that when
20 I picked up my OC can, there was a puddle of the OC
21 on the floor.
22    Q    So you say this video shows that you
23 did not spray it?
24    A    That is correct.
25    Q    So are you now -- so at the hearing

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 273

1 with Chief Turner you changed your answer to no, I
2 did not?
3      A      I do not recall.
4      Q      Wait a minute.  You just said the video
5 said you didn't do it.
6      A      Yes.
7           MS. SELLERS:  Object to the form of the
8      question.
9 BY MR. WILLIAMS:
10      Q      So if the video said you didn't do it,
11 didn't you tell Chief Turner -- wouldn't you
12 reasonably tell Chief Turner, I didn't do it if you
13 believed it?
14      A      Well, I was under advice of counsel, so
15 at that time I only spoke to Chief Turner real
16 briefly in regards to what had happened, so -- so in
17 that, my union rep is the one that presented that --
18 that evidence to Chief Turner.
19      Q      And it's your belief the video
20 exonerates you and shows you did not do it?
21      A      Yes.  And my belief.
22      Q      So let's get this story straight.  You
23 first said no when you was first asked that you used
24 it; correct?
25      A      Yes.

Page 274

1      Q      Then at the scene when a sergeant came
2 up again, you said, yes, I did use it; correct?
3      A      Yes.
4      Q      And then when the OPS investigation
5 where you had -- under oath and a duty to tell the
6 truth, you said you had used it?
7      A      From what I recall, yes, I did explain
8 that.
9      Q      You just asked for leniency; right?
10      A      I do not recall.
11      Q      Okay.  Then you're saying now that you
12 get to the hearing where Chief Turner -- to decide
13 your fate and your union rep argues that the video
14 shows you didn't use it, and now you're saying you
15 never used it; is that correct?
16      A      I cannot answer that question.
17      Q      Well, you believe when you finished
18 with -- with Chief Turner, you had not used it;
19 correct?  At that time you don't believe you'd used
20 it?
21      A      That is correct.
22      Q      So you went from one, two, three -- you
23 have four different changes in your answer; correct?
24      A      I can't answer that question.
25      Q      Well, let's count them.  You have the

Page 275

1 no initially.  That's one.  You had yes at the
2 scene, two, because you called your supervisor and
3 were crying about it and saying, I misspoke.  You
4 recanted; remember?
5      A      Continue.
6      Q      So that was two.  Number 3 was the OPS
7 file investigation where they asked you a couple of
8 times and you said yes, and then four, you're saying
9 at Chief Turner's hearing you said no?  You now
10 believe no?  That is four different answers --
11 changes; correct?
12           MS. SELLERS:  Object to the form of the
13      question.
14           THE WITNESS:  I can't answer that
15      question.
16 BY MR. WILLIAMS:
17      Q      At this time when Chief Turner is
18 making this decision isn't it true that based on the
19 reckoning period, the incident involving Mr. Squire
20 was something that should have been part of the
21 decision regarding your reckoning period.  That was
22 within the reckoning period for your discipline,
23 wasn't it?
24      A      I do not recall.
25      Q      Well, we can look now.

Page 276

1      A      Okay.
2      Q      The Mr. Squire incident happened on
3 June 19th, 2014, and this is going on -- I think you
4 finally had the hearing in February of 2015.  That's
5 within the -- less than a year.
6      A      That's what -- that is within a year.
7      Q      So you agree with me based on
8 disciplinary policy, Chief Turner had the right,
9 based on you-all's own policy, to consider the whole
10 issue with Squire when determining what to do with
11 you in February of 2015; is that correct?
12      A      Repeat your question again.
13      Q      Isn't it correct that Chief Turner had
14 the right under the disciplinary policy to consider
15 your incident with Mr. Squire when making the
16 decision whether to terminate you in February of
17 2015?
18      A      I can't answer that.
19      Q      Did you discuss with Chief Turner about
20 your emotional issues, potential emotional sensors
21 you'd discussed with the people at Early Warning
22 during your hearing?
23      A      I do not recall.
24      Q      How many times have you fired your
25 weapon outside of the incident with Mr. Hall while

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 70 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

Page 277

```
1    you were employed at APD?
2        A       How many times have I fired in -- it my
3    entire tenure?
4        Q       At APD other than the Hall situation.
5        A       None.
6        Q       The Halls was the only time you ever
7    fired your weapon since 2007?
8        A       Since 2007, 2008, yes.
9        Q       What about use your OC spray?  How many
10   times?  We know two times based on Wet Willie's.
11   Well, you don't think you used it that time, so
12   let's not count Wet Willie's because you said yes,
13   you did and then you said no, you didn't.  So what
14   about Mr. Squire?  Any other time other than
15   Mr. Squire you used your OC spray?
16       A       I'd say about four.
17       Q       Did you do a use of -- a use of force
18   report for every incident?
19       A       Oh, man -- the supervisor would do
20   that.
21       Q       But you were -- you were to document
22   that you used use of force in your initial report;
23   correct?
24       A       Yes.
25       Q       Would you -- what about the Taser?  How
```

Page 278

```
1    many times have you used your Taser?
2        A       Have I used the Taser?  I have not.
3        Q       What about the ASP baton?
4        A       The ASP baton.
5        Q       Uh-huh.
6        A       I have not.
7        Q       And what about physical force on a
8    suspect?  How many times have you done that?
9        A       Do not recall.  I would say once,
10   twice.
11       Q       So tell me what happened with the
12   disposition of this incident where -- with the Wet
13   Willie's.  Based on Exhibit Number --
14       A       Eighteen.
15       Q       -- 18 I'm correct that all the
16   supervisors under Cad -- under Chief Turner
17   recommended you be terminated, but Chief Turner
18   after the hearing disagreed and made your
19   truthfulness to be not sustained; correct?
20       A       Repeat your question again, sir.
21       Q       Am I correct based on the OPS file, the
22   other supervisors underneath Chief Turner had agreed
23   that you should be terminated?
24               MS. SELLERS:  Object to the form of the
25       question.
```

Page 279

```
1    BY MR. WILLIAMS:
2        Q       Isn't that correct?
3        A       I can't answer that question.
4        Q       Well, tell me what ends up happening to
5    you after this hearing when you had your union
6    representative speaking for you.
7        A       What happens -- what happened
8    afterwards, after the hearing with Chief Turner, I
9    was returning back to duty.
10       Q       Was you a sergeant at this time?
11       A       No, I was not.
12       Q       All right.  Anything -- anything -- how
13   long after the hearing was you returned back to
14   duty?
15       A       During the incident and also during the
16   investigation I was relieved of duty.  I was placed
17   on administrative leave.  I believe it was for -- I
18   believe a week.  Do remember, if I can recall.
19   Excuse me.
20       Q       All right.  The last thing is the
21   incident with Mr. Hall.  That's Exhibit Number 20.
22   My first question to you is, did you -- were you
23   truthful and honest when you participated in that
24   investigation?
25       A       I'm sorry.
```

Page 280

```
1        Q       Was you truthful and honest when you
2    gave statements pursuant to the OPS investigation
3    surrounding Mr. Hall, which is Exhibit Number 20?
4        A       Yes, I was.  Though I want to point out
5    that it's not Number 20 here.
6        Q       What is it?
7        A       Nineteen.
8        Q       Nineteen.  Okay.  Sorry.  Exhibit
9    Number 19 is the one with Hall.  I appreciate that.
10   Number 20 is the one with the young kid, the kid
11   from the Jay-Z concert.  Exhibit Number 19, were you
12   truthful and honest when you gave your statement in
13   Exhibit Number -- Exhibit Number 19?
14       A       Yes.
15       Q       By the way, when you were -- that
16   investigation with Wet Willie's, every time you met
17   with OPS, did you have your union rep there during
18   that time too?
19       A       Yes.
20       Q       So the -- was it ever argued or
21   discussed during those OPS meetings, about the
22   video?  I guess I'm trying to figure out if you had
23   your representative at Chief Turner's hearing
24   bringing up the video, why didn't you-all bring it
25   up during the OPS investigation?
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                          January 25, 2021

Page 281

```
 1      A      I cannot answer that question.
 2      Q      All right.  So let's look at your
 3  statement that you gave Bates stamped Number
 4  COA00098.  Actually -- it actually starts -- I'm
 5  sorry.  Your statement actually starts on COA00096
 6  and goes all the way over to 000192; am I correct?
 7  Am I correct?
 8      A      Yes.
 9      Q      Go to zero -- 00098.  I want to talk
10  about that.  All right.  Let's start in the middle
11  of the paragraph where it talks about the driver
12  still not complying with verbal commands.  I
13  unholstered my city-issued weapon at low ready
14  position.
15             Do you see that?  Do you see that?
16      A      Yes, I see it.
17      Q      While you're giving verbal commands and
18  you say he's not complying with your verbal
19  commands, what action had Mr. Hall done that allowed
20  you or permitted you or gave you the thought that
21  you should unholster your city-issued weapon at low
22  ready position?
23      A      I observed Mr. Hall move his vehicle
24  while Officer Evans was giving him -- was giving him
25  instructions, which was to no left turn; go
```

Page 282

```
 1  straight, and he kept moving his vehicle.  I then
 2  turned to look to see what was going on, and I heard
 3  the interaction between the driver and Officer
 4  Evans.  The driver kept moving his vehicle then down
 5  towards my -- into my direction.
 6             And I gave him my verbal commands to
 7  stop moving your vehicle.  I repeatedly gave these
 8  -- this command to stop moving your vehicle.  He
 9  kept moving his vehicle towards me.
10      Q      So are you saying that while you're
11  giving the commands, Mr. Hall is constant -- is
12  continuously driving his vehicle --
13      A      That is correct.
14      Q      -- in his -- okay.  And this -- okay.
15  Go ahead.  Finish your story.
16      A      And then upon that, he still was moving
17  his vehicle towards my direction.  I unholstered my
18  city-issued weapon.  I did not point my city-issued
19  weapon directly at him.  I pointed downward to get
20  him to stop.
21      Q      Is he -- did you -- say he keeps moving
22  his vehicle.  Is he talking to Officer Evans while
23  he's moving his vehicle?
24      A      When I kept telling him to stop --
25      Q      I wasn't talking about you.  I'm
```

Page 283

```
 1  talking about Evans.  Was he --
 2      A      Evans?
 3      Q      Yeah.  Was he --
 4      A      There was a time where he was.
 5      Q      So he was moving his vehicle and
 6  talking to Evans?
 7      A      Yes.
 8      Q      Okay.  Let's get back to you.  Is he
 9  talking to you and moving his vehicle too?
10      A      No.
11      Q      So when you got over there, he
12  stopped -- he stopped his vehicle?
13      A      I didn't go anywhere.
14      Q      Okay.  Well, you interjected into it
15  because you were not initially involved, from my
16  understanding?  Correct?
17      A      That is correct.
18      Q      When you interjected and came over and
19  started talking to Mr. Hall, was he moving his
20  vehicle?
21      A      When I interjected, I did not move
22  anywhere towards Mr. Hall.  He was moving towards
23  me.
24      Q      My question was, was he moving his
25  vehicle?  Was his vehicle moving, or was it still?
```

Page 284

```
 1      A      No.  His vehicle was moving.
 2      Q      So he is driving as he's talking to
 3  you?
 4      A      He's driving and was talking to Evans,
 5  and by the time he came into my -- into -- coming
 6  into my direction, I am then now giving him lawful
 7  commands to stop.  Stop moving your vehicle.  Stop
 8  moving your vehicle.  Stop moving your vehicle.
 9  That's when he --
10      Q      Did he ever stop?
11      A      That's when he stopped, after the third
12  one and after I had unholstered my weapon.
13      Q      So he eventually stopped?
14      A      Yes.
15      Q      And complied with your command to stop
16  moving his vehicle?
17      A      Yes.
18      Q      And then you-all had words?
19      A      No.
20      Q      Well, tell me -- tell me what happened
21  then.
22      A      After he stopped moving his vehicle, I
23  gave him -- I gave him -- I gave him -- I gave him
24  instructions to go to the right, go down, and come
25  back up.  Go to the right, come back down, and come
```

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 72 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 285

1    back up.
2        Q       Okay.  What happened next?
3        A       So it seemed -- it appeared that at
4    that time Officer Evans was on my right.  Captain
5    Carter was behind -- was -- was next to me as well.
6    He then -- it appeared that he was going to comply
7    to the suggestions given, so he moved his vehicle as
8    to -- as to merge back on into traffic.
9                I was able to see, you know, his back,
10   his -- I was able to see his back.  I was able to
11   see that his head was turned.  The next thing you
12   know, he guns it, making a hard left turn.
13       Q       So did you -- at this point he had
14   stopped, and you said you felt that he was going to
15   comply; right?
16       A       I'm sorry.
17       Q       He had stopped moving his vehicle?
18       A       Yes.
19       Q       And you felt like he was going to go
20   back the way you-all wanted him to go; right?
21       A       After giving him the instructions to go
22   to the right, go down, and come back up.
23       Q       Did you still have your holster -- your
24   gun out of your holster?
25       A       Once he started moving away, I then

Page 286

1    reholstered.
2        Q       But, no.  Before he moved away, once he
3    started talking to you, did you still have your gun
4    holstered?
5        A       Once he started talking to me?
6        Q       Uh-huh.
7        A       My -- from what I recall, my gun was
8    still -- my weapon was still in my hand.
9        Q       So you had it out in low ready?
10       A       Yes.
11       Q       What training allowed you to have it
12   ready -- low ready like that?  Is that how you-all
13   trained at APD?
14               MS. SELLERS:  Object to the form of the
15       question.
16   BY MR. WILLIAMS:
17       Q       I mean, if that's what the training --
18       A       In that -- in that incident, sir, I was
19   scared, and I was alarmed by Mr. Hall's actions to
20   continue to move his vehicle towards me after the
21   repeated -- repeated commands of stop.
22       Q       So --
23       A       So to gain compliance I unholstered my
24   weapon.  I unholstered my city-issued weapon to gain
25   compliance.

Page 287

1        Q       To gain compliance from Mr. Hall?
2        A       Yes.
3        Q       And that is something that you as --
4    as -- that is, you believe, consistent with the
5    training you had at APD; is that correct?
6        A       Yes.
7        Q       And so to gain control of the situation
8    with Mr. Hall, you took your gun out in the ready
9    position to make sure he complied?
10       A       That is correct.  To gain compliance
11   because I'm not at that -- I'm not at the level of
12   deadly force at that time.  I'm still at officer
13   presence.
14       Q       Okay.  At the time you had low ready,
15   were you in the pathway of the van?
16       A       Yes.
17       Q       You were in the direct pathway in front
18   of the van?
19       A       Yes, sir.  I was able to see the front
20   of the van, and I was able to see the driver, Mr.
21   Hall.  I was able to describe what I was able -- I
22   was able -- from my position, that is how I was able
23   to give a description of Mr. Hall.
24       Q       I'm not asking about a description.
25   I'm talking about, were you in direct path to be in

Page 288

1    danger of being hit by the van when you were in low
2    ready position?
3        A       Yes.
4        Q       So you were in front of the van?
5        A       Yes.
6        Q       So at some -- you testified earlier
7    that you -- when you fired the gun, you was not in
8    front of the van, so did you move at some point?
9        A       Yes, I did move after some point.
10       Q       So at some point you was in front of
11   the van, but then you moved to the side of the van?
12       A       When Mr. Hall appeared to comply to the
13   commands given to go straight, make a U-turn, and
14   come back up, he moved his van from -- he moved his
15   van and appeared to merge on into traffic.  When he
16   -- when he then gunned it to make that hard left
17   turn, out of reaction, I moved.
18       Q       As part of the OPS file they typically
19   ask you guys to sometimes draw where everything is
20   at; right?  Am I correct?
21       A       I cannot answer that question.
22       Q       I've seen, actually, diagrams where
23   you-all were asked to draw.  Not in this incident,
24   but -- you've never been able to do that?
25               (Exhibit Number P-21 was marked for

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                         January 25, 2021

Page 289

```
 1          identification.)
 2  BY MR. WILLIAMS:
 3       Q       Well, do this.  Would you mind -- do
 4  you mind drawing where you were at in relation to
 5  the van when -- where you, Officer Evans were at in
 6  relation to the van when you fired your weapon?
 7       A       In relation to when I fired the weapon?
 8       Q       Uh-huh.
 9       A       I can't -- I cannot give you a drawing
10  of that.
11       Q       Why?
12       A       Everything happened so fast.
13       Q       How about before you fired your weapon?
14  How about that?
15       A       I can give you an approximation of
16  before he made -- of before that left turn was made.
17       Q       At the time you fired the weapon were
18  you ever in front of Mr. Hall's van?
19       A       At the time when I fired?
20               MS. SELLERS:  Object to the form of the
21       question.
22               THE WITNESS:  I can't answer that
23       question.  No, I was not.  Sorry.
24  BY MR. WILLIAMS:
25       Q       Were you ever -- were you in the direct
```

Page 290

```
 1  path of his van when you fired your firearm?
 2       A       I can't answer that question.
 3       Q       Where were you -- where was the
 4  location -- your location in relation to the van
 5  when you first fired your gun?  Where you first
 6  pointed your gun?
 7       A       I was directly in front of it.
 8       Q       And this is when you moved to the left
 9  of him?
10       A       I never moved.
11       Q       So you never moved --
12       A       I never moved.
13       Q       -- the whole time?  Did he ever show
14  you a piece of paper that gave him permission to --
15  to have access to a certain part of the World
16  Congress Center?
17       A       No, he did not.
18       Q       Did he ever show Officer Evans?  Do you
19  know?
20       A       I know he showed Officer Evans
21  something.  I cannot recall what it was.
22       Q       Did Officer Evans ask your assistance?
23       A       No, not that I recall.
24       Q       Why did you -- why did you give it,
25  then?
```

Page 291

```
 1       A       I observed Mr. Hall moving his vehicle
 2  while Officer Evans was giving him -- while he's
 3  giving him commands -- commands of instruction to go
 4  straight, keep straight, no left turn, and he kept
 5  moving his vehicle while Officer Evans is giving him
 6  those -- while Officer Evans are giving those
 7  commands and instructions, and as he kept moving his
 8  van, he then comes -- he's coming into my direction.
 9       Q       My question was, why did you give
10  assistance -- why did you come over there if he
11  didn't ask for your assistance?
12       A       Looking at -- looking at what I
13  observed, Officer Evans needed assistance.  I was
14  even in the assistance -- I didn't need -- excuse
15  me.  What I am saying -- what I'm saying is, he's
16  not -- from what I observed, he's not complying with
17  Officer Evans.  He's just not, and then now he's
18  coming into my direction.  That's why I -- that's
19  why I then made contact with Mr. Hall.
20       Q       Mr. Evans never fired his weapon, did
21  he?
22       A       No.
23       Q       Did Officer Evans ever draw his weapon
24  out of his holster?
25       A       Not that I recall.
```

Page 292

```
 1       Q       What about Carter?  Did he ever draw
 2  his weapon?
 3       A       Not that I recall.
 4       Q       Did he ever fire his weapon?
 5       A       Not that I recall.
 6       Q       Was any other officers out there at the
 7  time?
 8       A       No.
 9       Q       You were the only officer that felt
10  that there was a threat to use deadly force?
11       A       Yes.
12       Q       You're the only officer out there who
13  felt the threat to have your gun in low ready
14  position?
15       A       Yes.
16       Q       Is this another time that you
17  interceded into a situation that didn't initially
18  involve you?  You first got the incident with the OC
19  spray with the arrest; correct?  Isn't that correct?
20       A       Yes.
21       Q       This is the second time this has
22  happened where you get involved in something that
23  doesn't initially involve you; correct?
24       A       Yes.
25       Q       It's also a situation where someone had
```

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                          January 25, 2021

Page 293

1  been -- you've used force on somebody where they
2  didn't obey your commands; correct?
3       A     I cannot answer that question.
4       Q     Well, you did -- you used force on
5  Mr. Squire after he didn't comply with your
6  commands; correct?
7       A     Yes.
8       Q     You arrested and charged the Carrs
9  after they didn't follow your commands; correct?
10      A     Repeat your question.
11      Q     You -- you arrested and charged the
12 Carrs when they didn't follow your commands;
13 correct?
14      A     Yes.
15      Q     And you cited, you grabbed the -- the
16 -- the young man that worked at the aquarium,
17 brought him back across the street, and charged --
18 gave him two citations when he didn't follow your
19 commands; correct?
20      A     Yes.
21      Q     Go to COA000110.  Do you see that?  You
22 were -- you were asked, "What was your position in
23 relation to the van when you discharged your
24 weapon?"
25            And your answer was what?

Page 294

1       A     "On left, driver's side."
2       Q     So you were not in front of the van
3  when you discharged your weapon; correct?
4       A     According to the statement, correct.
5       Q     Well, I'm asking you now.  Forget the
6  statement.  Was you in front of the van or not?
7       A     When I discharged, no, I was not.
8       Q     Let's go to 000 -- 000113.  They ask
9  you on that page, "Where were you in relation to the
10 van?  Now, you said you was on the left side of the
11 van."
12            You said, "That was correct.
13            Which is the driver's side?
14            Yes, sir.
15            So you are near the driver's side
16 window?
17            The driver's side window.
18            If you were by the driver's side window
19 when you fired your weapon, you were never in danger
20 of being struck by the van, were you?"
21            And your answer was, "Yes, I was."
22            You see that?
23      A     Yes.
24      Q     And then he said, "Explain how you were
25 in danger of being struck by a van if you were on

Page 295

1  the driver's side."
2            Do you see that question?
3       A     Yes.
4       Q     I'm going to ask you under oath right
5  now, can you explain to us in this case how you were
6  in danger of being struck by a van when you are
7  admitting that you were on the driver's side of the
8  van at the window?
9       A     How I felt that I was in fear of my --
10 in danger of myself other -- and of others is that
11 this is not your normal van.  This was a high cust
12 -- this was a customized van.  It was lifted with
13 high tires, and it was of not a normal standard.
14 To -- even to the point where I had to look up at
15 Mr. Hall.
16            So when he moved his vehicle again,
17 suggesting that he was going to comply with his head
18 turned and back towards me, I was able to see him.
19 So I'm now -- so while his van is moving, and then
20 he guns it to make that hard left turn, I felt that
21 I was going to be struck by that van, so that's
22 where I felt that I was in fear of my -- of my
23 safety and the safety of others.  Also being in
24 close proximity of the van as well.
25            (Exhibit Number P-22 was marked for

Page 296

1       identification.)
2  BY MR. WILLIAMS:
3       Q     As a result of the OPS investigation
4  you were terminated; correct?
5       A     Yes.
6       Q     Did you have a hearing with Chief
7  Turner -- well, it wasn't Chief Turner then.  Did
8  you have a hearing with the chief like you did the
9  first time with the truthfulness issue of Wet
10 Willie's?
11      A     I'm not understanding your question.
12      Q     To be terminated you had a hearing?
13 Remember, you had a hearing?
14      A     Yes.
15      Q     Did you have that type of hearing with
16 the chief for the Hall situation?
17      A     Yes.
18      Q     And did the union represent you in
19 that?
20      A     Yes.
21      Q     Now, you were also indicted for this
22 incident; correct?
23      A     Yes.
24      Q     And you were charged with aggravated
25 assault, violation of an oath by a public officer,

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 75 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                          January 25, 2021

Page 297

1  reckless conduct, and violation of oath by a public
2  officer; am I correct?
3      A      Can you repeat that again, please?
4      Q      My question was, you were charged with
5  aggravated assault, two counts of violation of an
6  oath by a public officer, and reckless conduct; am I
7  correct?
8      A      Yes.
9      Q      And you had legal counsel for that?
10     A      Yes.
11     Q      And what was the disposition of those
12 charges?  Or is there a disposition?
13     A      On -- there was a plea.
14     Q      And what was the plea?
15     A      I accepted the plea to probation and
16 community service.
17     Q      Did you plead guilty, sir?
18     A      Yes, I did.
19     Q      So you admitted -- you admitted guilt
20 to the counts of aggravated assault, two counts of
21 violation of public service, and reckless conduct?
22     A      I pled to the charges that were -- that
23 was placed on me, yes.
24     Q      So is the answer to my question yes?
25     A      It is yes.

Page 298

1      Q      Are you -- is it your position, then,
2  that although you pled guilty, you don't believe you
3  did anything wrong on this incident?
4      A      That is my belief.
5      Q      And although you pled guilty to the
6  offenses of aggravated assault, violation of public
7  office, and reckless conduct, you believe that you
8  did not violate Mr. Hall's Constitutional rights?
9      A      I do believe so.
10     Q      You believe you did not?
11     A      I do.  I believe I did not.
12     Q      And is your position in this case that
13 your actions with Mr. Cadeau -- let me strike that.
14 Your action with Mr. Hall prior to, during, and
15 after the incident involving Mr. Hall was in
16 consistency with what you were trained as an APD
17 officer?
18     A      Yes.
19     Q      Did you -- did you call 911 for Mr.
20 Hall after you shot him?
21     A      I've made notification that I just --
22 that I discharged my weapon in regards to the
23 incident.
24     Q      That was not my question.
25     A      So I advised --

Page 299

1      Q      Did you call --
2      A      -- radio.  Excuse me.  I advised
3  dispatch of the incident.
4      Q      Did you ask dispatch to call 911?
5      A      No, I did not.
6      Q      Did you know you'd hit him?
7      A      Afterwards.  It was -- afterwards it
8  was told to me that he was struck.
9      Q      Did you try to render any aid of any
10 sort?
11     A      I was not able to.
12     Q      Why not?
13     A      After discharging my weapon, Mr. Hall
14 continued to -- driving his van -- his van at a high
15 rate of speed.  I gave chase on foot while he was
16 weaving in and out of traffic.  When I made the
17 notification of the incident, I also gave a
18 description of the van and the direction of travel.
19     Q      Do you know if he was in control of the
20 van after you shot him?  Did you see what was going
21 on with him after he'd been shot?
22     A      No, I did not.
23     Q      So do you know -- you said he was at a
24 high rate of speed.  Do you know if he just lost
25 control because he'd just been shot?

Page 300

1      A      No, I do not.
2      Q      Do you expect to be -- did you expect
3  to be fired by Chief Turner regarding the Wet Willie
4  incident before you went to the hearing?
5             MS. SELLERS:  Object to the form.
6             THE WITNESS:  I can't answer that
7       question.
8  BY MR. WILLIAMS:
9      Q      What do you mean, you cannot answer
10 that?
11     A      Because after the meeting with Chief
12 Turner it was still under review.
13     Q      No.  I'm talking about before you got
14 there.  Did you expect to be fired before the
15 hearing?
16     A      No, I did not.
17     Q      Why not?
18     A      Because I didn't know what to expect.
19     Q      Do you know why Chief Turner did not
20 fire you for the Wet Willie's incident?
21     A      From the video that was present -- from
22 the video and evidence presented and why it showed
23 -- it shows that -- why I had first mentioned -- to
24 my belief why I first mentioned that I did not
25 deploy my OC to then admitting to it because of what

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 76 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                           January 25, 2021

Page 301

1  was presented, and then the video shows that I did
2  not deploy the OC.
3      Q       Did Chief Turner tell anyone to tell
4  you why you were not fired?
5      A       I can't answer that question.
6          MR. WILLIAMS:  I just need a couple of
7      more identification markers to introduce
8      these exhibits, and I think I'm going to be
9      done.
10         THE REPORTER:  Can we stop for just a
11     second, please?
12         THE VIDEOGRAPHER:  Going off video
13     record.  The time is 8:52.
14         (Discussion ensued off the record.)
15         THE VIDEOGRAPHER:  Time is 8:57.  We're
16     back on the record.
17         (Exhibits Numbers P-23, P-24, and P-25
18     were marked for identification.)
19         MR. WILLIAMS:  I'm going to introduce
20     Exhibit 22, which is the separation notice of
21     Mr. Cadeau from the city of Atlanta,
22     COA00247.  Next I'm going to introduce
23     Exhibit 23, which is the direct indictment of
24     Cadeau, true bill on October 10th, 2018.
25         Exhibit 24 will be the plea of guilty

Page 302

1      signed by Mr. Cadeau filed March 9th, 2020,
2      with the clerk's office; and then Exhibit 25
3      is a transcript of guilty plea of -- before
4      Honorable Judge LaGrua regarding the plea of
5      Mr. Cadeau.
6  BY MR. WILLIAMS:
7      Q       They're in order.  Excuse me, sir.
8  Exhibit 22, am I correct that is your separation
9  notice identifying when you were terminated,
10 separated from your employment with the city of
11 Atlanta?
12     A       Yes.
13     Q       Did you get a copy of that?
14     A       I believe so, yes.
15     Q       Did you still -- and when you got
16 terminated did you continue to have your benefits
17 and retirement?
18     A       No.
19     Q       What did you lose when you got
20 terminated?
21     A       Everything.
22     Q       Twenty-three, am I correct that is the
23 indictment?
24     A       It is.
25     Q       Is that the true bill of indictment for

Page 303

1  the charges you were indicted on in this case
2  involving Mr. Hall?
3      A       Yes.
4      Q       Let's go to 24.
5      A       Exhibit 24?
6      Q       The next one.  Exhibit 24, am I correct
7  that's the plea of agreement that you agreed to as
8  relates to the criminal charges brought against you
9  for the incident involving Mr. Hall?
10     A       Yes.
11     Q       And is that your signature on that plea
12 agreement?
13     A       Yes.
14     Q       What day did you sign it?
15     A       February 26 of 2020.
16     Q       You understand what pleading guilty
17 means?
18     A       Yes.
19     Q       Number 25 is the last one.  Am I
20 correct Exhibit 25 is a transcript of a hearing you
21 had where you pled guilty in open court for the
22 charges involving Mr. Hall?
23     A       Yes.
24     Q       When you -- when you testified in open
25 court, was your -- truthful and honest?

Page 304

1      A       Yes.
2      Q       Now, am I correct that the district
3  attorney's office had filed something to maybe
4  overturn your guilty plea?  Are you aware of that?
5      A       I'm sorry.
6      Q       Were you aware that the district
7  attorney had filed a motion to overturn your guilty
8  plea because Mr. Hall was not given adequate notice
9  of the hearing?  Were you aware of that?
10     A       I heard -- I was told something of that
11 matter.
12     Q       So although you pled guilty, it's still
13 outstanding whether or not your guilty plea is going
14 to be accepted; am I correct?
15     A       I can't answer that question.
16         MR. WILLIAMS:  I have no further
17     questions for you, Mr. Cadeau.
18             EXAMINATION
19 BY MS. SELLERS:
20     Q       Mr. Cadeau, I have some questions
21 today.  How are you today, sir?
22     A       I'm fine.
23         MS. SELLERS:  May I have some exhibit
24     stickers, Mr. Court Reporter.  I just have a
25     few questions.  I promise I will not keep you

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

Page 305

1    that long.
2              (Discussion ensued off the record.)
3              (Exhibits Numbers COA-A, COA-B, and
4         COA-C were marked for identification.)
5    BY MS. SELLERS:
6         Q    And I'm going to mark my exhibits as A,
7    B, and C because I believe that he used numbers, so
8    that way we'll be clear.
9              Mr. Cadeau, I believe when you
10   testified, when counsel for the Halls was talking to
11   you during your examination -- and I'm sorry.  I'm
12   going to wear my mask because I'm just real cold
13   sensitive.  Okay?  So if you can't hear me or
14   understand me, ask me to repeat it or rephrase it,
15   and I promise you I'll do that.
16             THE VIDEOGRAPHER:  I will say that this
17        is very --
18             MS. SELLERS:  It is?
19             THE REPORTER:  Sorry.  AJ, could you
20        repeat that?
21             THE VIDEOGRAPHER:  All I said is that
22        it was very blurry on the video.  I feel like
23        I'm doing not my job if --
24   BY MS. SELLERS:
25        Q    So I promise you I'm going to be super

Page 306

1    quick because the COVID situation has me.  So I'm
2    going to show you what I am going to mark as City of
3    Atlanta A, B, and C.  I have a copy for -- I believe
4    when you testified when Mr. Williams was asking you
5    questions, you talked about the Halls' vehicle.  Is
6    that correct?
7         A    Yes.
8         Q    And I believe that you mentioned that
9    the vehicle was not a regular van.  Is that what --
10   is that correct?
11        A    Yes.
12        Q    So let me show you this document.  Take
13   a look at those.  I'm sorry.  Take a look at those
14   pictures for me.  Do you recognize those pictures?
15        A    No.
16        Q    No?  Is this -- does this -- could this
17   be the van that the Halls was driving at the time of
18   the incident?
19        A    Yes.
20        Q    Now, I want you to turn your attention
21   to Plaintiffs' Exhibit 13.  It is the Atlanta Police
22   Department OPS file.  Do you see that?  Yes.  Okay.
23   So what I want to do is I want to make sure that I'm
24   reading this correctly.  Okay?  The subject incident
25   or the incident involving the Halls, if you look on

Page 307

1    page 2 of that document where it says, "6.09, use of
2    firearms 2/27/2017."
3         Q    Do you see that?
4         A    Yes.
5         Q    Okay.  Is that the date of the incident
6    involving the Halls?
7         A    2/27, yes.
8         Q    All right.  So let me just go through
9    these really quickly.  I'm sorry.
10             MR. WILLIAMS:  I don't think that's the
11        exact date.  I think that's the date down
12        there.  I think it happened on the 25th,
13        just --
14             MS. SELLERS:  Okay.
15             MR. WILLIAMS:  It's not a big deal.  I
16        just didn't want you --
17             MS. SELLERS:  Oh, no, no, no.  That is
18        fine.
19   BY MS. SELLERS:
20        Q    Mr. Cadeau, do you recall the date of
21   the -- the date that the complaint was filed in this
22   action?
23        A    No, I do not.
24        Q    Well, I'm going to represent to you
25   that the complaint that was filed --

Page 308

1         A    Excuse me, sir.
2         Q    -- copy of the complaint that we have
3    was filed on October 17, 2018.  Okay?  So I'm going
4    to ask you as we go through these documents,
5    these -- Plaintiffs' Exhibit 13 --
6         A    Yes, ma'am.
7         Q    -- which of these incidents occurred
8    before October 17, 2018.  Okay?  All right.  So you
9    look on these page -- on the first page, I see
10   08C0709CTSY.
11             Do you see that?
12        A    Yes.
13        Q    And it says a citizen's complaint; is
14   that correct?
15        A    Yes.
16        Q    And it appears that, if I'm looking at
17   how this is reading, that this violation occurred on
18   December 4, 2008, with a disposition on
19   January 20th, 2009.  Would that be correct?
20        A    Yes.
21        Q    And is 2008 before 2018, sir?
22        A    Yes.
23        Q    Is 2009 before 2018, sir?
24        A    Yes.
25        Q    Okay.  There is a -- let's go to the

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                January 25, 2021

---

Page 309

1  next one.  I see 08C0741UAF.  Do you see that, sir?
2    A    Yes.
3    Q    See the date of the incident occurred
4  on December 31st, 2008, sir?  Do you see that?
5    A    Yes.
6    Q    And it shows the disposition was on
7  August 6, 2009.  Do you see that?
8    A    Yes.
9    Q    Okay.  And August 6, 2009, occurred
10 before October 17, 2018; is that correct?
11   A    Yes.
12   Q    Okay.  Let's go to the next one,
13 11I0276AP.  Do you see that, sir?
14   A    Yes.
15   Q    Okay.  The date of that incident
16 happened on May 31st, 2011; is that correct, sir?
17   A    Yes.
18   Q    The disposition was on July 7, 2011; is
19 that correct, sir?
20   A    Yes.
21   Q    Is July 7, 2011, before October 17,
22 2018?
23   A    Yes.
24   Q    Is it before October 17, 2016?
25   A    Yes.

Page 310

1    Q    Okay.  I'm sorry.  Let me just ask that
2  same question for the previous one, 08C0741UAF.  It
3  looks like it was -- the disposition was October 6,
4  2009.  Is that correct, sir?
5    A    Repeat the --
6    Q    I'm sorry.  I'm going to go up one.  I
7  forgot to ask you that separate question.
8    A    Okay.
9    Q    The 08C0741UAF, do you see that?
10   A    Yes.
11   Q    Looks like the date of the incident was
12 December 31, 2008.  Do you see that, sir?
13   A    Yes.
14   Q    Do you see the disposition was on
15 August 6, 2009.  Do you see that, sir?
16   A    Yes.
17   Q    Does that August 6, 2009, date occur
18 before October 17, 2016?
19   A    Yes.
20   Q    Let's go up to the first one,
21 08C0709CTSY.  Do you see that, sir?
22   A    Yes.
23   Q    The date -- the incident occurred on
24 December 4, 2008, sir; is that correct?
25   A    Yes.

Page 311

1    Q    And the date of disposition was
2  January 20th, 2009, sir; is that correct?
3    A    Yes.
4    Q    Is that before October 17, 2016?
5    A    Yes.
6    Q    Let's jump down to -- with the fourth
7  one, which is 11I0291AT.  Do you see that, sir?
8    A    Yes.
9    Q    It looks like that incident occurred on
10 June 6, 2011.  Is that correct, sir?
11   A    Yes.
12   Q    It looks like the disposition occurred
13 on July 7, 2011.  Is that correct, sir?
14   A    Yes.
15   Q    Is that date before October 17, 2018,
16 sir?
17   A    Yes.
18   Q    Is that date before October 17, 2016,
19 sir?
20   A    Yes.
21   Q    Let's go to the next one, 12 -- I see
22 12I0860BA or zero BA.  Do you see that, sir?
23   A    Yes.
24   Q    It looks like that incident occurred on
25 December 10, 2012.  Is that correct, sir?

Page 312

1    A    Yes.
2    Q    Looks like the disposition was on
3  January 17, 2013.  Is that correct, sir?
4    A    Yes.
5    Q    Is January 6 -- January 17, 2013,
6  before October 17, 2018, sir?
7    A    Yes.
8    Q    Is January 17, 2013, before October 17,
9  2016, sir?
10   A    Yes.
11   Q    Let's do the next one, 13I0021STA.  Do
12 you see that, sir?
13   A    Yes.
14   Q    It looks like the incident occurred on
15 January 15, 2013.  Is that correct, sir?
16   A    Yes.
17   Q    Looks like the disposition was on
18 May 3rd, 2013.  Is that correct, sir?
19   A    Repeat that again, please.
20   Q    It looks like the disposition was on
21 May 3rd, 2013, sir.
22   A    Yes.
23   Q    Is that -- is May 3rd, 2013, before
24 October 17, 2018, sir?
25   A    Yes.

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

---

Page 313

1    Q        Is May 3rd, 2013, before October 17,
2  2016, sir?
3    A        Yes.
4    Q        Turn the page, please.  Thank you.  Top
5  line, 14IO260UAF, do you see that, sir?
6    A        Yes.
7    Q        Looks like the incident occurred on
8  April 18th, 2014.  Do you see that, sir?
9    A        Yes.
10   Q        Looks like the disposition was on
11 August, 19th, 2014.  Do you see that, sir?
12   A        Yes.
13   Q        August 19th, 2014, before October 17,
14 2018, sir?
15   A        Yes.
16   Q        Is it before October 17, 2016, sir?
17   A        Yes.
18   Q        Let's go to the next one.  It says --
19 use of force, 14IO431UAF.  Do you see that, sir?
20   A        Yes.
21   Q        Looks like the incident occurred
22 June 19th, 2014, sir.  Is that correct?
23   A        Yes.
24   Q        Disposition on January 6, 2015.  Do you
25 see that, sir?

---

Page 314

1    A        Yes.
2    Q        Does that -- is January 5 -- I'm sorry,
3  January 6, 2015, does that occur before October 17,
4  2016 -- 2018, sir?  I apologize.
5    A        Yes.
6    Q        Does it occur before October 17, 2016,
7  sir?
8    A        Yes.
9    Q        Okay.  Let's go to 14CO491CTSY.  Do you
10 see that, sir?
11   A        Yes.
12   Q        Looks like that event occurred on
13 October 7, 2014, sir.  Is that correct?
14   A        Yes.
15   Q        Disposition occurred on October 24,
16 2014; is that correct, sir?  Did I say October.  I'm
17 sorry.  Strike that.  September 24, 2014.
18   A        That is -- yes.
19   Q        I apologize for misstating that.  Is
20 September 24, 2014, before October 17, 2018?
21   A        Yes.
22   Q        Is it before October 17, 2016?
23   A        Yes.
24   Q        Okay.  Let's jump down to 14UAF.  I'm
25 sorry.  Wrong.  14CO540UAF.  Do you see that, sir?

---

Page 315

1    A        Yes.
2    Q        Okay.  Looks like the event occurred on
3  August 1, 2014.  Do you see that?
4    A        Yes, I do see it.
5    Q        Okay.  And now I see where the
6  disposition -- oh, sorry.  Excuse me.  Occurred on
7  December 29th, 2014.  Do you see that, sir?
8    A        Yes.
9    Q        Is December 29th, 2014, before
10 October 17, 2018?
11   A        Yes.
12   Q        Is it before October 17, 2016, sir?
13   A        Yes.
14   Q        Let's go down to the next one,
15 14IO635UAF.  Do you see that, sir?
16   A        Yes.
17   Q        Looks like the event occurred on
18 September 9, 2014.  Do you see that, sir?
19   A        Yes.
20   Q        Now, this one has, it looks like two
21 deposition dates.  I want to just make sure for the
22 use of force, the disposition date was
23 December 31st, 2014.  Do you see that, sir?
24   A        Yes.
25   Q        Is that December 31, 2014, date before

---

Page 316

1  October 17, 2018?
2    A        Yes.
3    Q        Is it before October 17, 2016?
4    A        Yes.
5    Q        Okay.  Then I have the truthfulness
6  complaint or claim.  It looks like that one, the
7  disposition was February 18, 2015.  Do you see that?
8    A        Yes.
9    Q        Is February 18th, 2015, before
10 October 17, 2018?
11   A        Yes.
12   Q        Is it before October 17, 2016?
13   A        Yes.
14   Q        Okay.  So just so that I'm clear, all
15 of the incidents other than the firearm discharge
16 involving the Halls occurred before October 17,
17 2018; is that correct?
18   A        Yes.
19   Q        And the dispositions also occurred
20 before October 17, 2018?
21   A        Yes.
22   Q        And the events occurred before
23 October 17, 2016; is that correct?
24   A        Yes.
25   Q        And the dispositions also occurred

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

---

Page 317

1  before October 17, 2016?

2      A      Yes.

3          MS. SELLERS:  I have no further

4  questions.

5          THE VIDEOGRAPHER:  Anything else, sir?

6          MR. WILLIAMS:  No.

7          THE VIDEOGRAPHER:  Going off the video

8  record.  The time is now 7:17 [sic] p.m.

9          (Discussion ensued off the record.)

10         THE REPORTER:  Miss Sellers, did you

11  want a copy?

12         MS. SELLERS:  Yes.  If you can do the

13  rough by tomorrow, I'm good with that.  That

14  works for me.

15         THE REPORTER:  Does Mr. Cadeau want a

16  copy of this?

17         THE WITNESS:  Yes, if possible.

18         (Deposition concluded at 9:12 p.m.)

19         (Pursuant to Rule 30(e) of the Federal

20  Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),

21  signature of the witness, MATHIEU CADEAU, has been

22  reserved.)

23

24

25

---

Page 318

1              COURT REPORTER CERTIFICATE

2

3  STATE OF GEORGIA    )

4  COUNTY OF GWINNETT  )

5

6          I hereby certify that the foregoing

7  transcript was taken down, as stated in the

8  caption, and the questions and answers thereto

9  were reduced to typewriting under my direction;

10  that the foregoing pages represent a true,

11  complete and correct transcript of the evidence

12  given upon said hearing, and I further certify

13  that I am not of kin or counsel to the parties

14  in the case; am not in the employ of counsel

15  for any of said parties; nor am I in any way

16  interested in the result of said case.

17

18  _____

19          Thomas R. Brezina, B-2035

20

21

22

23

24

25

---

Page 319

1              DISCLOSURE OF NO CONTRACT

2

3      I, Thomas R. Brezina, do hereby disclose

4  pursuant to Article 10.B of the Rules and

   Regulations of the Board of Court Reporting of the

   Judicial Council of Georgia that Elizabeth Gallo

5  Court Reporting, LLC was contacted by the party

   taking the deposition to provide court reporting

6  services for this deposition and there is no

   contract that is prohibited by O.C.G.A. 15-14-37(a)

7  and (b) or Article 7.C of the Rules and Regulations

   of the Board for the taking of this deposition.

8

       There is no contract to provide court reporting

9  services between Elizabeth Gallo Court Reporting,

   LLC or any person with whom Elizabeth Gallo Court

10  Reporting, LLC has a principal and agency

   relationship nor any attorney at law in this action,

11  party to this action, party having a financial

   interest in this action, or agent for an attorney at

12  law in this action, party to this action, or party

   having a financial interest in this action.  Any and

13  all financial arrangements beyond our usual and

   customary rates have been disclosed and offered to

14  all parties.

15      This 29th day of January, 2021.

16

17

18

19

20

21

22

23

24  _____

25      Thomas R. Brezina, B-2035
       Elizabeth Gallo Court Reporting, LLC

---

Page 320

1  CASE:  Noel Hall and Christina Hall vs City of Atlanta, et al.

2  NAME OF WITNESS:    Mathieu Cadeau

3      The preceding deposition was taken

4  in the matter, on the date and at the time and

5  place set out on the title page hereof.

6      It was requested that the deposition

7  be taken by the reporter and that same be

8  reduced to typewritten form.

9      It was agreed by and between counsel

10  and the parties that the deponent will read and

11  sign the transcript of said deposition. Said jurat

12  is to be returned, within 30 days after the transcript

13  is made available, to the following address:

14      Elizabeth Gallo Court Reporting, LLC

15      2900 Chamblee Tucker Road

16      Building 13, First Floor

17      Atlanta, Georgia 30341

18  If an errata is executed and returned

19  to EGCR within the 30 days allocated by law,

20  the executed errata will be sent to the taking

21  attorney for filing with the original transcript.

22  Should an executed errata not be forwarded from

23  EGCR to the taking attorney for filing, the

24  deposition was not reviewed and signed by the

25  deponent within 30 days.

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

Page 321

```
1    NAME OF CASE:    Noel Hall and Christina Hall vs City of Atlanta, et al.
     DATE OF DEPOSITION: 01/25/2021
2    NAME OF WITNESS:   Mathieu Cadeau
3    EGCR JOB NO.:      73765
4               CERTIFICATE
5         Before me this day personally
     appeared MATHIEU CADEAU, who, being duly
6    sworn, states that the foregoing transcript of
     his/her deposition, taken in the matter, on
7    the date and at the time and place set out on
     the title page hereof, constitutes a true and
8    accurate transcript of said deposition.
9         _____
10             MATHIEU CADEAU
11        SUBSCRIBED and SWORN to before me
12   this _____ day of _____ 20____.
13   in the jurisdiction aforesaid.
14
     _____    _____
15   My Commission Expires      Notary Public
16      STATE OF _____
17      COUNTY/CITY OF _____
18
19      []   No changes made to the Errata Sheet;
20   therefore, I am returning only this signed,
21   notarized certificate.
22      []   I am returning this signed,
23   notarized certificate and Errata Sheet with
24   changes noted.
25
```

Page 322

```
1         Errata Sheet
2    NAME OF CASE:      Noel Hall and Christina Hall vs City of Atlanta, et al.
3    DATE OF DEPOSITION: 01/25/2021
4    NAME OF WITNESS:   Mathieu Cadeau
5    Reason Codes: 1. To clarify the record
6                  2. To correct transcription errors
7                  3. Other
     _____
8    _____
9    Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   SIGNATURE:_____DATE:_____
25             Mathieu Cadeau
```

Page 323

```
1         Errata Sheet
2    NAME OF CASE:      Noel Hall and Christina Hall vs City of Atlanta, et al.
3    DATE OF DEPOSITION: 01/25/2021
4    NAME OF WITNESS:   Mathieu Cadeau
5    Reason Codes: 1. To clarify the record
6                  2. To correct transcription errors
7                  3. Other
     _____
8    _____
9    Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   SIGNATURE:_____DATE:_____
25             Mathieu Cadeau
```

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 82 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                                      January 25, 2021

---

**Exhibits**

---

**Plaintiff's Exhibit 01**
10:22

**Plaintiff's Exhibit 02**
48:2,4,8,12,17

**Plaintiff's Exhibit 03**
109:8,10,23 115:1,13,
14,15 116:6

**Plaintiff's Exhibit 04**
109:9 115:16,18

**Plaintiff's Exhibit 05**
120:17 131:7,8

**Plaintiff's Exhibit 06**
131:7,9,11,15 132:4

**Plaintiff's Exhibit 07**
132:8 133:1,25 134:1
135:9,10 152:24 153:1,
5

**Plaintiff's Exhibit 08**
152:19,20 153:12,21,25
158:20 161:2

**Plaintiff's Exhibit 09**
179:5,6 183:24 186:20
188:20,21

**Plaintiff's Exhibit 10**
190:14,19

**Plaintiff's Exhibit 11**
195:2,9 196:4,5 198:4,5

**Plaintiff's Exhibit 12**
219:17

**Plaintiff's Exhibit 13**
221:8,9,11 306:21
308:5

**Plaintiff's Exhibit 14**
232:14,15

**Plaintiff's Exhibit 15**
236:22 237:1

**Plaintiff's Exhibit 16**
243:25 244:17

**Plaintiff's Exhibit 17**
248:15

**Plaintiff's Exhibit 18**
4:23

**Plaintiff's Exhibit 19**
268:6 280:8,9,11,13

**Plaintiff's Exhibit 20**
264:16 279:21 280:3

**Plaintiff's Exhibit 21**
5:7

**Plaintiff's Exhibit 22**
301:20 302:8

**Plaintiff's Exhibit 23**
301:23

**Plaintiff's Exhibit 24**
301:25 303:5,6

**Plaintiff's Exhibit 25**
302:2 303:20

**Defendant'
s Exhibit A** 5:15

**Defendant'
s Exhibit B** 5:16

**Exhibit Binder** 3:6 4:1
5:1

**Defendant'
s Exhibit C** 5:18

---

**0**

**0** 131:9

**000** 294:8

**00004** 221:12

**000113** 294:8

**000192** 281:6

**00098** 281:9

**001609** 3:21

**001612** 3:22

**0022** 232:18

**002204** 109:11

**002334** 232:18 233:4,
17

**002335** 232:18

**002410** 239:2,7

**002413** 240:21

**002429** 257:3

**02334** 232:25

**0635** 264:7

**07** 110:10 138:8 265:13

**08** 133:7 265:4

**08C0709CTSY** 308:10
310:21

**08C0741UAF** 309:1
310:2,9

---

**1**

**1** 6:4 10:22 173:14
241:5 260:5 315:3

**1/10/08** 135:10

**1/22/08** 135:16

**10** 3:8 131:20 190:14,19
311:25

**100** 2:5

**109** 3:12,14,17

**10th** 198:5 301:24

**11** 195:2,9 196:5 198:5

**11/14/2012** 240:3

**11/8/2012** 240:4

**11I0276AP** 309:13

**11I0291AT** 311:7

**12** 160:10,12 161:1
219:17 311:21

**12I086OBA** 311:22

**13** 221:9,11 240:2
306:21 308:5

**131** 3:20

**132** 3:23

**13246** 139:1

**13I0021STA** 312:11

**14** 232:14,15 258:23

**141021** 243:23

**14C0540UAF** 264:10
314:25

**14CO491CTSY** 314:9

**14I0260** 243:23

**14I0260UAF** 313:5

**14I0431UAF** 313:19

**14I0635** 268:7

**14I0635UAF** 315:15

**14UAF** 314:24

**15** 11:15 35:5 133:13
236:22 237:1 257:13
312:15

**153** 4:3

**16** 35:5,6 205:17 243:25
244:17

**1646** 138:25

**17** 205:12,17 248:15
308:3,8 309:10,21,24
310:18 311:4,15,18
312:3,5,6,8,24 313:1,
13,16 314:3,6,20,22
315:10,12 316:1,3,10,
12,16,20,23 317:1

**17-4-20** 4:11 219:24

**179** 4:4

**18** 4:9 12:22 13:2,3
160:5 268:8,9 278:15
316:7

**18th** 313:8 316:9

**19** 173:9,11,15 268:6
280:9,11,13

**190** 4:6

**195** 4:9

**1966** 11:15

**19th** 276:3 313:11,13,
22

**1:42** 6:9

---

**2**

**2** 48:2,4,8,12,17 153:25
154:7 159:3 162:23
192:6 307:1

**2/27** 307:7

**2/27/2017** 307:2

---



Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

**20**  183:22 264:16 279:21 280:3,5,10

**200**  137:14

**2000**  11:18 12:14 207:8, 9,14

**2001**  12:14 207:8,9,17

**2006**  208:5

**2007**  47:20 75:3,4 110:18 111:11,15 277:7,8

**2008**  3:15 44:21 75:4,13 76:14 115:21 121:17,19 133:13 204:16,17 224:18 277:8 308:18,21 309:4 310:12,24

**2009**  222:4 223:11 308:19,23 309:7,9 310:4,15,17 311:2

**2010**  4:3 153:15 155:5 190:20

**2011**  45:7 223:13 309:16,18,21 311:10,13

**2012**  12:20 235:21 238:7 239:5 240:2,16 241:3,5,15 311:25

**2013**  12:20 196:18 203:6,8,9 207:5 209:4 312:3,5,8,15,18,21,23 313:1

**2014**  34:7,14 35:18,24 196:5,9,18 197:8 198:14 199:2 209:4 249:4,8 257:13 258:23 260:5 267:16 276:3 313:8,11,13,22 314:13, 16,17,20 315:3,7,9,18, 23,25

**2015**  80:17 133:7 198:5 276:4,11,17 313:24 314:3 316:7,9

**2016**  35:16 75:12,13,21 76:14 203:21 205:4,5, 12 206:4 309:24 310:18 311:4,18 312:9 313:2, 16 314:4,6,22 315:12 316:3,12,23 317:1

**2017**  35:12 77:3 116:7,

**22**  121:24 122:2 125:2, 13 130:16,22 131:25 203:19,24

**2018**  130:8,13 131:16, 18,20 301:24 308:3,8, 21,23 309:10,22 311:15 312:6,24 313:14 314:4, 20 315:10 316:1,10,17, 20

**202**  139:14

**2020**  4:5 5:14 18:5 48:7 179:6 183:23 190:19 302:1 303:15

**2021**  6:2,8

**2022**  4:6 190:16,20 191:8

**20th**  222:4 308:19 311:2

**219**  4:11

**22**  131:16 301:20 302:8

**221**  4:12

**23**  301:23

**232**  4:15

**2335**  232:19

**236**  4:17

**23rd**  110:9 125:13

**24**  301:25 303:4,5,6 314:15,17,20

**2407**  241:13

**2412**  239:21

**244**  4:19

**248**  4:21

**24th**  48:7

**25**  3:15 6:2,8 302:2 303:19,20

**2517**  265:10,11,15

**2518**  265:21

**257**  265:5,7

**258**  4:23 5:3

**25th**  307:12

**26**  5:14 303:15

**2600**  2:5

**264**  5:5

**27**  152:25

**288**  5:7

**295**  5:8

**29th**  315:7,9

**2C**  133:19,22 136:2

---

**3**

**3**  109:8,10,23 115:1,14, 15 116:6 156:20 192:7 198:4 265:9 275:6

**30(e)**  317:19

**301**  5:10,12,13

**30248**  11:23

**30303**  2:6

**30337**  2:14

**304**  3:5

**305**  5:15,16,18

**31**  242:21,25 310:12 315:25

**31st**  241:2 309:4,16 315:23

**3:21**  80:24

**3:41**  81:1

**3rd**  312:18,21,23 313:1

---

**4**

**4**  109:9 115:3,6,16,18 139:16 308:18 310:24

**4,000**  37:23

**4.1.1**  155:16

**4.1.3**  156:20

**4.2.5**  160:10 162:23

**4.2.50**  161:2

**4.216**  158:21

**4.6.9**  173:24 174:7

**4.69**  173:8,15

**404 222-0170**  2:7

**404 222-9922**  2:6

**404 684-9515**  2:15

**404 688-4503**  2:14

**45**  188:20,22

**46**  184:1 188:20

**47**  3:10

**4:21**  160:18

---

**5**

**5**  109:9 120:17 125:11 131:8 314:2

**51**  134:5

**5:21**  160:20

**5:32**  160:23

---

**6**

**6**  131:7,9,11,15 132:4 225:7 249:8 309:7,9 310:3,15,17 311:10 312:5 313:24 314:3

**6.09**  307:1

**6:20**  195:20

**6:21**  195:22

**6th**  249:4

---

**7**

**7**  3:4 131:18 132:8 133:1 134:1 135:10 152:24 153:1,5 198:14 223:12 309:18,21 311:13 314:13

**7/14**  190:20

**7785**  198:10

**785**  198:8

**7:17**  317:8

**7:47**  258:13

**7:55**  258:17

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

---

**8**

**8** 133:16 152:20 153:12, 21,25 158:20 161:2

**8:52** 301:13

**8:57** 301:15

**8th** 131:25 238:7 239:5 240:15 241:9,14

---

**9**

**9** 179:5,6 183:22 186:20 188:21 315:18

**9-11-30(e)** 317:20

**9/13** 138:7

**911** 55:5 76:17 298:19 299:4

**9:12** 317:18

**9th** 302:1

---

**A**

**A.J.** 2:17

**a.m.** 225:7

**abide** 118:17

**ability** 61:2 97:18 116:15 202:12,18 208:10

**above-referenced** 239:17

**absent** 142:14

**academy** 27:24 59:20 61:23,25 75:6 79:22 107:14 127:12,13 133:3 135:12,16 137:4 139:8, 21,23 143:6 197:15 217:25

**accelerated** 165:3

**accept** 215:13

**acceptable** 32:7 124:7 129:18

**accepted** 297:15 304:14

**accepting** 47:9

**access** 290:15

**accident** 134:5 135:12 138:8 235:21

**accidentally** 234:3

**accomplish** 163:3

**accountable** 128:21, 25 129:24

**accurate** 95:10 243:3 249:12

**accurately** 106:14 221:16

**accusations** 262:11

**accused** 80:1

**accustomed** 107:12

**achievement** 191:12

**acknowledge** 223:21 227:8 242:7

**acknowledging** 240:12

**act** 94:18 187:9,12

**acting** 136:15

**action** 25:10 32:25 33:15 71:4 98:3 102:19, 23 104:22 106:1,2 108:25 159:6 281:19 298:14 307:22

**actions** 25:9 26:16 28:7 31:25 49:4 63:11 68:20 70:5 71:2 102:18 106:7,10 107:12 112:22,23 113:13 128:9 129:18 130:2 137:18 140:8,24 142:16 145:23 146:7,14,23,24 148:2, 12 186:11 218:23,24 219:7,8 245:2 286:19 298:13

**actively** 191:9

**Adair** 76:6

**adamant** 259:12

**adamantly** 272:3

**Adams** 134:1

**add** 233:19

**additional** 32:19 141:6 142:19,20 187:19 215:17 216:21 222:9,12

**address** 11:16,18 202:9

**adequate** 77:9 123:10, 22 304:8

**adhere** 118:18

**adjustment** 24:14

**administrative** 279:17

**admission** 79:22

**admit** 234:7 266:12

**admitted** 155:11 227:12 234:15 255:4 258:4 265:17 297:19

**admitting** 295:7 300:25

**admonishment** 222:15 224:9

**adult** 12:21

**adverse** 255:24

**advice** 139:11 273:14

**advise** 60:19

**advised** 137:18 226:2 231:1,2 298:25 299:2

**affairs** 70:21

**affecting** 202:12,18 208:10

**affection** 120:9

**affects** 142:23 143:22

**affidavit** 74:4,5

**affirmation** 74:4

**afternoon** 8:17

**aggravated** 65:24 66:1,7 296:24 297:5,20 298:6

**aggressive** 201:10,20

**aggressively** 201:14

**agility** 139:21,25 143:12,16

**agitated** 87:13,15

**agitating** 87:5,7,11

**agree** 40:11 64:5,10,17 67:3,7 71:3,6 72:1,5,8, 11,17 73:14 74:6,9,11, 22,25 90:3 97:6,9,24 113:1 114:9,10,17 116:21 119:12,25 120:2 122:21,24 123:9,12,21 124:5,8 128:15,19,24 129:3,16,19,23 130:2 140:18 142:6 143:21,25 151:24 152:3 153:20 154:5,13,15 155:4,13 156:4 157:8,10,17 162:12,15 170:2,4 173:20 182:3 205:19 222:19,22 228:17,20 246:7 252:21 253:6 254:19 255:8 276:7

**agreeable** 7:18,19 9:5, 6,25 10:1 161:13

**agreed** 186:15 278:22 303:7

**agreement** 7:10 303:7, 12

**ahead** 52:8 66:21 140:23 147:17,18,19 149:6 181:6 204:22 251:15 256:6 266:21 282:15

**aid** 77:17 299:9

**aim** 169:7

**aiming** 169:11

**AJ** 305:19

**alarmed** 286:19

**allegation** 192:8 260:20,22,24

**allegations** 239:10 244:10 263:11

**allege** 48:20 163:9

**allowance** 161:17 162:1

**allowed** 7:13 28:25 57:25 58:18 78:10 79:5 122:22 123:1 140:22 162:13 173:25 180:21

---

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

254:14 281:19 286:11

**alternate** 181:12,14

**amended** 3:8,11 10:23 48:6

**Amendment** 23:2 27:22 28:25 31:18 55:18 56:5 72:10,19 73:7,19,21 74:7,12 89:2,8 245:22

**amount** 20:13 162:3 190:6 217:12

**analysis** 181:4

**and/or** 317:20

**angry** 102:12

**ankles** 97:18

**answering** 9:11 87:21 241:11

**answers** 127:20 181:24 275:10

**Anyone's** 73:12

**anytime** 112:5 234:7

**APD** 28:15,20 32:7 33:7,9,18,25 38:6 40:22 41:3,6,8 43:11,15 44:2, 24 47:1,5,7,8 49:1 55:14 58:20 59:2,7,15, 22 62:4 69:6 72:5 75:3 77:22,25 80:1 89:9 107:8,20 108:2,10 111:12,18,22 116:2 119:4 120:20 122:2 126:18 128:20 130:8 146:3,16 147:1,4 148:5, 13,16,19 150:7,11 151:13,21 152:2,14,16 153:13,23 156:24 157:10 171:15 172:7 173:25 179:6 180:25 182:13 183:7,12,17 184:3,10,13,17 191:8 193:10 196:10,24 197:10,21,24 198:23 201:18 205:1 206:13,18 210:6 214:7 219:10,24 221:23 235:13 253:21 254:7,20 277:1,4 286:13 287:5 298:16

**APD's** 33:9

**APD.SOP** 155:5 183:23 190:16,19 191:8

**apologize** 115:16 149:5 204:22 205:11 314:4,19

**appeal** 185:5

**appearance** 238:6

**APPEARANCES** 2:1

**appeared** 84:2 238:9 241:15 285:3,6 288:12, 15

**appears** 308:16

**application** 3:12 36:17 47:10

**applications** 47:10

**applied** 128:16

**apply** 46:25 69:14 74:24

**appointed** 137:7,9

**apprehend** 173:12

**apprehension** 122:17

**approached** 42:9 228:24 260:18

**approaching** 28:8 32:1 49:13

**appropriately** 159:2 244:20

**approval** 20:16,19

**approved** 36:9 210:3 244:12

**approximate** 84:16

**approximately** 92:25

**approximation** 91:23 289:15

**April** 34:14,19 110:9,18 313:8

**aquarium** 261:21,24 293:16

**area** 25:4 75:16,19,23 76:6,16,17 77:10,15,17 166:17 179:16 211:12

225:16 260:8 261:25

**argued** 280:20

**argues** 274:13

**arm** 264:23

**arms** 265:18

**arrest** 15:18 29:15 31:1,8,11 39:4 41:9 54:11 69:21 70:4 74:8 84:21,22 120:12 162:25 163:5,20,21 246:13,20 292:19

**arrested** 27:8 29:2 41:19 50:8,12 59:1,6 69:25 82:25 83:18 147:8 247:23 269:11 293:8,11

**arrestee** 83:23 84:12 85:9 88:13,16,21 89:1 92:10 93:13,14,18 101:3,7 106:18 107:4, 18 108:8,16,19 119:22 147:9 148:3,11 154:21 155:4,12 156:13 162:16 209:7 249:15 251:9 252:4

**arresting** 28:8 31:25 32:1 49:14 246:15

**arrived** 134:4 135:11

**asleep** 159:19,25 225:9,13 226:6 227:19, 24 229:10,13,18 230:18,24 231:11,15,18 233:25 234:4,7,12,16, 19

**ASP** 278:3,4

**ass** 85:5

**assault** 65:23,24 66:2, 7,12,14,15 69:25 158:4, 6 163:3 252:9,12,19,22 258:4 296:25 297:5,20 298:6

**assaulted** 67:20 260:21

**assess** 53:23

**assessment** 53:24 140:18

**assigned** 76:2 92:2

**assignment** 75:17 216:13,25

**assignments** 217:10

**assistance** 268:22 290:22 291:10,11,13,14

**assume** 9:24 270:12

**Assumes** 180:9,11 254:9,22

**Atlanta** 2:4,6,10,11,14 4:3,4,6,12 6:6,16 7:6,8 8:14 16:8,23 18:18 19:5,6 20:3 22:24 28:11,23 29:14,21 30:5, 11,14 33:1,2 47:9,12 48:23,24 49:1 69:18 70:12,22 76:13 106:20 109:25 116:14 118:2, 18,20 131:14 135:11 142:24,25 143:23,24 144:9,24,25 145:25 146:10 196:10,24 206:17 207:25 211:7 221:18 238:6 239:4 241:14 245:2 246:2 270:10,13 301:21 302:11 306:3,21

**atmosphere** 23:18

**attached** 5:22 142:18

**attacked** 269:9

**attempt** 58:17

**attempted** 60:6 140:12

**attend** 77:18 137:13 199:15 214:17 238:19 239:16

**attending** 206:5 249:25

**attention** 60:20 128:4 188:19 209:20 306:20

**attire** 135:17

**attitude** 87:8

**attorney** 17:19,20,21 71:5 252:19 304:7

**attorney's** 69:8 133:4 304:3

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 86 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

**audio** 264:1

**August** 4:9 11:15 196:5,9 197:8 249:3,8 260:5 267:16 309:7,9 310:15,17 313:11,13 315:3

**aunt** 11:25 13:11

**authority** 117:15

**authorize** 31:10 214:7

**authorizing** 31:12

**avoid** 171:15 172:1,7, 15

**awake** 159:4,16

**aware** 51:17 55:25 56:1 63:24 201:23 226:22 304:4,6,9

**awoken** 229:7 233:12

―――――――――

**B**

**BA** 311:22

**bachelor's** 45:3,6

**back** 19:2 70:8 81:2,4 92:6 94:9 104:14,19,23, 24 105:2,8,10 109:1,10 115:2,4 127:14 133:7 138:14 139:12 143:18 160:13,24 162:17 165:25 166:25 169:22 195:12,23 196:5 197:6 199:2 201:14 206:16, 20,25 213:17 216:24 223:11 230:25 235:22 241:12 256:23 257:16 258:18 264:23 265:18 267:7,10,11 269:1,10 279:9,13 283:8 284:25 285:1,8,9,10,20,22 288:14 293:17 295:18 301:16

**background** 45:2

**Bahamas** 207:13

**Baker** 140:3,4

**bank** 212:5

**Barr** 138:17,18

**based** 28:9 29:12 40:21 41:2 68:2 70:18 87:23 88:25 89:7 106:9 151:13,21 152:2 157:4 168:18 169:10 181:25 183:6,11 186:19 226:6 235:12,17 253:16,17 255:6,7 267:23 268:1 275:18 276:7,9 277:10 278:13,21

**basically** 24:5 207:24 208:6 244:23 260:2

**basis** 54:19

**bates** 3:13,15,18,21,23 4:7,9,13,15,17,19,21,23 5:3,5,8 109:11,17 110:12 115:14,20 120:18 131:9 135:25 221:11 232:16 237:2 239:2 248:23 281:3

**baton** 278:3,4

**battery** 66:17,18 70:1

**began** 140:24

**behalf** 2:2,10 6:16 20:22

**behavior** 40:16 50:1 52:4 53:24 54:5 55:6,11 78:17,19,20,22 79:10 168:10 191:11,17 246:23

**behaviors** 49:24 192:21

**belief** 40:2 59:17 61:8, 17,18 124:24 129:2 167:9 169:24 182:13 273:19,21 298:4 300:24

**believed** 147:25 148:3, 11 273:13

**believes** 174:13

**belittled** 265:24 266:6

**belligerence** 25:11

**belt** 101:18,19

**bench** 84:1 92:14,15,17 93:3,15 96:12,19,21,22 97:2

**beneficial** 204:8

**benefits** 37:7,9,14,19, 24 47:13 302:16

**Beyonce** 209:18 263:2

**big** 85:5 307:15

**bill** 301:24 302:25

**birth** 11:12,14,15

**bit** 54:10 64:15 146:22

**black** 80:3

**Blank** 5:7

**blind** 272:16

**blurry** 305:22

**bodily** 83:21 122:12,13 124:25 126:12 163:23 172:24 174:16,21,24,25 219:3,4

**body** 85:6 166:7

**boisterously** 266:13, 16

**book** 127:2 241:5

**Boone** 261:12

**borderline** 140:14

**born** 45:19

**bothered** 179:22

**bottom** 115:24 154:7 173:15 233:18 239:23

**Bouldercrest** 134:6

**boundary** 138:2

**boy** 179:21 180:3,15

**boys** 204:18 206:2

**break** 40:22,24 80:22 158:10,12 160:12 182:3

**briefly** 45:1 273:16

**bring** 67:11,13 68:17 201:15,16 267:7 280:24

**bringing** 280:24

**brings** 157:18

**broke** 40:20

**broken** 39:9 94:16 268:21

**brought** 20:2 45:25 60:20 134:17 188:18 202:23 269:10 293:17 303:8

**Buckhead** 75:16,18,23 76:16

**building** 15:8,9,11,13, 14,16 22:7,10 25:25 26:9 38:19,22 39:1,4, 23,25 41:15,22 42:2,6, 12 211:16

**bullets** 167:7

**Bump** 56:2,3,4,7,8,20, 24 57:6,13,17 58:6 85:3,4 89:2,10,15,17,25 90:1,2,8,15 94:10 250:2,9

**Bumpity** 56:2,3,4,7,8, 20,24 57:6,13,17 58:6 85:3,4 89:1,10,14,17,25 90:1,8,15 94:10 250:1,9

**bunch** 115:11,12

**busy** 165:13 167:16

**buttocks** 85:8

**button** 9:4 15:12

―――――――――

**C**

**C-H-E-R-U-B-I-N** 13:18

**C000025** 265:8

**Cad** 278:16

**Cadeau** 3:2,9,15 5:11, 12 6:1,5,19,21 7:1,5,22 11:10 31:17 81:4 109:12 121:3,8,11,14 133:1 135:11 136:14 137:25 139:11,13 161:1 195:25 210:2 231:2 239:3,9,10,16 241:6 253:3 258:20 264:22,24 265:22 298:13 301:21, 24 302:1,5 304:17,20 305:9 307:20 317:15,21

**Cadeau's** 3:10 202:10

**cadet** 75:5 133:3,8,10 134:14 141:10,24

―――――――――



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 87 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

142:11 223:22

**calculus** 161:17,25

**call** 23:1 47:25 55:5
56:8 60:24 62:2 90:14,
15 100:22 134:4 135:5
136:3 226:5 298:19
299:1,4

**called** 27:25 31:7 56:3
185:25 186:7 211:23
223:17 261:11 275:2

**calling** 85:3

**calls** 76:17 136:6

**cam** 166:7

**camera** 166:5,7

**canister** 270:20 272:14

**capability** 105:24

**capacity** 2:10 16:11

**Captain** 81:23 149:9
163:25 164:20 175:1,4,
5,19,21 176:7,10,18,19
178:19 179:16 182:5
285:4

**car** 15:15 223:2 228:2,
13

**care** 202:22 203:11

**career** 111:10 205:1

**careful** 240:7

**Carla** 212:13,14

**Carolyn** 13:24

**Carr** 13:24 14:18,23
15:13,17,18,22 18:9
24:10 28:5,7 38:11
41:22 42:8,15 43:18,23
243:12,15,16,17,24
244:6

**Carrs** 16:3 20:2,8 21:13
27:3,5 28:8,17 29:16
31:6 32:1,13,20,23
33:8,16 34:8,11,13
35:18 38:16 42:10 49:5,
13 58:23 68:1 80:8
95:21 117:3 119:20
144:3 145:1,9 154:19
163:4,8,9 236:1 244:14,
18,21 245:12 246:3,11

263:1 267:18 293:8,12

**carry** 39:14 113:17,19,
21 114:1,16,19 116:5
186:2

**carrying** 203:19

**Carter** 6:15 149:9
163:25 164:20 175:2,4,
5,19,21 176:7,10,19
178:20 179:17 182:6
249:25 250:7,9 285:5
292:1

**case** 7:6 16:6,9,18,19,
24 18:9,23,24 19:3,7,10
20:1,5,6,9,22 26:21
30:12 32:22,25 43:22,
23 48:3 55:4 70:21
103:15 109:25 131:14
144:20,22 145:21
184:24 185:14 236:3
245:7,10 247:4,13,20
252:18 295:5 298:12
303:1

**caused** 62:14 135:12

**center** 168:24 169:8,11
170:18 209:19 260:8
290:16

**ceremony** 137:13
207:17

**certificate** 11:12 202:7

**certification** 3:12
44:11 78:1,5 202:6

**certifications** 77:22,24

**chain** 69:13 70:8

**chair** 92:13 101:12

**chance** 105:16 195:10
221:19 251:18

**change** 216:13 217:16
258:11

**changed** 205:12
217:10 271:3 273:1

**charge** 15:23 23:25
54:12 68:3 69:20

**charged** 42:18 50:12
66:16 68:1 252:18
293:8,11,17 296:24
297:4

**charges** 67:9 69:9
297:12,22 303:1,8,22

**charging** 28:9

**chase** 165:25 214:2,3,4
267:20,24 299:15

**cheating** 140:15

**Cherubin** 13:16

**chief** 2:11 36:9,10 81:9,
13,15,16,18 82:17 83:1
147:22 184:17,21,22
185:5,8,11,12,21 189:6
197:25 198:6 256:24
257:5 272:7,10 273:1,
11,12,15,18 274:12,18
275:9,17 276:8,13,19
278:16,17,22 279:8
280:23 296:6,7,8,16
300:3,11,19 301:3

**Childers** 81:20,21

**children** 12:21,22,24
13:2 23:14 42:21 50:7
246:25

**choice** 97:6 142:7

**choose** 46:18 168:23

**chose** 181:14

**Chrisanne** 198:6

**Christina** 6:6

**circles** 115:17

**circumstances** 14:2,7
45:24 46:6,25 47:5
53:13,17,22 162:7
183:6 191:1 218:16

**citation** 31:10,11,12
237:7 262:5,7

**citations** 267:8 293:18

**cited** 15:18,21,22 23:21
42:15 293:15

**citizen** 51:5 53:18
55:18 62:5,13,18,19,23
64:8,16,22 65:6,9,14
66:5 67:4 70:4 82:25
83:18 117:6 118:7
158:4 228:8

**citizen's** 308:13

**citizens** 61:10 69:15
70:12 74:25 114:14
142:24 143:23 153:22

**city** 2:10,11 6:6,16 7:6
8:14 16:7,8,23 17:14
18:8,18,21 19:5,6,21
20:2 22:24 28:11,23
29:14,21 30:4,11,14
33:1,2 47:8 48:23 49:1
70:22 77:16 80:16
109:24 116:14 118:2,20
131:14 142:24 143:23
144:9,18,24,25 146:10
196:10,24 211:8 239:4
245:2 246:1 270:10,12
301:21 302:10 306:2

**city-issued** 281:13,21
282:18 286:24

**Civil** 7:14 317:20

**claim** 97:25 164:6
316:6

**claiming** 134:10

**clarification** 161:20
180:10

**class** 136:16,22 137:1,
5,7,11,13,21 139:7,14,
23 143:18

**classmates** 136:15,17

**classroom** 218:5

**clear** 18:6 53:16 56:23
57:2 60:4 79:2 95:10
96:2 150:16 152:11
180:14 182:11 183:3
194:5 234:20 261:11
305:8 316:14

**clearance** 183:2

**clearing** 21:14

**clerk's** 302:2

**client** 35:7 72:2

**clinician** 199:11,21
201:1

**clip** 110:15

**clock** 140:24

**close** 14:9 15:13 21:15
84:12,20,24 92:17 93:2,
5 98:21,22 295:24



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 88 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

**closed** 14:11 98:12

**Closeout** 4:15,17,19, 21,23 5:3,5

**closest** 92:20

**COA** 3:21,22

**COA-A** 5:15,21 305:3

**COA-B** 5:16,22 305:3

**COA-C** 5:18,22 305:4

**COA000001** 4:20

**COA000007** 244:14

**COA000070** 4:20

**COA000071** 5:4

**COA000110** 293:21

**COA000194** 5:4

**COA000195** 3:16 115:20

**COA000247** 5:9

**COA0002515** 5:6

**COA0002574** 5:6

**COA000604** 4:10

**COA000609** 131:10

**COA00096** 281:5

**COA00098** 281:4

**COA001612** 131:10

**COA002025** 4:10

**COA002026** 3:13 109:11

**COA002109** 110:12

**COA002204** 3:13

**COA002324** 4:16 232:16

**COA002355** 4:16 232:16

**COA002399** 4:18 236:25 237:3

**COA002407** 238:2

**COA002412** 238:1 239:14

**COA002419** 4:18

236:25 237:4

**COA002421** 4:22 248:24

**COA002429** 256:23

**COA002438** 248:25 249:9

**COA002439** 249:2,9

**COA00247** 301:22

**COA002471** 255:16

**COA002484** 4:22 248:24

**COA002516** 264:19

**COA002517** 264:21

**COA00257** 265:4

**COA006550** 4:24

**COA006603** 4:24

**COA007785** 4:10

**COA007788** 4:10

**Cochran** 2:4

**code** 118:19,20 173:14

**coincide** 161:12

**cold** 305:12

**collected** 190:7

**college** 206:2,10

**color** 5:15,16,18

**Columbo** 227:18

**combative** 53:7

**combination** 125:23

**command** 37:10 39:7 53:11,19 61:4,6,7 68:23 69:13 70:8 251:21 253:10 263:11 282:8 284:15

**commanders** 215:20 216:6

**commands** 51:1,5,9 52:12 61:1,10,19 62:5 179:19 250:8 251:4,10 252:5 253:19 263:10 281:12,17,19 282:6,11 284:7 286:21 288:13

291:3,7 293:2,6,9,12,19

**comments** 86:25

**commit** 65:20 68:15 158:4 186:1 187:4,8,12 252:21

**committed** 67:14 70:4 71:4 118:14 186:12 188:17 189:4 258:4

**committing** 23:5 106:7 118:12 158:7

**communicated** 24:5

**communication** 23:7 201:16 208:15 236:10

**community** 76:18,21, 23 77:18 123:17 130:12 206:10 297:16

**company's** 113:9

**complaint** 3:11 4:15, 17,19,21,23 5:3,5 48:6, 19 189:18 209:15 222:24 258:22 307:21, 25 308:2,13 316:6

**complaints** 192:9,14 202:11 210:5 221:17,22

**complete** 48:12 139:24 142:15 143:8 159:2,4 202:1

**completed** 7:24

**completely** 160:8

**compliance** 155:1 219:9 286:23,25 287:1, 10

**complied** 284:15 287:9

**comply** 52:12,24 118:23 251:9 253:9 285:6,15 288:12 293:5 295:17

**complying** 250:8 251:4 281:12,18 291:16

**computer** 92:7 127:18

**concept** 41:13 59:4 129:12

**concern** 134:18,21 266:13,16

**concerned** 84:7,9 103:21 104:4 106:11,16 266:22

**concerns** 202:10 268:4

**concert** 209:16,17,18 263:3 280:11

**concluded** 247:14,21 271:6 317:18

**conclusion** 26:15 245:10

**conclusions** 71:20

**conduct** 15:16,19,22 40:17 41:1 42:16,17,18 86:10,11 140:14 142:18 191:9 192:21 237:7 246:16,19 257:8 267:2 270:25 297:1,6,21 298:7

**conducted** 70:20

**conducting** 71:18,19

**conference** 188:4

**confirm** 199:18

**confused** 85:20 151:6 205:11

**Congress** 209:19 260:7 290:16

**consequence** 144:23

**consequences** 142:17,18

**considerate** 154:9,16, 23 155:13

**consideration** 167:6

**considered** 40:25

**consistency** 263:14 298:16

**consistent** 106:19 107:6,12,19 108:1 145:24 146:2,7,8,15,25 147:3,25 148:4,12,15 183:6,16 185:16 263:9 287:4

**consistently** 75:18

**constant** 282:11

Elizabeth Gallo
COURT REPORTING, LLC

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 89 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                    January 25, 2021

constitution 23:2 40:7 56:4,15 63:1 64:6 68:6 69:5 72:10,20 73:8 116:12,16,17 157:24 253:6,17

constitutional 32:15 51:7,16,22 52:21 55:14 56:9,21,25 59:13 63:12, 16,20,22 64:4,18 72:4 73:15 89:1,4 90:3,7 113:18 120:13 123:4 156:8 245:18 253:7 298:8

contact 14:15 24:9 74:14,16 98:23 119:16 233:1,7 291:19

continue 9:1 14:23 15:4,6 39:25 129:2 139:12 143:16 210:24 216:16 254:4 275:5 286:20 302:16

continued 4:1 5:1 15:5 39:22 90:7 91:9 179:20 205:3 299:14

continuing 52:4 90:17 149:7 216:20

continuously 282:12

contradicts 250:24 251:25

control 117:20 169:20 170:3,5,12,20 287:7 299:19,25

Controlled 79:16

convenience 225:13 229:4,6

conversation 17:13, 17,20 19:19 27:14 88:25 100:18,23 101:2, 6 142:9 191:24 197:25 200:1 216:10

conversations 9:2 17:18 29:13 200:14,24 208:15 216:5

Cool 115:7

coordinator 136:16,22 137:2

copy 48:4,5 132:12

220:3,4,22 302:13 306:3 308:2 317:11,16

correct 11:2,3,4,7 16:4, 21,22 21:16,17 23:1,3, 7,9 24:6,25 26:1 27:1 28:12 30:18 33:14 35:20 37:13 38:19 40:13 41:16 43:10,12, 14 44:11 48:4,24 49:12 50:9,10,13,14 51:17 62:7 63:2 66:19 67:9 73:8 79:11,22 80:9,12 83:24 88:25 89:2,3 90:4 93:4 96:5,8,9 97:21 99:10,14 100:1,15,19, 25 101:4,10,14 104:25 105:13 109:1 112:2 114:14 115:22 116:4 117:1,3,7 118:8,15,25 119:18,19,20,21,23 120:1,20 121:9,14,18 122:3,22 124:3 125:10 130:8,13,16 131:1,9 132:2 133:8 134:11,25 136:8 138:8 144:20 145:1 148:5 157:19,20, 22 158:8 159:8,13,17, 22 160:2,5,8 162:21 163:17 168:17,20 169:5,8,12 173:22,24 174:3 176:4 178:4,6,8, 12,15,17,18 181:9 184:22 185:2,6,7,10,13 186:21,25 187:4,8,14 189:24 190:1,24 192:13 194:8 197:21,22 198:21,23 208:3 219:10 221:21 223:14,24 224:15 226:13,17,24 228:19 229:20 231:22 232:1 234:8 235:22 236:1,3,12,16 238:3,22 239:24 240:10,16 244:7,11,12,17,21,24, 25 245:3 247:4,24 248:1,4,9 252:1 256:4 259:4,25 260:2 262:13 264:2,6,18,20 267:1 268:11 271:16,25 272:24 273:24 274:2, 15,19,21,23 275:11 276:11,13 277:23 278:15,19,21 279:2 281:6,7 282:13 283:16, 17 287:5,10 288:20

292:19,23 293:2,6,9,13, 19 294:3,4,12 296:4,22 297:2,7 302:8,22 303:6, 20 304:2,14 306:6,10 308:14,19 309:10,16,19 310:4,24 311:2,10,13, 25 312:3,15,18 313:22 314:13,16 316:17,23

corrected 134:22 142:19

corrections 46:21 103:11,17

correctly 51:13 160:8 306:24

Cost 46:20

counsel 2:1 6:9 16:5 26:12 27:11 29:13 85:23 195:16 210:11 222:11 273:14 297:9 305:10

counseled 25:15 26:11 27:7 33:1 83:3 137:17 222:10 224:2 245:1,10, 12,19,21

counseling 79:25 83:6 144:6 188:7,12 210:12 214:8

counselor 248:22

counselors 214:7

count 255:18 274:25 277:12

counts 297:5,20

couple 14:15,21 21:11 35:3 110:5,23 130:5 254:11 275:7 301:6

courses 214:17

court 6:17,22 7:11,24 8:8 9:3,12 11:19,22 24:20 91:21 157:21 161:20 180:10 194:6 236:3 237:8,12,13,17, 18,19,22,24 238:6,19, 20,24 239:4,9,17 240:5, 6,15 241:14,21 242:6,8 266:5 303:21,25 304:24

courtesy 264:8,11,18

cousin 11:25 13:11,12

cousin's 13:13

coverage 77:10

covering 157:15

COVID 306:1

create 124:6 129:25

crime 22:23 23:5,20,22, 24 25:13,14 26:12 27:5, 19 64:24 65:9,21,22 67:14,17,18,22,25 68:1, 4 69:8,20 70:4 71:4,12 118:13,14 187:5,8 227:18

criminal 26:16 69:14 74:23 117:25 118:6,8 150:4 187:9,12 303:8

critical 112:18 123:9

cross 3:4 170:13,17

CROSS-EXAMINATION 7:20

crossing 261:6

crosswalk 164:2,3,6, 19,21 165:4,14 166:2 175:6,22,23,24,25 176:1,20 179:16 183:3

crowd 23:13,20 38:12 268:24 269:5 272:15,19

crying 275:3

cuffed 103:9

current 77:14

curse 23:20 38:11 42:22 68:2 245:13 259:21

cursed 259:23

cursing 28:3 259:17,20

cust 295:11

custom 59:21 62:3 108:9 129:25

customized 295:12

customs 28:18 33:10 41:3 106:20 107:7 146:9



Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                January 25, 2021

**CVSA** 79:14 111:5
  236:7

---

**D**

**DA's** 71:24

**daily** 82:15,16,18

**Dalton** 198:1

**Damages** 3:11

**danger** 52:1,5 164:6
  173:3 181:21,22 219:2
  288:1 294:19,25 295:6,
  10

**dangerous** 228:18,19

**dangers** 169:21

**Data** 3:17,20

**date** 11:14,15 110:10
  127:4 133:12 199:14,
  17,19 237:8,12,13,17,
  18,19,22,24 238:17,19,
  25 239:10 240:5,6,15
  241:21 242:9 307:5,11,
  20,21 309:3,15 310:11,
  17,23 311:1,15,18
  315:22,25

**dates** 263:21 315:21

**day** 38:16 72:2 73:5,15
  86:4 107:4,17 121:16
  167:3 183:15 224:22,23
  238:20 257:7 303:14

**day-to-day** 123:16
  217:11

**days** 86:2 189:25 202:4
  213:20 256:1 257:8,22,
  24,25

**days'** 257:6

**DC** 46:19,21

**deadly** 122:6,9,11,14,
  15,18,22,25 123:4,11,
  19 124:2,21,22 125:1
  172:25 173:12,22
  174:1,6,11,13,17
  179:10 182:14,19
  287:12 292:10

**deal** 179:24 307:15

**dealing** 194:3 208:5
  209:7 216:4,19

**deals** 221:25

**dealt** 59:6 144:3

**death** 122:14 125:1
  126:12

**deceit** 157:15

**December** 240:2
  308:18 309:4 310:12,24
  311:25 315:7,9,23,25

**decide** 68:25 274:12

**decided** 99:20 207:4

**decision** 47:13 141:7,
  9,23 142:10,22,23
  143:22 144:2,24 145:19
  147:7 150:1,8 170:13
  180:4,16 185:5,21
  186:3 213:10,11 215:5
  275:18,21 276:16

**decisions** 71:1 123:25
  124:1 161:19 162:2
  215:4 267:23

**deem** 55:6 66:20
  112:22

**deemed** 60:22 264:6

**deescalation** 125:12
  130:19

**defend** 42:3 66:24
  116:16 163:2

**defendant** 6:16 7:5
  8:14 13:19,20

**Defendants** 2:10 3:10

**Define** 157:13

**definition** 150:25
  151:1 188:25

**deflecting** 201:10

**degree** 45:6

**Dekalb** 38:3

**deliberately** 234:3

**demand** 222:2

**demeanor** 87:13,14

**demonstrated** 140:24
  263:22

**denying** 215:14

**department** 2:11 4:3,4,
  6,12 16:8 19:6 26:19,
  22,25 27:4 28:11 29:5,
  22 30:12,14 33:2 36:16
  47:9 48:24 70:23
  106:21 113:3,8 114:24
  118:18 130:1 142:24
  143:23 144:9,19 145:1,
  25 146:10 157:19
  191:12,19,25 194:8,16,
  21 197:1,3,10 198:23
  201:2 207:1 210:7
  221:18 229:24 242:8,
  18,21,25 245:2 246:2
  247:20 306:22

**department's** 112:15
  113:10

**dependent** 97:16

**depending** 97:14

**deploy** 104:20 256:16
  269:22 270:19 272:12
  300:25 301:2

**deployed** 104:19,23,25
  156:15 269:12,24
  270:1,18 272:19

**deploying** 256:15
  269:16

**deposed** 189:6

**deposition** 3:8 6:1,4,7
  7:5,9,12,17,18,23 8:3,5,
  18,19 9:3,20 10:22,24,
  25 11:1,6 109:10
  153:12 190:14 195:9
  243:25 248:15 315:21
  317:18

**deputy** 82:3,17 83:1
  147:22 198:6

**derogatory** 27:19 28:3
  57:23 85:2 86:25 91:1

**describe** 287:21

**description** 3:7 4:2 5:2
  269:8 287:23,24 299:18

**deserved** 156:5

**desire** 46:8 47:3,4
  49:23

**desk** 91:16,17 92:1,2,3,
  4,5 93:2,6,7 99:3,13,21,
  25 100:5 101:13,17
  155:3,9

**desks** 92:8

**detain** 86:13

**detainee** 86:14 87:9

**detainees** 86:10

**deter** 108:12

**determined** 172:11

**determining** 124:2
  276:10

**device** 174:14

**Diagonally** 93:16

**diagrams** 288:22

**differently** 69:15 70:13

**difficulty** 9:13

**direct** 5:10 23:11 81:17
  178:11,14 179:8
  287:17,25 289:25
  301:23

**directing** 25:21

**direction** 22:2,6,10
  24:15,18,23 69:3
  126:11 165:2 176:9,11,
  13,21 181:17 262:1
  269:10 282:5,17 284:6
  291:8,18 299:18

**directions** 209:23
  260:19

**directly** 8:9 24:19
  165:7 211:23 250:24
  282:19 290:7

**disadvantage** 63:21

**disagree** 54:25 96:24
  97:3 266:7,10

**disagreed** 278:18

**disarm** 78:15

**discharge** 116:15
  120:8 168:24 181:8
  316:15

**discharged** 180:1
  181:19 293:23 294:3,7

---

Elizabeth Gallo
COURT REPORTING, LLC

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 91 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

298:22

**discharging** 299:13

**disciplinary** 4:5,13
32:24 33:15 179:6
184:2,10 185:4 186:11
276:8,14

**discipline** 33:7 85:24,
25 156:4 184:13,17
186:3 222:14 252:16
275:22

**disciplined** 129:15
138:20 155:19,21,22,24
156:2 224:1,3,5,8,10,11
235:5,8,13 252:11,13,
15

**disciplining** 85:20

**discovery** 7:14

**discredit** 157:18

**discuss** 199:1 215:21
216:3,5 276:19

**discussed** 134:20
193:23 200:25 226:1
276:21 280:21

**discussing** 141:23

**discussion** 144:7,14,
17,18 147:22 160:19
195:21 218:7 301:14
305:2 317:9

**discussions** 193:2,20,
22 220:8

**dismissal** 20:9 142:14

**dismissed** 139:14
143:4

**disobedience** 42:20

**disobeyed** 39:7 60:25

**Disobeying** 262:8

**disorderly** 15:18,21
40:25 42:16,17,18
237:7 246:16,19

**disorientated** 78:15

**dispatch** 299:3,4

**dispersed** 268:25
269:6

**display** 78:19 168:10,
11

**displayed** 40:16 58:9

**displaying** 55:11

**disposition** 278:12
297:11,12 308:18
309:6,18 310:3,14
311:1,12 312:2,17,20
313:10,24 314:15
315:6,22 316:7

**dispositions** 316:19,
25

**dispute** 136:10 141:22
142:2,3,5 227:15
228:12,14 242:20
259:24 266:5

**disputing** 242:14,16,
23 243:10

**disregard** 61:3

**disrespect** 265:23

**disrespectful** 57:22
87:4 89:20 90:10,19,21
100:19 266:6

**disrespecting** 90:18
93:21

**disruptive** 249:24

**distance** 84:16 93:16,
17 98:17,20

**distraction** 250:7

**distress** 213:5,6

**district** 7:7,8 69:8 71:5
133:4 252:19 304:2,6

**Division** 7:9

**divorce** 203:2,5 204:12
207:5

**divorced** 12:17,19
205:6

**doctor** 212:19

**doctor's** 193:8

**document** 109:15,21
110:7 130:10,18,21
132:4 184:1 196:4
219:16,17 221:13
251:23,24 260:9 277:21

306:12 307:1

**documents** 196:1
210:10,22 308:4

**Donuts** 258:25 259:1,9
262:24

**door** 15:12 117:22
268:21,23,24

**double-checking**
240:7

**downward** 282:19

**doze** 158:25

**dozed** 234:2

**draw** 288:19,23 291:23
292:1

**drawing** 289:4,9

**Drive** 261:6

**driver** 281:11 282:3,4
287:20

**driver's** 294:1,13,15,
17,18 295:1,7

**driving** 164:17 169:18
170:2,19 173:4 175:25
282:12 284:2,4 299:14
306:17

**dropped** 256:2

**drove** 222:25 229:5

**dtd** 3:15,23 4:9 5:8

**due** 20:23 117:14
130:19,20,22 131:25
134:5 137:12 139:14
224:23

**duly** 7:2 116:11

**Dunkin'** 258:25 259:1,8
262:24

**duration** 186:14
192:22

**duties** 16:1 39:14,18,21
76:8,15 77:5,8 114:2
116:13,15 120:8
202:14,19 216:24
217:9,16 263:22

**duty** 38:5 67:8 71:11
101:18,19 114:19
116:22,24 158:21,25

159:2,4,7 187:9,13
224:18 226:12 230:19,
24 234:1,7 274:5 279:9,
14,16

---

**E**

**e-mail** 11:2 212:13

**EAP** 199:11 201:1

**ear** 262:16

**earlier** 88:25 125:8
145:10 157:4 226:11
247:25 250:25 252:1
253:5 254:3 288:6

**early** 4:6 186:7,10,17
190:21 192:18 194:14,
19 196:4,11,19,21
197:10,23 198:1,12,14,
22 199:1 214:11,12,22
215:6,17,22 216:8,14,
25 217:2,9,18 225:4
259:4,5 276:21

**easy** 110:16

**education** 40:21

**educational** 45:1

**educators** 37:18

**effect** 22:19 23:6
162:25 163:5

**effective** 201:16
208:10

**effectively** 202:13,18

**effects** 73:25

**effort** 119:8 140:24

**Eighteen** 268:10
278:14

**Eleven** 195:4

**Ellis** 121:4

**else's** 15:14 173:3

**Elsh** 5:10,12 121:3,5,6,
12

**embody** 161:17,25

**emotional** 202:11,17
208:9,16 209:7,24
213:4,5,6 216:3,10,19



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 92 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

276:20

**emotions** 213:16

**employ** 190:25

**employed** 113:3,8 254:7 277:1

**employee** 189:4 192:9 233:4

**employees** 154:8 156:16 158:24 159:3 161:3 162:23 173:11 193:10

**employees'** 191:9

**employment** 48:22,25 75:3 111:22 153:17 206:25 223:22 234:8 302:10

**encompass** 76:4

**encountered** 58:23 267:12

**end** 139:22 216:25 268:20

**ended** 22:7 247:14

**ends** 279:4

**enforce** 117:25 118:5, 13

**enforcement** 46:9,13, 15 47:4 118:19 142:25 143:24

**engage** 246:11,12

**engaged** 100:17

**ensued** 160:19 195:21 301:14 305:2 317:9

**ensure** 240:8

**entail** 192:19

**entailed** 192:20

**entered** 15:10,11 38:18 143:19

**enters** 246:2

**entire** 63:22 88:8 155:23 156:2 277:3

**entirety** 73:22 200:4, 12,16,18,21,22

**EPS** 11:10

**equipment** 136:3

**equipments** 77:13

**equipped** 77:12

**equitably** 154:2

**erratic** 78:17,18,19,22 79:9

**escape** 162:25

**Esquire** 2:3,4,12

**established** 154:1

**establishment** 117:21 224:25

**et al** 7:6

**ethic** 118:19

**ethics** 118:19

**evaluate** 142:21

**evaluates** 53:21

**evaluation** 197:14 198:13 199:2 214:10,12

**evaluations** 77:19

**Evans** 149:1,9 163:24 164:20 175:1,3,4 176:25 178:14 179:17 182:6 281:24 282:4,22 283:1,2,6 284:4 285:4 289:5 290:18,20,22 291:2,5,6,13,17,20,23

**evening** 225:2,14

**event** 138:12 314:12 315:2,17

**events** 10:17 77:15 86:22 88:8,12 228:10 316:22

**eventually** 284:13

**evidence** 110:24 145:5 180:9,12 189:3,9,11 190:4,6 254:9,22 272:4 273:18 300:22

**evident** 42:2 191:10

**ex-wife** 205:15

**exact** 34:25 307:11

**exam** 79:15 110:17,19 111:3,7,12,23 140:20

**examination** 3:3 36:19 139:15 304:18 305:11

**EXAMINATIONS** 3:1

**exams** 110:23

**exception** 182:24

**excessive** 150:21,23 151:1,5,11 173:21 186:21 253:8

**excuse** 15:16 25:20 26:19 58:9,23 77:20 102:23 121:1 138:17 179:20 204:3 210:8 212:17 213:14 226:25 229:15 240:11 256:5 257:2 272:11 279:19 291:14 299:2 302:7 308:1 315:6

**exhausted** 204:1,3

**exhibit** 3:7 4:2 5:2 10:19,22,24 47:21 48:2, 4,8,12,17 109:8,9,10,23 115:1,13,15,16,18 116:6 120:17 125:11 131:3,7,9,11,15 132:4, 8,9,22 133:1,14,25 135:9 152:19,24 153:1, 5,8,12,21,25 158:20 161:2 173:9 179:2,5 183:22 186:20 188:20 190:10,14,15,19 195:2, 5,9 196:4 198:4 219:12, 17 221:3,8,11 232:8,10, 14,15 236:18,22 237:1 243:25 244:2,17 248:11,15 257:18 264:12,16 268:6 278:13 279:21 280:3,8,11,13 288:25 295:25 301:20, 23,25 302:2,8 303:5,6, 20 304:23 306:21 308:5

**exhibits** 3:6 4:1 5:1,21 109:4 258:15 301:8,17 305:3,6

**exist** 191:11,18

**exit** 134:5 268:21,23

**exited** 268:24

**exonerated** 223:3,8 235:21

**exonerates** 273:20

**expect** 68:18 69:4,7,9 116:5 300:2,14,18

**experience** 41:6 103:11 105:15 167:17 187:16 213:4,6

**experienced** 103:17

**experiences** 215:1

**explain** 19:21 31:13 39:6 103:8 113:6 123:14 126:7,8 127:23 143:13 161:9 182:18 191:25 201:12 216:7 233:14,16 246:1,5,6 255:14 258:3 274:7 294:24 295:5

**explained** 26:20 30:3 234:4 266:12,15

**explaining** 86:23

**expressly** 161:3

**extent** 128:16 145:14

**external** 210:3,9,25 211:1,2,4 214:8

**extra** 14:5 38:5 117:19 202:13,19 203:1,12 208:11 216:16 217:12 244:11,19 258:25

**extra-duty** 38:7 266:25

**eyes** 256:10,12,16,19

**eyesight** 172:12

---

**F**

**face** 65:9 66:22 67:6 68:5 69:19 216:1,2 253:8 264:25

**faces** 208:22

**facsimile** 2:7,15

**fact** 20:24 21:18 30:17 33:6,14 49:15 97:24 99:13,20 111:25 116:24 123:3 161:18 162:1 170:10,18 180:19



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 93 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

187:12 227:11 237:16
239:3 242:7 249:18
250:19 252:9,15 259:23
264:15 269:21

**factor** 180:16,19,24
181:1,2

**factors** 215:4

**facts** 21:12 54:5,6
70:19 112:23,24,25
145:5 157:16 180:9,11
218:23 254:9,22 259:24

**failed** 136:2 139:11
179:19 236:2 239:9

**failing** 239:11

**fails** 138:3

**failure** 139:15 142:17
223:13,23 224:9

**fair** 29:4 33:6 34:18
49:4 50:15 121:25
130:7 183:17 184:9
185:18 188:11 203:13

**fairly** 154:2

**fall** 230:18,24 233:25
234:4,12,16

**fallen** 229:13 234:6,19

**falling** 225:13

**falsification** 112:15

**familiar** 126:19 127:15
179:12,13 184:9,12
230:5

**family** 46:10,11 47:14
194:3 204:13 206:11
208:1,11,17 209:2
216:23 243:17

**farmers** 212:4,7

**fast** 289:12

**fat** 85:5

**fate** 274:13

**fault** 83:12,13 241:25

**favor** 120:9

**FAVORS-COA000560**
4:7

**FAVORS-COA000565**

4:8

**FC0013241** 136:14

**FC013236** 133:4

**FC013240** 136:1

**FC013246** 138:23

**FC013247** 140:2

**FC013249** 133:5

**FC013505** 120:18

**FC013507** 120:19

**fear** 25:1 120:8 179:14
180:2 181:18 295:9,22

**February** 5:14 35:11
77:2 116:7,22 125:13
126:13 131:20 133:13
198:5 276:4,11,16
303:15 316:7,9

**federal** 7:13 157:25
317:19

**feel** 23:10 29:12 32:6
159:15 173:2 183:12
267:7 305:22

**feeling** 215:1 227:6

**feelings** 154:10,16,24
155:14

**feet** 91:24 92:24 93:1
97:12,13,25 98:11,18,
19

**fell** 225:8 226:6 227:19,
24 229:9 231:11,15

**felon** 173:12

**felony** 66:14,16,19,25

**felt** 25:4 28:13,18 33:8
84:18 86:20 100:4
102:17 105:6 192:22
234:2 250:6 285:14,19
292:9,13 295:9,20,22

**female** 17:7,19 18:17,
20 85:2 86:25 90:11
93:5 100:15

**fence** 260:21 262:12

**Ferry** 227:25

**festival** 14:4,9,12,14
21:14 23:14 263:2

**fight** 28:3 103:12
268:21,23,24 269:2

**fighting** 27:25 28:6

**figure** 208:25 280:22

**file** 4:15,17,19,21,23
5:3,5 28:25 47:25 69:8
85:11 96:23 97:4,5,9
109:24 110:6,8 111:21
112:1 133:3 141:6
149:12 188:12 189:2
235:23 236:24 242:15,
16 243:24 248:4 262:19
268:7 275:7 278:21
288:18 306:22

**filed** 16:2 48:3,5,6
203:5 221:22 302:1
304:3,7 307:21,25
308:3

**files** 248:17,18

**final** 255:23

**finalized** 203:7

**finally** 260:21 276:4

**financial** 202:24,25

**find** 39:12 41:17 71:7,9,
12 206:24 212:8 239:10

**finding** 26:14 67:10
189:3,12 239:3

**findings** 71:8 242:20,
23 243:2,7

**finds** 246:4

**fine** 304:22 307:18

**finger** 14:25 25:12 28:6
29:17 40:12,23 41:7
49:16 50:6 68:3 245:14
265:1

**finish** 9:8,10,19 147:18
149:6 158:14 179:7
181:6 200:19 282:15

**finished** 115:1 149:6
274:17

**fire** 150:12 180:4 292:4
300:20

**firearm** 66:8 78:1
101:25 125:13 130:11
178:6,10,13,19 180:5

290:1 316:15

**firearms** 130:20 178:23
307:2

**fired** 150:11,12,20
157:1 163:18 165:10
178:10,13,19,23 179:1,
9,25 276:24 277:2,7
288:7 289:6,7,13,17,19
290:1,5 291:20 294:19
300:3,14 301:4

**firing** 166:10 167:2

**Firm** 2:4

**fitness** 140:19

**flexibility** 38:4,7

**floor** 272:21

**fluid** 105:9

**follow** 50:25 51:5,9
53:11 61:10,19 62:5
68:19 69:2 71:24 72:9
116:6 117:6 127:5
128:17,21 142:17
153:21 210:24 252:5
253:5,19 262:1 263:12
293:9,12,18

**foot** 84:3 165:25 299:15

**force** 43:1,4,5 56:11
57:18 58:1,2,7,13,14,
17,18,25 59:14,16,17,
18 60:5,6,7,18,20,21
62:12,18,22,25 63:12,
16 64:2,4,8,12,15,19,
22,24,25 74:13 82:24
83:4 122:6,9,11,14,15,
18,22 123:1,4,11,12,19
124:2,3,5,22 125:1,18
130:11 150:21,23
151:2,5,9,10,11 158:7
161:4,15 162:3,13,24
163:4,7,9,10,17 172:25
173:12,22 174:1,6,11
179:10 180:17,23 181:4
182:14,19 186:22
192:8,9,14 202:11
215:21 216:6 218:7
220:9,13,18,25 243:12
244:13,20 253:7,8
254:4,12,13,17 255:5
257:7 262:12 264:18
277:17,22 278:7 287:12
292:10 293:1,4 313:19

Case 1:18-cv-04710-CAP  Document 260-10  Filed 08/16/21  Page 94 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

315:22

**forced** 161:18 162:2

**foreign** 66:10 117:12

**forget** 256:9 294:5

**forgot** 310:7

**form** 7:16 29:9,23 32:3, 9,16 33:3 39:10 40:14 49:7 51:10 52:25 57:19 59:8,23 60:12 61:12 63:3 65:1 68:8 69:22 71:13 72:12 78:23 80:4 87:25 99:15 100:7 106:22 107:9 108:3 114:4 119:13 129:21 130:24 141:11,15 144:11 145:2 146:4,17 147:10 148:6,21 149:14 150:14 151:15 152:8,17 156:9 163:2,11 168:3 169:13,23 170:14 171:17 172:2 180:8 183:9,18 187:21 188:14 189:13 191:3 194:9 198:16 199:3 200:2 201:3 202:20 203:14 210:15 213:7 218:10 232:2 235:15 236:13 242:10 243:4 245:4,15 246:21 247:5,11 248:6 251:11 252:23 253:11, 23 254:8,21 255:10 258:7 271:17 273:7 275:12 278:24 286:14 289:20 300:5

**formal** 207:17

**formally** 137:7,9 207:16

**forthcoming** 210:2

**forward** 143:17

**fostering** 130:12

**found** 15:2 26:10 41:17 83:13 114:22 141:6 186:1 187:18,20 188:2 189:10 244:9,10

**foundation** 113:14,24 114:10 204:14

**fourth** 72:10,19 73:7, 18,19,21 74:7,12

143:12,16 311:6

**frame** 34:19 35:12 225:11

**free** 55:20,23 74:7,12

**freedom** 23:2 31:18 51:16 55:15 89:2

**friend** 38:2

**front** 84:13 98:9,15 99:14,21 100:1,5 109:15 164:25 165:7,9, 19 177:4,7,9,11,12,17, 18,21 178:20,24 181:22 182:4,7,19,21,23 186:20 230:25 265:24 287:17,19 288:4,8,10 289:18 290:7 294:2,6

**fuck** 14:19,24 22:19,22 23:6,11 25:11 27:18 28:5 38:11

**full** 11:9 121:12 135:3

**fully** 77:12

## G

**gain** 286:23,24 287:1,7, 10

**Gallo** 2:17

**game** 55:2

**gap** 98:12

**gave** 14:24 23:11 38:4 49:16 125:21 131:8 151:8 210:21 226:22 232:23 246:20 247:25 249:3,7 262:5 269:7 270:20 280:2,12 281:3, 20 282:6,7 284:23 290:14 293:18 299:15, 17

**generally** 169:11

**gentleman** 147:8 148:11 261:13,14 263:5

**George** 2:10

**Georgia** 2:6,14 3:12 5:10 7:8 11:22 12:4 13:8,11,25 22:23 40:6 46:5,7,11,12,18 47:4,

12,14 54:25 64:7 69:14 70:22 74:23 116:12,14, 18 117:13 118:1,6 157:25 187:5 204:13 209:19 253:5,17 261:21,24

**give** 9:1,9 15:5 20:15 27:11 40:4 51:15 60:22, 23 65:5 77:14,19 79:15 84:15 95:9 98:16 106:14 109:8 110:22,25 111:17,22 115:11 132:11 142:20 150:16 152:19,20 153:2 158:15 174:22 206:14 210:10 226:23 233:13 234:20 242:17 243:24 245:13 251:17 255:18 264:5 267:8 287:23 289:9,15 290:24 291:9

**giving** 15:9 25:12 37:16 61:7 181:12 281:17,24 282:11 284:6 285:21 291:2,3,5,6

**Glazier** 212:13

**goals** 191:12

**good** 8:17,25 9:7 37:17 317:13

**gotcha** 24:21 208:14

**governing** 118:18

**government** 117:11

**grabbed** 264:23 293:15

**grabbing** 265:17

**graduate** 45:5,8,12

**graduated** 75:4,11 121:20

**graduation** 75:8 137:13

**Grant** 76:5

**greater** 202:24

**ground** 8:21

**grounds** 186:22 187:2, 6,10,13

**Grove** 11:22

**grow** 45:21

**guess** 34:17 110:7 222:19 280:22

**guide** 37:9

**guilt** 297:19

**guilty** 5:12,13 120:7 297:17 298:2,5 301:25 302:3 303:16,21 304:4, 7,12,13

**gun** 101:25 164:7,11 168:21 285:24 286:3,7 287:8 288:7 290:5,6 292:13

**gunned** 165:4 181:16 288:16

**guns** 285:12 295:20

**guy** 68:5 230:12,14 247:23 258:22 267:4

**guys** 21:14,15 199:1 288:19

## H

**half** 189:7

**Hall** 6:5,6 7:6 35:8 72:2 116:4,5 119:12 120:18 125:3 133:4,5 136:1,13 138:23 140:1 149:21 154:17 164:15 166:1 167:1,2,23 168:7,16 169:4 170:25 171:5,8, 13 174:11 175:24 176:9 177:14,24 180:6,17 181:12 182:13 183:13 185:1 187:17 212:19 213:20 219:7,8 260:8 262:22 276:25 277:4 279:21 280:3,9 281:19, 23 282:11 283:19,22 287:1,8,21,23 288:12 291:1,19 295:15 296:16 298:14,15,20 299:13 303:2,9,22 304:8

**Hall's** 146:15 164:7,22 165:9 176:21,23 286:19 289:18 298:8

**HALL-FC013236** 3:24

**HALL-FC013249** 3:24



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 95 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                    January 25, 2021

**HALL-FC013505** 3:18

**HALL-FC013507** 3:19

**Halls** 43:22 48:21 49:2 72:18 73:4,14 74:6,11 77:1 80:11 118:24 119:18 145:20 149:12 153:14 163:17,22,23 263:8 277:6 305:10 306:17,25 307:6 316:16

**Halls'** 119:15 145:24 146:8,24 306:5

**hand** 65:9,15,25 66:2,5 102:5,7 272:14,17 286:8

**handcuffed** 65:6,14 66:5,24 67:5 68:5 96:8 103:13 104:5 105:13,15 155:12 156:7 253:20 252:4 253:9,18 258:21

**handcuffs** 104:10

**handgun** 78:2

**handle** 68:21 87:23

**handled** 70:10 87:17

**handling** 88:6

**hands** 66:23 96:19,20, 21 103:9

**handwriting** 134:8 239:24

**happen** 36:14 126:9 180:19 196:16 240:8 263:13

**happened** 14:7 16:12 20:5 21:19 28:25 30:13, 21,22 31:13 32:20 33:16,21 34:9 35:11,18, 24 47:6 49:2 67:11 86:19,22 89:21 90:13, 22 91:9,12 125:2 138:10 140:19 146:25 149:22 152:15 165:17 180:6,22 192:17 193:19 204:15 205:14 208:2 223:20 224:20 225:24 227:2,10 230:18,24 233:25 234:25 235:3 240:6 246:5 248:3 257:17 259:4,15 260:5, 9 262:22 267:18 268:19

273:16 276:2 278:11 279:7 284:20 285:2 289:12 292:22 307:12 309:16

**happening** 34:14 55:7 170:23 279:4

**happily** 136:17

**hard** 165:3 177:15 285:12 288:16 295:20

**harm** 42:1 62:14 65:7, 18 83:21 102:25 103:3, 9,19,21,22,24 104:1,4, 11 105:8 106:13 122:13 125:1 126:12 163:23 164:11 170:20 172:24 173:6 174:21,25 219:3, 4

**harm's** 25:22 261:15

**harms** 106:14

**head** 9:2 223:1 264:25 285:11 295:17

**headphones** 260:7,17 262:15 263:5,6

**Heald** 270:5,6,7,19

**hear** 27:9 88:24 260:17 262:16 267:5 305:13

**heard** 27:10 43:7 79:16 81:22 89:17 282:2 304:10

**hearing** 272:25 274:12 275:9 276:4,22 278:18 279:5,8,13 280:23 296:6,8,12,13,15 300:4, 15 303:20 304:9

**heated** 90:24

**Heath** 270:4,5

**heavy** 137:12

**held** 6:7 128:20,21,25 129:24

**helped** 215:7

**helping** 52:2 54:5,7,13, 16

**hey** 28:24 207:21 226:6

**hiding** 231:13

**high** 45:8,11,13 295:11, 13 299:14,24

**higher** 268:2,4

**hindering** 15:25 54:1, 18

**hired** 47:5,7,19 75:3,4 79:19 110:18 141:9

**history** 4:13 131:8,16 221:7 243:19 257:19 264:5

**hit** 65:14 66:22 67:4,6 69:17,18 103:5,6,7 167:8 172:19 223:1 288:1 299:6

**hits** 65:8 66:4 68:5

**Hobbs** 82:1,4,14

**Hobbs'** 82:10

**hold** 44:4,7 45:3

**holder** 117:10,14

**holding** 78:16 117:13

**holster** 285:23,24 291:24

**holstered** 286:4

**home** 15:6,7 26:9 38:23 41:16,18 137:12 204:24 205:16

**hon** 235:9

**honest** 112:7 113:2,7, 11,12,20 114:1,18,21, 22 149:19,24 150:4 157:15 223:5,9 230:12 232:22 234:22 235:6,14 236:10 279:23 280:1,12 303:25

**honesty** 112:17 113:15

**Honorable** 302:4

**hope** 120:9 207:25

**hours** 216:17,21 254:11

**household** 208:7

**households** 202:23 203:12,19,24 204:24 205:13 206:16

**Hudson** 140:3,4

**hurt** 261:19 267:15

**husband** 15:3,12 24:10

**hypothetical** 65:5,13, 20 66:3,4 70:18

**hypothetically** 68:16

**I**

**I-285** 134:5

**identification** 10:20 47:22 109:5 131:4 132:10 153:9 179:3 190:11 195:6 219:13 221:4 232:11 236:19 244:3 248:12 258:16 264:13 289:1 296:1 301:7,18 305:4

**identified** 20:24 21:2,3, 8 210:3

**identify** 21:6 214:25

**identifying** 109:20 302:9

**illegal** 22:22 40:13,16, 19 49:25 50:2 89:14 94:18

**illustrating** 141:6

**immediately** 104:23

**imminent** 219:2

**impact** 215:2

**impartial** 265:22

**importance** 112:10

**important** 9:16 112:13, 14 123:14,15 157:5

**imposed** 116:13

**impossible** 113:21 131:22 132:2

**improper** 29:15 30:15 43:10

**improve** 119:7,11

**improved** 142:22

**in-service** 62:2 125:7 127:7 214:19 217:24

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 96 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                January 25, 2021

219:25 220:1,2,8,16

**inaccurate** 130:23
132:4

**inappropriate** 49:24
50:1 245:3

**incident** 3:23 14:8
16:12 21:13,19 28:17
30:18,21 31:6 32:13
33:8,21 34:8,11,13,23
35:7,14,17,19,21 36:3
48:20 49:1 67:16 68:23
70:9 72:3 73:5 77:2
82:21,23,24 83:4,8
95:20,21 100:3 106:18
117:1,3 124:19 125:2,9
135:15,16,21 136:1,19
137:18 138:17,18,19
147:7 149:13 153:14
155:23 156:2,3,14
162:15 166:13 168:7
177:13 180:5,6,15,17
185:1 187:17 188:2
209:6,14 212:11
213:17,20,23 215:7
216:6 222:1,3,6,7,18
223:2,7,14,16 224:18
228:22 231:7,24 236:1,
6 243:16,18 244:6,18
247:23 252:13 258:21
259:8 260:6,15,16,25
262:22 263:4 264:2,17
267:20,23,24 268:1,10
275:19 276:2,15,25
277:18 278:12 279:15,
21 286:18 288:23
292:18 296:22 298:3,
15,23 299:3,17 300:4,
20 303:9 306:18,24,25
307:5 309:3,15 310:11,
23 311:9,24 312:14
313:7,21

**incidents** 134:15 135:5
180:22 186:2 188:1
215:22 263:20 308:7
316:15

**incite** 38:12,15

**incited** 23:17,25

**inciting** 52:9,22 53:10

**including** 79:25 107:19
154:17,19,21

**inconsistent** 147:23
246:7

**incorrect** 130:13

**increase** 37:22 210:4

**INDEX** 3:1,6 4:1 5:1

**indication** 183:1

**indicative** 67:24

**indicted** 296:21 303:1

**indictment** 5:10
301:23 302:23,25

**individual** 2:10 3:17,20
63:1 67:20 69:17 78:16
86:24

**individuals** 80:8,11

**influenced** 120:8

**information** 8:9 42:5
127:25 210:9,11,13,22
226:24 269:8

**informed** 145:17

**infraction** 190:9

**initial** 277:22

**initially** 193:16 271:24
275:1 283:15 292:17,23

**initiate** 100:21

**initiated** 99:24 100:3,
18,23 101:2,6

**injured** 180:3 182:1

**injuries** 166:3 179:24

**injuring** 179:21

**injury** 62:14 174:16
175:1

**inmates** 103:12

**innocent** 120:7 167:8

**inside** 86:8 269:3
270:16,25

**instruct** 137:12

**instruction** 125:22
291:3

**instructions** 142:17
259:14 281:25 284:24
285:21 291:7

**instructors** 59:20
125:24

**instrument** 174:14

**insurance** 12:23,25
206:1

**integrity** 140:13 230:15

**intended** 106:8

**intention** 166:18

**intentionally** 120:3
154:25 256:11

**intentions** 94:22
166:20

**interact** 82:14

**interacted** 72:18 74:8
116:7 117:5 119:24

**interaction** 82:18
116:25 119:3 145:20
269:16 282:3

**interactions** 73:4
118:24 123:16 153:21

**interactive** 128:5

**interceded** 292:17

**interesting** 244:5

**interests** 154:10,16,24
155:14

**interject** 140:12

**interjected** 283:14,18,
21

**internal** 70:21

**Internet** 212:10

**intersection** 165:12,13
167:16,17 179:11,12,
14,19,21,23 183:1
225:15 227:25 229:7
261:4 262:21,23 267:21

**intervention** 191:10

**interviewers** 249:19

**intimidate** 94:2,4,13,
16,22 96:5 98:7,8 99:21
101:13,24 120:3 154:25
155:12

**intimidating** 99:9
155:21

**introduce** 6:9 264:16
301:7,19,22

**investigated** 112:5
154:2 244:6,19

**investigates** 227:18

**investigation** 15:17
30:17 54:18 70:19
71:19,20 232:19 240:24
241:1 244:23 246:3
264:22 270:2,25 271:5,
13,21,25 272:6 274:4
275:7 279:16,24 280:2,
16,25 296:3

**investigations** 184:7

**investigative** 189:2

**investigator** 240:19

**investigators** 149:20

**involve** 292:18,23

**involved** 14:14 26:23
35:21 150:3 213:2,23
215:12 283:15 292:22

**involving** 31:6 35:7,17
48:21 72:3 82:21 147:7
180:15 185:1 212:12,19
236:1,6 267:20 275:19
298:15 303:2,9,22
306:25 307:6 316:16

**irons** 103:14

**irreconcilable** 205:18

**issue** 50:23 134:24
135:2 215:8 231:25
234:25 237:6 244:11,13
264:17 276:10 296:9

**issued** 237:6 240:4

**issues** 184:7 210:4
216:9 223:22 263:11
276:20

---

**J**

**Jacqueline** 13:5

**January** 6:2,8 222:4
308:19 311:2 312:3,5,8,
15 313:24 314:2,3

**Jay-z** 209:15,17,18
263:2 280:11

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

**Jeff** 212:13

**job** 9:1,7 14:5 21:7
76:15 77:5,8 112:10
113:21 114:13 159:19
194:8 197:20 202:13,19
207:24 208:2 216:16
217:11 228:18 244:11,
19 258:25 266:25
268:11 305:23

**jobs** 38:6,7,8 117:19
203:1,12 208:11 217:13

**Jones** 136:12,21 139:3,
9 230:2,7,21 234:5,16,
18 235:6,14 236:11

**Jones'** 233:24

**Joseph** 261:11

**Judge** 302:4

**judged** 161:16

**judgment** 147:6

**judo** 201:7 202:2
214:18

**July** 223:3 258:23
259:5 309:18,21 311:13

**jump** 311:6 314:24

**jumped** 162:17

**June** 224:18 276:3
311:10 313:22

**jurisdiction** 77:11

**jury** 102:15

**justice** 113:14,25
114:10,14,17 157:6

**justifiable** 174:10

**justification** 218:19

**justified** 151:13,21
152:2,5,6,15 158:8
170:25 171:1,4,6,9
174:10 183:13 218:9
219:1

**justify** 58:2 218:16

**justifying** 218:20

---

**K**

---

**Kennedy** 2:13

**keys** 222:2

**kick** 84:2 97:12,19
98:23,25

**kid** 213:23 260:6,16
263:2 280:10

**kids** 129:6,17 205:8
206:4

**kill** 167:25 168:20,21
169:5,11

**killed** 170:25 171:5

**killing** 171:8

**kills** 168:25

**kind** 132:12,19

**knees** 84:10

**knew** 233:12 234:19

**knocked** 225:23
227:22 229:8 272:17

**knocking** 225:17

**knowing** 63:21 69:5
180:19

**knowledge** 42:5
165:11 176:18 182:25
250:12

---

**L**

---

**lady** 222:1,2 258:23
259:9

**Lagrua** 302:4

**laid** 204:14

**language** 42:19,20
201:11 246:24

**Large** 5:15,16,18

**larger** 269:4

**late** 134:4,10,14,15,24
135:3,5,11 136:3,6
223:23,25 238:9,13
241:16,18,22,25

**law** 16:8 17:14 19:5
26:19,21,25 27:4 29:5
30:11 33:2 39:8,12,13,
24 40:6,20,24 46:9,13,
15 47:4 51:4 56:16
58:16 89:12 94:16

118:8,19 142:25 143:24
144:9,19,25 245:2
246:2 247:19

**lawful** 15:5 39:7,14,18,
21 40:1,3 42:20 51:6
163:3 252:3 284:6

**lawfully** 39:3 173:21

**laws** 69:14 70:5 74:23
116:12 117:13,25 118:6
158:1 187:5 253:5

**lawsuit** 13:19 14:3 16:2
20:3 27:2 28:23 29:5
47:24 48:1,5

**lawsuits** 13:20,23
43:18,21,22

**lawyer** 248:21

**lead** 28:2

**leading** 136:7

**leaning** 250:1

**learn** 26:7 226:20
262:15

**learned** 26:12 38:22
95:16 107:8 108:10
146:9 216:8 262:18

**leave** 69:12 279:17

**leaving** 45:25 46:2
80:16 99:25 100:5
229:6

**led** 46:6,25 47:6 67:11
215:22 228:11

**left** 46:1 92:8,11 101:21
102:2 164:23 256:16,17
281:25 285:12 288:16
289:16 290:8 291:4
294:1,10 295:20

**leg** 84:3,8,9 103:13

**legal** 59:13 61:9 67:8
111:21 121:2 217:23
218:2 297:9

**legally** 58:13 173:25

**legs** 96:20,21,22 97:1,
16,17 103:9

**leniency** 274:9

**lessened** 258:6

**letter** 110:16 140:6

**letting** 129:8 208:24
209:1 210:17

**level** 287:11

**license** 44:8 207:13

**licenses** 44:5

**lie** 159:25 229:23,25

**lied** 160:1

**lieutenant** 81:20,21
82:9 140:3,4 226:2
231:1

**life** 25:1 119:8,11 173:3
213:11,12,13

**lifted** 295:12

**light** 152:7

**limitations** 55:24

**list** 174:22

**live** 119:8

**lived** 26:1

**lives** 173:6 213:12

**living** 46:10,20 47:16

**LLP** 2:13

**local** 158:1

**located** 45:14 175:11
177:25 211:6 269:10

**location** 269:2,12
290:4

**Locust** 11:22

**logbook** 240:7,10,13

**logged** 241:4

**long** 35:14 42:25 51:6
95:8 279:13 305:1

**longer** 111:11 170:11

**looked** 28:24 166:2
180:24 261:13

**lose** 169:20 170:3,5,20
302:19

**lost** 44:14 299:24

**lot** 138:14



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 98 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                 January 25, 2021

**loud** 266:18

**low** 281:13,21 286:9,12
287:14 288:1 292:13

**lowered** 252:16

**lunge** 83:25 97:13
98:22,25

**lunged** 83:18,23 85:10
86:18,20 97:24 102:24
104:13,18 105:11
108:16,19 162:17
247:24 248:1 249:15

**lunging** 83:20 85:15
100:22 102:19,20,22
105:19 106:4 250:16
251:3

**lying** 112:15 229:19,20
231:22 271:7

---

**M**

**M-A-R-S-T-O-N** 214:6

**made** 31:8 32:6 47:13
69:11 85:2 109:3
149:11 150:1,7 165:3
177:15 185:20 192:25
194:12 205:9 214:22
225:14 226:21 233:1,6
262:10 267:22 268:24
269:6 278:18 289:16
291:19 298:21 299:16

**Magic** 80:16

**magnitude** 123:19

**mail** 11:3

**Main** 2:13

**major** 82:1,4,12,14
135:12 197:25

**make** 8:22 11:1 26:13
56:22 57:2 72:9 73:6
77:9,12 88:13 95:9 96:1
98:23 119:8 124:7
144:16 147:24 161:18
162:2 180:4 191:17
200:16,17 215:4 263:11
287:9 288:13,16 295:20
306:23 315:21

**makes** 110:16 215:15

**making** 24:13 28:3
67:23 86:24 123:25
127:3 141:7,10,23
142:10,22,23 143:22
144:3 145:20 147:7
170:12 213:10 275:18
276:15 285:12

**male** 17:7,20,21 19:13

**maltreatment** 257:7

**man** 5:17 156:7 209:15,
18 214:1 253:18 277:19
293:16

**managerial** 82:10

**managers** 129:19

**manipulate** 140:25

**manipulative** 142:16

**manner** 42:3 154:8
164:17

**mannerism** 168:11

**manual** 126:21 127:10

**March** 3:15 115:21
121:17,19 131:16,18
302:1

**mark** 305:6 306:2

**marked** 10:19 47:21
48:2 109:5,8 131:3,7
132:8,9 153:8,11 179:2
190:10,13,19 195:2,5,8
219:12,16 221:3,8
232:10,14 236:18,21
244:2 248:11,14 258:16
264:12 288:25 295:25
301:18 305:4

**markers** 301:7

**market** 212:4,7

**marriage** 207:12

**married** 12:6,8,10,11,
13,15 46:22 207:7,10,
21

**Marston** 214:2,4
267:20

**Maryland** 46:3,4,7,12,
16,19 47:16 206:17,21,
25

**mask** 305:12

**mass** 168:20,24 169:8,
11 170:19

**match** 161:12

**Mathieu** 3:2,9,15 5:11,
12 6:1,4,21 7:1,5 11:10
120:24 121:3,8,9,11,14
137:25 139:13 317:21

**Matt** 55:1

**matter** 6:5 52:18 127:8
187:17 224:13 243:13,
15,16,17,24 244:6
264:15 268:2 304:11

**matters** 8:11 215:15

**Mayer** 198:6 199:23
200:1 201:1

**meaning** 128:6

**means** 7:23 10:8 40:20
85:5 118:5 120:3,12,15
161:7 162:5 169:7
172:23 188:17 190:5
303:17

**meant** 21:2 143:13
247:15

**Mechanicsville** 76:5

**medications** 10:11,15

**meet** 82:18 83:1,7,10
193:1,6,12,16 194:20
196:9 199:10,22 202:25
217:18 272:7

**meeting** 17:24 85:19
272:9 300:11

**meetings** 77:19 193:2
280:21

**member** 44:16,19,22
134:1

**memo** 140:2 141:6,23
198:5,15,18 256:24

**memorandum** 3:23
4:9 135:16

**Memorial** 211:10,15,21

**memory** 135:24 223:19

**mention** 85:9,12
271:23

**mentioned** 19:15 57:5
85:17 179:16 259:17
300:23,24 306:8

**merge** 285:8 288:15

**met** 197:24 225:25
226:4 280:16

**metal** 104:11

**method** 132:16

**mic** 191:21

**Michelle** 12:11

**middle** 14:24 25:12
28:6 29:16 50:6 121:8,9
281:10

**mile-and-a-half**
139:25

**mind** 52:16 65:23 70:13
106:9 152:21 166:14
170:13,17 289:3,4

**mindful** 119:6

**Mine** 152:25

**minute** 226:4 273:4

**minutes** 158:15 160:15

**misdemeanor** 66:17

**missed** 237:22 240:5

**missing** 89:9

**misspoke** 275:3

**misstating** 314:19

**misunderstood** 19:2

**moderate** 213:5

**moment** 144:10 225:12
227:21

**moments** 225:12

**money** 27:4 117:14,20,
22 145:1,9,16 216:22

**monitor** 191:9

**Montgomery** 206:9

**month** 18:2,5 207:1
259:6

**months** 136:7 141:8
207:2



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 99 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

**Moore** 212:13,14,18

**Morgan** 206:5,9

**morning** 135:18 136:3
225:4 241:5

**motion** 105:1,9 304:7

**Mount** 228:1

**move** 14:14,16,21
21:25 22:1 47:4 172:20
208:1 224:21,24 281:23
283:21 286:20 288:8,9

**moved** 285:7 286:2
288:11,14,17 290:8,10,
11,12 295:16

**movement** 109:3
163:1

**moving** 80:16 124:11,
16,22,23 125:18 126:3,
6,14 127:17 164:11
166:11,16 167:11,15
169:18,20 170:19 172:8
173:2 179:20 182:24
218:9,16,21 219:1
282:1,4,7,8,9,16,21,23
283:5,9,19,22,24,25
284:1,7,8,16,22 285:17,
25 291:1,5,7 295:19

**multiple** 134:14 135:4
136:6

**municipal** 238:6 239:4
241:14

---

**N**

**names** 13:4 17:5,16,25
125:25 126:1 208:23,25
243:20

**nationwide** 142:25
143:24

**needed** 14:13 127:5,16
138:15 162:11,13
189:10 193:14 203:12
204:6,7 205:15,16
206:2 291:13

**negative** 23:18 215:2

**night** 225:3,6 229:5,12
234:12 268:20

**Nineteen** 173:10 280:7,
8

**nod** 9:2

**Noel** 6:5 35:7

**nonshoot** 217:23

**nonshooting** 218:3

**normal** 9:2 25:16,17,
18,19,20 217:15,16
295:11,13

**north** 204:19

**northbound** 261:6,8

**Northern** 7:8

**Northside** 261:6

**notary** 8:8

**note** 67:23 264:22

**noted** 249:17

**notice** 3:8 5:8 7:10
10:23 11:2,5 17:2,3
228:9 237:16 255:23
301:20 302:9 304:8

**noticed** 263:10

**noticing** 24:10

**notification** 67:23
69:11 269:6 298:21
299:17

**noting** 141:9

**November** 130:22
131:25 238:7 239:5
240:15 241:5,14

**number** 6:3 10:19
47:21 48:4,17 109:8,9,
17 110:12 115:1,3,5,6,
14,15,16,18 120:17
125:11 131:3,7,8,9
132:8,9 133:1,16,25
135:10,25 137:14
139:15 152:20 153:8,
12,21,25 158:20 159:3
161:2 162:23 173:14
179:2,5,6 183:22
186:20 188:21 190:10,
14,19 192:7 195:2,3,5,9
196:5 198:5 219:12
221:3,9,11 232:10
236:18 237:2 239:2

243:25 244:2,17 248:11
264:12,16 265:9 268:6
275:6 278:13 279:21
280:3,5,9,10,11,13
281:3 288:25 295:25
303:19

**numbered** 3:13,16,18,
21,23 4:7,9,13,15,17,
19,21,23 5:3,5,8 109:11
120:18 131:9

**numbers** 109:4 258:15
301:17 305:3,7

**NW** 2:5

---

**O**

**O.C.G.A.** 4:11 317:20

**oath** 3:14 10:3,6 67:8
68:6 81:6 113:19,22
114:2,16 115:21 119:10
165:18 220:19 227:12
231:18 238:3 249:7
251:8,18 253:4 255:7
274:5 295:4 296:25
297:1,6

**obey** 53:19 157:25
179:19 251:21 293:2

**obeying** 263:9

**object** 29:9,23 32:3,9,
16 33:3 39:10 40:14
49:7 51:10 52:25 57:19
59:8,23 60:12 61:12
63:3 65:1 66:10 68:8
69:22 71:13 72:12
78:23 80:4 87:25 99:15
100:7 106:22 107:9
108:3 114:4 119:13
129:21 130:24 141:11,
14 144:11 145:2 146:4,
17 147:10 148:6,21
149:14 150:14 151:15
152:8,17 156:9 163:11
168:3 169:13,23 170:14
171:17 172:2 174:14
180:8 183:9,18 187:21
188:14 189:13 191:3
194:9 198:16 199:3
200:2 201:3 202:20
203:14 210:15 213:7
218:10 232:2 235:15
236:13 242:10 243:4

245:4,15 246:21 247:5,
11 248:6 251:11 252:23
253:11,23 254:8,21
255:10 258:7 271:17
273:7 275:12 278:24
286:14 289:20 300:5

**objection** 30:7 33:11
49:17 72:21 73:10
141:25 146:11 200:9
245:8,20

**objections** 7:16 29:24

**objective** 163:3

**objectives** 191:13

**obligation** 203:23

**obligations** 202:24,25

**obscenities** 50:16

**observed** 24:13 128:9
138:1 186:13 192:20
218:22 281:23 291:1,
13,16

**obstructing** 61:2

**obstruction** 246:16,18

**obtain** 139:24

**OC** 35:22 78:3,9,12,14,
21 79:5,11,13 82:21,25
83:4,11,21,22 86:21
101:3,9,13,16,18 102:5,
7,9,16 103:1 104:19,20,
23,25 105:3,18,20
106:1,3,6 107:5,14,19,
24,25 108:8,12,15,18
117:1 119:22 147:7
148:2,10 155:24 156:15
162:16,18 209:12 235:2
247:23 250:3 252:3
253:18 256:15,16
258:21 269:12,16,22,24
270:18,19,20 271:2,22
272:13,18,20 277:9,15
292:18 300:25 301:2

**occasion** 140:13

**occur** 17:13 310:17
314:3,6

**occurred** 18:3 263:24
308:7,17 309:3,9
310:23 311:9,12,24
312:14 313:7,21

---



Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                              January 25, 2021

314:12,15 315:2,6,17
316:16,19,22,25

**occurrences** 263:23

**OCGA** 219:24

**October** 198:14 199:2
241:2 242:21,25 257:13
301:24 308:3,8 309:10,
21,24 310:3,18 311:4,
15,18 312:6,8,24 313:1,
13,16 314:3,6,13,15,16,
20,22 315:10,12 316:1,
3,10,12,16,20,23 317:1

**off-duty** 21:7 38:5,7
268:11

**offenses** 298:6

**offensively** 174:15,19

**offer** 47:11,15

**office** 3:14 17:14 67:9
68:6 69:7,8 70:25
71:17,25 83:8 113:20,
22 114:3,17 115:21
117:10 119:10 133:4
253:4 298:7 302:2
304:3

**officer** 3:17,20 4:13
16:12 20:25 21:2,4,6,8
25:20 33:23 37:8,12
40:8 41:7,9 42:23
43:12,16 44:2,10,12
46:21 48:23 49:1 50:17,
20 51:23 52:11,23
53:10,14,23 54:2,8,11,
14,19,20 55:3,14,22
56:4,8,10 57:9,14,16,
18,25 58:3,6,11,13,18
59:7,14,15 61:9,17
62:12,14,17,19,22,24,
25 63:11 64:3,6,7,9,11,
14,15,17,18,21,23,25
65:8,13,20 67:4,5,7,9,
20,21 68:3,14 69:9 70:6
72:5 75:11 76:14,16
80:15 82:12 85:1,2
87:1,4,5,6,10 89:15
90:11 93:6 94:21
100:15 112:6,11,18
113:1,6,7,25 114:13,18
116:2,13 118:7 121:17
123:10 128:25 129:1,23
133:11,17 134:25 135:3
136:8,12,21 138:2

139:3,9 142:23 143:22
149:1,9 157:5 161:16,
18 163:24 175:1,3,4
176:25 178:13 179:17
182:5,6 187:9 191:18
202:10 206:13 210:2
213:2,22 214:22 223:23
227:17 239:3,16 241:6
249:21,24 250:7,9,20
254:4 281:24 282:3,22
285:4 287:12 289:5
290:18,20,22 291:2,5,6,
13,17,23 292:9,12
296:25 297:2,6 298:17

**officer's** 51:5 53:19
61:19 62:5 63:11

**officer-involved**
212:25

**officers** 37:10,12,15,
17,18 43:7 53:21 60:10
69:15 70:14 77:12
103:12 128:20 129:14,
17 130:1 162:1,6
185:11 225:17,18 292:6

**official** 16:1

**officially** 116:1

**oldest** 206:5

**one-day** 214:18

**one-year** 192:10,15

**online** 126:22 127:2,14

**OP** 120:20

**open** 14:10 21:21 25:23
92:4 303:21,24

**opened** 111:21

**opening** 14:12

**operating** 126:17
166:22 168:12

**operation** 127:9

**operations** 217:15

**opinion** 140:14

**opportunity** 8:1 99:24
137:4

**opposed** 37:7

**opposite** 53:12 181:14

**OPS** 4:13,17,19,21,23
5:3,5 30:17 70:23 71:3
85:11,15,16 96:23 97:4,
9 111:21 112:1,5
149:12 184:6 187:16
188:12 189:17 221:6,
17,22 223:6 230:17
235:23 236:24 242:14,
16,24 243:2,7 244:6,18
246:3 248:4,17,18
257:18,19 264:2,5,21
268:6 270:14 271:4,5,
12,21,25 274:4 275:6
278:21 280:2,17,21,25
288:18 296:3 306:22

**option** 78:13 194:24

**oral** 36:19 222:15 224:8

**order** 7:11 15:5 36:18
40:1,3 42:20 54:23
77:13 114:13,16,18
132:13 172:21 173:1
186:15 189:9 202:25
205:19,20 215:3 217:18
302:7

**ordered** 14:12 15:1,3
25:7

**ordering** 25:8 54:22

**orders** 15:9

**ordinances** 118:1

**original** 5:21,22

**originally** 258:6

**outstanding** 304:13

**overlooked** 240:4
241:7

**overnight** 225:3

**overriding** 71:16

**overrule** 185:21

**overturn** 304:4,7

---

**P**

**P-1** 3:8 5:21 10:19

**P-10** 4:6 190:10

**P-11** 4:9 195:5

**P-12** 4:11 219:12

**P-13** 4:12 221:3

**P-14** 4:15 232:10

**P-15** 4:17 236:18

**P-16** 4:19 244:2

**P-17** 4:21 248:11

**P-18** 4:23 258:15

**P-19** 5:3 258:15

**P-2** 3:10 47:21

**P-20** 5:5 264:12

**P-21** 5:7 288:25

**P-22** 5:8 295:25

**P-23** 5:10 301:17

**P-24** 5:12 301:17

**P-25** 5:13,21 301:17

**P-3** 3:12 109:4

**P-4** 3:14 109:4

**P-5** 3:17 109:4

**P-6** 3:20 131:3

**P-7** 3:23 132:9

**P-8** 4:3 153:8

**P-9** 4:4 179:2

**p.m.** 6:9 225:7 317:8,18

**pages** 184:1 265:9

**paid** 27:3 145:8

**paper** 5:7 110:15
290:14

**papers** 73:25

**paragraph** 116:10
117:6,9,24 139:10
140:9,11 141:5 142:13
143:3 173:19 281:11

**Paran** 228:1

**Park** 76:6

**parked** 138:15,16

**parking** 138:14,15

**part** 34:23 35:16 44:1
47:25 59:5,6 73:23
76:12 79:21 80:14
82:15 85:6 117:19,20

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 101 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

156:1 181:3 184:3
186:3 190:23 194:8
196:14 198:14,21 206:1
212:24,25 213:1 214:11
216:7 225:2 233:4
260:9,10 262:18 270:14
275:20 288:18 290:15

**partial** 5:18

**participants** 23:15

**participate** 122:1

**participated** 279:23

**participating** 23:14

**participation** 214:21

**parties** 7:10 14:13
270:16

**party** 6:20 17:21,22
20:3 47:24

**pass** 139:21

**passed** 237:25 238:21,
25

**past** 180:22 181:3
258:21

**path** 181:23 182:4,15
287:25 290:1

**pathway** 176:5,23
177:3,21 178:5,11,14,
20,25 179:9 182:7
287:15,17

**Patrick** 13:14

**Patrick's** 13:15

**patrol** 77:10 229:3

**patrolling** 77:17
225:16

**pattern** 234:21

**pay** 128:4 145:1 256:1

**paying** 209:20

**PD** 233:1,6

**peace** 44:10,11

**Peachtree** 2:5

**pedestrian** 166:12
179:13 261:5 267:2

**pedestrians** 14:13

149:9 163:24 164:1,2,5,
12 165:9,13,18 166:1,
17 167:3,13,18 175:6,8,
17 178:24 182:7 261:7,
10

**penalties** 10:3,7

**pending** 7:7

**people** 17:16,23 23:13
27:21 29:1 41:11 50:16,
20 55:14 60:16 69:25
70:13 144:8 159:13
164:19,21 167:23
169:18 174:22 185:17,
21 197:20,24 201:20
210:6 229:22 263:9,12
276:21

**people's** 32:15 154:24

**pepper** 148:10 156:7
225:14 229:4

**perceive** 124:1

**perceived** 102:24
164:14 219:3

**perform** 77:19 116:12
202:13,18 208:10

**performance** 55:1

**period** 12:24 82:6,8
88:19 137:22 185:25
192:10,15 196:25
208:24 209:1 275:19,
21,22

**perjury** 10:3,7

**permission** 290:14

**permit** 244:12,20

**permitted** 281:20

**person** 15:2 17:9,11
18:20 40:7 53:18 58:7
61:18 62:12,13 63:10
64:19,22,25 65:6 69:19
79:5 89:10 101:17
104:5 109:13 134:2
161:5 166:22 167:9
169:19 170:11 173:4
174:15,20,22,23
184:16,21 185:20
222:25 254:6 269:8

**person's** 64:18 155:14

**personal** 202:11,17

**personnel** 109:24
110:8 262:9

**persons** 154:10,17
174:23,24 269:9

**perspective** 161:16
204:7

**petitioning** 56:15

**philosophy** 60:17

**Phoenix** 45:4

**phone** 17:10

**photo** 5:15,16,18

**physical** 11:16,18
25:2,5 57:18 58:1,2,7,8,
13,14 62:18,22 64:22
65:7 88:14,18 135:18
139:15 140:19 158:7
163:2 249:20,23
250:20,21 254:5 278:7

**physically** 67:6 159:1
262:11

**Pickard** 139:4,5,6,9
140:2 141:22

**Pickard's** 142:3

**picked** 272:20

**pictures** 306:14

**piece** 5:7 290:14

**Piedmont** 268:17,18

**Pierre** 121:3

**Pittsburgh** 76:5

**place** 25:21 67:16
77:15 86:10 123:23
140:12 153:13 193:21
212:9 213:14,18 224:21
269:3 272:13

**plainly** 56:19 204:10

**Plaintiff's** 3:10

**plaintiffs** 2:2 6:12,14

**plaintiffs'** 48:6 161:2
221:8,11 306:21 308:5

**plan** 204:13

**platform** 142:21

**play** 55:1 128:1,6
169:22 180:18

**played** 180:16

**playing** 128:3 213:17

**plea** 5:12,13 297:13,14,
15 301:25 302:3,4
303:7,11 304:4,8,13

**plead** 297:17

**pleading** 303:16

**pled** 297:22 298:2,5
303:21 304:12

**PLF000003** 4:14

**PLF000004** 4:14

**PLF00003** 221:12

**plowed** 179:20

**plump** 85:5

**point** 31:16 41:7 44:10
55:8 71:1 88:17 90:23
106:12 205:18 206:12
234:14 246:13 250:15
264:24 272:2 280:4
282:18 285:13 288:8,9,
10 295:14

**pointed** 282:19 290:6

**pointing** 40:12,23

**police** 2:11 4:3,4,6,12
16:1,12 28:11 29:21
30:14 33:2 42:23 43:11,
16 44:1,16,19,22 47:9
48:22,24,25 55:13
70:23 79:22 94:23
106:20 112:11 113:3,8
114:23 116:13 118:7,18
135:11 144:25 145:25
146:10 161:18 162:1
184:18 185:6 189:16
206:25 221:18 223:1
227:13,22 233:13
306:21

**policies** 28:14 32:7,14
33:9,18 40:21 41:8
43:11 69:6 89:9 126:18,
24 128:16,21 129:3,24
130:6 146:3 147:4
148:1,4,16 173:25
180:23,25 182:12
186:19 226:6 235:12

**Elizabeth Gallo**
COURT REPORTING, LLC

Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 102 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

253:16,21

**policing** 94:20 95:4,7, 11,17

**policy** 43:14 112:15 113:10 126:21 127:4, 10,11 129:1,15 153:13 155:17 179:6 181:2 184:3,5,10 185:4 188:5 191:8 192:6 226:11 235:17 276:8,9,14

**polygraph** 79:15

**Ponce** 268:15

**poor** 141:7,9,23 142:10, 21,22 143:22 144:2,24 145:19 147:6

**pose** 52:1

**poses** 166:11,16

**posing** 53:25

**position** 25:25 87:23 136:15 281:14,22 287:9,22 288:2 292:14 293:22 298:1,12

**positions** 17:23 18:1 75:9

**positive** 130:12

**possesses** 174:13

**possessions** 73:25

**possibly** 78:15 104:3

**POST** 3:12

**potential** 98:4 164:11 191:11 210:4 276:20

**power** 76:19

**Powers** 227:25

**practical** 218:6

**practice** 28:19 59:1,21 62:4 96:18 107:7 130:1

**practices** 108:9 146:9 183:17 219:9

**precinct** 82:13 86:8

**preemptively** 227:2

**prefer** 8:4

**preponderance** 189:8,

11 190:4

**presence** 42:21 50:6 246:25 287:13

**present** 60:23 64:2 300:21

**presented** 58:14,19 64:13 83:17 106:10 122:13,14 142:8 151:4, 9,10,11 169:9 172:12 190:7 196:7 210:1 227:9,11 264:2 271:2,4 272:4 273:17 300:22 301:1

**preserve** 116:16

**pressed** 15:12

**pretty** 19:20 27:15,16, 17 61:9 139:22 259:12

**prevent** 10:12,16 105:18,20 106:2,6 162:25

**prevented** 39:17,21

**preventing** 15:25 39:14 88:5 106:4 170:23

**previous** 310:2

**previously** 180:7

**prior** 8:19 30:11 41:19 77:2 106:17 107:5,14, 24 108:7 110:8,9 146:14 153:13,16 156:22 165:9,16 175:19 190:21 196:1 213:18,20 219:18,20,22 221:13 298:14

**prisoner** 163:1 249:25

**private** 53:18 55:18 61:10 62:4,12,18,23 64:8,16,22 65:6,8,14 66:4 67:4 69:15 70:4 74:25 118:7 153:22 158:4 194:1,2

**probable** 246:10,12,20

**probation** 297:15

**problem** 50:15,19 51:2 134:13 153:7 192:24 211:11

**problems** 191:11,18 201:19

**procedure** 7:14 126:18 127:9 129:1 317:20

**procedures** 28:14 32:8,14 33:10,19 40:22 69:6 89:9 126:18,24 127:5 128:22 129:15 147:4 148:16 180:23 182:12 186:19 235:12 253:16

**proceeded** 14:23

**proceedings** 150:4

**process** 4:5 47:11 183:5 184:13 272:11

**produce** 112:24

**produced** 7:2 109:24 131:14 132:16 133:3

**profanities** 49:16 50:20

**profanity** 43:4,8,11,15 49:5 50:5,16 201:21

**professional** 44:5,7 70:25 71:18

**Profile** 3:18,21

**program** 142:15 143:5, 8 193:15 259:4,6

**prohibited** 117:12 161:3

**promise** 304:25 305:15,25

**promoted** 34:4,5,10 35:1 36:5,11,15 38:4 76:1 137:1 184:20

**promotion** 33:24 34:2, 22 35:19 36:2,14,23 37:1,4,6,20

**promotions** 36:8

**promptly** 160:8

**pronounced** 11:11 139:5

**proper** 40:17 77:13 94:20,23 95:6,11,16 135:17 183:16

**property** 161:5

**propose** 7:15

**prosecute** 120:6

**protect** 72:5 76:18,20, 22,23 77:1 94:21 116:16 159:13 169:22

**protected** 73:24

**protecting** 30:4

**protocol** 212:24 213:2

**provide** 46:9,10 53:20 191:9 210:6,12

**provided** 125:5,6 151:22

**provider** 210:3,10,19, 25 211:2

**provider's** 211:4

**Providing** 186:12

**proximity** 91:20 92:20 295:24

**psych** 193:3 194:7,15, 21,24 198:22 210:7

**psychiatrist** 197:9

**psychological** 193:4 214:10

**psychologist** 194:7 196:21,22,25 197:9 201:24

**psychologists** 196:10

**public** 117:14,15 166:11,17 167:4,8 228:19 296:25 297:1,6, 21 298:6

**puddle** 272:20

**pull** 168:20

**pulled** 177:16,18 178:5

**pulling** 205:16

**punctual** 160:4

**purpose** 99:9

**purposes** 7:13,15 136:23

**pursuant** 33:18 198:15 199:1 256:20 280:2

Elizabeth Gallo
COURT REPORTING, LLC

Case 1:18-cv-04710-CAP Document 260-10 Filed 08/16/21 Page 103 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

pursue 114:14,17

pursuit 157:6

push 143:18

pushes 138:1

put 36:17 54:21 115:2,
3,7,9 124:6 169:22
191:2,24,25 192:17
204:7,10 205:21 211:14
249:11,14

putting 29:24 89:5,6

**Q**

qualified 116:11

quality 119:8,11

Queens 45:15,17,19,
23,25 46:1,2

quelled 78:14

question 7:16 9:8,10,
11,17,18,21,23,24
16:15 18:19 19:2 22:3
29:24 30:8 40:9 42:14
43:13 47:2 49:8,10,19,
22 50:18 51:11 52:15,
16 53:1,12,16 54:9
56:12,14 57:20 59:3,9,
11,24 60:1,13 61:13,15
62:10,16 63:9 64:14
65:2 68:9,11,16 69:23
70:15 71:14 72:13,14,
23 73:2,3 74:20 78:24
79:1,2,7 80:5 87:19
88:1,3 94:24 95:9,11
99:16 100:2,8,12 101:5
106:23,24 107:10,11
108:4,11 110:4 113:23
114:5,6 119:14 122:23
127:20 129:5 130:6
135:1 141:12,15 144:12
145:3,6 146:18,19,22
147:11 148:7,8,22
149:15 150:10,15
151:8,16,17 152:9,11
153:14 155:6 163:12
164:8,24 165:20,22
167:1,14 168:4 169:15
171:3,5,18,20,24
173:23 177:17 178:9

317:19

182:11 183:19 184:2,11
187:7,22 191:4 194:10,
18,19 197:6 198:17
199:4 200:3,24 202:21
203:15 210:16 213:8
218:11,12 228:16 230:1
232:3,5 233:8 235:4,16
236:14 239:1 242:4,11
243:1,5 244:16 245:5,
16 246:14,22 247:6,8,
12 248:7 249:6,19
251:12,16,18 252:17,24
253:12,24 254:1,9,22
255:11,12 258:8,10
260:3 263:15 271:18
273:8 274:16,24
275:13,15 276:12
278:20,25 279:3,22
281:1 283:24 286:15
288:21 289:21,23 290:2
291:9 293:3,10 295:2
296:11 297:4,24 298:24
300:7 301:5 304:15
310:2,7

questioned 80:2

questioning 181:8

questions 21:12 95:25
96:3 110:5 127:7
195:11,12,18 234:22
250:11 253:13 304:17,
20,25 306:5 317:4

quick 306:1

quickly 307:9

quiet 51:20 53:11,14,
15,19 54:2,8,11 55:8

Quinten 13:5

**R**

racial 28:4

radio 299:2

raised 45:22

raising 28:6 50:6

rank 33:22 34:4

rate 299:15,24

reacted 109:3

reaction 25:19 182:25

288:17

read 7:22 8:1,6 189:1
233:22 240:1 249:18

reading 135:23 306:24
308:17

ready 161:22 195:12
281:13,22 286:9,12
287:8,14 288:2 292:13

real 120:25 121:1,12
182:3,11 273:15 305:12

realization 25:14

realize 95:6,13 209:9

realized 95:16 240:3

realizing 272:17

rear 268:21

reask 33:12 43:20 73:2

reason 19:9,15,24
20:22 21:9 23:10 25:18
50:8 54:20 59:14 83:22
100:17 150:19 156:14
174:11 179:25 181:11,
19 206:23 216:9 241:11
251:8,19 259:13

reasonable 83:12
122:17,20 123:23
161:16 162:20,24
167:13,19,21

reasonableness
161:15 162:5

recall 13:21 14:19
17:22 18:10 19:18 20:6
27:11,13 30:18,19
34:17 35:12,25 36:12
37:23 38:1 47:18 73:21,
23 74:1 80:18,19 81:25
82:7,8 86:17,23 88:7,8,
9,11 89:23 90:14,24
91:14 95:18,22 96:16
97:11 98:20 110:19,20,
21,22,25 111:2,4,6,16,
19 121:21 122:11
124:14,18 125:7,21
126:1,16,20 127:25
133:21 134:1,2 135:21
136:19 140:5 142:12
149:16 164:4 165:23,24
171:22 178:3 181:5
190:2 191:5 192:5,16

193:11 194:22 197:4,12
198:3 199:5,7,25 200:7
201:6,22 210:17,21,23
212:17 214:9,20 215:19
216:12 217:21 219:25
220:20,21,23 221:2
222:3,13 223:14,15
224:11,18 225:10,11,
12,22 228:3 229:14,16
231:4,5,6,7,10,12,13,
14,16 236:4,8 237:9,20
248:2 252:20 254:7,20,
23 259:1,10 260:15,24,
25 261:1,23 262:9,20
268:23 269:15,17 273:3
274:7,10 275:24 276:23
278:9 279:18 286:7
290:21,23 291:25
292:3,5 307:20

recalled 135:24

recalling 10:16 74:2
88:10

recant 271:3

recanted 271:9 275:4

receive 78:7 122:5
123:10 124:10,13
126:14 130:7 171:22
172:6 187:19 215:16
217:22 218:8,15,20
221:1 222:8,11 237:16
238:5 241:13,24

received 17:2,3 28:10
107:13,20 108:2 136:17
145:25 146:16 151:14
152:3,7,16 218:6,7
219:23 237:24 238:13,
17 239:4 241:2,16,22,
23,25 242:19,21

receiving 144:6

recent 202:10

recess 80:25 160:22
258:14

recited 125:17

reckless 297:1,6,21
298:7

reckoning 185:25
275:19,21,22

recognize 123:17,22



Case 1:18-cv-04710-CAP Document 260-10 Filed 08/16/21 Page 104 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau
January 25, 2021

153:15 170:1 172:22
215:4,13 306:14

**recognized** 168:6
171:13

**recollection** 221:16
259:15,16

**recommendation**
36:6 137:25 139:13
189:23 257:6 272:6

**recommendations**
210:25

**recommended** 137:24
184:25 185:13,18 271:6
278:17

**record** 6:10,20 8:12
11:8 29:25 30:4 80:24
81:2,4 160:18,19,21,24
189:1 195:20,21,23
258:13,18 301:13,14,16
305:2 317:8,9

**records** 214:8,15

**recruit** 135:11 136:14,
24 137:12,14,25 138:2,
3,24 139:8,11,13

**recycle** 143:7,14

**recycled** 142:15

**redo** 143:14

**reduced** 217:12,13

**reduction** 255:25

**reference** 142:4
233:24

**referencing** 141:20
143:3

**referring** 18:23 63:23
194:2 198:9 250:1,8

**refrain** 52:3,4 55:8

**refresh** 223:18

**refresher** 60:24

**refused** 15:10

**regard** 130:19,20,22
131:25

**register** 117:22

**regular** 37:8 48:22,25

124:3 306:9

**reholstered** 286:1

**reinforced** 61:24

**related** 197:20 202:13,
19 208:11,16 216:9
218:3

**relates** 27:10 28:17
38:5 112:10,18 145:20
220:24 243:12 303:8

**relating** 217:23

**relation** 84:11 130:12
177:25 289:4,6,7 290:4
293:23 294:9

**relationship** 82:10

**relatives** 13:10

**release** 261:4

**released** 261:6,7,12

**relieved** 279:16

**relinquish** 205:23

**rely** 112:23

**remain** 159:4

**remained** 271:1

**remedial** 135:18

**remember** 17:5,15,25
18:1,2 20:12 35:22
97:1,10,20,22 98:1,2,3
125:25 138:3 188:6
193:8 199:9,23 200:11,
13,23,24 209:16 211:16
212:15 220:4,11 222:6,
7 223:2,3 224:10
233:10,11,14 260:22
261:23 275:4 279:18
296:13

**remembering** 88:10

**reminded** 134:19
213:19

**remove** 233:19

**removed** 137:21

**render** 77:17 299:9

**rent** 206:1

**reopen** 14:10 21:18

**reopened** 14:22

**reopening** 21:15

**rep** 248:22 273:17
274:13 280:17

**repeat** 43:13 59:3
62:16 72:14 73:2 99:16
100:2 101:5 106:24
113:23 114:6 122:23
129:4 133:12 135:1
143:15,16 146:19 148:8
150:10 151:17 155:6
167:14 172:3 173:23
178:9 184:11 187:7
218:12 230:22 249:6
251:16 276:12 278:20
293:10 297:3 305:14,20
310:5 312:19

**repeated** 286:21

**repeatedly** 90:9 282:7

**rephrase** 9:18,22 27:2
305:14

**report** 3:17,20 4:15,17,
19,21,23 5:3,5 67:9,14,
15 69:7 71:5 85:11
118:14 120:19 130:13
159:5,16,20 210:2
226:22 264:5 277:18,22

**reported** 138:17,18
225:1

**reporter** 6:18,22 7:24
8:8 9:3 24:20 91:21
161:20,23 180:10
195:15 301:10 304:24
305:19 317:10,15

**reporters** 9:13

**reporting** 159:1

**reports** 77:18 86:11
160:7

**represent** 16:14,24
18:8,12,18,22 19:7,16,
22 109:12,23 296:18
307:24

**representation** 16:21
272:10

**representative** 189:17
248:18 279:6 280:23

**represented** 16:5,9

**representing** 6:12
16:18 19:10

**represents** 30:4

**reprimanded** 135:7

**requested** 224:22
270:19

**requesting** 255:25
256:1

**require** 61:9 68:7
194:20 253:21

**required** 36:17 40:7
53:19 62:5 72:4,9,18
73:4,6 112:6 117:6
118:23 119:2,11 128:17
139:21 143:7,10 153:20
154:15 188:3,9 194:6,
11,15 202:23

**requirement** 187:1

**requirements** 36:15
217:17

**requires** 51:4 69:5

**research** 47:12

**reserve** 7:15

**reserved** 317:22

**reside** 11:17 13:8,11

**residence** 12:1,3
224:22

**resides** 11:24 13:12

**resistance** 59:17

**resisting** 60:6

**resolve** 52:2 54:17
186:15 192:24

**resolved** 27:3

**resource** 194:12

**resources** 192:23,25

**respectfully** 265:23

**respond** 76:17 154:8

**responded** 42:11
230:25

**responding** 55:3,4,5



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 105 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau

January 25, 2021

**response** 25:20 128:1
233:9,14,22,23

**responses** 9:1,5

**responsibilities** 44:1
76:9,15 77:6,8 82:15,16
114:2 205:24,25 208:6

**responsibility** 77:1
116:22,25 204:25 205:7

**responsible** 77:11
159:1 184:17 204:24

**restaurant** 212:1

**restrict** 163:1

**result** 32:19,25 33:15
38:17 174:16,21 181:13
182:21 263:23 296:3

**resulted** 102:20,22
106:16

**results** 26:14 111:6,8
181:25 263:24

**retirement** 302:17

**retrained** 129:16

**retraining** 60:22

**retrieve** 127:2

**returned** 279:13

**returning** 138:12 279:9

**revealed** 241:1

**review** 67:1 77:18
184:5 188:4 189:8
300:12

**reviewed** 28:24 141:5

**reviewing** 221:20

**reward** 120:9

**Richards** 231:1,6,8

**rights** 32:15 56:16,17
64:19 72:4,19 73:7
113:18 120:14 154:9,
16,24 155:14 156:8
245:13 298:8

**riot** 24:2,3 38:13,15
52:10,22 53:10

**Road** 228:1

**roadway** 175:22

**Rockaway** 45:13,15

**role** 137:5,6

**roll** 60:24 134:4 135:5

**room** 86:9,12,14,16
88:22 92:6 94:9 115:10,
13 127:24

**rose** 84:1

**rough** 317:13

**route** 181:12

**routine** 206:22

**rubbed** 138:16

**rude** 266:6

**rudely** 265:23

**rule** 133:18,21 136:1
155:5,16 159:10 161:2
186:4,16 187:18 188:5
226:16 317:19

**rules** 4:3 7:13 8:22
71:16 118:17 126:24
153:13 154:1 186:2
317:20

**ruling** 188:1

**run** 139:12,25

**runners** 140:23

**Ryan's** 55:1

**S**

**safe** 42:7 77:17 169:17
181:13,21 262:3,4

**safer** 25:21

**safety** 15:14 41:23,24,
25 42:6 58:8,10 106:13,
16 179:15 181:18
266:13,16,23 268:2
295:23

**salary** 37:21,22

**Sam** 6:13

**Sampson** 2:13

**SAMUEL** 2:3

**sandwich** 54:23

**Sandy** 225:18 226:22
227:2,13,22 228:8
229:8 233:1,6,13

**satisfy** 190:8

**save** 173:6 213:11

**scared** 286:19

**scenario** 54:1 151:7,8

**scenario-based**
124:18

**scenarios** 217:24
218:3

**scene** 30:24 31:7 222:1
271:24 274:1 275:2

**schedule** 199:18

**scheduled** 199:11,14,
17

**school** 45:9,11,13 75:5

**scored** 128:11

**scoring** 128:14

**Scott** 230:2

**scrutiny** 140:12

**search** 74:3

**seconds** 140:23

**section** 4:11 173:14

**security** 268:22

**seizure** 74:3

**Sellers** 2:12 3:5 6:15
7:19 8:13 29:9,23 32:3,
9,16 33:3,11 39:10
40:14 48:8 49:7,17
51:10 52:25 57:19 59:8,
23 60:12 61:12 63:3
65:1 68:8 69:22 71:13
72:12,21 73:9 78:23
80:4 87:25 99:15 100:7
106:22 107:9 108:3
114:4 119:13 129:21
130:24 132:14,18,23
141:11,14,25 144:11
145:2,5 146:4,11,17
147:10 148:6,21 149:14
150:14 151:15 152:8,
17,22,25 153:4,7 156:9
158:10,12,17 160:16
163:11 168:3 169:13,23

170:14 171:17 172:2
180:8,11 183:9,18
187:21 188:14 189:13
191:3 194:9 195:3
198:16 199:3 200:2,9
201:3 202:20 203:14
207:21 210:15 213:7
218:10 232:2 235:15
236:13 237:1 242:10
243:4 245:4,8,15,20
246:21 247:5,11 248:6
251:11 252:23 253:11,
23 254:8,21 255:10,18
258:7 271:17 273:7
275:12 278:24 286:14
289:20 300:5 304:19,23
305:5,18,24 307:14,17,
19 317:3,10,12

**send** 7:25 8:9

**sensitive** 305:13

**sensors** 276:20

**sentence** 139:10
141:19 142:14 143:21

**SEOP** 128:16

**separate** 17:18 204:6
310:7

**separated** 302:10

**separation** 5:8 301:20
302:8

**September** 48:7
314:17,20 315:18

**sergeant** 31:3,4,5,16,
20,24 34:4,6 35:9,15
38:3 41:12 75:12 77:6,9
137:11,21 138:17
139:4,7 140:2 141:9,22
142:3 225:25 226:1,5
228:21,24 230:3,7,21
233:24 234:5,15,16,18
235:6,14 236:11 270:7,
19 274:1 279:10

**sergeants** 209:1

**serve** 76:18,20,23 77:1
94:21 159:13

**served** 36:16

**service** 76:24 193:3
297:16,21



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 106 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

**services** 193:4

**session** 188:8 198:13 199:2 239:17

**sessions** 199:11 201:19 202:9

**set** 28:14,19 116:6 174:6 186:20 191:17 221:16

**settled** 20:7,22 26:21 27:3 29:5 30:12 32:22, 25 144:20,22 145:13,14 245:7 247:14,18,21

**settlement** 20:8,12,16, 19 145:12 246:3 247:3, 10

**sexist** 207:11

**shackled** 96:11,22,24 97:1,12,16,17,21,22,25 98:4 103:10

**shackles** 103:13

**shackling** 96:19

**Shean** 2:4 6:11 8:17 48:8 110:1 255:17

**shield** 120:7

**shift** 159:22 217:16 225:3,5

**shifting** 84:4

**shirt** 261:20

**shook** 270:21

**shoot** 124:16 126:3 168:19,21 169:17,19 170:2,11,18 172:17,18 173:4 182:13

**shooting** 80:15 124:11 126:14 127:17 145:23 146:8,15,24 149:12,21 164:11 166:16 167:11, 15,25 168:1,2,5,15 169:4,6 171:16 172:1,7, 15 175:20 183:12 212:19,25 213:3 217:23 218:3,9,16,20 219:1

**shot** 164:7 165:17 169:3,4 170:25 171:4 176:12,22 177:18,24 178:4,6 298:20 299:20,

21,25

**shotgun** 78:2

**show** 48:1 109:7 131:6 132:7 153:11 157:21 189:10 190:13,18 195:1,8 219:15,16 221:8 223:13,23 224:9 232:7,13 236:5,21 237:8,13 243:20 248:14 260:14 290:13,18 306:2,12

**showed** 110:24 290:20 300:22

**showing** 223:23,25 242:6 272:12

**shown** 252:25

**shows** 243:22 257:22 258:2 272:19,22 273:20 274:14 300:23 301:1 309:6

**sic** 3:10 160:18 317:8

**sick** 223:17

**side** 84:5 101:21,22,23 102:2,3,4 109:17 115:8 164:25 175:22 177:4,6, 14 178:2 228:4 261:9, 17 272:16 288:1 294:1,10,13,15,17,18 295:1,7

**sidewalk** 14:14,17,22 21:25 22:1 24:14

**sign** 7:23 8:2,6 111:25 228:5,6 238:12 303:14

**signal** 183:2

**signature** 48:16 115:24 238:14 239:20 241:16,23 303:11 317:21

**signed** 190:20 237:12, 17 238:17 240:1,9,10, 12,13 241:6,9,22 249:8 302:1

**signs** 257:5

**similar** 162:6

**simple** 66:17,18 107:17 182:3,11

**simulation** 127:18,19, 21,23

**sir** 8:17 11:3 24:4,7 26:24 38:14 46:14 47:17 66:21 72:15 75:20 78:6,8 84:10,19 85:18 86:15 92:16 93:4 94:24 96:6 105:14 113:23 115:2,19,23,25 116:3 117:4,18 118:4,9, 22 120:5,11 122:7,23 125:15 128:18 131:12, 17 132:1,3 133:6,15,20 134:3,7,12 135:14,20 136:5,20,25 139:18 141:20 147:17 148:8 150:10 151:18 152:10 153:19 154:4 158:23 160:11 161:8 167:14 172:4 173:18,23 182:9 183:24 186:8 190:18 191:15,20 192:12 193:5 195:10,12 196:15 198:11 202:8,16 207:6 218:13 225:19 228:7 231:20 232:21 233:3 238:4 241:19 244:16 257:15,20 262:20 278:20 286:18 287:19 294:14 297:17 302:7 304:21 308:1,21,23 309:1,4,13,16,19 310:4, 12,15,21,24 311:2,7,10, 13,16,19,22,25 312:3,6, 9,12,15,18,21,24 313:2, 5,8,11,14,16,19,22,25 314:4,7,10,13,16,25 315:7,12,15,18,23 317:5

**sit** 29:15 40:3 44:4 147:14 165:23 166:15 188:3 200:1 211:16 220:19 222:17 251:17 269:21

**sitting** 65:6 91:16 92:12 93:7 98:25 99:6

**situated** 92:5

**situation** 52:2,13,17 53:3,9,13,20,21 54:7, 13,16,17,21 68:22 87:18 88:6 124:7 162:4, 7 172:25 184:24 208:12 209:3,11 213:13 235:3

260:9 262:25 268:6 277:4 287:7 292:17,25 296:16 306:1

**situations** 154:9

**sixth** 3:8 10:23

**sleep** 158:24 159:7 227:7 228:14 235:8

**sleeping** 158:21 224:17 226:11,16 228:18 233:2,7 235:11 236:6

**slowest** 140:22

**small** 212:7

**solemnly** 116:11

**son** 206:5,8

**sons** 206:2

**sooner** 8:23

**SOP** 4:3,5,6 153:15

**sort** 299:10

**sound** 34:15,19 196:6 207:11

**south** 76:6,7,12 261:8

**southbound** 261:9,12

**southeast** 76:10

**Southwest** 76:10

**speak** 55:20,23 128:7 194:17,18 210:18 226:2

**speaking** 144:21 181:24 201:14,20 279:6

**specific** 124:10 171:5 188:6 220:18

**specifically** 73:16 112:19 185:8 208:19 218:25 220:11,21,24 221:1

**speech** 23:3 31:18 51:16 55:15 89:3

**speed** 299:15,24

**Spell** 11:20 13:17 214:5

**spelled** 11:21

**Spillane** 82:17 83:2 85:19,20 147:23 197:25

Elizabeth Gallo
COURT REPORTING, LLC

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                    January 25, 2021

198:6 256:24

**split** 161:18

**split-second** 162:2
213:11

**SPO** 134:1 138:18

**spoke** 22:12 95:13
231:2 247:19 273:15

**spoken** 95:14,19
156:17

**sports** 54:24

**spot** 238:14 241:17,23

**spray** 35:22 78:3,10,12,
14,21 79:5,11,13 82:22,
25 83:5,11,21,22 86:7,
21 101:3,9,14,16,18
102:5,7,9,16 103:2
104:19,20,23,25 105:3,
18,20 106:1,3,6 107:5,
19,25 108:8,12,15,18
117:1 119:22 147:8
155:25 162:16,18
209:12 235:2 247:23
250:3 251:3 252:3
253:18 256:8,9,11,15,
16 258:21 269:22,24
271:22 272:23 277:9,15
292:19

**sprayed** 148:10,11
249:21 251:8,19 253:8

**spraying** 148:2 156:7
256:19

**spring** 34:19 233:6

**Springs** 225:18 226:22
227:3,13,22 228:8
229:8 233:1,13

**Squire** 249:15,20
250:4,19 251:3,8,19
252:22 256:19 258:22
275:19 276:2,10,15
277:14,15 293:5

**Squire's** 253:7

**sstarks@
cochranfirmatl.com**
2:7

**stability** 46:10

**Staff** 134:1

**staffing** 224:23

**stamped** 115:20
221:12 232:16 248:23
281:3

**stand** 99:21 149:11

**standard** 126:17 127:8
189:8 295:13

**Standards** 70:25 71:18

**standpoint** 82:11

**Starks** 2:3 6:13

**start** 46:25 195:12
205:1,16 257:23 281:10

**started** 49:13,14 100:6
121:17 136:8 189:25
196:5 207:2,3 261:4
283:19 285:25 286:3,5

**starting** 91:2 129:9
206:8

**starts** 281:4,5

**state** 5:10 6:20 11:8
12:3 70:22 116:17
117:11,12,13,15 118:1,
6 141:18 158:1 206:6,9
234:9 271:22

**stated** 49:5 230:19,25
234:1,8 241:6 264:22,
24 269:19 270:17

**statement** 85:6 135:23
142:4 151:24,25 152:3
165:16 230:17,20
232:19 233:5,19,25
234:8,9 238:2 241:12
248:1,25 249:3,7,17
250:15 255:4,6 280:12
281:3,5 294:4,6

**statements** 28:3,4
85:2,10,15 113:12
149:11 223:6 280:2

**States** 64:7 74:23
116:17 117:11 157:25
253:18

**stating** 261:23

**station** 126:22

**statute** 22:23,24 67:1
219:20 220:19,22,25

**stay** 137:12 159:16
205:15

**Steed** 81:23,24

**step** 58:18 104:14

**stepped** 104:19,21,23,
24 105:2,8,10 109:1
272:18

**stepping** 272:18

**steps** 47:6 70:7,12

**Sterling** 13:5,6,7 121:3

**sticker** 153:2

**stickers** 304:24

**stood** 98:9 99:14

**stop** 15:4,5,10 25:7,8
39:7 40:5,7 51:21
52:11,24 55:9 86:24
87:2,3,9 89:19 90:9,10,
12 91:3,5,8 94:7 98:10
163:22 168:1,2,6,15
169:3,5,6 170:9 172:16,
19,22,23 173:1,4
195:15 203:24 228:5,6
250:8 282:7,8,20,24
284:7,8,10,15 286:21
301:10

**stoplight** 228:4

**stopped** 44:23 75:10,
21 111:15 171:12
228:13 261:5 283:12
284:11,13,22 285:14,17

**stopping** 39:19,20
166:18,20 171:1,7

**store** 225:13 229:4,6

**story** 273:22 282:15

**straight** 271:8 273:22
282:1 288:13 291:4

**strain** 205:22

**street** 2:5,13 14:16,21
21:24 211:24 212:2
261:14,20 264:24
265:19 267:5,6,9,12,14
293:17

**streets** 14:10,11,12,22
21:16,18,21 25:22
69:18

**stress** 215:13

**stressors** 202:12,17
208:9,16 209:8,24
215:1,12,14,15 216:4,
10,20

**strike** 61:18 103:6
113:18 130:21 152:6
155:20 298:13 314:17

**strong** 59:17 124:24

**struck** 180:20 294:20,
25 295:6,21 299:8

**stuff** 95:23 216:17
232:1 253:20 267:18

**subdivision** 117:15

**subject** 306:24

**submit** 160:7

**submitted** 36:18 47:10
138:19

**subpoena** 236:3
237:12,18,24 238:5,8,
12,16 239:4 240:4,7,9,
13 241:2,5,6,8,13,15,18
242:7,24

**subtle** 201:17

**Subway** 54:22

**sued** 43:25

**sufficient** 189:3

**suggest** 52:3 200:23
201:19

**suggesting** 295:17

**suggestions** 285:7

**suit** 17:3 26:15

**Suite** 2:5

**Sunday's** 55:1

**super** 305:25

**superior** 136:23
208:21 226:13,17 230:8

**superiors** 61:25 62:8
85:11 149:21 208:15,
20,25 209:2 234:23

**supervised** 41:12

**supervising** 37:15



Case 1:18-cv-04710-CAP  Document 260-10  Filed 08/16/21  Page 108 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                          January 25, 2021

**supervision** 81:11

**supervisor** 26:18,22
30:23 31:17,24 36:5
37:11 67:13,22,24
68:17,20,21,22,25 69:4,
7 70:20 81:17 95:14,15,
19 127:1 129:19 136:16
137:2,5,8 159:5,17,21
192:3,4 223:18 226:20,
21,24 227:2 229:9
270:18 275:2 277:19

**supervisor's** 69:2
95:18

**supervisors** 30:21,22
67:12,15 70:9 185:12
188:4 201:23 215:21
269:11,19 270:16
278:16,22

**support** 189:3,11
205:13 216:23

**supporting** 208:6

**supposed** 70:9 226:7,
12,16 262:1

**surrounding** 54:6
280:3

**suspect** 102:12 108:19
172:1,7,16,18,19
174:13 278:8

**suspected** 173:12

**suspects** 80:3 171:16
269:10

**suspension** 86:1
189:23,25 255:25 256:2
257:6,21,25 258:5

**sustain** 222:19 244:10,
24 259:11

**sustained** 188:16,17
189:1,2,10 192:7 222:3,
20 223:11,12,13 224:14
235:20 239:11 242:2,6
244:9 246:4 247:3
260:1 263:25 264:6,8,9,
11,17 278:19

**swear** 6:23 116:11
117:9,25

**swerving** 228:13

swilliams@
cochranfirmatl.com
2:8

**Swinging** 231:1,5,7

**sworn** 7:2 74:4,5 138:2

**system** 3:17,20 4:7
140:25 186:7,17
190:21,23 191:2,16
192:18 194:14,20
196:4,11,20,21 197:11
198:2,13,14,22 214:11,
12,22 215:7,18,23
216:8,14 217:1,2,9,19

---

**T**

**T-O-W-A-L-I-G-A**
11:21

**T.sellers@tkstlaw.
com** 2:15

**tactical** 217:23 218:2

**taking** 10:10,15 77:15
95:8 111:2 137:5,6
151:7 193:21 202:22
203:11 213:13 268:1

**talk** 17:4,9 51:22 52:21
122:4 194:7,24 197:23
208:19 212:18 220:15
221:6 223:17 263:1
281:9

**talked** 18:20 38:10
112:6 144:8 149:20
213:24 224:4 228:22
253:4 306:5

**talking** 9:12,13 51:19
52:6,9,10,11,14,20,22,
24 54:24 56:17 92:23
100:14,15,24 107:2
110:16 164:1 165:15,16
166:21 179:8 197:2,17,
18 220:17,18 230:8
260:11 282:22,25
283:1,6,9,19 284:2,4
286:3,5 287:25 300:13
305:10

**talks** 158:21 281:11

**tangled** 115:4

**tape** 6:3 258:11

**target** 168:24 169:9

**Taser** 277:25 278:1,2

**taught** 58:20 106:20
183:12 219:10

**teaching** 37:15

**technique** 125:12

**techniques** 130:19

**telling** 85:14 90:16 91:2
260:23 261:22,25
282:24

**tells** 38:3 53:14 261:21

**ten** 43:2,3 92:24 213:19
225:7

**tend** 261:8

**tenure** 59:22 75:2
81:11 111:18 119:4
134:25 135:4 153:22
156:24 184:3 221:18,23
277:3

**terminals** 92:7

**terminate** 150:8
184:21 276:16

**terminated** 19:16,23
114:23 121:21 130:15
157:2,10 184:25 185:13
217:3 253:21 255:2,8,
15 257:24 258:5
278:17,23 296:4,12
302:9,16,20

**termination** 148:18
150:13 151:12,20
152:1,14 185:18 186:23
187:2,6,10,13 271:7

**terminology** 57:21,22

**test** 36:18 139:25
140:13 143:12,16 236:7

**tested** 128:11,13

**testified** 7:3 56:10 59:5
60:17 107:18 155:11
166:25 181:22 182:4,10
247:25 250:16 254:6
259:22 288:6 303:24
305:10 306:4

**testifies** 266:4,5

**testify** 165:11,18
247:25

**testifying** 10:12 165:8

**testimony** 10:2 81:5
157:4 180:7 250:25
252:1 255:7

**tests** 139:22

**themself** 66:24

**theorizing** 104:6

**thereof** 116:15 117:16
120:9

**thing** 49:12,14 55:2
79:15 158:3 162:20
235:19,25 242:17
243:11 244:5 262:2
279:20 285:11

**things** 27:25 28:2
32:14 36:20 48:19
50:11,20 52:15 90:24
116:9 132:20 133:2
180:25 200:25 204:7
205:21,23 206:3 227:9

**thinking** 34:24,25
106:12 170:22

**Thirteen** 232:9

**Thomas** 2:13

**thought** 57:3 141:17
149:5 183:5 194:14
207:18 209:20 247:10
260:19 271:1 281:20

**thousand** 34:9 196:17
207:16

**threat** 25:2,5 52:1,5,9,
21 53:9 57:16 58:8,10
62:13,19,24 63:10,17
64:2,9,16,23 65:7,18
66:23 67:5 69:19 78:14,
22 79:6,10,12 83:20
84:6,18,21 86:20 88:14,
17,18,19,21 99:2,5,8,
12,19,25 100:4,21,22
103:18 105:8 106:11
122:17,20,25 123:5,18,
23 124:1,6,8 126:4,7
148:25 149:3,8 151:8,
11 156:13 163:22
164:10,13,14,18
166:11,16,19,20,21,24



Case 1:18-cv-04710-CAP   Document 260-10   Filed 08/16/21   Page 109 of 111
Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                          January 25, 2021

167:1,3 168:1,6,7,14
169:4,5,6 171:2,7,13,14
172:22,23 173:2,5
249:16,20,23 250:20,21
251:20 254:5,14,18
255:5 292:10,13

**threaten** 108:13

**threatened** 100:4
102:17 103:3 105:6,7

**threatening** 83:21

**threats** 149:25

**threw** 260:20 262:11

**throughs** 71:24

**throw** 222:2

**Thurmond** 265:23
266:4 267:23

**Thurmond's** 264:23,
25 265:18

**Tiffany** 2:12 6:15
132:11 152:20 190:15
232:15

**time** 6:8 9:14 14:11
15:2,17 16:12 17:6,17
18:15,16,21 21:19 24:9
26:2 27:20 28:13,18
31:1,17,21 33:21,25
34:16,19 35:9,12 36:16,
22 37:3 40:10 41:19
43:4,25 46:22 48:21
59:2 73:1 74:8 75:8,9,
19,21 77:25 80:24 81:1
82:6,8,11 83:12 85:1,17
90:24 91:7 94:8 95:4
101:17 103:18 106:18
107:3,5,21 108:2,10
111:10,11,15,18 112:1
114:7 117:5 125:19
136:8 137:11 139:20,
23,24 143:11 144:4
147:25 148:3,12 149:2,
8 153:14 156:14
158:18,25 160:18,23
165:10,16,17 166:8,13
167:4 172:3 173:21,24
174:5 176:12,22 177:13
180:5 182:14 186:14
192:22 195:20,22
197:18 203:25 206:13
208:21,24 209:1,5,9,10
216:11,25 225:5,8,10,

12 226:3 227:6 246:11
254:13 255:18 258:13,
17 267:1 270:9 272:7
273:15 274:19 275:17
277:6,11,14 279:10
280:16,18 283:4 284:5
285:4 287:12,14
289:17,19 290:13
292:7,16,21 296:9
301:13,15 306:17 317:8

**timeline** 263:19

**times** 138:3 156:17
193:12 275:8 276:24
277:2,10 278:1,8

**tired** 159:20 204:4
226:12 227:6

**tires** 295:13

**today** 8:19 10:13 11:6
31:14 35:8 40:3 44:4
110:8,9 120:23 147:14
153:16 166:15 190:21
196:1 200:1 204:18
219:18,21,22 220:19
221:13 222:17 250:17,
25 255:7 269:21 304:21

**Today's** 6:7

**told** 18:7,11,13,14 19:6,
12 21:12 26:16,17 27:4
29:5 30:11 31:14 32:5,
14 33:18 87:9 89:19
90:9 91:5,8 98:9
124:15,16 150:19
172:14,17,18 183:7,16
212:23 217:19 219:1
229:3,9,11,17,23
234:15,16 247:18
261:10 269:7 271:15
299:8 304:10

**tolerated** 112:16

**tomorrow** 317:13

**Tompkins** 2:13

**tone** 201:17

**tonight** 230:19,24
234:1

**tool** 122:14

**tools** 37:16

**top** 109:18 110:13

115:9 120:20 240:24
313:4

**total** 257:8

**totality** 95:12 183:5

**totally** 78:17 268:1

**touch** 264:25

**tour** 159:2,4

**Towaliga** 11:18,21,22

**trading** 90:25

**traffic** 134:5,11 137:12
259:14 261:5,7,12
262:8 266:25 267:3
285:8 288:15 299:16

**train** 41:11 60:16
171:15

**trained** 32:13 33:17
59:15,19 61:21 78:10
94:12 168:22,23 172:21
173:1 183:7 256:15
286:13 298:16

**training** 27:24 28:10
29:20 32:12,19 40:21
41:2,5,8 58:22 59:1,5
60:8,11,24 61:24 78:7,
12 80:15 89:8 106:19
107:7,13,20 108:1
120:19 122:2,5,8
123:11,22 124:10,13,21
125:5,12,13,16,17
126:8,14 127:17 128:12
130:8,10,11,12,13,18,
20,22 131:8,15,25
133:2 135:18 138:1,4,
11,12,13 139:14,15
140:20 142:19,20
145:24 146:16 147:1
148:4,13 151:13,21
152:2,7,16 168:19
169:10 171:25 172:6,10
182:12,16 183:11
187:19 214:20 215:17
217:22 218:2,6,8,15,19,
20 219:7,9,23 220:2,6,
12,14 221:1 222:9,12
256:20 286:11,17 287:5

**trainings** 129:24

**transcript** 5:13,23 7:25
302:3 303:20

**travel** 206:20,21 299:18

**traveling** 165:2 206:16

**treat** 80:2 118:10

**treated** 70:13

**treating** 265:22

**trial** 259:23

**trigger** 177:16,18

**trip** 11:1

**true** 99:22 112:23,24,25
113:22,25 114:24 119:4
120:4 123:7 148:13
162:18 194:16 229:24
234:10,13 238:24 248:5
251:22,24 253:10,14
255:9 260:23 275:18
301:24 302:25

**trust** 117:10 119:7,9

**truth** 110:17,19 111:12,
23 113:15,24 114:10
236:7 274:6

**truthful** 112:7,10,14
113:2,7,11,12,20 114:1,
18,21,22 149:19,24
150:5 156:16 157:2,9,
12,14 160:1 223:5,9
230:11 231:21 232:22
234:22 236:10 249:11
279:23 280:1,12 303:25

**truthfully** 10:12 250:11

**truthfulness** 79:15
110:24 112:17 156:23
157:5 187:1 215:8
231:25 278:19 296:9
316:5

**turn** 53:8 137:6 165:3
177:15 281:25 285:12
288:17 289:16 291:4
295:20 306:20 313:4

**turned** 37:1 176:9
282:2 285:11 295:18

**Turner** 2:10 36:10 81:9
185:8,11,12,17,22
189:6 256:24 257:5
272:7,10 273:1,11,12,
15,18 274:12,18 275:17
276:8,13,19 278:16,17,
22 279:8 296:7 300:3,



Case 1:18-cv-04710-CAP  Document 260-10  Filed 08/16/21  Page 110 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                                    January 25, 2021

12,19 301:3

**Turner's** 275:9 280:23

**turning** 258:24

**Twenty-seven** 152:22

**Twenty-three** 302:22

**type** 10:11 48:14 52:1
60:11 130:2 235:2
267:17 296:15

**typically** 288:18

---

**U**

**U-TURN** 288:13

**uh-huh** 9:3 57:15 65:16
203:10 259:19 265:6
278:5 286:6 289:8

**ultimate** 257:21

**ultimately** 28:8 49:14
184:16

**unable** 76:22 159:3

**unacceptable** 137:19

**unaccounted-for**
117:14

**unauthorized** 192:7,8,
14

**uncle** 11:25 13:11

**unclear** 171:24

**undermining** 191:12

**underneath** 60:16
278:22

**understand** 8:10 9:17,
19,20,21 10:2,4,5,6,7
21:7 26:13 29:14 30:8,9
41:3,8 49:10 55:13 79:7
81:5,6 94:24 95:3
111:20,23 112:9 119:10
129:11,12,16 142:16
144:7 161:6 162:5,8,9
164:8 171:24 174:5
184:12,15 185:20,24
186:4,6 189:9 191:19
231:17,19,23 247:17
259:13 266:24 303:16
305:14

**understanding** 18:19
20:10,23 21:2 25:24
27:21,24 28:4,10 29:20
36:13 40:15 47:2 51:24
55:17 58:12,15 61:14
63:10 66:6 78:9 89:7
96:2 151:1,5 161:10
165:24 168:18 185:17
207:25 215:11,12
237:21,23 283:16
296:11

**understood** 9:24
28:19 62:4 112:1,4
144:10 156:22,23 157:1
184:18 227:21

**undesirable** 137:19

**unfavorable** 136:15

**unholster** 281:21

**unholstered** 281:13
282:17 284:12 286:23,
24

**uniformly** 154:2

**union** 44:17,20,23
189:16 248:18,22
272:10 273:17 274:13
279:5 280:17 296:18

**United** 64:7 74:23
116:17 117:11 157:25
253:17

**University** 45:3

**unlawful** 61:5,6,7,11,
19 62:6 64:6 252:6,7

**unnecessary** 161:4
162:10 186:22 244:13,
20 253:7 254:4 257:7
262:12 264:18

**unreasonable** 74:7,13
161:4,6,10,13

**unsafe** 159:12

**untruthful** 186:25

**unwarranted** 148:19
150:13

**update** 77:14 127:14

**uphold** 118:19 157:24

**upset** 91:2,4,12

**utilize** 192:24

---

**V**

**van** 5:15,17,18 174:18
176:6,10,11,21,23
177:4,5,6,7,9,11,13,14,
17,19,22 178:1,2,5,11,
14,21,25 179:9 182:5
287:15,18,20 288:1,4,8,
11,14,15 289:5,6,18
290:1,4 291:8 293:23
294:2,6,10,11,20,25
295:6,8,11,12,19,21,24
299:14,18,20 306:9,17

**vehicle** 80:16 124:22,
23,24 126:3,4,6,10
138:16 145:24 146:8,
15,24 164:7,12,17,22
165:9,19 166:11,16,23
167:7,8,12,16,23 168:2,
12 169:18,19,20,21
170:2,3,5,9,12,19,20
172:1,8,15,16,19 173:2
179:19 181:16,23
182:8,15,20,22,23
218:9,17,21 219:1
235:21 261:4 281:23
282:1,4,7,8,9,12,17,22,
23 283:5,9,12,20,25
284:1,7,8,16,22 285:7,
17 286:20 291:1,5
295:16 306:5,9

**vehicles** 124:11,17
125:18 126:15 127:18
138:13 171:16 261:16

**vehicular** 267:2

**verbal** 9:1,5 201:6
202:1 214:18 281:12,
17,18 282:6

**verbally** 249:24

**verification** 110:17,19
111:12,23 236:7

**verifications** 110:4

**verify** 8:2

**versus** 6:6 7:6

**victim** 269:7

**video** 80:15,23 127:19,
21 128:1,3,5,10,12

160:17 195:19 258:12
272:12,19,22 273:4,10,
19 274:13 280:22,24
300:21,22 301:1,12
305:22 317:7

**videotape** 6:4 10:23

**view** 5:18 23:19

**viewpoint** 14:6

**violate** 72:10,19 73:7,
15 118:8 129:1,2,14
298:8

**violated** 155:5 156:8
245:24 253:6

**violating** 64:18 155:16
187:1 226:15

**violation** 55:10,12
56:21,25 63:1,19 64:3
68:15 74:3 123:4
133:19,21 136:2 159:10
160:1 186:1,11,15,16,
21 187:5,18,20 188:5,7,
18 189:5 190:9 243:22
296:25 297:1,5,21
298:6 308:17

**violations** 136:7 154:1
189:23

**Virginia** 46:19

**visual** 172:13

**voice** 79:16 266:17

**volume** 179:13

**voluntarily** 196:13
226:23 227:1

**volunteer** 111:17

**volunteered** 137:14

**Vortex** 211:23

---

**W**

**wait** 8:4 9:8,9,10 34:12
226:4 273:4

**waiting** 54:23

**waive** 8:3

**waken** 233:12

**walk** 261:7,11 267:10

**Elizabeth Gallo**
COURT REPORTING, LLC

Case 1:18-cv-04710-CAP Document 260-10 Filed 08/16/21 Page 111 of 111

Noel Hall and Christina Hall vs City of Atlanta, et al.
Mathieu Cadeau                                                    January 25, 2021

**walked** 54:22 65:13 162:17 264:23 265:18 267:11

**walking** 15:4,6 24:6,8 25:25 26:3,5,8 109:10 209:20 260:16 261:14, 19

**walks** 267:4

**walkway** 175:17

**wanted** 98:7 127:14 132:20 236:9 285:20

**warning** 4:6 115:12 186:7,10,13,17 190:21 192:18 194:14,20 196:4,11,19,21 197:11, 24 198:1,12,14,22 199:2 214:11,12,22 215:6,17,22 216:8,14 217:1,2,9,19 259:4,6 276:21

**warrant** 38:25 39:4 74:4

**warranted** 150:9

**watch** 241:5

**watching** 84:25

**weapon** 66:8,9,10 78:1, 16 101:24 163:18 165:10 166:10 167:3 168:24 174:13,17 177:25 179:9 180:1,20 181:9,19 276:25 277:7 281:13,21 282:18,19 284:12 286:8,24 289:6, 7,13,17 291:20,23 292:2,4 293:24 294:3, 19 298:22 299:13

**weapons** 77:21,24

**wear** 305:12

**weaving** 299:16

**week** 189:6,7 242:8 279:18

**weight** 205:16

**Wet** 35:21 209:11 215:7 231:25 235:1 262:25 268:5,13 269:1,3 277:10,12 278:12 280:16 296:9 300:3,20

**Whichever** 188:9

**white** 5:15,17,18 80:2, 8,11

**Whitmore** 231:1

**wife** 72:2 204:18

**Williams** 2:4 3:4 6:11, 12,19 7:4,21 8:11,15, 16,18 10:21 29:10 30:1 31:4,5,16,20 32:4,11,17 33:5,13 39:15 40:18 47:23 48:9,11 49:9,20 51:14 53:5 57:24 59:12 60:2,15 61:16 63:6 65:4 68:12 69:24 71:22 72:16,24 73:13 79:3 80:7,21 81:3 88:4 99:18 100:9 107:1,15 108:6 109:6 110:2 114:8 119:17 129:22 130:25 131:5 132:11,15,19,24, 25 141:13,16,21 142:1 144:15 145:7 146:6,13, 21 147:13 148:9,23 149:18 150:18 151:19 152:12,19,24 153:1,5, 10 156:11 158:11,14,19 160:14,25 161:21,24 163:15 168:8 169:16,25 170:16 171:21 172:5 179:4 180:13 183:10,21 187:24 188:15 189:15 190:12,15,17 191:6,22 194:13 195:4,7,13,17, 24 198:20 199:6 200:6, 10 201:5 203:3,17 207:23 210:20 213:21 218:14 219:14 221:5 232:6,12,15,17 235:18 236:15,20 237:3,5 242:13 243:8 244:4 245:6,11,17,25 247:1,9, 16 248:8,13 251:14 253:2,15 254:2,10,24 255:13,20 258:11,19 264:14 271:20 273:9 275:16 279:1 286:16 289:2,24 296:2 300:8 301:6,19 302:6 304:16 306:4 307:10,15 317:6

**Willie** 235:1 300:3

**Willie's** 35:21 209:11 215:8 232:1 262:25

268:5,13 269:1,3 277:10,12 278:13 280:16 296:10 300:20

**window** 225:17 227:22 294:16,17,18 295:8

**witnessed** 60:19 265:22

**witnesses** 262:10

**woke** 225:16,20

**woken** 227:13

**women** 23:14 42:21 50:7 207:11 246:25

**word** 22:15,17,22 23:19 39:11,12 54:15,17 56:2, 7 260:2

**wording** 39:13

**words** 23:20,25 27:25 28:6 38:11,12 40:23 42:22 68:2 90:25 93:20 156:17 201:15 284:18

**work** 4:3 75:14,22 81:8, 9,23 82:3 94:23 126:24 153:13 154:1 159:1,10 186:2,4,16 187:18 188:5 192:21 201:24 203:1,12 216:21 223:14 225:1 254:4,19

**worked** 75:18 179:11, 23 225:3 260:7 293:16

**working** 14:5 16:11 21:6 44:23 47:1 75:10, 22 77:13 179:14,18 206:17 209:19 217:13 261:3,24 268:11

**works** 38:2 184:13 317:14

**world** 142:25 143:24 209:19 260:7 290:15

**worse** 215:15

**writing** 95:23,24 96:1 140:2

**written** 36:18 43:15 146:2 147:3 156:17

**wrong** 29:8 30:13,15 32:1,6 83:14,16 129:9 222:18 242:3 298:3

314:25

**wrote** 238:13 240:1 241:16,22

---

**Y**

**Yarborough** 12:11

**year** 18:2,5 34:5,17,23, 24,25 124:14 125:7,8 276:5,6

**yearly** 62:1 214:19 220:7

**years** 35:4 43:2,3 179:12,18,23 208:4 209:5 213:18

**yell** 261:18

**yelled** 259:12

**yelling** 258:24 259:20 269:5

**York** 45:15,16

**you-all** 12:15 21:18 96:18 168:22 200:25 207:4,7,10,15 280:24 284:18 285:20 286:12 288:23

**you-all's** 276:9

**young** 209:14,18 214:1 280:10 293:16

**youngest** 206:8

---

**Z**

**zone** 75:15 76:2,3,16 77:6 82:5,13,15 86:8 211:12 241:2

**zones** 81:10