## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **NOEL HALL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **FILE NO: 1:18-cv-04710-CAP** |
| | ) | |
| **CITY OF ATLANTA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGEMENT AGAINST DEFENDANTS

**COME NOW** Plaintiffs, and hereby file their brief in support of their motion for partial summary judgement against Defendant GEORGE TURNER ("Chief Turner"), Defendant CITY OF ATLANTA ("the City"), and Defendant MATHIEU CADEAU ("Officer Cadeau") and show the Court as follows:

## I.   INTRODUCTION

This case involves claims against Officer Cadeau, Chief Turner, and the City, for their actions and omissions that jointly resulted in the violation of Plaintiffs Noel Hall and Christina Hall's ("the Plaintiffs") federally protected statutory and

constitutional rights. These claims arise from Officer Cadeau use of excessive and unreasonable force when he shot into Plaintiffs' vehicle on February 25, 2017.

The claims against Chief Turner, in his individual and supervisory capacity, are based on the years leading up to the incident in question where Chief Turner repeatedly failed to supervise and properly discipline officers, including Officer Cadeau, creating a custom and pattern of unreasonable and excessive force. Chief Turner was aware of Officer Cadeau's propensity for violence and excessive force, and was told to fire Officer Cadeau, but deliberately refused to do so, thereby allowing Officer Cadeau to continue his violations as he did in the shooting incident on February 25, 2017. Chief Turner's deliberate indifference is shown through his failure to adequately supervise and discipline Officer Cadeau, this indifference was the moving force behind the violation of Plaintiffs constitutional rights.

The claims against the City allege failure to train, supervise, and discipline its officers, including Officer Cadeau, and are based on the City's actions and omissions through Chief Turner, as well as other supervisors within APD. The claims against the City include the following; (1) failing to train and supervise Officer Cadeau and other officers regarding the legal and tactical circumstances that justify shooting into a moving or fleeing vehicle; (2) failing to provide adequate supervision and

discipline of Officer Cadeau by failing to terminate or refer him for criminal charges

for his repeated excessive force incidents, including but not limited to, his use of OC

"pepper" spray on a handcuffed and defenseless prisoner; (3) failing to terminate

Officer Cadeau for being untruthful to his supervisors; failing to provide adequate

supervision and discipline to its officers for use of excessive force, as demonstrated

by Chief Turner's repeated rejection of recommendations from the ACRB regarding

officer discipline for use of excessive force; and (4) failing to use the polygraph and

computer voice stress analyzer (CVSA) exam to evaluate the truthfulness of officers

involved in excessive force incidents, including deadly force incidents.

## II.   STATEMENT OF THE CASE

On February 25, 2017, Plaintiffs, along with their children and a friend of the

family traveled from North Carolina to Atlanta to attend a moto-cross event.[1]  After

the moto-cross event, the Hall family left the Georgia Dome and walked to their van

in the parking lot.[2]  After obtaining their van, Mr. Hall drove back towards the

Georgia Dome and approached the intersection of Northside Drive and Ivan Allen

---

[1] Deposition of Christina Hall, 9/25/20, Page 25.

[2] Deposition of Christina Hall, 9/25/20, Page 39.

Jr. Boulevard where APD officer, Nathan Evans, who was also working off-duty and directing traffic.[3] After a brief verbal exchange between Mr. Hall and officer Nathan Evans, Officer Cadeau approached the Hall's vehicle and confronted Mr. Hall, who was in the process of making a left turn.[4] Mr. Hall was attempting to turn because he had a pass allowing him entry into a designated pit area, but Officer Cadeau refused to look at his pass.[5]

As Mr. Hall was driving, Officer Cadeau fired his weapon into the van,[6] striking him in his left arm, shoulder, and chest area.[7] Officer Cadeau's actions were in violation of clearly established state and federal law. Officer Cadeau was terminated from APD.[8] APD's investigation into this shooting determined that "[t]he evidence and circumstances in this matter do not satisfy the objective

---

[3] *Memorandum, Atlanta Police Department Office of Professional Standards (OPS), Investigation and Disposition OPS File #17-I-0110-PS*, Pages 2-3, attached as **Exhibit 1**.

[4] Deposition of Christina Hall, 9/25/20, Pages 40-41; Deposition of Noel Hall, 9/25/20, Pages 48-49.

[5] Deposition of Christina Hall, 9/25/20, Pages 38-39, 42-43; Deposition of Noel Hall, 9/25/20, Pages 48-49, 59-60.

[6] Deposition of Christina Hall, 9/25/20, Pages 41-42; Crime scene photos of Hall Van, attached as **Exhibit 2**.

[7] Noel Hall Injury Photos, attached as **Exhibit 3.**

[8] Separation Notice, attached as **Exhibit 4**.

reasonableness standard as set forth in *Graham v. Conner*, 490 U.S. 386 (1989), nor does the evidence in this incident support any articulable threat of physical violence or deadly force toward Sergeant Cadeau or anyone else present."[9] Officer Cadeau was indicted on four counts, one count of aggravated assault, in violation of OCGA Section 16-5-21; two counts of violation of oath of public office, in violation of OCGA Section 16-10-1; and one count of reckless conduct in violation of OCGA Section 16-5-60(B).[10]

## A. Claims Against Chief Turner

Plaintiffs' lawsuit alleges that Chief Turner is responsible for the violation of Plaintiffs' constitutional rights due to his knowledge, participation and ratification of a history of widespread abuses by APD officers, including Officer Cadeau's use of excessive force and violations of APD policies. Furthermore, Chief Turner failed to take the necessary corrective action to resolve issues relating to obvious, flagrant, and rampant violations of use of force within APD during the time he served as Chief of Police. Moreover, by failing to adequately investigate and discipline APD

---

[9] *Memorandum, Atlanta Police Department Office of Professional Standards (OPS), Investigation and Disposition OPS File #17-I-0110-PS*, Page 5.

[10] Direct Indictment, attached as **Exhibit 5**.

officers like Officer Cadeau, who consistently used excessive force and violated APD policies, Chief Turner created and allowed a custom of widespread and persistent abuses by APD officers.

APD's Office of Professional Standards (OPS) reported directly to Chief Turner in his role as Chief of Police. OPS is "responsible for the disciplinary process of the Atlanta Police Department" with the duty to "ensure the integrity of the Department."[11] APD has a disciplinary process for its officers, administered through OPS, that is designed with the purpose to "provide the Department with a disciplinary system that responds to the needs and concerns of the community" with the intent to "prevent and correct inappropriate behavior" of its officers "[t]hrough an effective disciplinary system."[12]

The goal of APD's disciplinary process is to provide "thorough, impartial investigations of all allegations of employee misconduct and imposes appropriate disciplinary actions for all sustained work rule of City ordinance violations."[13]

---

[11] APD.SOP.1010, Mission and Organization of the Department, Section 4.2.50, at Page 4, attached as **Exhibit 7**.

[12] APD.SOP.2020, Disciplinary Process, Page 2, attached as **Exhibit 8.**

[13] *Id.* at Page 4.

During his tenure, Chief Turner was "responsible for the effective and professional administration of the disciplinary process" for the Department, including "the authority to review, revoke, or modify any disciplinary actions taken by any supervisor in the Department" including oral admonishment, written reprimand, suspension without pay, demotion and dismissal.[14]

As part of its disciplinary process for its officers, APD has equipped and authorized OPS to use polygraph and Computer Voice Stress Analyzer (CVSA) exams for the detection of deception in administrative investigations of its officers relating to allegations of work rule violations, including maltreatment and unnecessary force.[15]  APD "considers the polygraph and Computer Voice Stress Analyzer (CVSA) to be useful investigative tools combined with other evidence in establishing the innocence or guilt of an accused employee."[16]

APD requires that "[e]mployees shall be truthful in their written and spoken words at all times."[17]  In fact, APD's disciplinary rules subject an officer to dismissal

---

[14] *Id.* at Pages 2, 22-23.

[15] APD.SOP.3120, Polygraph and Computer Voice Stress Analyzer, Page 1, attached as **Exhibit 9**.

[16] *Id.*

[17] APD.SOP.2010, Work Rules Section 4.1.3, Truthfulness, Page 3.

if it is determined that they have been untruthful in their written or spoken word.[18] APD's policy regarding use of CVSA and polygraph examinations states that "[e]mployees can be required to submit to a CVSA or polygraph examination during and administrative investigation" and that "[a]n employee who refuses to take a polygraph or CVSA examination will be subject to further disciplinary action."[19]

Prior to the Hall shooting incident, Chief Turner was aware that Officer Cadeau had a history of violating APD's work rules, as shown in his OPS Officer Disciplinary History.[20]  In 2009, within two years of being hired, Officer Cadeau was the subject of a citizen complaint alleging excessive force.  In 2011, he received an oral reprimand for his lack of punctuality, and a written reprimand for sleeping on duty. In 2013, he received an oral admonishment for his conduct and appearance in court.  In 2014, Officer Cadeau was investigated for maltreatment or unnecessary force regarding four separate incidents, occurring in April, June, August,[21] and

---

[18] APD.SOP.2020, Disciplinary Process, Page 18.

[19] APD.SOP.3120, Polygraph and Computer Voice Stress Analyzer, Page 1.

[20] Atlanta Police Department OPS Officer Disciplinary History, Officer Mathieu Cadeau, attached as **Exhibit 10.**

[21] OPS Case File 14I0540UAF, attached as **Exhibit 11** (Officer Cadeau received oral admonishment for conduct, allegation was that he grabbed Mr. Samuel Thurmand by both of his

December.[22] As a result of receiving numerous unauthorized excessive force complaints against him, Officer Cadeau was designated for APD's Early Warning Program,[23] a policy that is designed to provide APD command with an opportunity to review Officer Cadeau's behavior and intervene.[24]

On May 13, 201, a Communication Dispatcher called Officer Cadeau several times to respond to nearby incidents, but he did not answer. APD 911 received a call from a citizen (Andrew Bell) stating that an Atlanta Police vehicle was weaving on Powers Ferry Road.[25] A Sandy Springs officer responded to the call, and when he approached the vehicle, he found Officer Cadeau in the driver seat with his head down, his eyes closed, sleeping behind the wheel. When asked about the incident he lied to his superiors.[26]

---

arms, threw him against a gate fence and started "Mudding" his face on his forehead and chin while yelling at him.)

[22] OPS Case File 14I0635UAF, attached as **Exhibit 12** (Carolyn Carr and Micheal Gibson incident).

[23] APD.SOP.2022, Early Warning System, attached as **Exhibit 13.**

[24] Memorandum, August 18, 2014, Re: EARLY WARNING – Officer Mathieu Cadeau, attached as **Exhibit 14.**

[25] OPS Case File 11I0921AT, attached as **Exhibit 15**.

[26] *Id.*

On October 6, 2013, while directing traffic at a festival, Ms. Carolyn Carr and Mr. Charles M. Gibson were nearing their home at 261 Peters Street, Atlanta, Ga, when Officer Cadeau physically assaulted, injured, and falsely arrested them as they were attempting to gain entry to their own residence. Officer Cadeau was not on duty at the time, he was working an extra job.[27]

On June 19, 2014, Officer Cadeau discharged his OC "pepper" spray into the face Mr. Eric Squire while he was handcuffed and secured to a bench while inside the Zone 2 precinct.[28]    On August 26, 2014, OPS sustained work rule violation charges against Officer Cadeau for maltreatment or unnecessary force, and for conduct, based in part, on Officer Cadeau's admission that he sprayed Mr. Squire because he refused to stop his "disrespectful behavior" towards Officer Carter referring to her as "Bumpity Bump."[29]

On July 20, 2014, Officer Cadeau was untruthful when he reported to his supervisor that he had not used his OC spray on a citizen.[30]  On January 23, 2015,

---

[27] OPS Case File 14I0260UAF, attached as **Exhibit 16.**

[28] OPS Case File 14I0431UAF, attached as **Exhibit 17.**

[29] *Id.*

[30] Investigative and Disposition, from Lieutenant D. Ferguson to Major B. K. Martin, dated December 31, 2014, attached as **Exhibit 18.**

following a command review of the OPS finding that Officer Cadeau violated APD's policy requiring truthfulness, Officer Cadeau's commander recommended to Chief Turner that he be terminated.[31]   However, Chief Turner rejected the finding of OPS that Officer Cadeau was untruthful and should be terminated, instead Chief Turner reversed this finding and allowed Officer Cadeau to remain on the force.[32]

**B.  Atlanta Citizen Review Board (ACRB)**

In 2007, the City established the Atlanta Citizen Review Board (ACRB) by ordinance as an independent agency.  The purpose of the ACRB is to provide citizen oversight of misconduct accusations against sworn members of the police and corrections departments in the City of Atlanta and to provide a credible, independent forum where complainants and accusations can be addressed.  During his tenure, Chief Turner engaged in a widespread and persistent pattern and practice from 2010-2016 of routinely rejecting recommendations of the ACRB that action be taken against officers which the ACRB found to have used improper and excessive force.[33]

---

[31] Investigation and Disposition of OPS Complaint #14-I-0635-UAF, from Deputy Chief J. P. Spillane to Assistant Chief S. L. Jones, dated January 23, 2015, attached as **Exhibit 19.**

[32] Notice of Proposed Adverse Action (NPAA), Adverse Action Continuation, and Notice of Final Adverse Action (NFAA), attached as **Exhibit 20.**

[33] ACRB Records, attached as **Exhibit 21.**

The ACRB "has the power to recommend that the Chief of Police take certain actions; including, but not limited to recommending general reforms (such as hiring, firing, demotion, punishment, or commendation)." [34]  In a March 2016 press release, the ACRB made the public aware of concerns regarding the Chief of Police's responses to citizen complaints:

> One of the most significant challenges facing the ACRB is the Atlanta Police Department's lack of discipline on ACRB sustained complaints (complaints filed by citizens, discussed and reviewed by the ACRB and deemed credible or true based on the evidence obtained by experience investigators). While that in itself is a major criticism of APD, the failure to provide a response that has a legal or factual basis for the disagreements compounds, frustrates and weakens the intent of the ACRB ordinance.[35]

The ACRB's 2016 Annual Report addresses and illustrates the problems with the City's and Chief Turner's deliberate indifference to use of force by APD officers. Specifically, the report addressed disciplinary decisions from Chief Turner:

> After collecting the data for the 2016 APD responses to ACRB sustained complaints, the result is a dismal 18% rate of agreement, up from 11% in 2015.  As new decisions from the APD are received, at the

---

[34] APD.SOP.2300, Department Employees Cooperation with the Atlanta Citizen Review Board (ACRB); see also Sheena Robertson, Depo. (Rogers), Depo. Exhibit 1, at Page 6 (m)(1).

[35] ACRB Executive Director, Lee Reid Speaks Out on Chiefs Responses to Citizens Complaints, March 3, 2016, attached as **Exhibit 22;** see also Samuel Lee Reid Depo. (Rogers), 1/25/18.

end of each year, the rate of agreement changes to account for the newly received complaints. Over the past five years, the APD has agreed with 24% of ACRB sustained complaints, as shown in the chart below representing the 5-year history of APD decisions. This percentage rate is disappointing to the agency and more importantly to the citizens of Atlanta. [36]

According to the ACRB, the "board's actions through thorough investigations and robust community outreach and education are all blunted by APD's actions on ACRB sustained complaints."[37] Further, the report states that "the APD's responses to the board's work is troublesome and a direct cause to citizen's angst over the level and sincerity of the APD's commitment to holding officers accountable for their actions."[38] Moreover, the report concludes that "the APD responses to ACRB complaints cause citizens to question where is the integrity and fairness."[39] According to the ACRB, "[w]ords of commitment to holding officers accountable appear hollow when the statistical evidence reveals actions that are contradictory" such that "responses to ACRB decisions is a grave concern of citizens" and

---

[36] ACRB 2016 Annual Report, 2016 Chief's Discipline, attached as **Exhibit 23.**

[37] *Id.*

[38] *Id.*

[39] *Id.*

"reduce[es] the trust and faith in the APD's ability to appropriately handle citizen complaints" which "has a direct impact on the ACRB and the leadership of the City."[40]

## C. APD's Policies and Training on Use of Firearms

APD's use of force policy specifically incorporates O.C.G.A. § 17-4-20 and states that documentation shall be made, and maintained by the Training Section, that all APD officers carrying "lethal and less lethal weapons" have received a copy APD's use of force policy.[41]  Furthermore, APD's work rules include a specific written directive for officers regarding use of firearms, and investigations that are required into use of firearms by officers.[42]

APD policy requires that that anytime an officer uses force while on duty or causes injury or death of another person, there must be a "Chain of Command Review" of the incident as follows: (1) an "on duty supervisor will report to the scene," (2) the "employee's supervisor must report to the scene," and (3) and the

---

[40] *Id.*

[41] APD.SOP.3010, Use of Force, Section 4.5. attached as **Exhibit 24**.

[42] APD.SOP.2010, Use of Firearms, Section 4.6.9, Section 4.6.16, Investigations of Firearms Use.

"employee's supervisor" is required to "investigate the employee's use of force."[43] Further, this policy requires that the "supervisor must complete a Use of Force Report (Form APD 809) on any incident defined in sections 4.5.2 through 4.5.7 before the end of that tour of duty."

APD also has specific policies and procedures that require training of all officers regarding use of firearms and use of deadly force.  APD's policy states that the purpose of the Training Section is to "provide or make available to employees training which is required by Georgia POST, the City of Atlanta, and the Department."  APD is "responsible for providing training to allow employees to obtain knowledge, skills, abilities and to provide a safe and secure environment for the City of Atlanta."[44] APD's policy requires that the Training Section conduct an annual analysis of all use of force reports filed to determine if any patterns or trends in the use of force exist within the department that would affect the training needs of employees, equipment issued to employees, or department policy and procedure.

### D. APD's Documentation and Analysis of Use of Force

---

[43] APD.SOP.3010, Sections 4.5.2, 4.6.1, 4.6.2, and 4.6.3.

[44] *Id.* at Section 3.1.  (emphasis added).

APD Training Section's *"2013 Use of Force Report"* documents 15 reported use of firearm incidents out of 542 total use of force incidents reported by APD officers in 2013.[45]  Of the 15 reported use of firearm incidents, two (2) related to incidents of APD officers use of force by shooting into vehicles.[46]  APD Training Section's *"2014 Use of Force Report"* documents 16 reported use of firearm incidents out of 608 total use of force incidents reported by APD officers in 2013.[47]  Of the 16 reported use of firearm incidents, two (2) related to incidents of APD officers use of force by shooting into vehicles.[48]  APD Training Section's *"2015 Use of Force Report"* documents 15 reported use of firearm incidents out of 618 total use of force incidents reported by APD officers in 2015.[49]  Of the 15 reported use of

---

[45] See *2013 Use of Force Report*, attached as **Exhibit 25.**

[46] See Use of Force Reports for March 2013, attached as **Exhibit 26**; and corresponding Police Report attached as **Exhibit 27**; Use of Force Reports for September 2013, attached as **Exhibit 28**; and corresponding Police Report attached as **Exhibit 29**; and Use of Force Report for October 2013, attached as **Exhibit 30.**

[47] See *2014 Use of Force Report*, attached as **Exhibit 31.**

[48] See Use of Force Reports for May 2014, attached as **Exhibit 32**; and corresponding Police Report attached as **Exhibit 33**; Use of Force Reports for November 2014, attached as **Exhibit 34**; and corresponding Police Report attached as **Exhibit 35.**
[49] See *2015 Use of Force Report*, attached as **Exhibit 36.**

firearm incidents, six (6) related to incidents of APD officers use of force by shooting into vehicles.[50]

## III.  LEGAL ARGUMENT

### A. Summary Judgment Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law.[51]  A dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[52]  Summary judgment is mandated where the party opposing the motion has failed to establish the existence of an element essential to his case, and on which he bears the burden of proof.[53]  Furthermore, "the mere existence of *some* alleged factual dispute between the parties will not defeat an

---

[50] See Use of Force Reports for April 2015, attached as **Exhibit 37**; and corresponding Police Report attached as **Exhibit 38**; Use of Force Reports for May 2015, attached as **Exhibit 39**; and corresponding Police Report attached as **Exhibit 40**; Use of Force Reports for July 2015, attached as **Exhibit 41**; and corresponding Police Report attached as **Exhibit 42**; Use of Force Reports for August 2015, attached as **Exhibit 43**; and corresponding Police Report attached as **Exhibit 44**; Use of Force Reports for November 2015, attached as **Exhibit 45**; and corresponding Police Report attached as **Exhibit 46**; and Use of Force Reports for December 2015, attached as **Exhibit 47**; and corresponding Police Report attached as **Exhibit 48**.

[51] *Fed. R. Civ. P. 56(c)*.

[52] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

[53] *Id.* at 322.

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[54]  In ruling on a motion for summary judgment, the role of the court is not to try issues of fact but only to determine whether there are issues of fact to be tried.[55]

### B. Officer Cadeau's Liability

Officer Cadeau is not entitled to qualified immunity, which provides that "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[56] Qualified immunity does not apply where the facts show that the official violated the plaintiff's constitutional rights and where the law clearly established those rights at the time of the alleged misconduct.[57]

---

[54] *Scott v. Harris*, 552 U.S. 372, 380 (2007) quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).*

[55] See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[56] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[57] *Arnold v. Bunn*, 565 F. App'x 812 (11th Cir. 2014) citing *Morton v. Kirkwood*, 707 F. 3d 1276, 1281 (11ᵗʰ Cir. 2013)

The evidence is overwhelming and without genuine dispute regarding any material facts, that Officer Cadeau violated clearly established statutory and constitutional rights of Plaintiffs. This is evident from his termination by APD for violating the standards of *Graham v. Connor* set forth in APD's use of force policy; from Officer Cadeau's indictment and guilty plea for his reckless conduct towards Plaintiffs and aggravated assault of Mr. Hall; and from Georgia law's statute, O.C.G.A. § 17-4-20, which defines the circumstances under which an officer can use deadly force. Whether analyzed under the Fourth Amendment or Fourteenth Amendment, Officer Cadeau's actions clearly violated Plaintiffs' constitutional rights to be free from excessive and unreasonable force, which in this case was egregious and shocking.[58]

In determining whether a right was clearly established, the Court looks to binding decisions of the Supreme Court of the United States, the Eleventh Circuit, and the highest court of the relevant state.[59] As the Supreme Court explained in

---

[58] See *Carr v. Tatangelo*, 338 F.3d 1259 (11th Cir. 2003); and *Favors v. City of Atlanta*, 2021 U.S. App. LEXIS 6973 * (11th. Cir. 2021).

[59] *McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007)*, see also *Marsh v. Butler County*, 268 F.3d 1014, 1032 n. 10 (11th 2001) (en banc).

*Hope v. Pelzer*, "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." As the Supreme Court stated in *Pelzer,* "[t]his is not to say that an officers action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[60]  (emphasis added).

Scott DeFoe, a law enforcement expert retained by Plaintiffs, determined based on his education, training and experience in law enforcement, and his review of the record, that Officer Cadeau's actions were not consistent with standard police practices.

> It is my opinion that a reasonable police officer acting consistent with standard police practices would have used effective communication skills, de-escalation, and defusing techniques to properly explain to Mr. Noel Hall why he was being denied access and prohibited from negotiating a turn.  It is my opinion former Atlanta Police Department Sergeant Elsh Mathieu Cadeau, No. 4844, failed to use proper effective communication skills, de-escalation, and defusing techniques to properly explain to Mr. Noel Hall why he was being denied access and prohibited from negotiating a turn.  In addition, based on my review of the facts in this matter, Police Officer Nathan Evans was having a discussion with Mr. Noel Hall when Sergeant Elsh Mathieu Cadeau,

---

[60] *Hope v. Pelzer*, 536 U.S. 730, 738 (2001).

approached Mr. Hall's vehicle unsolicited and engaged in a verbal dispute with Mr. Noel Hall.[61]

According to Mr. DeFoe, Officer Cadeau exercised poor tactical judgment during his encounter with Mr. Hall, including his decision to unholster his weapon and place it in a low ready position.[62] Mr. DeFoe assessment of the actions and behavior of Officer Cadeau during this incident let him to conclude that Officer Cadeau failed to maintain self-control and "manage his anger" which resulted in the unnecessary use of deadly force.[63]

Mr. DeFoe began his career in law enforcement as a police officer from 1989-1995, rising through the ranks to serve as a detective and special agent.[64]  His law enforcement experience spans twenty-eight years and includes over 100 use of force investigations.[65] Mr. DeFoe's law enforcement experience includes police practices and tactics, vehicle pursuits, and use of force.[66]

---

[61] Scott DeFoe, Rule 26 Report, Page 9.

[62] *Id.* at Page 30.

[63] *Id.* at Pages 30-31.

[64] *Curriculm Vitae*, Scott A. DeFoe, attached as **Exhibit 49**.

[65]  *Expert Report of Scott DeFoe*, at Pages 1-4, attached **Exhibit 50**.

[66] *Curriculm Vitae*, Scott A. DeFoe.

## C. Chief Turner's Supervisory Liability

Plaintiffs' lawsuit alleges that Chief Turner's routine and systematic rejection of officer discipline and training recommendations from the ACRB, and failure to require OPS to use CVSA exams during internal affairs excessive force investigations, demonstrate his deliberate indifference to the constitutional rights of citizens to be free from excessive force. Under *Monell,* a municipality may be held liable for, among other things, deliberate indifference to training, supervision, discipline, and for failing to adopt and enforce policies necessary to prevent constitutional violations.[67]  Based on *Monell*[68] and cases from the Eleventh Circuit, supervisors may be held liable for, among other things, deliberate indifference to training, supervision, discipline, and for deliberate indifference towards adopting and enforcing policies necessary to prevent constitutional violations.[69]

---

[67] See *City of Canton v. Harris*, 489 U.S. 378, 380 (1989); *Adams v. Custer*, 2016 U.S. Dist. LEXIS 3762, *65-66 (S.D. FLA. 2016), citing *Vann v. City of New York*, 72 F.3d 1040, 1049-51 (2d Cir. 1995); and *Nolin v. Town of Springville*, 45 F. Supp. 2d 894, 909 (N.D. Ala. 1999), also citing *Vann v. City of New York.*

[68] See *Monell v. Department of Social Services, 436 U.S. 658 (1978).*

[69] *Id.*, at Page 3.  (citations omitted).

In *Fundiller v. City of Cooper City*, the Eleventh Circuit stated that "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a "custom" within the meaning of *Monell*.[70] The *Fundiller* decision also summarizes the liability of a supervisor (such as Chief Turner), explaining that "[s]upervisory liability is not limited, however, to those incidents in which the supervisor personally participates in the deprivation" but can exist if "a history of widespread abuse puts the responsible supervisor on notice of the need for improved training or supervision, and the official fails to take corrective action."[71]

Prior to this shooting, Chief Turner was aware that Officer Cadeau had a history of violating the constitutional right of citizens, including five prior claims for maltreatment or unnecessary force, one of which resulted in a lawsuit, *Carr et al. v. Mathieu Cadeau et al.*, N.D.Ga., Civil Acton No. 1:15-cv-3837-CAP, being filed against Officer Cadeau, Defendant City of Atlanta, and Chief Turner individually.[72]

---

[70] *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th. Cir. 1985). (citations omitted).

[71] *Id.* (citations omitted).

[72] See Atlanta Police Department OPS disciplinary history (Officer Cadeau).

In *Carr,* the plaintiffs (Carolyn Carr and Michael Gibson) alleged that during an outdoor arts festival on Peters Street where they resided, they were confronted by Officer Cadeau "telling them to get out of the street and onto the sidewalk" prompting Mrs. Carr to respond by saying "what, what the fuck" pointing toward her residence and saying "I live here. This is my house."[73]

According to their complaint, Officer Cadeau was observed "rushing toward his wife" and then "grabbing Plaintiff Carr and twisting her arm violently behind her, shoving her head-first into a parked car in the garage, then dragging her backwards … out onto the street."[74] Both Mrs. Carr and Mr. Gibson were arrested and filed suit alleging that their arrest and confinement were in retaliation for the "making of constitutionally protected statements impliedly critical of Defendant Cadeau."[75] Their case against the City, Chief Turner, and Officer Cadeau was

---

[73] *Carr* complaint, attached as **Exhibit 51.**

[74] *Id.* at Paras. 20-21.

[75] *Id.* at Para. 31.

ultimately settled.[76]   However, OPS did not sustain the work rule allegations against Officer Cadeau for maltreatment or unnecessary use of force.[77]

Plaintiffs also retained a law enforcement expert, Jeffrey J. Noble, who has experience as a former Deputy Chief of Police that includes supervisory and management experience, along with "extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, [and] officer misconduct."[78]   Mr. Noble was a police officer in the City of Irvine for 28 years rising to the position of Deputy Chief of Police prior to his retirement, after serving in a variety of assignments, including as an Officer, Senior Officer, Sergeant, Lieutenant, and Commander.[79]   His experience also includes Training and Internal Affairs.[80]

_____

[76] City Settlement with Carolyn Carr and Michael Gibson attached as **Exhibit 52.**

[77] See OPS Case File 14-I-0260-UAF.

[78] Expert Report of Jeffrey J. Noble, Page 1, attached as **Exhibit 53.**

[79] *Id. at Page 1.*

[80] *Id.*

In reference to the incident where Officer Cadeau sprayed a handcuffed prisoner, Mr. Noble concluded that "[a]ny reasonable Chief of Police would have referred Cadeau for criminal prosecution and terminated his employment for engaging in the intentional physical abuse of a prisoner."[81] Mr. Noble based this opinion on the fact that Officer Cadeau admits that the prisoner was handcuffed to a bench inside the police precinct and was not a physical threat.[82] While it was recommended that Officer Cadeau receive a five-day suspension, Cadeau only received a two-day suspension, which was approved by Chief Turner.[83] According to Mr. Noble, "[a]ny reasonable police officer would know that the intentional and malicious use of force in this matter designed to inflict pain without any lawful justification would not only be a violation of the Atlanta Police Department policy, but a serious criminal act."  In Mr. Noble's opinion, "Officer Cadeau's action in administering severe pain or suffering as a punishment, under the color of his

---

[81] *Id.* at Page 7.

[82] *Id.*

[83] *Id.*

authority, can only be viewed as torture which is an unconscionable and egregious act of misconduct."[84]

Officer Cadeau admitted that it was unlawful to use his OC spray on a person because they did not follow his commands in these circumstances, and he agreed that he committed a criminal assault.[85]  Officer Cadeau even admitted, during his deposition, that he should have been terminated from his employment due to his conduct in this matter and could not explain why he was not terminated or why his discipline was reduced.[86] Chief Turner agreed that Officer Cadeau's conduct "would be considered an aggravated assault and battery" and that "striking a handcuffed prisoner would warrant termination,"[87] and although he was aware of this incident, Chief Turner failed to report this matter to the prosecutor or terminate Officer Cadeau's employment due to this incident.[88]

---

[84] *Id.*

[85] Deposition of Mathieu Cadeau, Pages 246-247.

[86] *Id.* at Page 253.

[87] Deposition of George Turner, Pages 64, 75-76, 264.

[88] *Id.* at Pages 243-244, 264.

Mr. Noble also concluded that "[a]ny reasonable Chief of Police Would Have Terminated Officer Cadeau's Employment for Untruthfulness."[89]   Officer Cadeau acknowledged that he used OC spray and that he told Sergeant Towns that he did not use OC spray, but then admitted that he later retracted his earlier statement.[90] According to Mr. Noble, "[p]olice officers who engage in intentional, malicious, deceptive action in a formal setting such as during a criminal or administrative investigation will permanently destroy an officer's credibility." [91]

APD's standard operating procedure on "*Polygraph and Computer Voice Stress Analyzer*"[92] explicitly states that the Department "considers the polygraph and computer voice stress analyzer (CVSA) to be useful investigative tools...." However, in practice, the CVSA is rarely used during OPS investigations into use of force by APD officers, including officer involved shooting investigations, thereby allowing officers accused of improper use of force to avoid complete accountability, and to avoid termination of an officer for being untruthful. Chief Turner admits that

---

[89] Expert Report of Jeffrey J. Noble, at Page 9.

[90] Deposition of Mathieu Cadeau, at Page 273.

[91] Expert Report of Jeffrey J. Noble, at Page 14.

[92] APD.SOP.3120, Polygraph and Computer Voice Stress Analyzer, at Page 1.

"truthfulness" is the paramount character for a police officer, because "the accountability of an officer's testimony and his written word is absolutely critical" as it concerns "the faith of an officer within the community that they've been sworn to protect and serve." [93]  While CVSA exams are used by APD as part of their hiring process,[94] APD did not use them when the truthfulness of officers like Officer Cadeau were put at issue.

Mr. DeFoe is critical of the limited use of CVSA exams as part of OPS investigations, particularly in cases involving an officer's use of deadly force. [95]  Mr. DeFoe believes that CVSA exams are not being used by OPS as they should to help resolve conflicts in evidence and accounts between officers and witnesses regarding incidents.[96] He believes that CVSA exams should be used if there is a question about whether an officer is being truthful.[97]  However, according to Lt. Hajredin Zenelaj, who has been assigned to the internal affairs division of OPS since 2015, could not

---

[93] Deposition of George Turner, Pages 123-124.

[94] *Id.* at Pages 122-123.

[95] *Id.* at Pages 220-221.

[96] *Id.*

[97] *Id.*

recall any instance where a CVSA exam was used during an OPS investigation into an officer involved shooting.[98]

Chief Turner admits that CVSA exams are available to be used during investigations into officer misconduct and should be used as a resource and tool to determine the truth.[99] Chief Turner admits that he had the authority to order CVSA exams as part of OPS investigations.[100]

The first element of Plaintiffs' *Monell* claim requires a showing that their constitutional rights were violated.[101] (emphasis added). There is overwhelming and uncontroverted evidence that Officer Cadeau violated clearly established statutory and constitutional rights of Plaintiffs. This is evident from Officer Cadeau's termination, indictment and guilty plea. The second element of a *Monell* claim is a showing that "the municipality had a custom or policy that constituted deliberate indifference to that constitutional right."[102] (emphasis added). In *Favors*, the

---

[98] Deposition of Lt. H. Zenalaj, 1/30/20, Page 40.

[99] *Id.* at Pages 122, 285.

[100] *Id.* at Pages 285-286.

[101] *Favors v. City of Atlanta*, 2021 U.S. App. LEXIS at * 7.

[102] *Id.* at * 8.

Eleventh Circuit explained that deliberate indifference is established if a plaintiff "present[s] some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." <u>The third and final element in determining the City's liability for failure-to-train, requires that "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform."</u>[103]  (emphasis added).  In *Favors*, the City of Atlanta admitted to being on notice of the need to train and supervise on the use of deadly force by shooting into moving or fleeing vehicles.

> The City does not contest the district court's determination and agrees that the "undisputed evidence … showed that the City was on notice that its officers needed training on the use of deadly force." Thus, we affirm this ruling as well…. To recap, the record establishes that the City knew of a need to train in the particular area of deadly force used against fleeing vehicles.[104]

---

[103] *Favors* *12-13, <u>citing</u> *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  (emphasis in original).

[104] *Id.* at *9-10.

### D. **The City's Liability**

The City has failed to adequately train and supervise its officers regarding the legal and tactical circumstances that justify shooting into a moving or fleeing vehicle. APD has repeatedly violated its use of force policy in ways that have impacted the training and supervision received by Officer Cadeau and other APD officers relating to the proper use of deadly force, including situations where APD officers fire into moving vehicles. APD policy states that all commanders and supervisors within APD are responsible for ensuring that APD officers understand and comply with APD's use of force policies.[105]

Since 2011, there have been no updates to APD's firearms or use of force training, despite numerous incidents where officers have shot into moving vehicles.[106] According to SPO Patrick Fite, who is exclusively responsible for training officers regarding use of firearms and deadly force, and who has been assigned to the academy since 2004,[107] there have been no format updates in the

---

[105] APD.SOP.3010, Use of Force, Section 3.1 and 3.2.

[106] See Patrick Fite (*Rogers)*, Rule 30(b)(6) Depo., 9/28/2018, at Pages 28:4-24, 29:16-33.

[107] See Patrick Fite (Favors*)*, Rule 30(b)(6) Depo., 9/27/2018, at Pages 37:17-22, 53:5-8.

curriculum or training relating to firearms qualifications and use-of-deadly force training since 2011.[108]   APD provides no academy or in-service training regarding circumstances that justify an officer shooting into a moving vehicle. [109] Moreover, APD has conducted no systematic review or analysis of use of force incidents involving firearms discharges into moving vehicles, which violates APD's use of force policy that requires an annual analysis of all use of force incidents. [110]

Officer Cadeau maintains that his actions of shooting into the Hall's vehicle were consistent with the training he received from APD, and furthermore, Officer Cadeau believes that he did not use excessive force when he shot into the Hall's vehicle.[111] During his deposition, Officer Cadeau was shown a copy of O.C.G.A. § 17-4-20 and stated that he had never seen a copy of the statute prior to being shown the statute at his deposition.[112]   He also testified that he could not recall whether he

---

[108] Patrick Fite (*Rogers*), Rule 30(b)(6) Depo., 9/28/18, at Page at 28:4-24.

[109] *Id.* at Pages 25:25; 26:1-6, 36-38.

[110] *Id.* at Page at 29:5-10.

[111] *Id.* at Page 298, Lines 5-18.

[112] Deposition of Mathieu Cadeau at Page 219, Line 15-22.

had ever received any specific training on O.C.G.A. § 17-4-20.[113] The City has not produced documentation that Officer Cadeau was provided with a copy of APD's use of force policy, nor documentation that Officer Cadeau was provided with a copy of or O.C.G.A. §17-4-20.[114]   (emphasis added).

As explained in *Canton,* the need for adequate training on the constitutional limitations on use of deadly force by an officer is "so obvious" because there is a "moral certainty" that police officers will be "required to arrest fleeing felons" and are given "firearms, in part to allow them to accomplish this task."[115] *Canton* explained that "[i]n that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.[116]

In *Harris v. Coweta County*,[117] the district court explained that "[o]ne of the ways a plaintiff may demonstrate a county's *deliberate indifference* is by showing

---

[113] *Id.* at Page 220, Lines 24-25; Page 221, Lines 1-2.

[114] See Deposition of Patrick Fite (Hall), 9/29/20, at Pages 24-27, 68-69, 72-73.

[115] *Canton*, 489 U.S. at 390, n.10.

[116] *Canton, 489 U.S. at 390.*

[117] 2003 U.S. Dist. LEXIS 27348 (N.D. Ga. 2003).

that the need for a particular type of *training* is obvious, even without prior incidents to place the municipality on notice."[118]  In *Depew v. City of St. Marys*,[119] the Eleventh Circuit affirmed a trial court ruling denying summary judgment in an action based on 42 U.S.C. § 1983, holding that there was sufficient evidence that a municipality knowingly approved a pattern of improper police conduct.

> In this case, while the city provided rules and regulations for the operation of its police department, these rules were violated on numerous occasions. The city, however, failed to rectify the situation. The evidence revealed several incidents involving the use of unreasonable and excessive force by police officers. Therefore, the city had knowledge of improper police conduct, but failed to take proper remedial action. The continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983.[120]

In *Vineyard v. County of Murray*,[121] the Eleventh Circuit affirmed a district court judgment for the plaintiff in an action against a county, holding that there was substantial evidence of inadequate policies of supervision, discipline and training in

---

[118] *Id.* at *28, citing *Young v. City of Augusta, Ga., 59 F.3d 1160, 1172 (11th Cir. 1995)*.  (emphasis in original).

[119] 787 F.2d 1496 (11th Cir. 1986).

[120] *Depew*, 787 F.2d at 1499.  (citations omitted).

[121] 990 F.2d 1207, 1212 (11th Cir. 1993).

defendant's sheriff's department that were the moving force behind the constitutional violation. As in *Vineyard,* there is substantial evidence of the City having inadequate policies of training, supervision and discipline of its officers regarding use of deadly force, which demonstrate a deliberate indifference to the rights of citizens to be free from constitutional violations.[122] Plaintiff's law enforcement expert, Scott DeFoe, concluded that APD did not have adequate policies or training in place regarding the circumstances that justify shooting into moving or fleeing vehicles.

> It is my opinion that at the time of this incident, the Atlanta Police Department (APD) did not have adequate policies and procedures in place for when it would be appropriate for officers to shoot into moving vehicles and did not provide adequate training to Sergeant Elsh Mathieu Cadeau, No. 4844, regarding the same. It is my opinion that APD's policies regarding when it is appropriate to shoot into a moving vehicle should make it clear that an officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.[123]

---

[122] *Id.*

[123] *Expert Report of Scott DeFoe,* Opinion No. 8, at Page 20.

Due to the failure of APD's chain of command to properly document and evaluate use of force incidents on APD Form 809, the Training Section's annual analysis of "all use of force reports to determine if any patterns or trends exist within the department that would affect the training needs of employees, equipment issued to employees, or department policy or procedure" could not occur as required by APD.SOP. 3010, Section 4.8 (Analysis of Use of Force Reports). Consequently, the Training Section's annual "Use of Force Reports" from 2013-2015, and subsequent years, make no reference or analysis regarding any trends concerning APD officer's use of force by discharging their weapons into vehicles, as required by APD.SOP.3010, Section 4.8.

In *Fundiller v. City of Cooper City*, the Eleventh Circuit, addressing supervisory liability, stated that "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a "custom" within the meaning of *Monell*.[124]

The Supreme Court has defined the term "custom" to include "persistent and wide-spread . . . practices," "permanent and well settled"

---

[124] *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th. Cir. 1985) (citations omitted); <u>see also</u> *Goodson v. Atlanta*, 763 F.2d 1381, 1389 (11th. Cir. 1985) (jail supervisor's failure to (a) train subordinates and to establish procedures for protection of constitutional rights and (b) to take action against violations of which he had notice can be a basis for liability) (citations omitted).

practices, and "deeply embedded traditional ways of carrying out policy." Although not necessarily adopted by a person or body with rulemaking authority, customs can become so settled and permanent as to have the force of law. To have this effect, the custom must be "created" by those whose "edicts or acts may fairly be said to represent official policy."[125]

In *Vann v. City of New York*, a decision from the Second Circuit that has been cited approvingly within the Eleventh Circuit, the Court explain the deliberate indifference standard.

> To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate. ("whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there police officers had used excessive force"). Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was "contrary to the practice of most police departments" and was "particularly dangerous" because it presented an unusually high risk that constitutional rights would be violated. [126]

---

[125] *Id.* at 1442.  (citations omitted).

[126] *Vann v. City of New York*, 72 F.3d 1040 (2nd. Cir. 1995) (citations omitted); see also *Adams v. Custer*, 2016 U.S. Dist. LEXIS 3762, at *65-66 (S.D. Fla. Jan. 2016); *V. v. Seminole County Sch. Bd.*, 2007 U.S. DIST. Lexis 113992, *15 (M.D. Fla. March 21, 2007)("deliberate indifference may also be 'an official decision not to remedy a violation."); and *Nolin v. Town of Springville*, 45 F. Supp. 2d 894, 909 (N.D. Ala. March 22, 1999), citing approvingly to *Vann*.

In his role as Chief of Police from January 2010 through December 2016, the City appointed and provided Chief Turner with ultimately responsibility for the management and operation of APD.[127]  Chief Turner failed to take the necessary corrective action to resolve issues relating to obvious, flagrant, and rampant violations of use of force within APD during the time he served as Chief of Police.

By failing to adequately investigate and discipline APD officers like Officer Cadeau, who consistently used excessive force and violated APD policies, the City acting through Chief Turner, created and allowed a custom of widespread and persistent abuses by APD officers. As a result, Chief Turner's actions and omissions contributed to the violation of Plaintiffs' constitutional rights. Thus, the City, through the actions of Chief Turner, are responsible for the violation of Plaintiffs' constitutional rights due to his knowledge, participation, and ratification of a history of widespread use of excessive force by APD officers, including Officer Cadeau.

## IV.   **CONCLUSION**

For the reasons shown herein, Plaintiffs request that this Court grant their motion for partial summary judgment.

---

[127] APD.SOP.1010, Mission and Organization of the Department, Section 4.2.50 Mission and Organization of the Department, Page 4.

Respectfully submitted this 26th day of August, 2021.


**THE COCHRAN FIRM ATLANTA**

*/s/ Samuel L. Starks*                      100 Peachtree Street, NW
Samuel L. Starks, Esq.                     Suite 2600
Georgia Bar No.: 676515                    Atlanta, Georgia 30303
sstarks@cochranfirmatl.com                 Fax: 404-222-0170
***Attorney for Plaintiffs***              Tel.: 404-222-992

## <u>CERTIFICATION OF COMPLIANCE and SERVICE</u>

The undersigned counsel certifies that the foregoing document has been prepared using Times New Roman, 14 point.

I hereby certify that I have this day electronically filed with the Clerk of Court the foregoing BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

This 26th day of August, 2021.

**THE COCHRAN FIRM ATLANTA**

*/s/ Samuel L. Starks*
Samuel L. Starks, Esq.
Georgia Bar No.: 676515